1   FRANK FALZETTA, Cal. Bar No. 125146
    SCOTT SVESLOSKY, Cal. Bar No. 217660
2   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    333 South Hope Street, 48th Floor
3   Los Angeles, California 90071-1448
    Telephone: 213-620-1780
4   Facsimile: 213-620-1398
    ffalzetta@sheppardmullin.com
5   ssveslosky@sheppardmullin.com

6   TED C. LINDQUIST, III, Cal. Bar No. 178523
    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
7   Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4109
8   Telephone: 415-434-9100
    Facsimile: 415-434-3947
9   tlindquist@sheppardmullin.com

10  Attorneys for Defendant and Counterclaimant
    LIBERTY MUTUAL FIRE INSURANCE
11  COMPANY

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14  LARGO CONCRETE, INC., a            Case No. C07-04651 CRB (ADR)
    California Corporation; N.M.N.
15  CONSTRUCTION, INC., a California   Hon. Charles R. Breyer
    Corporation,                       [Complaint Filed: September 10, 2007]
16
                Plaintiffs,            **DECLARATION OF**
17                                     **STEPHANIE RENNER IN SUPPORT**
        v.                             **OF DEFENDANT AND**
18                                     **COUNTERCLAIMANT LIBERTY**
    LIBERTY MUTUAL FIRE                **MUTUAL FIRE INSURANCE**
19  INSURANCE COMPANY, a               **COMPANY'S MOTION TO**
    Massachusetts Corporation, and DOES **DISQUALIFY ROXBOROUGH,**
20  1 through 100, inclusive.          **POMERANCE & NYE FROM**
                                       **REPRESENTING PLAINTIFFS**
21              Defendants.
                                       Date:  November 30, 2007
22                                     Time:  10:00 a.m.
                                       Place: Courtroom 8
23  AND RELATED COUNTERCLAIM

24

25

26

27

28

## DECLARATION OF STEPHANIE RENNER

I, Stephanie Renner, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I have personal knowledge of the facts set forth below and, if called and sworn as a witness, could and would testify competently thereto.

2.      I am an associate at Stites & Harbison PLLC in Lexington, Kentucky.  I represented defendant Liberty Mutual Fire Insurance Company and its affiliates (the "Liberty Mutual companies") in matter entitled <u>Republic Services, Inc. v. Liberty Mutual Insurance Co., et al</u>, Case No. 03-4949-KSF (E.D. KY).  On November 10, 2003, Republic Services, Inc. ("Republic") sued the Liberty Mutual Companies in Kentucky state court, and two days later, the Liberty Mutual companies removed the case to the United States District Court for the Eastern District of Kentucky.

3.      On August 15, 2006, I deposed Republic's counsel, Craig Pynes, in the <u>Republic Services</u> matter.  Attached to this declaration as Exhibit D are true and correct copies of the cited excerpts from a certified copy of the deposition transcript of Craig Pynes.

4.      On August 15, 2006, I attended the deposition of Lisa Hansen in the <u>Republic Services</u> matter.  Attached to this declaration as Exhibit E are true and correct copies of the cited excerpts from a certified copy of the deposition transcript of Lisa Hansen.

1       5.    On August 1, 2006, the Liberty Mutual companies moved to

2 disqualify Mr. Pynes and Roxborough, Pomerance & Nye (the "Roxborough firm")

3 from representing Republic due to the conflict of interest arising from Mr. Pynes'

4 prior representation of the Liberty Mutual companies in matters substantially related

5 to the <u>Republic Services</u> litigation.  On October 20, 2006, the United States District

6 Court for the Eastern District of Kentucky issued its Opinion and Order ("Order")

7 disqualifying Mr. Pynes and the Roxborough firm from representing Republic

8 adverse to the Liberty Mutual companies in the <u>Republic Services</u> matter.  Attached

9 to this declaration as Exhibit B is true and correct copy of the District Court's

10 October 20, 2006 Order.

11       I declare under penalty of perjury, pursuant to the laws of the United

12 States of America, that the foregoing is true and correct.

13

14       Executed this 19th day of October 2007 at Lexington, Kentucky.

15

16

17

18                   STEPHANIE RENNER

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

12/02/2006  01:20    3                                    PAGE  02

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

Eastern District of Kentucky
FILED

OCT 2 0 2006

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 03-494-KSF

REPUBLIC SERVICES, INC.                                  PLAINTIFF

V.                          **OPINION AND ORDER**

LIBERTY MUTUAL INSURANCE
COMPANY, *et al.*                                       DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is currently before the Court on the defendants' motion to disqualify Craig S. Pynes and the remaining members of Roxborough, Pomerance & Nye from *pro hac vice* representation of the plaintiff. [DE #213] This matter has been fully briefed, and is now ripe for review.

I.    **RELEVANT FACTUAL BACKGROUND**

Plaintiff, Republic Services, Inc. ("Republic") asserts that it instituted this lawsuit because the defendants, Liberty Mutual Insurance Company, Liberty Insurance Acquisition Corporation f/k/a Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, the First Liberty Insurance Corporation, and Helmsman Management Corporation, Inc. (the "Liberty Companies"), collectively failed to properly handle, administer and manage Republic's self-insured workers' compensation program. Republic alleges that the Liberty Companies made representations and assumed certain common law and contractual duties pertaining to their administration of Republic's workers' compensation program and Republic now seeks to recover from the Liberty

3

Companies damages sustained as a result of the Liberty Companies' failure to properly administer the workers' compensation program.

This action has been pending in this Court since it was removed from Jessamine Circuit Court on November 12, 2003. [DE #1]  On May 2, 2006, this Court granted Republic's motion for admission *pro hac vice* of Nicholas P. Roxborough, Michael B. Adreani and Craig S. Pynes as co-counsel for Republic in this action. [DE #112]    Thereafter, on August 1, 2006, the Liberty Companies filed this motion to disqualify on the grounds that Craig S. Pynes and another member of Roxborough, Pomerance and Nye ("the Roxborough Firm") have clear conflicts of interest in undertaking representation in this case, and their disqualification should be imputed to the entire firm. [DE #213]

**II.     THE LIBERTY COMPANIES' MOTION TO DISQUALIFY**

In support of their motion to disqualify, the Liberty Companies allege that two attorneys in the Roxborough Firm, Karen Gichtin and Craig Pynes, previously represented the Liberty Companies in matters both related and unrelated to the issues in this action.  Before joining the Roxborough Firm, both Gichtin and Pynes practiced law with Kern & Wooley, LLP in Los Angeles, California, where some portion of their practice was dedicated to representation of the Liberty Companies.

The Liberty Companies allege that Gichtin was heavily involved in *RemedyTemp, Inc. v. Liberty Mut. Fire Ins. Co.*, C.D. Cal., 8:04-cv-00385, an action involving similar issues currently before the Court in this action.  During the course of her representation of the Liberty Companies in the *RemedyTemp* matter, the Liberty Companies allege that Gichtin became familiar with the Liberty Companies' internal claims practice, confidential and privileged documents, and overall litigation strategy.  Pynes, the Liberty Companies alleges, also devoted the majority of his time at

-2-

4

12/02/2006  01:28    3                                    PAGE  04

Kern & Wooley to the defense of the Liberty Companies in matters involving bad faith and fraud claims, gaining information about the Liberty Companies' policies and procedures related to employee progression, employee evaluations, and general claims file management and recordkeeping.

The Liberty Companies argue that attorneys Roxborough, Adreani, and Pynes have entered their *pro hac vice* appearances and taken depositions on behalf of Republic without first disclosing their connection to Liberty Mutual by and through Gichtin and Pynes' former employment with Kern & Wooley, and without disclosing that Gichtin is a now an attorney with the Roxborough Firm. The Liberty Companies rely on the affidavit of Lisa Kralik Hansen, a former attorney at Kern & Wooley. Hansen testifies that during her employment at Kern & Wooley, a significant portion of her practice involved "representing the Liberty Mutual group of companies in insurance coverage, insurance 'bad faith' and other related matters." Furthermore, Hansen testifies that Pynes, during his employment at Kern & Wooley,

> worked almost exclusively on matters for the Liberty Mutual group of companies (hereinafter "Liberty") in both litigated and non-litigated matters pertaining to insurance coverage and the defense of insurance "bad faith" actions, based on a number of theories that would have included breach of contract, breach of the implied covenant of good faith and fair dealing and fraud.  While representing Liberty, Craig Pynes was involved in the review of Liberty's claims files and/or claims manuals, written discovery, mediation and strategy discussions, document productions (including analyses of privilege materials) and the preparation of legal memoranda.  Mr. Pynes also had some client contact with claims personnel with Liberty.  Mr. Pynes would have been exposed to confidential information concerning Liberty Mutual's practices and procedures, strategies for handling litigation, claims operation, general claim file management and record keeping.

[DE #213, Ex A]

Hansen also testifies that during her employment with Kern & Wooley, she worked closely

-3-

12/02/2006  01:20   3                                                    PAGE  05

with Gichtin on a daily basis as one of her immediate supervising attorneys. According to Hansen, Gichtin worked extensively on *RemedyTemp*, which involved Liberty Mutual's claims handling for a national market workers' compensation customer. Hansen testifies that Gichtin, as an active member of Liberty Mutual defense team in the *RemedyTemp* matter, was involved in all aspects of the litigation. Additionally, Hansen claims that Gichtin also worked on several other matters for Liberty involving insurance coverage, "bad faith" claims, claims for equitable relief and contribution, and claims of malicious prosecution. [*Id.*]

In its reply, the Liberty Companies submit, *inter alia*, portions of the depositions of Pynes, Hansen, and Gichtin as further evidence of a conflict requiring disqualification. Based on affidavits, depositions and other evidence, and relying on Rules 1.9 and 1.10 of the Kentucky Rules of Professional Conduct, the Liberty Companies argue that a conflict of interest exists because both Pynes and Gichtin have represented the Liberty Companies in matters "substantially related" to the present litigation, and that Pynes and Gichtin's conflicts of interest must be imputed to the entire Roxborough Firm.

The Liberty Companies' reply also contains a claim that the Roxborough Firm's paralegal engaged in unethical behavior by contacting the Liberty Companies' expert witness. The Liberty Companies argue that this behavior further justifies disqualification of the Roxborough Firm. While Republic has filed a rejoinder brief to address this allegation, the Court declines to consider this allegation in the context of this motion to disqualify.

III. **REPUBLIC'S RESPONSE TO THE LIBERTY COMPANIES' MOTION TO DISQUALIFY**

In response to the Liberty Companies' motion to disqualify, Republic first argues that Pynes

-4-

6

12/02/2006  01:20    3                                                    PAGE  06

only worked at Kern & Wooley for 8 months, and during that time, never handled any workers' compensation bad faith claim handling cases.[1] Additionally, Pynes' declaration reveals that he never received any training in Liberty's bad faith claim handling practices in the workers' compensation area; that during his employment at Kern & Wooley, he never saw Liberty's workers compensation Best Practices Manual, or any other workers' compensation claim manuals; that none of the Liberty Companies' Rule 30 designees deposed in this case ever dealt with Pynes because they work in Liberty's workers' compensation division - a group with which Pynes never had any involvement. [DE # 230, Ex A]  While Pynes may have had access to confidential claims handling materials outside the workers' compensation context, Republic contends that the Liberty Companies have presented no evidence that Pynes actually looked at these materials, or is presently utilizing any knowledge gained from reviewing such materials in this matter.

Turning next to Gichtin's involvement in this action, Republic argues that Gichtin has only worked for the Roxborough firm since March 29, 2006.  Upon her hiring, Gichtin testifies that she is "walled off" from participating in any Liberty matters.  She is paid an annual salary and will not be apportioned any specific part of the fee involving the Liberty cases.  Gichtin testifies that from the date of her hiring by the Roxborough firm, she has

> not worked on any matters involving Liberty. Furthermore, other than with regard to the instant declaration, I have not been involved in any discussions concerning Liberty.  I am precluded from using the Firm's only paralegal, as it is my understanding that she works on Liberty matters. Rather, for paralegal type projects, I utilize one of our file clerks.

---

[1] Republic's response, including Pynes' declaration, states that Pynes never handled any workers' compensation cases with the extremely limited exception when Pynes "assisted another attorney with reviewing claim files for purposes of redacting personal identifying information of claimants, such as their social security numbers and telephone numbers."

12/02/2006  01:20    3                                        PAGE  07

[DE #230, Ex E]

Republic contends that the Liberty Companies have waived the conflict issue. Republic alleges that a voice mail message left with Bill Cupelo, Liberty Mutual's Executive Vice President and Senior Corporate Counsel, near the end of April 2006 informed the Liberty Companies that the Roxborough Firm would be entering an appearance as counsel for Republic in this matter. [DE # 230, Ex C]. Then, on May 1, 2006, Republic filed its motion for attorneys Roxborough, Adreani, and Pynes to be admitted *pro hac vice*. Nevertheless, Republic argues that the Liberty Companies waited until one day after the discovery cutoff - August 1, 2006- to file its motion to disqualify.

Moreover, Republic argues that during the two and one half years Pynes has been associated with the Roxborough Firm and the Roxborough Firm has been involved in the *RemedyTemp*, the Liberty Companies never objected to the Roxborough's Firm's representation in that matter. As a result, Republic argues that the Liberty Companies' delay in objecting to the Roxborough Firm's representation of Republic in this matter is simply an effort to gain a tactical advantage in this action.

## IV.    ANALYSIS

Motions to disqualify are governed by two sources of authority. First, all attorneys are bound by the local rules of the court in which they appear. Joint Local Rule 83.2(a)(4) permits attorneys not admitted to the Eastern District of Kentucky to seek admission *pro hac vice*, provided they abide by the rules of the Kentucky Supreme Court governing professional conduct. In its Order granting *pro hac vice* admission to Pynes, Adreani and Roxborough, the Court also noted that these attorneys are subject to the rules of the Kentucky Supreme Court governing professional conduct. [DE #112] The Kentucky Rules of Professional Conduct, and the judicial decisions interpreting those rules and standards, govern the professional conduct of the attorneys appearing in the Eastern

-6-

8

12/02/2006  01:20    3                                                                  PAGE  08

District of Kentucky.

Additionally, federal common law also governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties. *See F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995); *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994). A district court has inherent authority to disqualify an attorney as a sanction for professionally unethical conduct. *See Cavender v. U.S. Xpress Enters, Inc.*, 191 F.Supp.2d 962, 965 (E.D.Tenn. 2002) (a court's authority to disqualify an attorney for unethical behavior derives from the local rules of the court and federal law). However, a district court "does not possess unfettered discretion to disqualify counsel." *Kitchen v. Aristech Chemical*, 769 F.Supp. 254, 258 (S.D.Ohio 1991). Such an extreme sanction "should only be utilized when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Applicances, Inc.*, 250 F.Supp.2d 863, 865 (S.D.Ohio 2002)(*citing Kitchen*, 769 F.Supp. at 257-79). Thus, motions to disqualify "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982). When confronted with a motion to disqualify, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of its choice. *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988). Resolving these competing interests requires the court to balance the interest of the public in the proper safeguarding of the judicial process together with the interests of each party to the litigation. *General Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 715 (6th Cir. 1982).

-7-

9

12/02/2006  01:20    3                                          PAGE  09

The Kentucky Rules of Professional Conduct, contained in Kentucky Supreme Court Rule 3.130, guide this court's review of the conduct at issue in this matter. Specifically, Rule 1.9, entitled "Conflict of Interest: former client," provides as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same of a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation;

(b) Represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly associated had previously represented a client
    (1) whose interests are materially adverse to that person; and
    (2) about whom the lawyer had acquired information protected by Rule 1.6 and 1.9(c) that is material to the matter; unless the former client consents after consultation.

(c) A lawyer who has formerly represented a client in a matter of whose present or former firm has formerly represented a client in a matter shall not thereafter:
    (1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known; or
    (2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

SCR 3.130(1.9). Rule 1.10, entitled "Imputed disqualification: general rule," governs disqualifications which may be imputed to an entire firm. This rule provides:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
    (1) The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
    (2) Any lawyer remaining in the firm has information protected by

-8-

12/02/2006  01:20    3                                                    PAGE  10

Rules 1.6 and 1.9(b) that is material to the matter.

(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

(d) A firm is not disqualified from representation of a client if the only basis for disqualification is representation of a former client by a lawyer presently associated with the firm, sufficient to cause that lawyer to be disqualified pursuant to Rule 1.9 and:

      (1) the disqualified lawyer is screened from any participation in the matter and is apportioned no specific part of the fee therefrom; and
      (2) written notice is given to the former client.

SCR 3.130 (1.10).

In cases on disqualification based on former clients, the Sixth Circuit, following circuits nationwide, developed a three part test in *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990). The *Dana* test analyzes: (1) whether a past attorney/client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) whether the subject matter of those relationships is substantially related; and (3) whether the attorney acquired confidential information from the party seeking disqualification. *Id.* at 889. The party moving for disqualification bears the initial burden of persuasion and proof on its motion. *Bartech Industries, Inc. v. International Baking Co. Inc.*, 910 F.Supp. 388, 392 (E.D.Tenn. 1996). A decision to disqualify counsel must be based on a factual inquiry conducted in a manner which will afford appellate review. *General Mill Supply Co.*, 697 F.2d at 710.

While the three-part test enunciated in *Dana* should guide this court's analysis, it is also important to consider how Kentucky courts have interpreted and applied Rules 1.9 and 1.10. In *Lovell v. Winchester*, 941 S.W.2d 466 (Ky. 1997), the appellants consulted an attorney, Charles King, regarding a claim alleging a shortage of acreage in land purchased from Minnie Kidd. The

-9-

12/02/2006  01:28    3    PAGE  11

appellant's affidavit indicated that on April 17, 2002 "they had visited King at his office, discussed their claim, and left their original documents pertaining to the land transaction with King. Approximately one month later, King returned the documents along with a letter declining representation." *Id.* at 467. In 1994, the appellants subsequently retained another attorney and sued Kidd. Kidd then engaged King to defend her in the same action.

The appellants moved to disqualify King pursuant to Rules 1.7 and 1.9. of the Kentucky Rules of Professional Conduct. In his defense, King argued that he recalled nothing about the consultation with the appellants and was only able to recall their visit to his office by referring to an old office calendar. The circuit court denied the motion to disqualify, and the appellants sought a writ of mandamus in the Court of Appeals. The Court of Appeals denied relief, without comment, and an appeal was taken to the Kentucky Supreme Court.

The Kentucky Supreme Court first held that the appellants were "clients" of King for purposes of Kentucky Rules of Evidence 503(a)(1) and the attorney client privilege attached. Even though King argued that disqualification was unnecessary due to his lack of recall regarding the consultation with the appellants, the Kentucky Supreme Court held:

> we believe that the situation creates a perception of betrayal and disloyalty which cannot be condoned. To sanction this professional conduct merely on the claim that he recalls nothing of the prior contact impairs public confidence in the legal system. Further, there is the potential to prejudice clients in the employ of legal counsel. Maintaining public confidence in the legal system requires that preservation of client confidences should outweigh the interests of individual lawyers and individual clients in freely contracting with each other. Client confidence should prevail among these competing interests. Thus, we are of the opinion that granting the extraordinary relief requested by the Appellants is consistent with the goals of KRE 503 and the policies underlying the Rules of Professional Conduct.

*Id.* at 467-68. The Kentucky Supreme Court went on to note that "[e]ven though the comment to

-10-

Rule 1.9 specifically rejects the 'appearance of impropriety' standard in favor of a fact-based test applied to determine whether the lawyer's duty of loyalty and confidentiality to a former client will likely be compromised by the subsequent representation, the appearance of impropriety standard is still a useful guide for ethical decisions." *Id.* at 468.   In reaching this decision, the Kentucky Supreme Court relied on a similar case from Arkansas, where the Arkansas Supreme Court held that even though the "appearance of impropriety standard" was not adopted as part of the Arkansas rules of professional conduct, lawyers must avoid the appearance of impropriety because it is an integral component of the rules of professional conduct. *Id.* (*citing First American Carriers, Inc. v. Kroger Co.,* 787 S.W.2d 669 (Ark. 1990). In the Arkansas case, a law firm was disqualified even though no confidential information was obtained and the contacts were minimal. *First American Carriers, Inc.,* 787 S.W.2d at 673.

The Kentucky Supreme Court again addressed this issue in *Jaggers v. Shake,* 37 S.W.3d 737 (Ky. 2001). In *Jaggers,* the appellants sought to compel the trial judge to disqualify counsel for the appellee based on an alleged conflict of interest.  The Kentucky Supreme Court reaffirmed the appearance of impropriety standard, but held that it was not implicated in this case because the affected parties had waived any conflict, and "the mere fact of two attorneys in the same firm representing a party on the one hand and being adverse to that person as a witness in another case on the other hand is too attenuated to create an appearance of impropriety." *Id.* at 740.

In an opinion entered this week, the Sixth Circuit addressed the issue of imputed disqualification currently before the Court.   In *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.,* ___ F.3d ___, 2006 WL 2956522 (6th Cir. October 18, 2006), the court outlined the facts as follows:

-11-

Attorney John Egan was employed by plaintiff National Union's law firm, Plunkett, from September 2003 until July 11, 2006. During that time, Egan represented this same plaintiff in this very case and in other insurance-related matters involving defendant, Alticor. Specifically, Egan spent forty percent of his billable time representing plaintiff in insurance-coverage disputes against defendant Alticor; he participated in depositions, document production and strategy sessions, and he drafted pleadings, motions briefs, and reports for plaintiff. Indeed, in this very action, Egan drafted plaintiff's complaint for declaratory judgment and the FED. R. CIV. P. 26 initial disclosures. In July 2006, Egan left the employ of Plunkett and, on July 17, 2006, became an associate with defendant's law firm, Wilson Young. The final briefs in this case were filed by the parties on June 1, 2006.

*Id.* at *1. The plaintiff filed its motion to disqualify based on Michigan's Rules of Professional Conduct governing disqualification and imputed disqualification. Michigan's rules at issue in *National Union* are substantially similar to Rules 1.9 and 1.10 of the Kentucky Rules of Professional Conduct. Because of Egan's former representation of National Union, the Sixth Circuit held that Rule 1.9(a) disqualified Egan from representing Alticor. Moreover, the Sixth Circuit held that based on this disqualification and the clear language of Rule 1.10(a), no attorney in Egan's new law firm may represent Alticor or any other defendants-appellants against National Union in this matter. Under the circumstances of the case, the Sixth Circuit determined that Wilson Young cannot "avoid imputed disqualification by 'screening' Egan from this matter, no matter how diligently." *Id.* at *3.

Considering the Kentucky Rules of Professional Conduct and the relevant caselaw set out above, the Court now turns to the specific facts at issue in this case.

A. PYNES

Prior to joining the Roxborough Firm on March 24, 2004, Pynes practiced law at Kern & Wooley in Los Angeles, California for approximately 8 or 9 months. [DE #230, Ex A] While at Kern & Wooley, Pynes did not handle any workers' compensation bad faith claim actions for the Liberty Companies or any other insurer, with one limited exception where he reviewed claim files for

-12-

purposes of redacting personal identifying information of claimants. Otherwise, Pynes worked on bad faith litigation and coverage for non-workers' compensation lines of insurance on behalf of Liberty and other insurers.

Under both Rule 1.9 and the *Dana* test articulated by the Sixth Circuit, the court must first determine whether or not Pynes' representation of the Liberty Companies was substantially related to the issues currently before the court. In deciding whether the prior and present matters are substantially related, the district court must examine the precise nature of the relationship between the present and former relationships. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1029 (5th Cir. 1981). The substantial relationship test has only been met "when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation." *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir. 1988). The Sixth Circuit has avoided narrow interpretations of whether a representation is substantially related. *See General Electric Co. v. Valeron Corp.*, 608 F.2d 265, 267 (6th Cir. 1979)(holding that preparation of patent applications was substantially related to a later patent infringement case because the attorney had access to confidential files relating to all patents).

While Pynes' representation of the Liberty Companies in non-workers' compensation matters was not substantially related to the issues currently before this Court, he did represent the Liberty Companies in *Tony's Fine Foods, Inc. v. Liberty Mutual Insurance Co.*, case number 2002067108, filed in the Superior Court of the State of California, County of Alameda.[2] A review of the Complaint in *Tony's Fine Foods* reveals claims for breach of contract, breach of the duty of good

_____

[2] Such representation is sufficient to create the attorney-client relationship contemplated by the first prong of the *Dana* test requiring a "past attorney-client relationship."

-13-

faith and fair dealing, negligence, unfair business practice (including improper policy and marketing manipulations, misleading and fraudulent advertising and illusory coverage of the employer liability policy), all based upon a contractual relationship between Tony's Fine Foods and Liberty Mutual Insurance Company. Pursuant to their contractual relationship, Liberty Mutual, in return for substantial premiums, sold Tony's Fine Foods annual liability insurance polices which provided insurance coverage for, among other things, workers' compensation and employers' liability. The facts and issues involved in the Liberty Companies defense of the *Tony's Fine Foods* case, while involving different claims files, are substantially the same as the facts and issues currently before this court - the mishandling of the Tony's Fine Foods and Republic's workers' compensation programs. Certainly, the same defenses, strategy and litigation tactics are implicated in both matters.

In *Tony's Fine Foods*, Pynes was directed by a supervising attorney to prepare a privilege log; however, he does not remember the specific case, and testified in his deposition that the project took just a few hours. [DE # 230 Ex A, DE # 233, Ex 1] Rule 1.9, however, does not require that Pynes recall the representation or remember the specifics of the case. The fact that Pynes represented the Liberty Companies in a substantially related matter, and is now adverse to the Liberty Companies, is a conflict of interest under Rule 1.9(a). Since the Liberty Companies have not consented after consultation, Pynes' representation of Republic is in violation of this rule. Additionally, Pynes' representation of the Liberty Companies is analogous to the disqualified attorney's representation at issue in *Lovell*. Based on the Kentucky Supreme Court's holding in *Lovell*, the appearance of impropriety alone is sufficient to disqualify Pynes from representation of Republic against the Liberty Companies in this action.

Even if Pynes' former representation of the Liberty Companies did not rise to the level

-14-

12/02/2006  01:20  3                                                    PAGE  16

requiring disqualification under 1.9(a) or the appearance of impropriety standard, Pynes would also be disqualified under Rule 1.9(b) and the third prong of the *Dana* test, both of which require that Pynes "acquired" confidential information.  During his employment at Kern & Wooley, other attorneys at that firm represented the Liberty Companies in the *RemedyTemp*.  A review of the Complaint in *RemedyTemp* reveals that RemedyTemp asserted claims against Liberty Mutual Fire Insurance Company for tortious breach of the implied covenant of good faith and fair dealing, unfair business practices, and breach of contract based on a contractual relationship between RemedyTemp and Liberty whereby RemedyTemp procured workers' compensation insurance policies from Liberty. [DE #213, Ex 4]  Clearly, the *RemedyTemp* matter is substantially related to the present matter in that it contains claims based on the mishandling of workers' compensation insurance policies and implicates the same defenses, strategy and litigation tactics.

Although Pynes denies that he acquired any confidential information about the Liberty Companies, the evidence reveals that during his employment at Kern & Wooley, including his representation of the Liberty Companies in the *Tony's Fine Foods* case, Pynes prepared a privilege log, had access to Liberty Mutual's claim manuals, and was privy to discussions about strategy for a number of matters including but not limited to a mediation and a number of document productions. While Pynes "does not recall ever reviewing Liberty Mutual's practice and procedures, strategies for handling litigation, claims operation, general claim file management and record keeping documents or having any discussion with Liberty personnel on these issues on workers' compensation or non-workers' compensation cases" [DE #230 Ex A], an attorney formerly employed by Kern & Wooley, Lisa Kralik Hansen, states in her affidavit that "Pynes worked almost exclusively on matters for the Liberty Mutual group of companies . . . in both litigated and non-litigated matters pertaining to

-15-

insurance coverage and the defense of insurance 'bad faith' actions..." and that Pynes "was involved in the review of Liberty's claims files and/or claims manuals, written discovery, mediation and strategy discussions, document productions (including analysis of privileged materials) and the preparation of legal memoranda." She further testifies that Pynes had client contact with Liberty representatives, and "was exposed to confidential information concerning Liberty Mutual's practices and procedures, strategies for handling litigation, claims operation, general file management and record keeping," [DE #213, Ex 2]

Again, even though Pynes "does not recall" portions of his involvement as counsel for the Liberty Companies in the *Tony's Fine Foods* case, he undoubtedly acquired confidential information during this representation and/or during his representation of the Liberty Companies in other related matters which could be used to Republic's advantage in this action. *See General Electric Co.*, 608 F.2d at 267. Republic's attempts to argue that Pynes was a mere associate with no client contact and no access to confidential information is disingenuous. Rule 1.9(b) simply does not require that Pynes actually remember or "used" the confidential information. While previous versions of Rule 1.9(b) actually required "use" of confidential information, the rule now only requires that confidential information was "acquired." Thus, under Rule 1.9(b) and the *Dana* test, Pynes is disqualified from representing Republic in this matter.

Since only three months elapsed between the time Roxborough, Adreani and Pynes were admitted *pro hac vice* and the Liberty Companies filed its motion to disqualify, no waiver occurred. The voice mail message advising the attorney for the Liberty Companies in the *RemedyTemp* matter that the Roxborough Firm would be entering an appearance in this case is irrelevant. There is no evidence that the message stated the nature of the case, that the case had been ongoing for over two

-16-

years, that any former Kern & Wooley attorney would be working on the case, or that there was any conflict or even a request for a waiver of conflict. [DE #230 Ex C, DE #233 Ex 4] Before filing its motion to disqualify, the Liberty Companies' attorneys were required to gather sufficient evidence and legal authority before presenting this serious issue to the Court. Three months is not an unreasonable delay. Furthermore, the fact that the Roxborough Firm represented *RemedyTemp* in a substantially related matter against the Liberty Companies for a period of time while Pynes was employed there without objection from the Liberty Companies does not necessarily result in waiver. The *RemedyTemp* matter was litigated in a different jurisdiction with undoubtedly different rules and caselaw on this issue.

**B.    GICHTIN**

As noted above, a review of the complaint in *RemedyTemp* reveals that the issues involved in that matter are "substantially related" to the issues currently before the court. Because Gichtin formerly represented the Liberty Companies in *RemedyTemp*, a substantially related matter, and because the Liberty Companies do not consent to her representation, she is precluded from representing Republic in this matter under Rule 1.9(a).

**C.    IMPUTED DISQUALIFICATION TO THE ROXBOROUGH FIRM**

Both Pynes and Gichtin are disqualified from representing Republic in this matter. The court must next consider whether or not their disqualification should be imputed to the entire Roxborough Firm. Rule 1.10(a) provides "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2." Under this rule, based on Pynes' conflict of interest, the disqualification

-17-

12/02/2006  01:20    3

must be imputed to the entire Roxborough Firm.[3]

While the Court acknowledges that disqualification of Republic's chosen counsel is indeed harsh, this result serves the useful function of protecting "the reasonable expectations of former and present clients" and "promotes the public's confidence in the integrity of the legal profession." *Lovell*, 941 S.W.2d at 469. To some extent, this harsh result is mitigated by the fact that Republic may continue to be represented by its local counsel, who have been actively involved in this litigation since its initiation in 2003, while the Roxborough Firm has only been admitted *pro hac vice* in this action since May, 2006.

---

[3]Inasmuch as Pynes' conflict of interest must be imputed to the entire Roxborough Firm, the Court declines to decide whether the screening mechanisms implemented on behalf of Gichtin would be sufficient to avoid imputation of disqualification to the Roxborough Firm or whether the *National Union* case nullifies the screening exception in this case. Additionally, the court declines to decide whether Republic's failure to provide written notice to the Liberty Companies as required by Rule 1.10(d)(2) justifies imputed disqualification.

-18-

12/02/2006  01:20    3                                                    PAGE  20

V.    CONCLUSION

Accordingly, the Court being otherwise fully and sufficiently advised, HEREBY ORDERS that:

(1)    Republic's motion to file rejoinder brief to address new issues raised in the Liberty Companies' reply [DE #235] is GRANTED;

(2)    the Liberty Companies' motion for leave to file reply memorandum in excess of fifteen pages [DE #234] is GRANTED;

(3)    the Liberty Companies' motion to disqualify Craig S. Pynes and the remaining members of Roxborough, Pomerance & Nye from *pro hac vice* representation of Republic [DE #213] is GRANTED; and

(4)    the Court's Order granting *pro hac vice* status to Nicholas P. Roxborough, Michael B. Adreani, and Craig S. Pynes [DE #112] is VACATED.

This 20th day of October, 2006.

KARL S. FORESTER, SENIOR JUDGE

-19-

21

# EXHIBIT D

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

LEXINGTON DIVISION


REPUBLIC SERVICES, INC.,                )
                                        )
                    PLAINTIFFS,         )
                                        )
        V.                              )  CIVIL ACTION NO.  03-494 KSF
                                        )
LIBERTY MUTUAL INSURANCE                )
COMPANY, LIBERTY INSURANCE              )
ACQUISITION CORPORATION F/K/A           )
LIBERTY MUTUAL FIRE INSURANCE           )
COMPANY; ETC., ET AL.,                  )
                                        )
                    DEFENDANTS.         )
_____     )


# DEPOSITION OF CRAIG S. PYNES

# AUGUST 15, 2006



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

**REPORTED BY:**
APRIL PRAXMARER
CSR NO. 12437
JOB NO. 06AE335-AP

```
 1                    UNTIED STATES DISTRICT COURT
 2                   EASTERN DISTRICT OF KENTUCKY
 3                        LEXINGTON DIVISION
 4
 5    REPUBLIC SERVICES, INC.,        )
                                      )
 6         PLAINTIFFS,                )
                                      )
 7    VS.                            )CIVIL ACTION NO. 03-494 KSF
                                      )
 8                                    )
      LIBERTY MUTUAL INSURANCE        )
 9    COMPANY, LIBERTY INSURANCE      )
      ACQUISITION CORPORATION F/K/A )
10    LIBERTY MUTUAL FIRE INSURANCE )
      COMPANY, LIBERTY INSURANCE      )
11    CORPORATION, LM INSURANCE       )
      CORPORATION, THE FIRST LIBERTY)
12    INSURANCE CORPORATION AND       )
      HELMSMAN MANAGEMENT SERVICES, )
13    INC.,                           )
                                      )
14         DEFENDANTS.                )
                                      )
15
16
17
18
19
20         DEPOSITION OF CRAIG S. PYNES, TAKEN ON BEHALF OF THE
21    DEFENDANTS, AT 5820 CANOGA AVENUE, SUITE 250, WOODLAND HILLS,
22    CALIFORNIA, COMMENCING AT 4:05 P.M., TUESDAY, AUGUST 15, 2006,
23    BEFORE APRIL PRAXMARER, CERTIFIED SHORTHAND REPORTER NO.
24    12437.
25
```

2

```
 1    APPEARANCES OF COUNSEL:
 2
 3    FOR THE PLAINTIFF:
 4        MCBRAYER, MCGINNIS, LESLIE & KIRKLAND PLLC
          BY:  BRENT L. CALDWELL, ESQ.
 5        201 EAST MAIN STREET
          SUITE 1000
 6        LEXINGTON, KENTUCKY 40507
          (859) 231-8780
 7
 8    FOR THE PLAINTIFF:
 9        ROXBOROUGH, POMERANCE & NYE, LLP
          BY:  MICHAEL B. ADREANI, ESQ.
10        5820 CANOGA AVENUE
          SUITE 250
11        WOODLAND HILLS, CALIFORNIA 91367
          (818) 992-9999
12
      FOR THE DEFENDANTS:
13
          STITES & HARBISON, PLLC
14        BY:  STEPHANIE RENNER GILFORD, ESQ.
          250 WEST MAIN STREET
15        SUITE 2300
          LEXINGTON, KENTUCKY 40507-1758
16        (859) 226-2250
17
18    FOR THE DEFENDANT, YANNY & SMITH:
19        CHARLSTON REVICH & CHAMBERLIN, LLP
          BY:  TIM HARRIS, ESQ.
20        1925 CENTURY PARK EAST
          SUITE 1250
21        LOS ANGELES, CALIFORNIA 90067-2746
          (310) 551-7000
22
23
24
25
```

3

```
 1                              INDEX

 2

 3   DEPONENT      CRAIG PYNES                    PAGE

 4   EXAMINATION

 5   BY MS. GILFORD                                 5

 6

 7   EXHIBITS FOR IDENTIFICATION

 8   DEFENDANTS'

 9   NO.        DESCRIPTION

10   1          AFFIDAVIT OF LISA KRALIK HANSEN     25

11   2          AFFIDAVIT OF CRAIG S. PYNES         56

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    4
```

```
 1                    WOODLAND HILLS, CALIFORNIA;

 2                TUESDAY, AUGUST 15, 2006, 4:05 P.M.

 3

 4                        CRAIG S. PYNES,

 5    HAVING BEEN FIRST DULY AFFIRMED BY THE REPORTER, WAS EXAMINED

 6                    AND TESTIFIED AS FOLLOWS:

 7

 8                        EXAMINATION

 9

10    BY MS. GILFORD:

11        Q    MR. PYNES, COULD YOU STATE YOUR FULL NAME FOR

12    THE RECORD.

13        A    SURE.  CRAIG SANFORD PYNES.

14        Q    HAVE YOU EVER HAD YOUR DEPOSITION TAKEN

15    BEFORE?

16        A    NO.

17        Q    BUT YOU'VE TAKEN A NUMBER OF DEPOSITIONS

18    YOURSELF; CORRECT?

19        A    YES.

20        Q    I'M JUST GOING TO DO AN ABBREVIATED VERSION

21    OF THE ADMONITIONS, JUST SO THAT WE'RE ON THE SAME

22    PAGE.

23        A    OKAY.

24        Q    YOU UNDERSTAND THAT THE OATH THAT YOU'VE

25    TAKEN IS THE SAME AS IF YOU WERE IN A COURT OF LAW?
```

5

1    BUT I DIDN'T PERSONALLY HANDLE ANY CASES THAT WERE

2    ASSIGNED TO ME THAT INVOLVED WORKERS' COMPENSATION BAD

3    FAITH OR WORK COMP IN GENERAL.

4        Q    DID YOU WORK ON ANY CASES THAT INVOLVED BAD

5    FAITH OR OTHER INSURANCE CONTACTS BESIDES WORKERS'

6    COMPENSATION?

7            MR. ADREANI:  OBJECT TO FORM.

8            YOU CAN ANSWER.

9            THE WITNESS:  SOME OF MY CASES WERE BAD

10   FAITH.  IN OTHER INSURANCE LINES, NO.  PROBABLY MORE

11   THAN ANYTHING ELSE WOULD BE, YOU KNOW, PROPERTY

12   CONSTRUCTION DEFECT TYPE OF CASES, WHERE YOU'RE DEALING

13   WITH COVERAGE, RESULTING DAMAGES FROM A CONSTRUCTION

14   DEFECT PROJECT.

15   BY MS. GILFORD:

16       Q    AND WERE YOU INVOLVED IN GIVING COVERAGE

17   OPINIONS?

18       A    I WOULD WORK -- I'D PREPARE LETTERS THAT I

19   DID NOT SIGN.  I WOULD -- SOMEONE ELSE WOULD ULTIMATELY

20   END UP, YOU KNOW, SIGNING THEM AND CHANGING THEM FOR

21   THEIR OWN PURPOSES, AND THEY WOULD SIGN THEM.

22       Q    DID YOU EVER DO ANY WORK ON A CASE CALLED

23   TONY'S FINE FOODS?

24       A    I DON'T REMEMBER THE NAME OF THE CASE.

25       Q    DO YOU EVER REMEMBER WORKING ON A DOCUMENT

15

1    REVIEW IN A WORKERS' COMPENSATION BAD FAITH CASE?

2        A    ONE TIME IN A PROJECT -- IT WAS NOT A CASE I

3    WAS HANDLING -- I DID IT FOR MELODEE YEE, AND IT WAS

4    MAYBE JUST A FEW HOURS.  I HAD NO IDEA WHAT I WAS DOING

5    BECAUSE I HAD NO TRAINING ON WORK COMP OR WORK COMP BAD

6    FAITH.

7            SHE TALKED TO ME FIVE OR TEN MINUTES, AND I

8    WAS LOOKING FOR, YOU KNOW, ADDRESSES AND NAMES OF

9    UNDERLYING CLAIMANTS SO THAT THEY COULD BE REDACTED.

10   OTHERWISE, I REALLY DIDN'T KNOW WHAT I WAS DOING.

11   HONESTLY.

12       Q    DID YOU EVER REVIEW DOCUMENTS FOR PRIVILEGED

13   INFORMATION IN THAT CASE FOR MELODEE YEE?

14       A    THAT'S WHAT MY UNDERSTANDING -- FROM WHAT SHE

15   HAD TOLD ME, THAT'S WHAT I WAS PRIMARILY DOING, WAS

16   MAKING SURE THAT ANY SENSITIVE INFORMATION WAS

17   REDACTED.

18           AND I MAY HAVE EVEN DONE A VERY SMALL

19   PRIVILEGED LOG.  LESS THAN A PAGE.

20       Q    DO YOU EVER REMEMBER --

21           MR. ADREANI:  YOU'RE TALKING PRIVILEGE, NOT

22   ATTORNEY-CLIENT PRIVILEGE FROM --

23           MS. GILFORD:  NO.  I'M TALKING ABOUT

24   PRIVILEGED INFORMATION.

25           MR. ADREANI:  OKAY.

16

1          IT SAYS, "IN BOTH LITIGATED AND NONLITIGATED

2    MATTERS PERTAINING TO INSURANCE COVERAGE AND THE

3    DEFENSE OF BAD FAITH INSURANCE ACTIONS."

4          DO YOU DISAGREE WITH THAT STATEMENT?

5          MR. ADREANI:  OBJECT TO FORM.

6          THE WITNESS:  NO.  I DON'T KNOW THAT I

7    DISAGREE, OTHER THAN IT'S PRETTY VAGUE.

8    BY MS. GILFORD:

9          Q    HOW IS IT VAGUE?

10          A    IT MIGHT IMPLY THAT I WORKED ON WORK COMP BAD

11    FAITH ACTIONS, WHICH I DIDN'T, OTHER THAN A COUPLE

12    HOURS ON ONE SMALL PROJECT.

13          Q    OKAY.  DO YOU KNOW WHAT THE TONY'S FINE FOODS

14    CASE WAS ABOUT?

15          A    NO.

16          MR. ADREANI:  OBJECT TO FORM.

17          THE WITNESS:  I MEAN, AS I SAID, I WORKED, AT

18    MOST, A HALF DAY ON IT.

19    BY MS. GILFORD:

20          Q    BUT YOU'RE AWARE THAT IT INVOLVED WORKERS'

21    COMPENSATION BAD FAITH?

22          MR. ADREANI:  OBJECT TO FORM.

23          THE WITNESS:  I REALLY DIDN'T UNDERSTAND WHAT

24    IT INVOLVED.  IT REALLY WASN'T THAT KIND OF

25    INFORMATION.  I WAS GIVEN A FIVE- OR TEN-MINUTE

28

1   EXPLANATION AS TO THE PROJECT I WAS DOING, AND THAT WAS

2   IT.

3   BY MS. GILFORD:

4       Q    AFTER THAT, WERE YOU EVER COPIED ON ANY

5   LETTERS OR E-MAILS INVOLVING THAT CASE?

6       A    NO.  IT WASN'T MY CASE.

7       Q    OKAY.  WELL, JUST BECAUSE IT WASN'T YOUR

8   CASE -- I MEAN, I SOMETIMES GET COPIED ON THINGS THAT

9   AREN'T MY CASE.

10           I MEAN, WERE YOU EVER COPIED ON ANY LETTERS

11  OR E-MAILS?

12      A    IT WAS JUST A SINGLE PROJECT, SO, NO, I

13  WASN'T.

14      Q    OKAY.  AFTER BAD FAITH ACTIONS, IT SAYS,

15  "BASED ON A NUMBER OF THEORIES THAT WOULD HAVE INCLUDED

16  BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF

17  GOOD FAITH AND FAIR DEALING AND FRAUD," AND YOU'VE

18  ALREADY SAID THAT YOU THINK THAT IMPLIES THAT YOU MIGHT

19  HAVE WORKED ON A CASE THAT INVOLVES ISSUES SIMILAR TO

20  THIS CASE, OTHER THAN THAT IMPLICATION?

21      A    WELL, OTHER OTHER SUPERFICIALLY, THAT THEY --

22  I GUESS WORK COMP COULD INVOLVE BREACH OF CONTRACT, BAD

23  FAITH AND POTENTIALLY FRAUD, AS DO BUSINESS ACTIONS, AS

24  DO ALL TYPES OF LITIGATION, THEY INVOLVE COMPLETELY

25  DISTINCT POLICIES, COMPLETELY DISTINCT CASES.

29

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

1          IF YOU LOOK AT THE CASE LOG, IT'S TOTALLY

2     DIFFERENT.  AND THE WHOLE WAY YOU WORK UP A WORK COMP

3     BAD FAITH CASE, AS I LEARNED HERE EXCLUSIVELY, FROM

4     TRAINING FROM NICK ROXBOROUGH OR FROM MIKE, IS TOTALLY

5     DIFFERENT THAN HOW YOU WOULD WORK UP A BAD FAITH, YOU

6     KNOW, COMMERCIAL GENERAL LIABILITY COVERAGE ACTION OR

7     FIRST-PARTY PROPERTY ACTION.

8          Q    BUT YOU DID WORK ON THOSE OTHER CASES THAT

9     YOU'RE JUST NOW DESCRIBING FOR LIBERTY MUTUAL AT KERN &

10    WOOLEY?

11         A    YEAH, I DID DO COVERAGE, MOSTLY PROPERTY.  OR

12    EARTHQUAKE, I GUESS, WOULD BE INCLUDED IN THERE.

13         Q    WHILE REPRESENTING -- WELL, THE NEXT SENTENCE

14    SAYS, "WHILE REPRESENTING LIBERTY, CRAIG PYNES WAS

15    INVOLVED IN THE REVIEW OF LIBERTY'S CLAIMS FILES AND/OR

16    CLAIMS MANUALS."

17              IS THAT TRUE?

18              MR. ADREANI:  OBJECT TO FORM.

19              THE WITNESS:  I DON'T THINK SO.  I MEAN, I

20    WOULD HAVE LOOKED AT SOME CLAIM FILES ON THE PROPERTY

21    CLAIMS I WAS WORKING ON.

22              AS FAR AS THE CLAIM MANUALS, AS I SAID

23    EARLIER, LISA KRALIK HANSEN WOULD BE PRIMARILY INVOLVED

24    IN GETTING THE CLAIM MANUALS, REVIEWING THEM AND THEN

25    USUALLY GIVING ME THE PORTIONS THAT SHE THOUGHT WAS

30

```
 1    PERTINENT.  SHE WOULD MICRO MANAGE THAT PART OF THE
 2    CASE.
 3    BY MS. GILFORD:
 4         Q    OKAY.  THE NEXT ONE IS WRITTEN DISCOVERY.
 5              DID YOU WORK ON WRITTEN DISCOVERY FOR LIBERTY
 6    MUTUAL?
 7         A    YEAH.  I WOULD DRAFT THE RESPONSES AND, YOU
 8    KNOW, REVIEW DOCUMENTS PERTINENT TO THE SPECIFIC CASE.
 9    I WOULDN'T BE LOOKING AT INTERNAL LIBERTY DOCUMENTS.  I
10    WOULD BE LOOKING AT THE CASE DOCUMENTS.
11         Q    WELL, AND THE CASE DOCUMENTS WOULD HAVE
12    INCLUDED INTERNAL LIBERTY DOCUMENTS, WOULDN'T THEY
13    HAVE?
14         A    IT WOULDN'T BE --
15              MR. ADREANI:  OBJECT TO FORM.
16              YOU CAN ANSWER.
17              THE WITNESS:  I THINK THERE'S A DISTINCTION
18    THERE.  I'D BE LOOKING AT, FOR INSTANCE, IF THERE WERE
19    CLAIM HANDLING LOGS PERTINENT TO, LET'S SAY, A
20    FIRST-PARTY PROPERTY CLAIM, YEAH, I WOULD PROBABLY BE
21    LOOKING AT THOSE.
22              AND THAT WOULD PROBABLY BE THE ONLY CLAIM
23    MATERIALS -- YOU KNOW, ANYTHING THAT WAS SENT TO THEM
24    ON THE PROPERTY CLAIM.
25              BUT AS FAR AS THE ACTUAL INTERNAL LIBERTY
```

31

1    MATERIALS, NO, I WASN'T LOOKING AT THAT, OTHER THAN

2    LISA GIVING ME THE -- YOU KNOW, SEGREGATING SOME

3    PORTION TO PRODUCE USUALLY.

4    BY MS. GILFORD:

5        Q    WERE YOU EVER INVOLVED WITH LISA IN

6    DISCUSSIONS ABOUT WHAT SHOULD OR SHOULDN'T BE PRODUCED

7    IN THE CASES INVOLVING LIBERTY?

8            MR. ADREANI:  OBJECT TO FORM.

9            YOU CAN ANSWER.

10           THE WITNESS:  I DON'T KNOW IF IT WAS THAT

11   SPECIFIC.  SHE WOULD TELL ME -- I GUESS SHE WOULD TELL

12   ME WHAT HER TAKE WAS ON IT.  WHAT SHE THOUGHT SHOULD BE

13   PRODUCED.

14   BY MS. GILFORD:

15       Q    OKAY.  THE NEXT IN THIS LIST -- IN THE

16   SENTENCE IS MEDIATION AND STRATEGY DISCUSSIONS.

17           WERE YOU EVER INVOLVED IN MEDIATION AND

18   STRATEGY DISCUSSIONS FOR LIBERTY MUTUAL WHILE AT KERN &

19   WOOLEY?

20       A    NOT REALLY.  AGAIN, THAT'S ANOTHER

21   FRUSTRATION.  THAT WOULD BE HANDLED BY RON, SUSAN OR

22   LISA.  AND THEY MIGHT TALK TO ME OR ANOTHER ASSOCIATE,

23   YOU KNOW, TANGENTIALLY BUT THEY WOULD LARGELY DEAL WITH

24   MEDIATION AND STRATEGY.

25       Q    DID YOU EVER ATTEND A MEDIATION FOR LIBERTY

                                                        32

1   MUTUAL WHILE YOU WERE AT KERN & WOOLEY?

2       A    I DID.

3       Q    AND WAS THE -- DO YOU EVER REMEMBER ATTENDING

4   A MEDIATION FOR LIBERTY WHILE YOU WERE AT KERN & WOOLEY

5   THAT THE RESULTING -- IF THERE WAS A SETTLEMENT, THAT

6   THE RESULTING SETTLEMENT WAS CONFIDENTIAL?

7       A    NO.  ACTUALLY, IT DIDN'T SETTLE.  THE ONE I

8   REMEMBER REAL WELL INVOLVED TRAVELERS, AND THEY

9   ACTUALLY WALKED OUT.

10      Q    THE NEXT IN THIS LIST, DOCUMENT PRODUCTIONS,

11  INCLUDING ANALYSES OF PRIVILEGED MATERIALS.

12           DO YOU RECALL WORKING ON DOCUMENT PRODUCTIONS

13  FOR LIBERTY MUTUAL?

14      A    ON FIRST PARTY OR CGL OR EARTHQUAKE-TYPE

15  CASES.

16      Q    WHAT DOES CGL STAND FOR?

17      A    I'M SORRY.  COMMERCIAL GENERAL LIABILITY.

18      Q    AND IN THOSE CASES, DID YOU EVER REVIEW

19  DOCUMENTS TO DETERMINE WHETHER THEY WERE -- THEY SHOULD

20  BE WITHHELD SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE?

21      A    IT WOULD BE DOCUMENTS SPECIFIC TO THE CASE

22  INVOLVED.

23           SO MCLAUGHLIN WOULD BE DOCUMENTS INVOLVED IN

24  THAT CASE.

25      Q    OKAY.  SO YOU DID REVIEW DOCUMENTS TO

33

1    DETERMINE WHETHER THEY SHOULD BE WITHHELD SUBJECT TO

2    ATTORNEY-CLIENT PRIVILEGE IN VARIOUS CASES FOR LIBERTY

3    MUTUAL?

4        A    YES.

5        Q    DID YOU EVER PREPARE LEGAL MEMORANDA FOR

6    LIBERTY MUTUAL?

7            MR. ADREANI:  OBJECT TO FORM.

8            THE WITNESS:  GENERALLY, I PREPARE -- YEAH, I

9    RESEARCH.  BUT IT'S DONE ON SPECIFIC LAW, YOU KNOW,

10   WHAT'S THE LAW OF, YOU KNOW, CONNECTICUT ON THIS OR

11   THAT ISSUE OR -- YOU KNOW.

12   BY MS. GILFORD:

13       Q    INVOLVING WHATEVER THE PARTICULAR FACTS OF

14   THE CASE WERE THAT YOU WERE WORKING ON?

15       A    YEAH.  AGAIN, NOT WORK COMP, NOT WORK COMP

16   BAD FAITH THAT I EVER RECALL.

17       Q    THE NEXT SENTENCE SAYS, "MR. PYNES ALSO HAD

18   SOME CLIENT CONTACT WITH CLAIMS PERSONNEL AT LIBERTY."

19           IS THAT TRUE?

20       A    MINIMAL, SOME.

21       Q    "MR. PYNES WOULD HAVE BEEN EXPOSED TO

22   CONFIDENTIAL INFORMATION CONCERNING LIBERTY MUTUAL'S

23   PRACTICES AND PROCEDURES, STRATEGIES FOR HANDLING

24   LITIGATION, CLAIMS OPERATIONS, GENERAL CLAIM FILE

25   MANAGEMENT, NO RECORD KEEPING."

34

1   LIBERTY CASES?

2        A    NOT -- NO, NOT NECESSARILY.

3        Q    SOMETIMES?

4             MR. ADREANI:  OBJECT TO FORM.

5             YOU CAN ANSWER.

6             THE WITNESS:  NOT -- AGAIN, NOT REALLY.

7   ACTUALLY, THAT WAS ANOTHER FRUSTRATION.

8   BY MS. GILFORD:

9        Q    WHEN DID YOU LEAVE KERN & WOOLEY?

10       A    MARCH OF '04.

11       Q    WHY DID YOU LEAVE?

12            MR. ADREANI:  OBJECT TO FORM.

13            THE WITNESS:  I JUST DIDN'T LIKE THE

14   ENVIRONMENT THERE.  YOU KNOW, I THINK I HAD A

15   PERSONALITY CONFLICT WITH LISA HANSEN, HONESTLY, AMONG

16   OTHERS.  IT WAS NOT A GREAT PLACE TO WORK.

17   BY MS. GILFORD:

18       Q    DID ANYONE EVER SUGGEST TO YOU THAT YOU

19   SHOULD LEAVE?

20            MR. ADREANI:  OBJECT TO FORM.

21            YOU CAN ANSWER.

22            THE WITNESS:  NO.  I THINK SUSAN OLSON AT ONE

23   POINT TOLD ME I WOULDN'T HAVE A LONG FUTURE THERE, SO

24   THAT CERTAINLY INSPIRED ME.

25            THAT WAS AFTER LISA AND I HAD HAD AN

37

1    ARGUMENT, BECAUSE HER -- I HAD SOME ISSUES WITH HER AND

2    HER SECRETARY.  PERSONAL, NOT WORK RELATED.

3    BY MS. GILFORD:

4        Q    WERE THERE ANY SPECIFIC PROCEDURES THAT YOU

5    HAD TO FOLLOW WHEN YOU WERE LEAVING, FOR INSTANCE --

6    WELL, I MEAN, DID YOU PACK UP YOUR STUFF AND LEAVE, OR

7    DID YOU HAVE TO SIGN SOMETHING OR DID YOU HAVE TO SAY

8    YOU DIDN'T TAKE ANYTHING OR DID THEY TELL YOU NOT TO

9    TAKE PARTICULAR THINGS?

10       A    I DON'T RECALL SPECIFICALLY.

11            MR. ADREANI:  I'M GOING TO OBJECT TO FORM.

12            THE WITNESS:  I THINK THEY TOLD ME NOT TO

13   TAKE ANYTHING, AND I DIDN'T TAKE ANYTHING.

14   BY MS. GILFORD:

15       Q    OKAY.  YOU DIDN'T TAKE ANY ELECTRONIC OR HARD

16   COPIES OF SAMPLE PLEADINGS?

17       A    NOT THAT I RECALL.

18       Q    DID YOU TAKE ANY -- DID YOU PRINT OFF ANY

19   E-MAILS AND TAKE THEM WITH YOU?

20       A    NO.

21       Q    DID YOU TAKE ANY OF YOUR BILLING RECORDS?

22       A    NO.

23       Q    WHERE IS THE NEXT PLACE YOU WERE EMPLOYED

24   AFTER KERN & WOOLEY?

25       A    I THINK TWO DAYS LATER, HERE.  I'VE BEEN

38

1    EMPLOYED HERE EVER SINCE.

2        Q    YOU WERE EMPLOYED HERE TWO DAYS AFTER YOU

3    LEFT KERN & WOOLEY?

4        A    I WANT TO SAY IT WAS TWO DAYS OR ROUGHLY TWO

5    DAYS.

6        Q    SO IN MARCH OF 2004?

7        A    RIGHT.

8        Q    SO WERE YOU TALKING TO THE ROXBOROUGH FIRM

9    BEFORE YOU LEFT KERN & WOOLEY?

10       A    YES.

11       Q    HOW DID THAT COME ABOUT?

12           MR. ADREANI:  OBJECT TO FORM.

13           THE WITNESS:  SUSAN MADE A SARCASTIC COMMENT,

14   AND I DIDN'T KNOW WHETHER TO TAKE IT SERIOUSLY OR NOT,

15   SO I TOOK IT VERY SERIOUSLY.  AND I IMMEDIATELY -- SHE

16   MADE THAT COMMENT WHEN SHE FOUND OUT THAT I WAS ALREADY

17   FAXING RESUMES.

18           AND I FOLLOWED UP AND TALKED TO

19   NICK ROXBOROUGH, INTERVIEWED, AND WAS HERE.

20   BY MS. GILFORD:

21       Q    DID YOU FAX A RESUME TO ROXBOROUGH, POMERANCE

22   & NYE?

23       A    YES, I DID.  I MADE THE MISTAKE OF FAXING IT

24   FROM KERN & WOOLEY, WHICH WAS STUPID.  ANYWAY.

25           MS. GILFORD:  MAYBE YOU SHOULD CHECK THE FAX

39

1          MR. ADREANI:  OBJECT TO FORM.

2          YOU CAN ANSWER.

3          THE WITNESS:  I HONESTLY DON'T RECALL.

4    BY MS. GILFORD:

5     Q    WERE YOU TOLD DURING THE INTERVIEW PROCESS

6    THAT IF YOU CAME TO WORK HERE, YOU'D BE HIRED TO DO A

7    PARTICULAR KIND OF WORK?  BESIDES PRACTICING LAW,

8    OBVIOUSLY.

9     A    I HONESTLY DON'T RECALL.

10     Q    HOW MANY LAWYERS ARE IN THIS OFFICE?

11     A    IN THIS OFFICE?  I WANT TO SAY PROBABLY ABOUT

12    13.

13     Q    AND YOUR OTHER OFFICE IN L.A. DOESN'T HAVE

14    LAWYERS?

15     A    WE USE THAT OFFICE, ACTUALLY, AS A RESOURCE.

16    I DON'T KNOW THAT WE HAVE ANY LAWYERS THAT WORK OUT OF

17    THAT OFFICE EXCLUSIVELY, BUT WE ALL DO WORK THERE AT

18    POINTS IN TIME.

19     Q    IS IT JUST AN OFFICE FOR THAT PURPOSE, OR ARE

20    THERE PEOPLE EMPLOYED IN THAT OFFICE?

21          MR. ADREANI:  OBJECT TO FORM.

22          YOU CAN ANSWER.

23          THE WITNESS:  WE -- I'M NOT SURE I UNDERSTAND

24    THE QUESTION.

25    ///

45

```
 1    BY MS. GILFORD:

 2        Q    IS IT JUST AN EMPTY OFFICE FOR YOU TO USE, OR

 3    ARE THERE PEOPLE WHO WORK THERE EVERYDAY?

 4        A    THERE'S NOT -- THERE ARE PEOPLE THAT WORK

 5    THERE EVERY DAY, BUT THEY DON'T WORK FOR OUR FIRM.

 6    IT'S LIKE A FIJIAN TYPE OF SETUP, WHERE WE CAN USE THE

 7    FACILITIES WHEN WE NEED THEM.  AND I THINK WE HAVE OR

 8    HAD AN OFFICE THERE, AS WELL AS A CONFERENCE ROOM.

 9        Q    AND THAT'S IN DOWNTOWN L.A.?

10        A    NO.  THAT'S IN WESTWOOD.

11        Q    SORRY.

12             MR. ADREANI:  WILSHIRE IS A LONG STREET.

13             MS. GILFORD:  I KNOW.  A COUPLE OF YEARS OUT

14    OF L.A., AND I'VE ALREADY STARTED MAKE IT ALL RUN

15    TOGETHER.

16             MR. ADREANI:  IS THIS A GOOD TIME TO TAKE A

17    BREAK?

18             MS. GILFORD:  YEAH.  THAT'S FINE.

19             MR. ADREANI:  THANKS.

20             (BRIEF PAUSE IN THE PROCEEDINGS.)

21    BY MS. GILFORD:

22        Q    MR. PYNES, WHEN YOU CAME TO WORK HERE, DID

23    YOU TELL ANYONE AT KERN & WOOLEY THAT YOU WERE COMING

24    TO WORK AT ROXBOROUGH, POMERANCE & NYE?

25        A    YEAH.  I HAD A DETAILED DISCUSSION, ACTUALLY,
```

46

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF LOS ANGELES        )


     I, April Praxmarer, CSR 12437, in and for the State

of California, do hereby certify;

     That, prior to being examined, the deponent named

in the foregoing deposition was by me duly sworn to

testify the truth, the whole truth and nothing but the

truth;

     That said deposition was taken down by me in

shorthand at the time and place therein named, and

thereafter reduced to typewriting under my direction,

and the same is a true, correct and complete transcript

of said proceedings;

     I further certify that I am not interested in the

event of the action.

     Witness my hand this _____21st_____ day of

___August___, 2006.


                         _____

                         Certified Shorthand

                         Reporter for the

                         State of California

**EXHIBIT E**

# CERTIFIED COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON

REPUBLIC SERVICES, INC.                          )
                                                 )
                                    PLAINTIFF,   )
                                                 ) CIVIL ACTION
            V.                                   ) CASE  NO. : 03-494 KSF
                                                 )
LIBERTY MUTUAL INSURANCE COMPANY, ET AL.         )
                                                 )
                                   DEFENDANTS.   )
_____)

## DEPOSITION OF:  LISA KRALIK HANSEN
## TAKEN: AUGUST 15, 2006

### Dalene Court Reporters

16161 Ventura Boulevard, #734
Encino, California 91436
Telephone: 661.726.0584

Reported By:

Judy K. Boswell

CSR 7500

DEPOSITION OF LISA KRALIK HANSEN

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3              AT LEXINGTON

4

5   REPUBLIC SERVICES, INC.,          )
                                      )
6              PLAINTIFF,             )
                                      )      CIVIL ACTION
7      VS.                            )      NO. 03-494 KSF
                                      )
8   LIBERTY MUTUAL INSURANCE COMPANY, )
    LIBERTY INSURANCE ACQUISITION     )
9   CORPORATION F/K/A LIBERTY MUTUAL  )
    FIRE INSURANCE COMPANY, LIBERTY   )
10  INSURANCE CORPORATION, LM         )
    INSURANCE CORPORATION, THE FIRST  )
11  LIBERTY INSURANCE CORPORATION AND )
    HELMSMAN MANAGEMENT SERVICES,     )
12  INC.,                             )
                                      )
13             DEFENDANTS.            )
    _____)

14

15

16      DEPOSITION OF LISA KRALIK HANSEN, TAKEN

17   ON BEHALF OF PLAINTIFF, AT 5280 CANOGA

18   AVENUE, SUITE 250, WOODLAND HILLS,

19   CALIFORNIA, COMMENCING AT 10:01 A.M.,

20   TUESDAY, AUGUST 15, 2006, BEFORE

21   JUDY K. BOSWELL, CSR 7500.

22

23

24

25

                                              2

DEPOSITION OF LISA KRALIK HANSEN

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            ROXBOROUGH, POMERANCE & NYE
              BY:  MICHAEL B. ADREANI, ESQ.
 5            5820 CANOGA AVENUE
              SUITE 250
 6            WOODLAND HILLS, CALIFORNIA  91367
              818.992.9999
 7
                   -- AND --
 8
              MCBRAYER, MCGINNIS, LESLIE & KIRKLAND PLLC
 9            BY:  BRENT L. CALDWELL, ESQ.
              201 EAST MAIN STREET
10            SUITE 1000
              LEXINGTON, KENTUCKY  40507
11            859.231.8780

12

13    FOR THE DEFENDANTS:

14            STITES & HARBISON PLLC
              BY:  STEPHANIE RENNER GILFORD, ESQ.
15            250 WEST MAIN STREET
              SUITE 2300
16            LEXINGTON, KENTUCKY  40507
              859.226.2250

17

18    FOR THE DEPONENT:

19            PETERSON & BRADFORD, LLP
              BY:  RONALD J. SKOCYPEC, ESQ.
20            100 NORTH FIRST STREET
              SUITE 300
21            BURBANK, CALIFORNIA  91502
              818.562.5800

22

23

24

25
                                                    3
```

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

```
1                     I N D E X

2   DEPONENT:          EXAMINED BY:              PAGE:

3   LISA KRALIK HANSEN   MR. ADREANI               5

4

5

6   EXHIBITS FOR IDENTIFICATION:

7   PLAINTIFF'S:

8   A - AFFIDAVIT OF LISA KRALIK HANSEN            9

9

10          QUESTIONS UNANSWERED BY DEPONENT:
11                PAGE        LINE
                    7          21
12                  8           5
                   11          15
13                 13          24
                   15          19
14                 24          25
                   26           4
15                 26          11
                   26          19
16                 27          14
                   27          21
17                 45          15
                   53          23
18                 54          10
                   54          22
19                 56          12
                   64          16
20                 65          15
                   67          19
21

22

23          INFORMATION REQUESTED:

24                  (NONE)

25
                                                    4
```

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

1          WOODLAND HILLS, CALIFORNIA

2          TUESDAY, AUGUST 15, 2006

3               10:01 A.M.

4

5          LISA KRALIK HANSEN,

6     CALLED AS A DEPONENT AND SWORN IN BY

7     THE DEPOSITION OFFICER, WAS EXAMINED

8          AND TESTIFIED AS FOLLOWS:

9

10     DEPOSITION OFFICER:  YOU DO SOLEMNLY AFFIRM THE

11  TESTIMONY YOU MAY GIVE IN THIS MATTER SHALL BE THE TRUTH,

12  THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH UNDER PENALTY

13  OF PERJURY?

14     THE DEPONENT:  YES.

15

16          EXAMINATION

17  BY MR. ADREANI:

18     Q.  GOOD MORNING, LISA.

19     A.  GOOD MORNING.

20     Q.  CAN YOU JUST GIVE YOUR FULL NAME FOR THE RECORD.

21     A.  LISA KRALIK HANSEN.

22     Q.  IF YOU CAN SPELL IT, TOO.

23     A.  KRALIK, K-R-A-L-I-K, HANSEN, H-A-N-S-E-N.

24     Q.  LISA, WE KNOW EACH OTHER, OBVIOUSLY.  WE WORKED

25  TOGETHER IN THE PAST SO I'M GOING TO SKIP ALL THE

5

DEPOSITION OF LISA KRALIK HANSEN

1   OTHERWISE SHE'S INSTRUCTED NOT TO ANSWER.

2           MR. ADREANI:  ALL RIGHT.

3           THE DEPONENT:  TO THE BEST OF MY RECOLLECTION,

4   I'M NOT AWARE OF MR. PYNES WORKING ON MATTERS FOR CLIENTS

5   OTHER THAN A LIBERTY MUTUAL GROUP OF COMPANIES.

6           MR. SKOCYPEC:  SO MUCH FOR MY OBJECTION.

7           MR. ADREANI:  IT WAS WELL STATED, THOUGH, RON.

8           MR. CALDWELL:  VERY WELL STATED.

9   BY MR. ADREANI:

10      Q.  YOU HAVE HERE SOME AREAS WHERE MR. PYNES WORKED,

11  INCLUDING COVERAGE, DEFENSIVE BAD FAITH, BREACH OF

12  CONTRACT, IMPLIED COVENANT, AND FRAUD; RIGHT?

13      A.  THAT'S WHAT IT SAYS.

14      Q.  WELL, THAT'S ALSO YOUR RECOLLECTION; RIGHT?

15      A.  AS I SIT HERE TODAY OR AS OF THE TIME I SIGNED

16  THE DECLARATION?

17      Q.  MR. PYNES NEVER WORKED ON ANY OF THOSE CASES WITH

18  REGARD TO WORKERS' COMPENSATION BAD FAITH, DID HE?

19      A.  YES, HE DID.

20      Q.  WHAT CASE WAS THAT?

21      A.  TONY'S FINE FOODS VERSUS LIBERTY MUTUAL, I

22  BELIEVE, IS THE CAPTION OF THE CASE.

23      Q.  WHAT OTHER CASE DID HE WORK ON?  THAT WAS THE

24  ONLY ONE?

25      A.  WHAT DO YOU MEAN BY "OTHER CASE"?

                                                          32

DEPOSITION OF LISA KRALIK HANSEN

1    Q.  WELL, WE'LL GET TO THE TONY'S FINE FOOD VERSUS

2  LIBERTY.  BUT THE QUESTION WAS THAT MR. PYNES DIDN'T WORK

3  ON ANY CASE INVOLVING WORKERS' COMPENSATION BAD FAITH.

4  AND YOU SAID THAT'S NOT TRUE; RIGHT?

5    A.  CORRECT.

6    Q.  YOU'VE GIVEN ME ONE NAME OF ONE CASE.  WHAT ELSE?

7    A.  OTHER WORKERS' COMPENSATION RELATED CASE FOR

8  LIBERTY MUTUAL?

9    Q.  I SAID WORKERS' COMPENSATION BAD FAITH CASES.

10    A.  TO THE BEST OF MY RECOLLECTION, THAT TONY'S FINE

11  FOODS IS THE ONLY WORKERS' COMPENSATION BAD FAITH CASE

12  THAT MR. PYNES WORKED ON.

13    Q.  OTHER THAN THAT, MR. PYNES WORKED ON OTHER LINES

14  OF INSURANCE; RIGHT?

15    A.  YES.

16    Q.  OKAY.  ON TONY'S FINE FOODS, MR. PYNES -- HE

17  WORKED WHAT?  THREE HOURS ON THAT CASE?

18    A.  I DON'T KNOW THE HOURS SPENT.

19    Q.  WELL, HOW DO YOU KNOW HE WORKED ON IT?

20    A.  IN DISCUSSIONS WITH OTHER PEOPLE IN MY OFFICE TO

21  PREPARE FOR TODAY'S DEPOSITION, MY RECOLLECTION WAS

22  REFRESHED THAT ONE OF THE CASES THAT MR. PYNES WORKED ON

23  WHILE AT KERN & WOOLEY WAS TONY'S FINE FOODS.  AND I WAS

24  ALSO MADE AWARE THAT HE WAS ASSIGNED A DOCUMENT REVIEW, A

25  PRIVILEGE REVIEW, AND PREPARATION OF A PRIVILEGE LOG.

33

DEPOSITION OF LISA KRALIK HANSEN

1      AND UPON MY RECOLLECTION BEING SO REFRESHED, I

2  HAVE NOW A SPECIFIC RECALL THAT MR. PYNES HAD ASKED ME

3  PERSONALLY A FEW QUESTIONS, EITHER IN THE PROCESS OF THE

4  DOCUMENT REVIEW, THE PRIVILEGE REVIEW, OR PREPARATION OF

5  THE PRIVILEGE LOG.

6      Q.  DO YOU RECALL EXACTLY WHAT MR. PYNES DID ON THAT

7  CASE?

8      A.  I BELIEVE THAT HE REVIEWED LIBERTY MUTUAL

9  WORKERS' COMPENSATION CLAIMS FILES, CONDUCTED A PRIVILEGE

10  REVIEW, MADE A LEGAL DETERMINATION OF WHAT DOCUMENTS WERE

11  PRIVILEGED, PROTECTED OR OTHERWISE IMMUNE FROM DISCOVERY,

12  AND THAT HE DRAFTED A PRIVILEGE LOG.

13      Q.  HE JUST LOOKED AT CLAIM FILES; RIGHT?  FOR LESS

14  THAN HALF A DAY?

15      A.  I DON'T KNOW HOW LONG HE SPENT.  I DON'T HAVE

16  ACCESS TO TIME RECORDS.  I DON'T KNOW HOW LONG IT TOOK HIM

17  TO DO THE REVIEW I PREVIOUSLY TESTIFIED ABOUT IN

18  PREPARATION.

19      Q.  YOU DON'T HAVE ANY REASON TO THINK HE SPENT MORE

20  THAN THAT AMOUNT OF TIME, DO YOU?

21      A.  I DON'T KNOW HOW MUCH TIME HE SPENT.  I DON'T

22  KNOW HOW MANY CLAIM FILES THERE WERE OR THE VOLUME OF THE

23  CLAIM FILES HE WAS REVIEWING.

24      Q.  SO YOU DON'T HAVE ANY REASON TO THINK HE SPENT

25  ANY MORE THAN THAT AMOUNT OF TIME?

34

DEPOSITION OF LISA KRALIK HANSEN

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA        )
                           )        SS.
COUNTY OF LOS ANGELES      )


5     I, JUDY K. BOSWELL, CSR #7500, A CERTIFIED

6  SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA,

7  DO HEREBY CERTIFY:

8     THAT PRIOR TO BEING EXAMINED, THE WITNESS NAMED

9  IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO

10  TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE

11  TRUTH.

12     THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

13  SHORTHAND AT THE TIME AND PLACE THEREIN NAMED AND

14  THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION AND

15  SUPERVISION.

16     I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

17  OUTCOME OF THE EVENTS OF THE ACTION.


19  WITNESS MY HAND THIS _15th_ DAY OF

20  _Aug._ , 2006:


23  _____ CSR #7500
         CERTIFIED SHORTHAND REPORTER


79

DALENE COURT REPORTERS

50

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3          I am employed in the County of Los Angeles; I am over the age of eighteen
years and not a party to the within entitled action; my business address is 333 South Hope
4    Street, 48th Floor, Los Angeles, California 90071-1448.

5          On **October 23, 2007**, I served the following document(s) described as
**DECLARATION OF STEPHANIE RENNER IN SUPPORT OF DEFENDANT AND**
6    **COUNTERCLAIMANT LIBERTY MUTUAL FIRE INSURANCE COMPANY'S**
**MOTION TO DISQUALIFY ROXBOROUGH, POMERANCE & NYE FROM**
7    **REPRESENTING PLAINTIFFS** on the interested party(ies) in this action by placing
true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

8
Nicholas P. Roxborough, Esq.
9          Michael L. Phillips, Esq.
Roxborough, Pomerance & Nye LLP
10         5820 Canoga Ave., Suite 250
Woodland Hills, CA 91367

11

⊠    **BY MAIL:**  I am "readily familiar" with the firm's practice of collection and
12         processing correspondence for mailing.  Under that practice it would be deposited
with the U.S. postal service on that same day with postage thereon fully prepaid at
13         Los Angeles, California in the ordinary course of business.  I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or
14         postage meter date is more than one day after date of deposit for mailing in
affidavit.

15

☐    **BY OVERNIGHT DELIVERY:**  I served such envelope or package to be
16         delivered on the same day to an authorized courier or driver authorized by the
overnight service carrier to receive documents, in an envelope or package
17         designated by the overnight service carrier.

18

⊠    **FEDERAL:**  I declare that I am employed in the office of a member of the bar of
this Court at whose direction the service was made.  I declare under penalty of
19         perjury under the laws of the United States of America that the foregoing is true and
correct.

20
Executed on **October 23, 2007**, at Los Angeles, California.
21

22

23                                                            ANDREA J. HERNANDEZ

24

25

26

27

28

W02-WEST:LH4\400453783.2