1  Nicholas P. Roxborough, Esq. (Bar No. 113540)
   Michael L. Phillips, Esq. (Bar No. 232978)
2  ROXBOROUGH, POMERANCE & NYE LLP
   5820 Canoga Ave., Suite 250
3  Woodland Hills, California 91367
   Telephone:    (818) 992-9999
4  Facsimile:    (818) 992-9991
   E-Mail:    npr@rpnlaw.com
5             mlp@rpnlaw.com

6  Attorneys for Plaintiffs/Counter-Defendants, LARGO
   CONCRETE, INC. and N.M.N. CONSTRUCTION, INC.
7

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10 | LARGO CONCRETE, INC., a California | Case No. C07-04651 CRB (ADR)
   | Corporation; N.M.N. CONSTRUCTION, | *The Hon. Charles R. Breyer*
11 | INC., a California Corporation. |
   |  | **DECLARATION OF NICHOLAS P.**
12 |  | **ROXBOROUGH, ESQ. IN OPPOSITION TO**
   | Plaintiffs, | **LIBERTY MUTUAL'S MOTION TO**
13 |  | **DISQUALIFY ROXBOROUGH,**
   |  | **POMERANCE & NYE FROM**
14 | v. | **REPRESENTING PLAINTIFFS**

15 |  | Date:  December 21, 2007
   | LIBERTY MUTUAL FIRE INSURANCE | Time:  10:00 a.m.
16 | COMPANY, a Massachusetts Corporation, | Ctrm:  8
   | and DOES 1 through 100, inclusive. |
17 |  | [Memorandum of Points and Authorities;
   |  | Objections To Evidence Submitted In Support Of
18 | Defendants. | Liberty Mutual's Motion To Disqualify and
   |  | Supporting Declarations Filed and Served
19 |  | Concurrently Herewith]

20 | AND RELATED COUNTERCLAIM | Complaint filed:    September 10, 2007

21

22
       I, NICHOLAS P. ROXBOROUGH, declare as follows:
23
       1.    I am an attorney licensed to practice law in the state of California and am admitted
24
   before this Court. I am a founding partner of Roxborough, Pomerance & Nye LLP, attorneys of record
25
   for the plaintiff Largo Concrete, Inc. and plaintiff and counter-defendant N.M.N. Construction, Inc.
26
   (collectively "Plaintiffs"). I have personal knowledge of the facts set forth below and, if called and
27

28                                          1

1 sworn as a witness, could and would testify competently thereto.

2 **RPN BACKGROUND**

3    2.    I graduated from Town School for Boys in San Francisco in approximately 1970,

4 attended Saint Ignatius High School in San Francisco for one year and graduated from Lowell High

5 School in 1974.  Thereafter, I attended UC Berkeley and the Institute of Europe Studies in Vienna,

6 Austria for my undergraduate studies and Southwestern Law School in Los Angeles, California, for my

7 J.D. I started my own firm in Los Angeles in March, 1985.  My first legal work involving a workers

8 compensation bad faith dispute was in 1985.

9    3.    One of the areas I and my firm specialize in is the unique and recent area of workers'

10 compensation bad faith litigation on behalf of employers against their workers' compensation carriers.

11 We focus on claims mishandling, letters of credit, analysis of reserving, and all issues relevant to the

12 employer/workers' compensation carrier relationship.  Litigating a workers' compensation bad faith

13 case is entirely different than other insurance lines.  These cases involve different insurance policy

14 obligations and procedures; different case law; different individuals within the control group at the

15 insurance company; different types of adjustors and witnesses; different manuals or Best Practices; etc.

16 It is not an overstatement to say that I and this firm started to formally develop the law in this unique

17 area in California from 1992-1999.

18    4.    I was counsel of record for the plaintiffs in the following precedential cases in the area

19 of workers' compensation bad faith claims mishandling: *Courtesy Ambulance Service of San*

20 *Bernardino v. Superior Court* (1992) 8 Cal.App.4th 1504; *Maxon Industries v. State Compensation*

21 *Insurance Fund* (1993) 16 Cal.App.4th 1387; *Security Officers Service, Inc. v. State Compensation*

22 *Insurance Fund* (1993) 17 Cal.App.4th 887; *Tricor v. State Compensation Insurance Fund* (1994) 30

23 Cal.App.4th 230; *McGregor Yacht Corp. v. State Compensation Insurance Fund* (1998) 63 Cal.App.4th

24 448; *Notrica v. State Compensation Insurance Fund* (1999) 70 Cal.App.4th 911; *State Comp. Ins. Fund*

25 *v. Superior Court (Schaefer Ambulance Service, Inc.)* (2001) 24 Cal. 4th 930.  Prior to these cases, there

26 was no developed case law in this unique area of law in California.

27    5.    My firm has never been able to hire an associate who has experience in the area of

28

2

1 | workers' compensation bad faith lawsuits. Therefore, myself and my partners have to engage in
2 | extensive formal and informal instruction and on-the-job training of new associates on how to litigate
3 | these types of California workers' compensation bad faith cases. I have developed training programs
4 | for our associates and require every associate to become familiar with a large RP&N Binder
5 | concerning case law, key terms, insurance policies and key documents in the workers compensation
6 | insurance arena.

7 |      6.     In March of 2004, my firm hired Craig S. Pynes as an associate. Mr. Pynes had been
8 | working previously with other law firms including the law firm of Kern & Wooley for about eight
9 | months. He came to Roxborough, Pomerance & Nye with approximately fourteen years of litigation
10 | experience.

11 |      7.     As expected with all new associates at my firm, it was clear from the interview process
12 | that Mr. Pynes did not know anything about our specialty area of practice. Mr. Pynes was
13 | subsequently trained in prosecuting workers' compensation bad faith cases by my partners and me. I
14 | personally trained Mr. Pynes extensively on both a formal and informal basis. This included
15 | procedures concerning Workers Compensation Manuals or Best Practice Guidelines of either workers'
16 | compensation carriers and/or third party administrators ("TPA"). I also trained him on how to take
17 | depositions of a workers' compensation adjustor. On an informal basis, I provided him on a case by
18 | case basis, further extensive training. At no time did Mr. Pynes ever tell me, suggest or otherwise
19 | indicate that he knew anything about any aspect of workers' compensation bad faith litigation prior to
20 | his employment at RP&N. In fact, just before he started here, I asked him to read all the major cases
21 | that our firm had won successfully on appeal so that he could become familiar with this area of the law.
22 | At the time, Mr. Pynes was unfamiliar with this new area of case law. I also gave him a copy of the
23 | RP&N Binder referenced in ¶ 5.

24 |      8.     For the first two years, Mr. Pynes tenaciously learned this area of the law. This included
25 | imparting upon him approximately 20 years or more of my personal knowledge, experience and
26 | exposure to this unique area of the law in terms of discovery issues, key documents that have to be
27 | obtained, etc. During the course of his training, I stressed to Mr. Pynes, as I do to all my associates, that

28 |

1    in addition to the workers' compensation claim files concerning the injured worker, some of the key

2    documents to be obtained are the carrier or TPA's Claims Manual, Best Practices Guideline, and

3    training documents specific to and mentioning workers' compensation.  At no time did Mr. Pynes ever

4    tell me that he had ever seen any such documents of any insurance company or TPA, etc., concerning

5    workers compensation issues.

6          9.      As I recall, I have been involved in six (6) prior workers' compensation bad faith cases

7    against Liberty. These cases include:  1) *Parvin Manufacturing v. Liberty Mutual Insurance Company*

8    *and Liberty MutualCorporation*, LASC Case No. BC186045; 2)*Faris Bros. v. Liberty Mutual*

9    *Insurance Company*, LASC Case No. BC 217855; 3) *Kimco v. Liberty Mutual Fire Insurance*

10   *Company* , USDC (CA-Central), Case No. 01-927; 4); *RemedyTemp v. Liberty Mutual Fire Insurance*

11   *Company* , USCC (CA-Central), Case No. 04-00385; 5) *Kinecta v. Liberty Mutual Fire Insurance*

12   *Company* (non-litigated case – settled in mediation April 4, 2006); and 6) *Republic Services, Inc v.*

13   *Liberty Mutual Insurance Company*, etal, USDC (KY-Eastern), Case No. 03-494.

14         10.     *Parvin* was a *Business & Professions Code*, sec. 17200 ("UCL") representative action

15   against Liberty Mutual Insurance Company based upon their misallocation of certain workers'

16   compensation expenses associated with defense medical-legal examinations. *Faris Bros*. was a class

17   action lawsuit we filed against Liberty Mutual Insurance Company (Liberty Mutual) in approximately

18   1996. It settled in 2001 for approximately $2 million. It was also based upon Liberty's misallocation of

19   expenses associated with workers compensation defense medical-legal examinations, the affect of

20   which was to artificially raise California employers' experience modification factor and consequently,

21   their future workers compensation premiums. While a bad faith lawsuit, and one that settled on a class

22   wide basis, that matter did not require me to request claims manuals from these defendants'.

23         11.     In August, 2001, our firm filed the *Kimco* matter. Myself and my current partner

24   Michael Adreani were the primary attorneys handling that litigation.  In that matter, I recall receiving

25   from counsel for Liberty Mutual Fire Insurance, ("Liberty Fire") a copy of their workers'

26   compensation Best Practices Guidelines.  When that matter settled to final conclusion, those Best

27   Practices Guidelines, and indeed all documents produced under a Protective Order relative to that case,

28

1   were either discarded, destroyed or possibly returned to counsel for Liberty. Kern & Wooley was, at

2   some point in time, counsel of record in the Kimco case. Again, they were subbed out during the

3   litigation. Liberty Fire's Best Practice documents were very similar to standard Best Practices that

4   other carriers and TPA's in the industry utilize. As I recall, there was generally very little, if anything,

5   that was unique about Liberty Fire's Best Practice Guidelines. Attached hereto as Exhibit "A" is a true

6   and correct copy of Best Practice Guidelines that one can get as a matter of public record on a website.

7   These Best Practices are from a national claims expert, Doug McCoy who I deposed in the Republic

8   Services action. Mr. McCoy was the Defendants' claims expert in that case and several other cases.

9   Generally, the areas covered in these Best Practices areas are typical of the areas covered by most

10  workers' compensation claims Best Practices Guidelines in the industry.

11          12.    In my 20 plus years of experience in the workers' compensation bad faith arena, I have

12  seen "Manuals", "Guidelines", or "Workers' Compensation Best Practices" from most, if not all of the

13  major workers' compensation carriers and TPA's doing business in California. I saw these documents

14  in detail many years before Mr. Pynes came to work for me specifically, or Roxborough, Pomerance &

15  Nye, generally. I have deposed over 100 adjustors, claims supervisors, workers' compensation claims

16  managers, and individuals identified as the most knowledgeable person at either the insurance carrier

17  or the TPA on the subject of these workers' compensation guidelines and/or workers compensation

18  claims handling issues.

19          13.    Neither I nor my partners needed to hire Craig Pynes in March, 2004, to know that

20  Liberty Fire had a document concerning their workers compensation Best Practices that they gave to

21  their adjustors on how to handle workers compensation claim files. Indeed, prior to Craig Pynes being

22  employed by Roxborough, Pomerance & Nye, Mr. Adreani and I had already undertaken investigations

23  concerning the potential lawsuit involving *Remedy Temps v. Liberty Fire.* That lawsuit was filed a

24  matter of days after Mr. Pynes joined the law firm. As in the *Kimco* case, we sent out our firm's

25  discovery requesting not only the workers' compensation claim files that Liberty Fire possessed

26  concerning Remedy Temp's workers' compensation claims, but also a request for their "Manuals", etc,

27  concerning how they train their workers' compensation adjustors. We received numerous "versions"

28

1  of these "manuals" which were referred to as "Best Practice" guidelines. At no time has Craig Pynes

2  had any involvement in the *Remedy Temp* case and he will have no involvement in the upcoming

3  arbitration that is currently scheduled for January 16, 2008. That arbitration hearing is being conducted

4  by Mr. Adreani and myself in front of the honorable Justice Panelli. Ironically, Liberty Fire has not

5  filed a motion to disqualify our firm in that case. RP&N has multiple versions of the six pages or less

6  Liberty Fire's Best Practice Guidelines. However, those documents are covered by a Protective Order.

7  I would be happy to make a copy available to this court if Liberty Fire will waive the terms of the

8  Protective Order. To date, their counsel has refused RP&N's request to do so.

9      14.    In 2006, on the Remedy Temp case, I met and spoke with William Cupelo who

10  represented himself to be a high ranking employee for "Liberty". Mr. Cupelo and I had, I believed,

11  developed a relationship during one of the mediations of the *Remedy Temp* case. In fact, with the

12  written consent of Liberty Fire's outside counsel on *Remedy Temp*, Mr. Cupelo had been dealing

13  <u>directly</u> with both me and Mr. Adreani at various times, on the *Remedy Temp* case. Interestingly

14  enough, at no time during the course of the *Remedy Temp* matter has Mr. Cupelo, or <u>anyone</u> else on

15  behalf of any Liberty entity informed me of any concerns regarding any conflict of interest based on

16  Craig Pynes' employment with our firm. Indeed, no Liberty entity has ever filed a motion to disqualify

17  our firm in that case, even though that case has been handled by our firm for almost four years.

18                           **RPN'S INVOLVEMENT IN THE KENTUCKY CASE**

19      15.    In or about April, 2006, I was formally asked to come in as pro-hac-vice counsel in the

20  *Republic Services case* matter which is discussed, in part, in Liberty Fire's motion to disqualify. At the

21  time, a trial date had already been set, there was a discovery cut-off in place, yet a tremendous amount

22  of discovery, percipient depositions and expert depositions needed to be done in that case in a very

23  short time frame.

24      16.    Our firm was specifically brought into the *Republic* matter based on our specific, unique

25  and specialized expertise in the area of workers' compensation bad faith claims mishandling. At the

26  time, Kentucky counsel had already received from the various Liberty defendants, Best Practice

27  Guidelines. I recall those guidelines being virtually identical, or very similar, to some of the ones I saw

28

1 | in the *Kimco* and *Remedy Temp* cases.

2 |     17.    Given the very short period of time remaining before trial, it was necessary for me to
3 | have at least two extremely knowledgeable and senior litigators assisting in the deposition and
4 | discovery process. One of them was Michael Adreani, my partner. Mr. Adreani and I agreed that
5 | Craig Pynes would be the logical choice to assist on some depositions' in California on short notice
6 | because Mr. Pynes had not only been working extensively in this area with Mr. Adreani, Mr.
7 | Pomerance and myself, but additionally had, in January/February, 2006, successfully tried with Mr.
8 | Adreani and I, a case against a national workers' compensation carrier in an eleven day arbitration.
9 | Because of the successful work that Mr. Pynes did in these workers' compensation bad faith cases for
10 | our clients', Mr. Pynes as asked to work with Michael Adreani and I on the *Republic* case which he did
11 | for approximately three or four months.

12 |     18.    Around late July/early August, 2006, I heard from lead counsel in Kentucky, McBrayer,
13 | McGinnis, Leslie & Kirkland, that Liberty was making a motion to disqualify our firm in the *Republic*
14 | matter because of Mr. Pynes. The law firm that took the lead in filing the opposition was McBrayer,
15 | McGinnis, Leslie & Kirkland. Our firm round-tabled and discussed arguments, suggestions, and
16 | detailed theories with the McBrayer Firm, many of which ultimately were either not used or modified
17 | by lead counsel in Republic Services opposition to Defendants' Liberty's motion to disqualify. At the
18 | time, they said they did not think much of Defendants' chances of succeeding on their motion to
19 | disqualify our firm.

20 | ## ETHICAL WALL

21 |     19.    Upon receiving the Kentucky court's Order in the *Republic* matter, disqualifying our
22 | firm, I was shocked. However, I immediately constructed an ethical wall within the firm to isolate Mr.
23 | Pynes from any cases that did involve, or potentially could involve any Liberty entity.

24 |     20.    On December 11, 2006 I authored and delivered a memorandum to Craig Pynes that
25 | instructed him not to perform any work on any matter that involved Liberty Mutual. Attached hereto
26 | as Exhibit "B" is a true and correct copy of this memorandum. At the time, we only had one Liberty
27 | case, the *Remedy Temp* case, which only Mr. Adreani and I were handling against Liberty Fire.

28 |

21.    Karen Gitchen was hired by our firm in March, 2006 and left after her one year anniversary, in March, 2007.  Unlike Craig Pynes, it was my understanding that she had some involvement in a workers' compensation bad faith case, specifically the *Remedy Temp* case at Kern & Wooley.  Although we understood her role on that case to have been of a junior associate, with no deposition involvement, a condition of her employment with our firm was that she could not work on any Liberty cases while employed in our office.  Accordingly, when she came here, she had no involvement whatsoever in the Remedy Temp case. Her office was the very last office at the furthest end of the corner of the hall.  At no time did Ms. Gitchen and I, or to my knowledge anyone else in my firm, ever discuss anything about Liberty generally or the *Remedy Temp, Republic* or *Kinecta* cases specifically with Karen Gichtin.

22.    The only cases my firm has prosecuted against any Liberty entities have been workers' compensation bad faith claims mishandling cases or representative actions dealing with specific workers' compensation issues.  Since Craig has worked at RP&N, I am unaware of our firm having filed any non-workers' compensation bad faith lawsuits against any insurance entity with the name Liberty in it ("Liberty").  The only active cases against a Liberty entity that we have handled since receiving the Kentucky Court's Order in the *Republic* matter have been *Remedy Temp* and the *Largo* case and the only attorneys who have worked on these two cases are myself, my partner Michael Adreani, and my associate Michael Phillips.  Both cases are against Liberty Fire. As I have done in the past with any associates who worked on a Liberty case, since Craig has been here, I instructed Mr. Phillips that Mr. Pynes is to have no involvement or access to the *Remedy Temp* or *Largo* cases.

### A WORKERS COMPENSATION CLAIM FILE IN CALIFORNIA

23.    I have prosecuted numerous workers ' compensation bad faith claims mishandling matters and class actions against the major workers' compensation insurance carriers and TPA's. In most, if not in all of these cases, I requested, and received, through discovery, or voluntarily, the employee workers' compensation claims files from the carrier or TPA.

24.    I have deposed over one hundred, if not more, workers' compensation claims adjustors, supervisors and claims managers.  I have also deposed and cross examined, at trial, the workers

8

DECLARATION OF NICHOLAS P. ROXBOROUGH, ESQ. IN OPPOSITION TO LIBERTY MUTUAL'S MOTION TO DISQUALIFY- Case No. C07-04651 CRB (ADR)

compensation claims experts that have been retained by TPA's and carriers. I provide training to my associates on how to take these depositions and what to look for in a workers' compensation claim file. I have given speeches on numerous occasions throughout California, on all subjects of workers' compensation, including an employer's right to audit the manner in which their workers' compensation carrier or TPA has handled their claim files.

25.    The workers compensation claim file is basically the TPA or the carrier's record of whether or not they did what they are required to do under the law, according to industry practice, and/or their Best Practices. The information contained in these files contains no information regarding a civil law firm's strategies on how to defend the carrier or TPA in workers' compensation bad faith claims mishandling cases.

26.    Since I have been practicing in this area, I cannot remember a single time ever seeing, learning or hearing about any third party administrator or any workers compensation carrier filing in a workers' compensation claim file any of their internal documents that discuss or have anything to do with a law firm, such as Kern & Wooley's, strategies or "trade secrets" for defending carriers against claims of workers' compensation bad faith.

27.    A workers' compensation claim file simply contains the adjustor's notes, the medical records concerning the nature and extent of a worker's injury, whether the file had been investigated or not, whether the insured was defended in the action, records regarding payments of medical bills, medical liens, etc. Many of the records are indeed a matter of public record at the workers compensation appeals boards throughout California.

28.    There is absolutely nothing confidential in a workers' compensation claim file in terms of a carrier or third party administrator's strategies of defending itself against allegations of workers' compensation bad faith claims handling practices. What can be confidential is medical information concerning the injured worker that is unrelated to the worker's claim for workers' compensation benefits.

29.    In or about 2003, at the request of Senator Mountyjoy's office, I testified before the California Legislature concerning California employers' need to gain full and complete access to their

1 | workers' compensation claim files in order to be able to reasonably and accurately audit whether a
2 | workers' compensation carrier or TPA properly and reasonably administered their workers'
3 | compensation claim files.

4 | 30.    Effective January 1, 1995, Labor Code Section §3762 was passed by the Legislature.
5 | Over the last twelve years, amendments have been made to Labor Code Section §3762. The primary
6 | focus of these amendments has been to ensure that the employer does not see any highly sensitive
7 | medical information that is unrelated to the workers' compensation claims being made by the injured
8 | worker. As a consequence, when receiving workers' compensation claim files, from carriers or TPA's,
9 | our firm typically receives privilege logs. These privilege logs typically identify information that is
10 | being withheld for purposes of privacy of the injured worker or unrelated medical information.

11 | 31.    For example, in the *Kimco* and *Remedy Temp* cases, we received workers' compensation
12 | claim files from Liberty Fire. The contents were typical of what I have seen over the last twenty years
13 | in workers' compensation claim files. We also received privilege logs from Liberty Fire. The privilege
14 | log in Remedy Temp was received when Craig Pynes was employed by Roxborough, Pomerance &
15 | Nye.  A true and correct copy of the privilege log prepared by Kern & Wooley in the *Remedy Temp*
16 | case is attached hereto as Exhibit "C". The attached privilege log represents similar privacy redactions
17 | that I recall seeing in the *Kimco* case.

18 | 32.    As this honorable court can see, I did not learn anything about what Liberty Fire redacts
19 | in workers' compensation claim files from Mr. Pynes- I learned it from Liberty Fire and their retained
20 | civil litigation counsel, in the *Kimco* and *Remedy Temp* cases.

21 | 33.    Mr. Pynes has never provided me, or volunteered to provide me with any information
22 | regarding "alleged" internal strategies or policies used by Kern & Wooley or Liberty in defending
23 | workers' compensation insurance bad faith claims mishandling matters.

24 | 34.    Attached hereto as Exhibit "D" is a true and correct copy of the Alameda County
25 | Superior Court docket sheet in the *Tony's Fine Foods v. Liberty Mutual Insurance Co.* matter bearing
26 | case number 2002067108. The named defendants in the *Tony's Fine Foods* matter is Liberty Mutual
27 | Insurance Company and Liberty Mutual Corporation, while the named defendant in Largo is Liberty

28 |

Mutual <u>Fire</u> Insurance Company. In addition, I have reviewed the pleadings identified on this docket sheet and determined that neither Ms. Yee nor Lisa Kralik Hansen's name appear on any of the listed pleadings and the only pleading executed by Ms. Hansen was the Notice of Ex Parte Application and Ex Parte Application for an Order Staying the Action by Stipulation. Although this document was executed by Ms. Hansen, her name does not appear as attorney of record; it appears she executed the pleading simply on behalf of Susan Olson.

35.    Attached hereto as Exhibit "E" is a true and correct copy of pertinent portions of the transcript of the Deposition of Susan Olson that I took on November 16, 2007.

36.    Attached hereto as Exhibit "F" is a true and correct copy of pertinent portions of the transcript of the Deposition of Melodee Yee that I took on November 16, 2007.

37.    Attached hereto as Exhibit "G" is a true and correct copy of pertinent portions of the rough ASCI transcript of the Deposition of Lisa Kralik Hansen that I took on November 27, 2007.

38.    Attached hereto as Exhibit "H" is a true and correct copy of Ms. Olson's June 18, 2003 declaration in support of a stay in the Tony's Fine Food's case which I obtained as part of our docket search. In her declaration, Ms.Olson confirms that she is appearing on behalf of "Liberty Insurance Corporation and Liberty Mutual Insurance Company (erroneously sued and served as Liberty Insurance Company)." Neither are parties to the herein Largo action.

I declare under perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct.

Executed this _30TH_ day of November, 2007 at Woodland Hills, California.

NICHOLAS P. ROXBOROUGH

DECLARATION OF NICHOLAS P. ROXBOROUGH, ESQ. IN OPPOSITION TO LIBERTY MUTUAL'S MOTION TO DISQUALIFY- Case No. C07-04651 CRB (ADR)





Home

About Doug McCoy

Expert Testimony

Articles & Manuals

Speeches

Helpful Links

**McCoy Consulting, Inc.
Contact Information**

Mailing Address
P. O. Box 491540
Lawrenceville, Georgia
30049

Shipping Address
1000 Hurricane Shoals Rd
Bldg A, Suite 160
Lawrenceville, Georgia
30043

678-407-1663 phone
770-962-8120 direct
770-963-7678 fax

Email Address
doug@mccoy.net

©2001 Robert Holmes'
CI Development

*You are Visitor*
**1 7 0 5 6**

# Workers Compensation Best Practices

**Supervision** - The supervisor plays a pivotal role in assuring quality claim management. Supervisors focus on managing, coaching and evaluating the performance of others. They provide technical expertise, recognize improvement opportunities and ensure the files are properly documented.

**Coverage** - It is important that policy coverage be verified before benefits are extended. Proper verification and interpretation of coverage can avoid estoppel from asserting coverage defenses, inability to recover payments made in error and unnecessary time and expense expended in attempted recovery of improper payments.

**Notice/Assignment** - The early receipt of an injury notice with early assignment to appropriate claim handlers is essential to realize savings through early intervention with establishing contact with all parties to the claim, conduct thorough and accurate investigations and manage the medical and disability aspects of the claim to an early resolution.

**Contact** - Initial and subsequent contact sets the foundation of claim management. Contact initiates claim communication with all concerned parties. The information gathered from contact provides direction for further investigation and case management.

**Investigation** - A thorough investigation is cost effective and has tremendous leverage in all phases of claim management. Investigation is the cornerstone of claim management. It requires timely and thorough fact gathering, which makes claim management possible. Claims involving compensability and recovery potential should have an investigation performed and file documentation addressing the exposure and outlining the future course of action.

**Reserving** - Reserves or estimates must reflect the claim handler's best judgment of the probable ultimate pay-out of the claim at any point in time. Estimates are the result of evaluation of all key areas of development of a claim. Each aspect of a claim; indemnity, medical and expense, should be evaluated on its merits and be continually updated and refined.

**Disability Management** - Efforts to shorten the length of

time between the date of disability and the date the injured worker returns to gainful employment or the date of claim resolution. When the need for disability management is not recognized promptly, it can result in prolonged disability payments.

**Medical Management** - There is substantial economic opportunity in medical management. The claim handler should be actively involved in the medical management process. The claim handler coordinates with the employer, medical provider and any nurse case manager that may be assisting with the management of the medical aspects of a claim.

**Medical Cost Containment** - The concept of managed care, provider networks and utilization management are critical to reduce claim costs. The claim handler should take advantage of existing cost containment programs and explore and utilize new and innovative programs.

**Recovery** - There are substantial savings to be realized through recognition and pursuit of recovery opportunities including subrogation and second injury funds. Recovery is an essential part of proper claim handling. The recognition and timely handling and pursuit of claims involving recovery potential is important to maximize recovery.

**Litigation Management** - The claim handler's litigation management strategies should be to 1.) prevent litigation 2.) resolve litigation timely 3.) manage litigation activities 4.) manage legal/defense costs.

**Data Management** - The accuracy of the data fields is extremely important when a claim manager uses artificial intelligence to establish reserves or perform other predictors for file management or loss prevention.

**Claim Resolution** - The majority of claims are concluded by payment of statutory benefits. Frequently medical or disability management is utilized to return the injured worker to employment. There are some claims that cannot be resolved through such efforts and require lump sum settlements. A claim handler's responsibility is to manage claims. Timely file closure results in cost reduction to clients.



# I N T E R

# O F F I C E

# MEMO

| To: | **CSP** | cc: **Partners, File** |
| --- | --- | --- |
| **From:** | **NPR** | |
| **Subject:** | **Republic Services** | |
| **Date:** | **December 11, 2006** | |

The partners recently met in light of the Kentucky decision and have decided that as we did with Karen Gichtin, we are following the same policy of putting a wall around you concerning any future Liberty cases in the office.

Craig, please note that this is not a reflection on anything you have done. In fact, the partners intellectually and otherwise, firmly believe that the Kentucky Judge is just flat out wrong. Legally, the cases he cited bore no reasonable relationship to the four hours of work you apparently did on a Liberty workers' comp case which seems to have involved only redacting the names and social security numbers of claimants. You've never shared anything whatsoever with us in terms of your short period of time at the Kern & Wooley law firm concerning Liberty, or for that matter, any of their other clients.

Our clients' have had an extremely unfortunate relationship with Liberty who seem to always use a scorched earth tactic when Liberty's policyholders question Liberty's conduct. Mike and I have known about this long before you ever joined the firm. Nevertheless, we wanted to make sure that you understood that we feel we have no choice but to make sure you are not involved in any Liberty or Liberty related cases. Fortunately, there is plenty of other work to do in the firm, so that won't be a financial problem whatsoever.



**RemedyTemp v. LMFIC**
Claim Files

(K&W File No.: 700-18147)

**REDACTED DOCUMENTS FROM CLAIMS FILES**

Dated: September 3, 2004

1 = Personal identifying info prohibited by statute
2 = Unrelated medical info prohibited by statute

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 16828; 16837-39; 16843; 16850; 16854-55; 16858; 16861-64; 16867; 16870-71; 16873; 16879; 16883; 16887; 16897; 16902; 16904-06; 16925; 16927; 16930; 16933-35; 16939-41; 16985; 17009-11; 17019; 17023; 17072-73; 17084; 17087; 17095; 17098; 17100; 17106-08; 17129-30; 17137; 17141; 17150-51; 17154; 17160 | Various | Documents re Ricardo Coria with personal identifying information | 1 |
| Various | 16866; 16913; 16961; 17019-20; 17024-25; 17040 | Various | Documents re Ricardo Coria with unrelated medical information | 2 |
| Various | 17164-66; 17175; 17191; 17212; 17221-22; 17248; 17255; 17287; 17289; 17292; 17303; 17322; 17347; 17350; 17363; 17379; 17389; 17391; 17405-08; 17412; 17416; 17419; 17424-27; 17458-59; 17498; 17502; 17504; 17519; 17521; 17529-30; 17577-79; 17597; 17601 | Various | Documents re Georgina Anderson with personal identifying information | 1 |
| Various | 17188; 17223; 17227; 17249; 17257; 17294; 17311; 17333; 17350; 17430-31; 17500; 17511; 17515; 17544 | Various | Documents re Georgina Anderson with unrelated medical information | 2 |
| Various | 17606-08; 17610; 17612-16; 17618-21; 17623-27; 17630; 17639; 17647; 17650-53; 17665-66; 17668-69; 17671-74; 17677; 17679-80; 17684-86; 17695-97; 17699-700; 17702; 17709; 17716; 17724-25; 17732-49; 17864-66; 17887-89 | Various | Documents re Rosalia Vargas with personal identifying information | 1 |
| Various | 17656; 17689; 17704; 17718; 17632; 17641; 17657 | Various | Documents re Rosalia Vargas with unrelated medical information | 2 |
| Various | 21475; 21641-42; 21681-82; 21564; 21775; 21782; 21794; 21796; 21809; 21812; 21817; 21820-21; 21928; 21930; 22063-64; 22072-81; 22089; 22101-03; 22105; 22107-10; 22112; 22113 | Various | Documents re Jennifer Cruz with personal identifying information | 1 |
| Various | 21488; 21491-92; 21495; 21512-13; 21527; 21529-30; 21543; 21562; 21580-82; 21611; 21739; 21753; 21822-23; 21920; 21924; 22060; 22065; 22069; 22097 | Various | Documents re Jennifer Cruz with unrelated medical information | 2 |

577.1

REMEDYTEMP v. LMFIC
C&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 30317; 30606; 30189-90; 30201; 30203; 30209; 30211; 30215-16; 30218; 30220; 30222; 30225; 30229; 30231-32; 30236; 30245; 30247; 30254; 30255; 30247; 30259-60; 30264; 30268; 30271; 30273-74; 30278; 30280; 30282; 30284; 30287-88; 30293; 30295; 30297-99; 30302-05; 30307; 30310-11; 30313-14; 30318-23; 30576-77; 30604-05; 30620; 30634-35; 30639-40 | Various | Documents re Lam Nguyen with personal identifying information | 1 |
| Various | 30575-77 | Various | Documents re Lam Nguyen with unrelated medical information | 2 |
| Various | 28438; 28440; 28451-52; 28455-56; 28459-61; 28463; 28465; 28467-68; 28474-75; 28477-81; 28483-93; 28496; 28498; 28502-03; 28507-09; 28512; 28516; 28518-19; 28522-23; 28526; 28529; 28532; 28535; 28537; 28540; 28542-43; 28546-47; 28550-51; 28554-56; 28558; 28560-61; 28565; 28569; 28574-77; 28580; 28583-84; 28587; 28590; 28593; 28596; 28599-602; 28618; 28623; 28631; 28652; 28728; 28722; 28731; 28767-68; 28770; 28786; 28822-23; 28829; 28832-33; 28835; 28838; 28840-41; 28843; 28849; 28852-53; 28856; 28868; 28871; 28877-85; 28887-903; 28905-10; 28959-87; 28990; 28992; 28994; 28996; 29003; 29006; 29009; 29012; 29015; 29018; 29020; 29023; 29026; 29029; 29033; 29036; 29039; 29042; 29045; 29050-51; 29053; 29081-85; 29089; 29091; 29093-95; 29097-100; 29105; 29111; 29113; 29115-18; 29139; 29151; 29169; 29174; 29177; 29183; 29187; 29191; 29204; 29206; 29215; 29235; 29242; 29246; 29256-58; 29260-62; 29269; 29275; 29282; 29291; 29293-94; 29313; 29330; 29332; 29334; 29336; 29338; 29340; 29342; 29344; 29354-55; 29357; 29359; 29362; 29366; 29376; 29380-81; 29385; 29387-88; 29401; 29054; 29056-57; 29059-61; 29068; 29072-74; 29252 | Various | Documents re Deborah Fuentes with personal identifying information | 1 |
| Various | 28443; 28643; 28658-59; 28737; 28743; 28753-54; 28760; 28792; 29077; 29078; 29193; 29194; 29218-20; 29249-53 | Various | Documents re Deborah Fuentes with unrelated medical information | 2 |

- 2 -

8577.1

REMEDYTEMP v. LMFIC
&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/PROTECTION |
|---|---|---|---|---|
| Various | 29450-52; 29497; 29543; 29632; 30092; 30142; 29409-10; 29414; 29423-24; 29426; 29429; 29438-39; 29448-49; 29454; 29457; 29461; 29468-69; 29483-84; 29496; 29498; 29501-02; 29504-05; 29508-09; 29517; 29520; 29524; 29531-32; 29534; 29540; 29544; 29550; 29555; 29557; 29560; 29564; 29567; 29568; 29577; 29583; 29585; 29595; 29601; 29605; 29608; 29615; 29619; 29621; 29634; 29636; 29637; 29644; 29648; 29650; 29653; 29659; 29662; 29666; 29672; 29683; 29687; 29693-95; 29697-99; 29711; 29718; 29730; 29735; 29736; 29739-40; 29745; 29748; 29750-52; 29754; 29762-65; 29767-69; 29771-72; 29774; 29776-77; 29779; 29791; 29793-94; 29804-05; 29809; 29813-18; 29821-22; 29833; 29836-37; 29842-47; 29851; 29871; 29883; 29893; 29895; 29899; 29906; 29913; 29920; 29946; 29948; 29952-53; 29959; 29983; 29999-30000; 30022; 30060; 30066; 30072; 30090; 30093; 30095-96; 30101-03; 30110; 30114; 30155; 30163; 30165; 30167; 30169; 30184 | Various | Documents re Rebecca Lopez with personal identifying information | 1 |
| Various | 29416; 29444; 29528; 29565; 29569-70; 29609-10; 29623-24; 29638-39; 29654-55; 29667-68; 29690; 29741; 29801; 29865; 29999-30000; 30003; 30026; 30126; 30136; 30146; 30171 | Various | Documents re Rebecca Lopez with unrelated medical information | 2 |
| Various | 27478-79; 27481-82; 27492; 27500-02; 27506; 27515-16; 27519; 27525; 27527; 27538; 27540; 27542; 27549; 27552; 27554-56; 27560; 27566-67; 27573; 27591-95; 27600; 27616; 27623; 27625; 27633; 27649; 27655; 27657-59; 27673; 27680; 27685; 27688; 27693; 27700-01; 27704; 27711; 27716; 27734; 27738; 27742-43; 27751-52; 27772; 27800; 27813-14; 27818; 27821; 27831; 27836; 27844-48; 27850-52; 27854-55; 27858-59; 27864; 27866; 27869-70; 27875; 27895; 27898-99; 27902-03; 27907; 27909-10; 27917; 27919; 27930; 27932; 27937; 27939; 27946; 27955-56; 27981-82; 27997; 28006; 28008; 28011; 28026; 28028; 28031; 28037; 28049; 28051; 28055-56; 28079; 28081; 28086; 28089; 28101-02; 28111; 28122; 28132-33; 28137-38; 28142-43; 28152; 28157; 28163-64; 28166; 28168-70; 28174; 28176; 28186; 28216-17; 28244; 28249-51; 28253; 28255-56; 28260-61; 28263; 28266; 28273; 28285; 28289; 28293-94; 28299-300; 28303-04; 28315; 28321-22; 28330-32; 28338; 28376-81; 28383-86; 28388-90; 28393-406; 28410; 28412; 28414-16; 28424; 28428-29 | Various | Documents re Valerie Maddox with personal identifying information | 1 |
| Various | 27495; 27548; 27773; 28123; 28229; 38403-04; 38410; 38438-39; 38441; 38468 | Various | Documents re Valerie Maddox with unrelated medical information | 2 |

577.1

REMEDYTEMP v. LMFIC
C&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 17909; 17911; 17920; 17923-25; 17928; 17931; 17934; 17937; 17940; 17943; 17947; 17950; 17987; 17990-93; 17996; 17999; 18003-04; 18010; 18012; 18016; 18019; 18021; 18026; 18033; 18041; 18045; 18062; 18066; 18068-69; 18085; 18089; 18116; 18128; 18132-34; 18137; 18140; 18143; 18146; 18149; 18152; 18156; 18159; 18166; 18175; 18181; 18259; 18262; 18265; 18268; 18272; 18189-91; 18193; 18207; 18215-16; 18225; 18227; 18229; 18232; 18235; 18239; 18245; 18246; 18249; 18252; 18278; 18283-84; 18303; 18307; 18313; 18315; 18317; 18319; 18322-23; 18326-27; 18330; 18334; 18375; 18378; 18381; 18384; 18420-21; 18445; 18448; 18460; 18480; 18570; 18597-98 | Various | Documents re Robley Emerson with personal identifying information | 1 |
| Various | 17955; 17951; 18000; 18005; 18115; 18160; 18164; 18187; 18275; 18287; 18304; 18308; 18423; 18507 | Various | Documents re Robley Emerson unrelated medical information | 2 |
| Various | 19126; 19131; 19142; 19163; 19166; 19167-74; 19178-79; 19188; 19192; 19199-200; 19207; 19215; 19220; 19231; 19244; 19256-57; 19259-61; 19271-72; 19282; 19287; 19299; 19311; 19315; 19320-23; 19335; 19337-39; 19341; 19343; 19346; 19362; 19364; 19366-67; 19380; 19382-83; 19407; 19422-23; 19446; 19451-52; 19468-69 | Various | Documents re Maria Aranda with personal identifying information | 1 |
| Various | 19144; 19182; 19194; 19223; 19288 | Various | Documents re Maria Aranda with unrelated medical information | 2 |
| Various | 26351; 26403; 26041; 26049; 26053-54; 26061-63; 26070; 26072-74; 26076; 26078-85; 26099-100; 26108-19; 26137-56; 26170-70; 26195; 16201; 26210; 26212; 26219; 26222; 26225; 26228; 26236; 26238-39; 26242; 26246; 26255; 26257; 26263-65; 26268-71; 26290; 26326; 26330; 26346; 26350; 26357; 26372-74; 26376; 26383-86; 26388; 26390; 26410; 26412; 26418; 26420; 26422; 26424; 26447; 26449 | Various | Documents re Jose Maldonado with personal identifying information | 1 |
| Various | 26248; 26917-18; 26921; 26927; 27078; 26203; 38478-79; 38485-86 | Various | Documents re Jose Maldonado with unrelated medical information | 2 |
| Various | 26614; 26624-25; 26655; 26812; 26820; 26897; 26901; 26905; 26909; 26913-14; 26920; 16926; 26936; 26941; 26945; 26947; 26983-85; 26987; 26990; 26994; 26996; 27000 | Various | Documents re Alvin Brown, Sr. with personal identifying information | 1 |
| Various | 26616; 26657; 26683; 26689-90; 26703; 26749-64; 26822-23; 26916 | Various | Documents re Alvin Brown, Sr. with unrelated medical information | 2 |

- 4 -

8577.1

REMEDYTEMP v. LMFIC
K&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 27024; 27044-45; 27269-70; 27296; 25934; 25958; 25966; 25973; 26018; 26020; 26028; 26034; 27061; 27075; 27077; 27098; 27120; 27127; 27151; 27226; 27267-68; 27271-74; 27291-92; 27297; 27316; 27325; 27354; 27378; 27387; 27394; 27442 | Various | Documents re Maria Flores with personal identifying information | 1 |
| Various | 27024; 27027; 27093; 27095; 27195 | Various | Documents re Maria Flores with unrelated medical information | 2 |
| Various | 18605-09; 18612-14; 18626-30; 18633-34; 18638-44; 18653-54; 18656; 18661; 18663; 18665-66; 18669; 18671; 18674-75; 18706-10; 18713; 18718; 18740; 18756; 18761-62; 18767; 18769; 18777; 18784; 18789; 18792; 18794; 18801; 18804; 18812; 18816-17; 18832; 18856; 18869; 18873; 18875; 18878; 18883; 18907; 18972; 18977; 18986; 18998-005; 19010-011; 19027; 19054; 19057; 19059-61; 19068; 19070; 19076; 19079; 19115 | Various | Documents re Maria Quintana with personal identifying information | 1 |
| Various | 18817-18 | Various | Documents re Maria Quintana with unrelated medical information | 2 |
| Various | 14217; 14219-61; 14264-69; 14272-73; 14282-83; 14288-93; 14296-99; 14302-03; 14306-58 | Various | Documents re Raul Lozano with personal identifying information | 1 |
| Various | 16349; 16538; 16555; 16575; 16577; 16579; 16581; 16586; 16600-01; 16604-06; 16619-20; 16622-23; 16627; 16634; 16636; 16653; 16661; 16733; 16671-72; 16702; 16726; 16729 | Various | Documents re Manuel Osorio with personal identifying information | 1 |
| Various | 16437; 16446; 16471; 16505; 16520; 16567; 16700; 16702-04 | Various | Documents re Manuel Osorio with unrelated medical information | 2 |
| Various | 25719; 25776; 25782-83; 25833-34; 25816; 25634; 25702; 25844; 25853; 25856; 25889-90; 25892 | Various | Documents re Maria Flores with personal identifying information | 1 |
| Various | 25857; 25862; 25870 | Various | Documents re Maria Flores with unrelated medical information | 2 |

- 5 -

8577.1

**REMEDYTEMP v. LMFIC**
**K&W File No.: 700-18147**
**PRIVILEGE LOG**

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 11617-19; 11626-35; 11652; 11654; 11656; 11660-61; 11666-71; 11704-10; 11712-17; 11719-24; 11726; 11728-30; 11735; 11737; 11739; 11741; 11744; 11748; 11750; 11757-58; 11760; 11763; 11767-71; 11774; 11776; 11781; 11784-85; 11787; 11791; 11798; 11801; 11810; 11817-18; 11821-25; 11843-44; 11853; 11855-56; 11858; 11912; 11921; 11924; 11942-43; 11974-75; 11982-83; 11996; 12054-57; 12067; 12073-76; 12088; 12090; 12093-95; 12119; 12124-25; 12128; 12133; 12145-46; 12149; 12158; 12166; 12173-75; 12182-91; 12208; 12210; 12212; 12216-17; 12222-26; 12262-67; 12269-82; 12284-86; 12288-90; 12295; 12297; 12299; 12301; 12304; 12308; 12310; 12317-19; 12323; 12327-31; 12334; 12336; 12341; 12344; 12358; 12374; 12374-A; 12377-78; 12381-85; 12403-04; 12413; 12415-16; 12418; 12473; 12482-83; 12501-02; 12517; 12533-34; 12541; 12556; 12615-18; 12628; 12634-37; 12649; 12651; 12657-59; 12660; 12665-86; 12688; 12690; 12695; 12707-08; 12710; 12715; 12720; 12728 | Various | Documents re Tomas Gutierrez with personal identifying information | 1 |
| N/A | 11638 | N/A | Document re Tomas Gutierrez with unrelated medical information | 2 |
| Various | 16362; 16372; 16382; 16384-85; 16387; 16390; 16394; 16401; 16408-09; 16413-14; 16416; 16426; 16435; 16444; 16452; 16467; 16469; 16492; 16495; 16502-03; 16509; 16511; 16517; 16519; 16525; 16528; 16530; 16532; 16534-35 | Various | Documents re Manual Osorio with personal identifying information | 1 |
| Various | 16341; 16351; 16417; 16427; 16437; 16446; 16520-21 | Various | Documents re Manuel Osorio with unrelated medical information | 2 |
| Various | 15931; 15944; 15954; 15983; 15986; 16007; 16059; 16080-81; 16092; 16100-03; 16107-08; 16110-12; 16216; 16225; 16301; 16318; 16328; 15775-76; 15784-91; 15796-801; 15803; 15822-23; 15825-31; 15833-34; 15836-37; 15839-43; 15845-47; 15851-52; 15855; 15873-74; 15888; 15890; 15906-07; 15912; 15916; 15918; 15921; 15926; 16072; 16332; 16334; 16336 | Various | Documents re Duane Beaman with personal identifying information | 1 |
| Various | 15989-90; 16115-16; 16215; 16217; 16304-05; 15806-07; 15814; 15877; 15879; 15897; 15880; 15862-63; 15777 | Various | Documents re Duane Beaman with unrelated medical information | 2 |
| Various | 10901; 10906; 10912; 10959; 10969; 10983; 10985; 10933; 11013; 11026-28; 11048-49; 11053-54; 11073; 11098-99; 11110; 11123; 11125; 11131; 11135; 11137-38; 11145; 11149; 11151; 11153; 11155; 11181; 11183; 11220; 11236; 11238; 11242; 11245; 11248-50; 11252; 11254-55; 11259-61; 11264; 11267; 11274-78; 11280; 11282; 11285; 11289; 11294; 11297; 11300; 11302; 11304; 11314-15; 11323; 11325; 11330; 11332; 11340; 11371; 11381; 11384; 11386; 11390; 11425; 11428-30; 11432-35; 11456-59; 11485; 11511; 11524; 11568; 11587; 11608-09; 11611-13 | Various | Documents re Israel Lopez with personal identifying information | 1 |

8577.1

REMEDYTEMP v. LMFIC
C&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 10891; 10940; 10962-64; 11011-12; 11035; 11050; 11079; 11126; 11162; 11190; 11351; 11360; 11364; 11368; 11378; 11492; 11517-19 | Various | Documents re Israel Lopez with unrelated medical information | 2 |
| Various | 20939; 20944; 20982; 21021; 21023; 20897; 20914-15; 20935-37; 20696; 20704; 20715; 20723; 20730; 20745; 20747; 20749; 20753; 20756; 20768; 20770; 20782-87; 20838; 20853; 20861-62; 20875; 20877; 20263-67; 20281; 20287; 20294; 20308; 20339; 20374; 20403; 20407; 20416; 20454; 20471; 20495; 20507-08; 20515; 20536; 20550-51; 20553; 20560; 20566; 20570-74; 20586; 20593; 20604; 20607; 20620; 20635; 20652; 20656; 20669; 20671; 20673; 20686 | Various | Documents re Aurora Pena with personal identifying information | 1 |
| Various | 20892; 20902-03; 20967; 20700-01; 20705-06; 20710-11; 20719-20; 20792; 20808; 20855-56; 20870; 20882-83; 20891; 20296; 20314-16; 20345-47; 20376; 20561; 20580-82; 38717 | Various | Documents re Aurora Pena with unrelated medical information | 2 |
| Various | 19856-58; 19863; 19881; 19895; 19901; 19903-08; 19911; 19913; 19917; 19919-20; 19922; 19940-41; 19949-50; 19959-60; 19954; 19964; 19966; 19970; 19984; 20024; 20058; 20060; 20062; 20065; 20072; 20077; 19942-48; 19860; 19852-55; 19529; 19545; 19555; 19576; 19561-83; 19591-92; 19611; 19614; 19623; 19636-37; 19640-42; 19654; 19703; 19731-32; 19743; 19751; 19758; 19769; 19771; 19777; 19784; 19797; 19799-800; 19803; 19810; 19815; 19819; 19821; 19823; 19827; 19829-31; 19834; 19836-37; 19840; 20017; 20032 | Various | Documents re Belina Cuevas with personal identifying information | 1 |
| Various | 19538; 19540; 19547; 19671; 19673; 19714; 19716; 19786; 19760; 20018-19; 20037-38 | Various | Documents re Belina Cuevas with unrelated medical information | 2 |
| Various | 21206-07; 21209; 21272; 21278-80; 21340; 21349; 21356; 21359; 21373; 21396; 21399; 21410; 21425; 21436-37; 21169; 21176-77; 21182-85; 21188; 21193-96; 21200-03; 21205; 21091; 21094-95; 21101; 21113; 21120; 21129; 21138; 21140; 21148; 21150; 21158; 21166; 21088-89; 21245; 21247 | Various | Documents re Sara Herbert with personal identifying information | 1 |
| Various | 21364; 21170; 21152; 21160 | Various | Documents re Sara Herbert with unrelated medical information | 2 |
| Various | 14368-69; 14371; 14374-75; 14377; 14379; 14382; 14384; 14397; 14410; 14412; 14429-31; 14433; 14435; 14437; 14443; 14446; 14450-54; 14461; 14463; 14466; 14469; 14474; 14477; 14485; 14488; 14497; 14504; 14507; 14509; 14511-14; 14516; 14518; 14523; 14530; 14532; 14534; 14539; 14544; 14546-50; 14555-65; 14567-73; 14575; 14579-83; 14595-93; 14596-97; 14600; 14610; 14612-13; 14625; 14637-39; 14641-62; 14644; 14654; 14658; 14660; 14662; 14665; 14668; 14682; 14685; 14690; 14942 | Various | Documents re Shawn Cornist with personal identifying information | 1 |

- 7 -

3577.1

REMEDYTEMP v. LMFIC
K&W File No.: 700-18147
PRIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 14392; 14403; 14415; 14423; 14428; 14490; 14499; 14535; 14605; 14951 | Various | Documents re Shawn Cornist with unrelated medical information | 2 |
| Various | 20181; 2-183; 20241; 20250-53; 20269-70; 20289; 20291-92; 20397; 20420; 20422-23; 20460; 20489; 20503-05; 20615; 20463-64; 20603; 20649; 20657-58; 20667; 20676; 20736; 20659; 20661 20663; 20666; 20678; 20680; 20775; 20780; 20840-41; 20843-46; 20848; 20850-51; 21061; 20410; 20412; 20119-21; 20137-39; 20167; 20174; 20179 | Various | Documents re Lucia Lopez with personal identifying information | 1 |
| N/A | 20737 | N/A | Document re Lucia Lopez with unrelated medical information | 2 |
| Various | 21062; 20169; 20176; 20185; 20195; 20198; 20208-09; 20219; 20221; 20228-29; 20234-35; 20237-38; 20243; 20248 | Various | Documents re Aurora Pena with personal identifying information | 1 |
| N/A | 20526 | N/A | Documents re Aurora Pena with personal identifying information | 2 |
| Various | 13646; 13657; 13676; 13680; 13687; 13705; 13730-31; 13742; 13750; 13770; 13773; 13780; 13786-87; 13791-93; 13903; 13806-09; 13811; 13825; 13841; 13847-48; 13850-53; 13855; 13857; 13859; 13862; 13867-68; 13872-74; 13891; 13893-94; 13900; 13912; 13919-25; 13927-30; 13961-64; 13977-78; 14031; 14037; 14040; 14043; 14046; 14050; 14052; 14069; 14072; 14077-78; 14080-81; 14084-85; 14090; 14095; 14120; 14125; 14184; 14188; 14196; 14199-202; 14206; 14212 | Various | Documents re Maria Alvarado with personal identifying information | 1 |
| Various | 13658; 13690; 13706; 13817; 13942; 13969; 14016; 14018; 14020-22; 14025; 14102 | Various | Documents re Maria Alvarado with unrelated medical information | 2 |
| Various | 14702; 14708; 14720; 14731; 14735; 14738; 14742; 14744-45; 14753; 14755-56; 14779; 14785; 14791; 14794; 14799; 14826; 14838-40; 14847-48; 14854; 14867; 14870; 14880; 14970; 15028-29; 15119-21 | Various | Documents re Alfredo Lopez with personal identifying information | 1 |
| Various | 14746; 14780; 14801; 14786 | Various | Documents re Alfredo Lopez with unrelated medical information | 2 |

- 8 -

58577.1

EMEDYTEMP v. LMFIC
&W File No.: 700-18147
RIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 15160; 15171-72; 15196; 15198; 15203-05; 15209-10; 15213-14; 15226-28; 15240-42; 15245; 15266; 15275; 15278; 15289; 15303; 15319; 15303; 15387; 15402; 15413; 15417; 15429; 15442-45; 15458; 15461; 15467; 15470; 15475; 15479; 15484; 16493; 15503-04; 15506; 15508; 15513; 15516; 15519; 15524; 15527; 15533; 15539; 15544; 15550; 15560-64.1; 15576-81; 15583-86; 15588-90; 15592-93; 15595; 15600; 15606; 15608; 15634; 15639; 15641-46; 15659-63; 15669; 15675; 15678-79; 15685-87; 15708; 15729; 15763-64; 15766 | Various | Documents re Maria Orozco with personal identifying information | 1 |
| Various | 15146; 15150; 15182; 15186-87; 15294-97; 15300; 15251; 15256; 15260; 15281-83; 15286; 15310-11; 15314; 15366; 15396-97; 15432; 15486; 15520; 15545; 15551; 15540; 15454; 15451; 15623; 15708; 15710 | Various | Documents re Maria Orozco with unrelated medical information | 2 |
| Various | 13343-44; 13362-63; 13381-82; 13391; 13400; 13409; 13419-20; 13436; 13445-46; 13448; 13451; 13457; 13469-73; 13476; 13481-82; 13493; 13497; 13505-08; 13512-14; 13525-26; 13532; 13542; 13561; 13566; 13580; 13586-87; 13592; 13594; 13621; 13632; 13842 | Various | Documents re Victor Diaz with personal identifying information | 1 |
| Various | 13349; 13368; 13421; 13458 | Various | Documents re Victor Diaz with unrelated medical information | 2 |
| Various | 12741; 12734; 12747-48; 12751; 12756; 12774; 12851-66; 12872; 12949; 12954; 12876-79; 12882; 12898-99; 12902; 12905; 12919; 12923-25; 12930; 12940-43; 12945; 12956; 12972; 12999; 13025; 13041-42; 13056; 13087; 13089; 13095; 13119; 13133; 13137; 13164; 13173; 13178-80; 13188; 13191; 13202; 13206; 13208; 13216; 13218; 13220; 13225; 13229; 13231; 13234-35; 13239-40; 132476-47; 13249; 13254; 13259; 13263; 13269; 13295; 13297-98; 13304-07; 13309; 13312; 13322; 13327; 13338 | Various | Documents re Rafael Bayardo with personal identifying information | 1 |
| Various | 12926; 12946; 13066; 13073; 13250 | Various | Documents re Rafael Bayardo with unrelated medical information | 2 |
| Various | 25064; 25070; 25072-77; 25079-80; 25108-09; 25111-12; 25129; 25131; 25133; 25135; 25141-43; 25155; 25166; 25169; 25171; 25173; 25175; 25177; 25179; 25181; 25188; 25193; 25212; 25214-15; 25217-20; 25222-23; 25226; 25229-34; 25236; 25243; 25246-48; 25251; 25255; 25539; 25568; 25572-74; 25579-81; 25583; 25586-88; 25590-91 | Various ✓ | Documents re Troy Jimerson with personal identifying information | 1 |
| Various | 25145; 25157; 25347-49; 25355-56; 25408-09; 25467; 25475; 25482-83; 25516; 25521 | Various | Documents re Troy Jimerson with unrelated medical information | 2 |

36577.1

EMEDYTEMP v. LMFIC
&W File No.: 700-18147
RIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 22156; 22162; 22186; 22211; 22233; 22238; 22240; 22246; 22255-56; 22267; 22530; 22534; 22537; 22539; 22542; 22545; 22547-48; 22521-22; 22526; 22508; 22517; 22501; 22505-06; 22484-85; 22487; 22496; 22500; 22280-81; 22291; 22301; 22311; 22324; 22357; 22360-61; 22380; 22398-99; 22418; 22463-64; 22466-68; 22474; 22477; 22480-81; 22483; 22619-20; 22629; 22643; 22659; 22666; 22675; 22695-96; 22705; 22707-08; 22717; 22772-73; 22800; 22813; 22816-18; 22825-27; 22837-38; 22979-81; 23013; 23025-26; 23055; 23057-58; 23060; 23067; 23070; 23076; 23078; 23176; 23233; 23257-58; 23284-92; 23307; 23322; 23359; 23368-69; 23378-79; 23386-87; 23408; 23431; 23445-47; 23459; 23463-64; 23488; 23513-14; 23517-18; 23556; 23571; 23590; 23640-41; 23667-49; 23662-64; 23674; 23679-80; 23684-86; 23702-03; 23713-15; 23728-29; 23751-52; 23771-73; 23779-81; 23786-90; 23793; 23818-19; 23824; 23839-40; 23844-45; 23849-50; 23860-61; 23871-72; 23876; 23896-97; 23913; 23916; 23919-20; 23937; 23939-46; 23958-68; 23977-79; 23989-90; 24002-04; 24050-51; 24079; 24089-92; 24101-03; 24130-33; 24141-42; 24149-50; 24155-56; 24160-61; 24179-81; 24199-200; 24227-28; 24240-41; 24253-55; 24268-70; 24274-76; 24291-92; 24304-06; 24318-21; 24324-27; 24345-46; 24364-65; 24387; 24399-400; 24412-14; 24417-20; 24423-27; 24436-37; 24452-54; 24463-64; 24473-74; 24483-85; 24504-05; 24517-18; 24521; 24540-41; 24556-57; 24572-73; 24609-10; 24628-29; 24641-42; 24666-70; 24672; 24674; 24690-92; 24694; 24696; 24712-14; 24718-21; 24725-27; 24737; 24740; 24755-56; 24771-72; 24787-88; 24812; 24836-37; 24845; 24860-65; 24868-69; 24878-80; 24889; 24892; 24895-98; 24901-02; 24917-18; 24926; 24938-39; 24951-55; 24958-59; 24961-62; 24971-74; 24983; 24993-95; 25006-07; 25022-24; 25036-37; 25046; 25048; 25057-59 | Various | Documents re Mariano Mendoza with personal identifying information | 1 |
| Various | 35057; 35064; 35067; 35070; 35072; 35075; 35076-79; 35084; 35086-87; 35095-97; 35099-35102; 35114; 35120; 35128-29; 35136; 35138-45; 35149-55 | Various | Documents re Jesse Boulette with personal identifying information | 1 |
| Various | 35120-21; 35146 | Various | Documents re Jesse Boulette with unrelated medical information | 2 |
| Various | 32395-98; 32398; 32400-01; 32403; 32407-08; 32416-17; 32425-26; 32428; 32431; 32437; 32439-42; 32445-47; 32449; 32451-54; 32456-64; 32472-73; 32475; 32480; 32484; 32486; 32497; 32498; 32500; 32502; 32504; 32506-07; 32510; 32514; 32518; 32519; 32522; 32524; 32526; 32543; 32552; 32555; 32557-58; 32573; 32580; 32587; 32601-02; 32607; 32611; 32615; 32618; 32620; 32624-26; 32633; 32635; 32637; 32639-42; 32649; 32652; 32655-58; 32662-63 | Various | Documents re Linda Dalton with personal identifying information | 1 |
| Various | 32468-69; 32490; 32494; 32533; 39013; 39015-18; 39020 | Various | Documents re Linda Dalton with unrelated medical information | 2 |

58577.1

EMEDYTEMP v. LMFIC
&W File No.: 700-18147
RIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 32003; 32015; 32018; 32028; 32036; 32039; 32046; 32053; 32060-63; 32070; 32072; 32080; 32087; 32090-91; 32094; 32096; 32099; 32100; 32102; 32108-09; 32111-12; 32114-15; 32118-20; 32122-23; 32125; 32136; 32141; 32145-47; 32154-55; 32164-65; 32102; 32195; 32197; 32205; 32225; 32227-30; 32232-41; 32254-57; 32260-63; 32267-69; 32289; 32293; 32301; 32304; 32307-10; 32315; 32319; 32339-41; 32350-51; 32354; 32361-63; 32365; 32368; 32371; 32373-77; 32379-84 | Various | Documents re Eduardo Olea with personal identifying information | 1 |
| Various | 32008-09; 32020; 32030; 32040; 32054; 32193; 32196; 32210; 32216 | Various | Documents re Eduardo Olea with unrelated medical information | 2 |
| Various | 31712; 31717; 31721; 31728; 31732; 31735; 31742; 31754-56; 31763-64; 31767; 31769; 31775-77; 31779; 31785-86; 31788; 31792; 31796; 31798; 31801-03; 31806; 31809; 31811; 31816-17; 31821; 31832; 31834; 31841; 31847; 31849; 31852; 31856; 31863-73; 31877; 31879; 31914; 31920; 31932-34; 31968; 31977; 31986 | Various | Documents re Ernest Holloway with personal identifying information | 1 |
| Various | 31957 ✓ | Various | Documents re Ernest Holloway with unrelated medical information | 2 |
| Various | 30662-53; 30757; 30660; 30667-68; 30686; 30688; 30711; 30713-16; 30719; 30722; 30728-35; 30738; 30743; 30746; 30750; 30753-54; 30758; 30760; 30764-65; 30770; 30773; 30782; 30785; 30786; 30789-89; 30805; 30808; 30810; 30812-14; 30816; 30820; 30828-31; 30833; 30835; 30837; 30843-46; 30848; 30851; 30857; 30861; 30864; 30871-72; 30878; 30880; 30888-89; 30895-96; 30898-99; 30908; 30935-38; 30964-65; 30975; 30977-79; 30981; 30983; 30990-92; 31000; 31004-05; 31009; 31016; 31018-23; 31026; 31028-30; 31033-36; 31043; 31058; 31066-68; 31071-73; 31079; 31086; 31092; 31094; 31097-98; 31113; 31123; 31125-26; 31129; 31132-33; 31137-38; 31141; 31145-47; 31149-52; 31159-63; 31165-68; 31171; 31173-84; 31186; 31193; 31199; 31208-11; 31219; 31222; 31224; 31226; 31219; 31230-31; 31252-53; 31271; 31277; 31274; 31279; 31282-84; 31293; 31296; 31298; 31302; 31307; 31309; 31313; 31316; 31321-22; 31325; 31329; 31332; 31334; 31345; 31349; 31356; 31358; 31366-67; 31374-75; 31382; 31386; 31397; 31400; 31416; 31418; 31421; 31425; 31428-29; 31432; 31449; 31456; 31458; 31477-79; 31481; 31495-86; 31490-91; 31495; 31497; 31499; 31501-02; 31511; 31515-16; 31525-26; 31528-29; 31531; 31533; 31535-36; 31538-39; 31541-43; 31547; 31550; 31552; 31554; 31557-61; 31563; 31566; 31569; 31570; 31573-74 | Various | Documents re Alicia Alvarez with personal identifying information | 1 |

258577.1

EMEDYTEMP v. LMFIC
&W File No.: 700-18147
RIVILEGE LOG

| DATE | LMFIC BATES NO. | DOCUMENT TYPE | DESCRIPTION | PRIVILEGE/ PROTECTION |
|---|---|---|---|---|
| Various | 30672; 30752; 31050; 31922; 31303; 31337; 31504; 31503; 31517-18 | Various | Documents re Alicia Alvarez with unrelated medical information | 2 |
| Various | 38041; 38044-45; 38059; 38117 | Various | Express Notes | 2 |
| Various | 33677; 33679-80; 33683; 33693; 33696; 33700; 33704-05; 33708; 33721; 33734; 33738-39; 33742; 33755; 33758-60; 33771; 33784; 33790; 33792; 33796; 33799-800; 33802; 33807-08; 33813; 33816-17; 33821; 33823-24; 33826; 33831-32; 33834; 33839; 33845; 33848-49; 33852; 33855; 33858; 33861; 33864; 33872-74; 33876-77; 33881-86; 33888; 33900-01; 33915; 33927; 33962; 33974; 33989; 34012; 34051-53; 34057; 34069-70; 34072-76; 34083; 34085; 34087; 34089; 34091; 34097; 34099; 34101; 34109; 34145 | Various | Documents re Maria Cardenas with personal identifying information | 1 |
| Various | 33690; 33724; 33763; 33774; 33827; 33835; 33866; 34025-26; 34103 | Various | Documents re Maria Cardenas with unrelated medical information | 2 |
| Various | 34159-60; 34173; 34182; 34191; 34198-99; 34206; 34208; 34210; 34212-13; 34220; 34223; 34225-26; 34228-29; 34232; 34234; 34240; 34246; 34248-50; 34253-55; 34272; 34293; 34304; 34307; 34318; 34323-24; 34326; 34352; 34364; 34368-69; 34376; 34447; 34449-52; 34459-60; 34556; 34643; 34647-55; 34668-69; 34716; 34739; 34741; 34748; 34750-51; 34753-55; 34764; 34777-78; 34797; 34814; 34820-21; 34829; 34833-34; 34839-42; 34844-45; 34865; 34867; 34869; 34879; 34881; 34886; 34896; 34905-08; 34923-25; 34936-37; 34940; 34942; 34944; 34947-48; 34958; 34984; 34997; 35004; 35009; 35011; 35021-23; 35046; 35048; 35050; 35054 | Various | Documents re Mike Barela with personal identifying information | 1 |
| Various | 34486; 34572; 34888; 35008; 35013 | Various | Documents re Mike Barela with unrelated medical information | 2 |

- 12 -

585577.1

EXHIBIT

D

| Date | Action | Image (Java) | Image (TIFF) |
|------|--------|--------------|--------------|
| 10/01/02 | Complaint Breach of Contract/Warranty Filed | 📄 | 📄 |
| 10/01/02 | Civil Case Cover Sheet Filed for Tony's Fine Foods, Inc. | 📄 | 📄 |
| 10/01/02 | Complex Designation Requested | | |
| 10/01/02 | Summons on Complaint Issued | | |
| 12/19/02 | Substitution of Attorney Filed for Tony's Fine Foods, Inc., a California corporation | 📄 | 📄 |
| 01/30/03 | Complex Determination Hearing 03/14/2003 02:00 PM D- 22 | 📄 | 📄 |
| 01/30/03 | Case Management Conference 03/13/2003 08:45 AM D- 30 | | |
| 01/30/03 | Hearing Reset to Case Management Conference 03/24/2003 03:45 PM D- 22 | 📄 | 📄 |
| 03/06/03 | First Amended Complaint Filed | 📄 | 📄 |
| 03/06/03 | Summons on Amended Complaint Issued | | |
| 03/07/03 | Case Management Statement of Tony's Fine Foods, Inc., a California corporation Filed | 📄 | 📄 |
| 03/14/03 | Complex Determination Hearing Commenced and Completed | 📄 | 📄 |
| 03/14/03 | Motion Denied | 📄 | 📄 |
| 03/14/03 | Hearing Vacated: Case Management Conference 03/24/2003 03:45 PM D- 22 | | |
| 04/07/03 | Summons with Proof of Service As to Liberty Mutual Insurance Compnay, a Corporation, Liberty Insura | 📄 | 📄 |
| 05/06/03 | Stipulation and Order Re: Extension of Time to Respond to Complaint Filed for Liberty Mutual Insuran | 📄 | 📄 |
| 05/20/03 | Stipulation and Order Re: Extension of Time to Respond to Complaint Granted | 📄 | 📄 |
| 05/22/03 | Demurrer and Motion to Strike Complaint Filed by Andrea Burton, Liberty Insurance Corporation, a Cor | 📄 | 📄 |
| 05/22/03 | Demurrer and Motion to Strike Complaint Hearing Confirmed for 07/07/2003 02:00 PM D- 514 | | |
| 05/22/03 | Proof of Service on Motion | 📄 | 📄 |
| 05/27/03 | Letter from Penelope S. Park to cont fm 7/7/03 to 7/21/03 re Motion to Strike/Demurrer Filed | 📄 | 📄 |
| 05/29/03 | Notice of change of hearing date Filed | 📄 | 📄 |
| 06/20/03 | Application Re: Stay Filed for Liberty Mutual Insurance Compnay, a Corporation, Liberty Insurance Co | 📄 | 📄 |
| 06/23/03 | Hearing Reset to Demurrer and Motion to Strike Complaint 07/21/2003 02:00 PM D- 514 | | |
| 06/26/03 | Memorandum of Points and Authorities in Opposition Filed | 📄 | 📄 |
| 06/26/03 | Opposition Filed | 📄 | 📄 |
| 07/07/03 | Application Re: Stay Granted | 📄 | 📄 |
| 07/21/03 | Civil Law and Motion Hearing Commenced and Completed | 📄 | 📄 |
| 07/21/03 | Demurrer and Motion to Strike Complaint - Dropped | 📄 | 📄 |
| 08/30/05 | Request Re: Dismissal with prejudice - entire action Filed | 📄 | 📄 |
| 08/30/05 | Request Re: Dismissal with prejudice - entire action Entered | | |

.

EXHIBIT

E

# CERTIFIED COPY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARGO CONCRETE, INC., A CALIFORNIA CORPORATION; ET AL., | ) ) ) |
| PLAINTIFFS, | ) ) ) |
| V. | ) NO. C07-04651 CRB (ADR) |
| | ) |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, A MASSACHUSETTS CORPORATION, AND DOES 1 THROUGH 100, INCLUSIVE, | ) ) ) ) |
| DEFENDANTS. | ) ) ) |

## DEPOSITION OF:  SUSAN OLSON
## TAKEN:  FRIDAY, NOVEMBER 16, 2007

### Dalene Court Reporters

16161 Ventura Boulevard, #734

Encino, California 91436

Telephone: 661.726.0584

Reported By:
Magdalene S. Puente
CSR 8498

DEPOSITION OF SUSAN OLSON

| | | |
|---|---|---|
| 1 | Q.   IN AUGUST OF? | 01:15:20 |
| 2 | A.   I DON'T KNOW WHAT YEAR, BUT YOU SAID HE | 01:15:23 |
| 3 | STARTED IN JULY.  IT WAS RIGHT BEFORE THE BABY WAS | 01:15:26 |
| 4 | BORN. | 01:15:30 |
| 5 | Q.   THERE IS A CONTENTION IN DECLARATIONS FROM | 01:15:44 |
| 6 | MS. HANSEN AND MS. YEE THAT MR. PYNES REPRESENTED | 01:15:48 |
| 7 | LIBERTY ON THE TONY FINE FOODS CASE, AND MY | 01:15:53 |
| 8 | UNDERSTANDING IS THAT MR. PYNES WAS HIRED BY YOU AND | 01:16:01 |
| 9 | OTHERS AT KERN AND WOOLEY TO WORK ON PROPERTY COVERAGE | 01:16:07 |
| 10 | MATTERS. | 01:16:12 |
| 11 |       IS THAT GENERALLY TRUE? | 01:16:12 |
| 12 | A.   NO, THAT'S NOT CORRECT. | 01:16:14 |
| 13 | Q.   WHY DON'T YOU TELL ME HOW -- | 01:16:16 |
| 14 | A.   MR. PYNES WAS HIRED TO WORK ON WHATEVER | 01:16:19 |
| 15 | LIBERTY MATTER HE WAS ASKED TO WORK ON OR ANY MATTER | 01:16:21 |
| 16 | THAT THE FIRM HAD. | 01:16:25 |
| 17 | Q.   OKAY.  I SEE.  AND THE FACT IS, THOUGH, THAT | 01:16:26 |
| 18 | FOR THE APPROXIMATE EIGHT MONTHS HE WAS THERE, THE ONLY | 01:16:32 |
| 19 | WORKERS' COMP BAD FAITH CASE THAT YOU KNOW OF THAT | 01:16:38 |
| 20 | ANYBODY'S BEEN ABLE TO EVEN POSSIBLY IDENTIFY THAT HE | 01:16:41 |
| 21 | WORKED ON WAS TONY FINE FOODS; IS THAT RIGHT? | 01:16:44 |
| 22 |       MS. HANSEN:  OBJECTION; LEADING, LACKS | 01:16:46 |
| 23 | FOUNDATION, ASSUMES FACTS NOT IN EVIDENCE, CALLS FOR | 01:16:49 |
| 24 | SPECULATION. | 01:16:51 |
| 25 |       THE DEPONENT:  MY UNDERSTANDING IS THAT HE DID | 01:16:55 |

17

DEPOSITION OF SUSAN OLSON

| | | |
|---|---|---|
| 1 | WORK ON TONY FINE FOODS CASE AND I BELIEVE THE OTHER | 01:16:57 |
| 2 | ONE THAT I HAD, VERGIS, WAS GONE BEFORE HE CAME. | 01:17:01 |
| 3 | **BY MR. ROXBOROUGH:** | 01:17:03 |
| 4 | Q.   RIGHT.  SO THE ONLY ONE WAS TONY FINE FOODS? | 01:17:04 |
| 5 | A.   MY UNDERSTANDING, BUT I DON'T KNOW IF THAT'S | 01:17:07 |
| 6 | TOTALLY CORRECT. | 01:17:09 |
| 7 | Q.   I UNDERSTAND. | 01:17:09 |
| 8 | AND NOBODY MADE DOCUMENTS AVAILABLE TO YOU TO | 01:17:10 |
| 9 | IDENTIFY WHAT WORKERS' COMP BAD FAITH CASE MR. PYNES | 01:17:14 |
| 10 | WORKED ON AT KERN AND WOOLEY? | 01:17:18 |
| 11 | A.   THAT'S CORRECT. | 01:17:21 |
| 12 | Q.   AND YOU DIDN'T ASK TO SEE ANY; CORRECT? | 01:17:21 |
| 13 | A.   THAT'S CORRECT. | 01:17:23 |
| 14 | Q.   AND YOU SAID THE VERGIS CASE. | 01:17:24 |
| 15 | WAS THAT A CASE AGAINST LIBERTY? | 01:17:27 |
| 16 | A.   I BELIEVE IT WAS AGAINST WAUSAU AND I BELIEVE | 01:17:28 |
| 17 | IT WAS IN NORTHERN CALIFORNIA. | 01:17:32 |
| 18 | Q.   AND IT WAS AN EMPLOYER INSURED OF WAUSAU SUING | 01:17:33 |
| 19 | FOR BAD FAITH CLAIMS MISHANDLING, BASICALLY? | 01:17:37 |
| 20 | A.   I DON'T KNOW.  I DON'T REALLY THINK IT WAS BAD | 01:17:40 |
| 21 | FAITH MISHANDLING OF FILES. | 01:17:44 |
| 22 | I THINK THEY ACTUALLY WANTED MORE COVERAGE, | 01:17:47 |
| 23 | BUT I CAN'T TELL YOU FOR CERTAIN. | 01:17:49 |
| 24 | Q.   IT WAS MORE OF A COVERAGE CASE? | 01:17:51 |
| 25 | A.   YES, TO THE BEST OF MY RECOLLECTION. | 01:17:53 |

18

1    I DON'T KNOW WHAT.                                              01:19:35

2         I THINK THAT'S ALL THAT I CAN THINK OF.                    01:19:39

3    Q.   SO KIMCO, REMEDYTEMP, AND VERGIS?                          01:19:41

4    A.   AND TONY FINE FOODS.                                       01:19:44

5    Q.   AND TONY.                                                  01:19:47

6         AND I THINK I SAW SOMEWHERE SOMEBODY                       01:19:48

7    MENTIONED, IT MIGHT HAVE BEEN MS. HANSEN IN HER                 01:19:53

8    DECLARATION OR DEPOSITION, THAT WESTWOOD HO?                    01:19:57

9    A.   YES.  I DID NOT WORK ON THE WESTWOOD HO CASE               01:20:04

10   SO I DON'T KNOW PRECISELY WHAT IT INVOLVED.                     01:20:08

11   Q.   WAS THAT ACTUALLY A LAWSUIT?                               01:20:10

12   A.   I CAN'T TELL YOU.  I DON'T KNOW.                           01:20:12

13   Q.   YOU'VE LISTED BASICALLY FOUR, MAYBE FIVE                   01:20:23

14   WORKERS' COMPENSATION CASES AT KERN AND WOOLEY FROM             01:20:28

15   FEBRUARY '96 TO SEPTEMBER OF '05, BASICALLY, FOR A              01:20:38

16   DECADE.                                                         01:20:41

17        IS IT FAIR TO SAY THAT WORKERS' COMP BAD FAITH             01:20:42

18   CASES AT KERN AND WOOLEY DURING THAT TIME PERIOD WAS A          01:20:46

19   SMALL ASPECT OF ITS CASES COMPARED TO THE OTHER THINGS          01:20:50

20   YOU FOLKS WERE DOING?                                           01:20:55

21   A.   IF YOU WANTED TO SAY IN RETROSPECT IN TERMS OF             01:20:57

22   ALL OF THE YEARS OF PRACTICE, THEN, YES.  BUT AT                01:21:00

23   CERTAIN TIMES IT MAY NOT HAVE BEEN A SMALL AREA OF THE          01:21:03

24   PRACTICE.                                                       01:21:06

25   Q.   AND WHAT DO YOU MEAN BY THAT?                              01:21:06

| | | |
|---|---|---|
| 1 | A.    THAT IS CORRECT. | 01:23:13 |
| 2 | Q.    AND VERGIS, WHEN WAS THAT IN THE OFFICE? | 01:23:15 |
| 3 | I KNOW YOU DON'T KNOW IF IT'S A WORKERS' COMP | 01:23:19 |
| 4 | CASE, BUT WHEN WAS THAT IN THE OFFICE? | 01:23:21 |
| 5 | A.    I DON'T KNOW.  IT WAS A VERY SHORT CASE. | 01:23:23 |
| 6 | Q.    AND WHEN YOU SAY "VERY SHORT"? | 01:23:26 |
| 7 | A.    IT WASN'T WITH US VERY LONG AND IT WAS | 01:23:28 |
| 8 | RESOLVED QUICKLY. | 01:23:31 |
| 9 | Q.    LESS THAN THREE MONTHS, SIX MONTHS? | 01:23:33 |
| 10 | A.    SIX MONTHS, PROBABLY.  BUT -- | 01:23:35 |
| 11 | Q.    WAS IT THERE WHEN MR. PYNES WAS THERE? | 01:23:37 |
| 12 | A.    AS I TESTIFIED EARLIER, I DON'T RECALL IF IT | 01:23:40 |
| 13 | WAS STILL THERE OR NOT.  I DON'T BELIEVE IT WAS. | 01:23:43 |
| 14 | Q.    AND WESTWOOD HO, YOU HAVE NO KNOWLEDGE? | 01:23:45 |
| 15 | A.    I KNOW THE NAME WESTWOOD HO.  I KNOW IT HAD | 01:23:47 |
| 16 | SOMETHING TO DO WITH YOGURT, BUT I DON'T RECALL | 01:23:51 |
| 17 | ANYTHING OTHER THAN THAT. | 01:23:53 |
| 18 | Q.    OKAY.  THAT'S FAIR. | 01:23:54 |
| 19 | AND NONE OF THESE QUESTIONS ARE SURPRISING | 01:23:56 |
| 20 | BECAUSE YOU WOULD AGREE THAT THE AREA OF WORKERS' COMP | 01:24:04 |
| 21 | BAD FAITH LAW WAS A NEW ANIMAL OF BAD FAITH IN | 01:24:06 |
| 22 | CALIFORNIA.  YOU AGREE WITH THAT? | 01:24:10 |
| 23 | A.    TO SOME EXTENT, YES. | 01:24:11 |
| 24 | I UNDERSTAND THAT THERE WERE OTHER FIRMS THAT | 01:24:14 |
| 25 | WERE HANDLING THAT PRIOR TO OUR HANDLING OF IT. | 01:24:15 |

23

| | | |
|---|---|---|
| 1 | A.   DID I PROVIDE TRAINING?  YES, I DID. | 01:35:49 |
| 2 | Q.   AND YOU DIDN'T TRAIN PEOPLE TO PUT STRATEGIES | 01:35:56 |
| 3 | OF KERN AND WOOLEY ON WORKERS' COMP BAD FAITH CASES IN | 01:35:59 |
| 4 | A WORKERS' COMP CLAIM FILE, DID YOU? | 01:36:03 |
| 5 | A.   DID I PERSONALLY, NO, I DID NOT. | 01:36:07 |
| 6 | DOESN'T MEAN IT DIDN'T GET PUT IN THERE. | 01:36:10 |
| 7 | Q.   DID YOU EVER SEE IT GET PUT IN THERE? | 01:36:13 |
| 8 | A.   NOT THAT I RECALL. | 01:36:14 |
| 9 | Q.   HAVE YOU BEEN INVOLVED AT ALL IN REVIEWING ANY | 01:37:01 |
| 10 | OF MS. HANSEN'S DECLARATIONS IN EITHER THE LARGO CASE | 01:37:05 |
| 11 | OR THE CASE IN KENTUCKY? | 01:37:11 |
| 12 | A.   NO, I HAVE NOT. | 01:37:13 |
| 13 | Q.   CAN YOU THINK OF ANY REASON WHY SHE WOULD | 01:37:17 |
| 14 | TESTIFY THAT YOU WERE INVOLVED IN PREPARING HER | 01:37:19 |
| 15 | DECLARATION IN THE KENTUCKY CASE? | 01:37:22 |
| 16 | **MS. HANSEN:**  OBJECTION; ASSUMES FACTS NOT IN | 01:37:26 |
| 17 | EVIDENCE, LACKS FOUNDATION. | 01:37:34 |
| 18 | **THE DEPONENT:**  I CAN'T -- | 01:37:34 |
| 19 | AS I SIT HERE TODAY, I'M NOT SURE WHAT YOU'RE | 01:37:36 |
| 20 | REFERRING TO. | 01:37:38 |
| 21 | **MR. ROXBOROUGH:**  I'LL HAVE MARKED AS EXHIBIT | 01:38:26 |
| 22 | 1, DEPOSITION OF MS. HANSEN DATED AUGUST 15TH, 2006. | 01:38:26 |
| 23 | (WHEREUPON, PLAINTIFF'S EXHIBIT 1 WAS MARKED | 01:38:26 |
| 24 | FOR IDENTIFICATION AND WAS ATTACHED HERETO.) | 01:38:26 |
| 25 | BY MR. ROXBOROUGH: | 01:38:26 |

32

| | | |
|---|---|---|
| 1 | MS. HANSEN:  DIFFERENT FROM WHAT? | 02:24:36 |
| 2 | THE DEPONENT:  DIFFERENT FROM WHAT? | 02:24:38 |
| 3 | BY MR. ROXBOROUGH: | 02:24:39 |
| 4 | Q.   A DIFFERENT PERSON LIKE -- JUST USING YOUR | 02:24:39 |
| 5 | PHRASE. | 02:24:41 |
| 6 | A.   THERE WAS A DIFFERENT PERSON HANDLING A FEW | 02:24:41 |
| 7 | DIFFERENT CASES. | 02:24:43 |
| 8 | Q.   SO THE ANSWER IS "YES"? | 02:24:44 |
| 9 | A.   YES.  I GUESS THE ANSWER IS "YES." | 02:24:45 |
| 10 | I CAN'T FIGURE OUT WHAT YOUR QUESTION WAS, TO | 02:24:47 |
| 11 | BE HONEST WITH YOU, NICK. | 02:24:50 |
| 12 | Q.   WELL, HOW MANY DIFFERENT PEOPLE AT LIBERTY DID | 02:24:51 |
| 13 | YOU DEAL WITH OVER THE TEN YEARS? | 02:24:54 |
| 14 | A.   OH.  NUMEROUS. | 02:24:55 |
| 15 | Q.   LIKE MORE THAN 10, MORE THAN 20? | 02:24:57 |
| 16 | A.   PROBABLY MORE THAN 100. | 02:24:58 |
| 17 | Q.   MORE THAN 100. | 02:25:00 |
| 18 | HOW MANY DID CRAIG DEAL WITH? | 02:25:01 |
| 19 | MS. HANSEN:  OBJECTION; VAGUE AND AMBIGUOUS, | 02:25:04 |
| 20 | "DEAL WITH." | 02:25:05 |
| 21 | THE DEPONENT:  HOW MANY DID HE SPEAK WITH? | 02:25:07 |
| 22 | BY MR. ROXBOROUGH: | 02:25:09 |
| 23 | Q.   IF YOU KNOW. | 02:25:09 |
| 24 | A.   MY GUESS WOULD BE -- | 02:25:10 |
| 25 | Q.   LET ME REPHRASE THE QUESTION.  LET ME REPHRASE | 02:25:13 |

62

1    **MS. HANSEN:** I'M GOING TO OBJECT TO THE WORD          02:30:57

2    "YOU" IN THE QUESTION BECAUSE EARLIER "YOU" WAS DEFINED    02:30:58

3    AS KERN AND WOOLEY, AND, MR. ROXBOROUGH, I THINK YOUR     02:31:01

4    QUESTIONS NOW APPEAR TO BE DIRECTED TO "YOU" AS           02:31:04

5    MS. OLSON.                                                02:31:07

6            **MR. ROXBOROUGH:** THAT'S FAIR.  YOU'RE CORRECT.  02:31:08

7    NOT ONLY DO THEY APPEAR TO BE, THEY WERE INDEED.  BUT     02:31:10

8    LET'S MAKE THE RECORD CLEAR.  SORRY.                      02:31:13

9    **BY MR. ROXBOROUGH:**                                    02:31:13

10   Q.   YOU DIDN'T PREPARE A PRIVILEGE LOG IN THE            02:31:16

11   TONY'S FINE FOODS CASE; RIGHT?                            02:31:20

12   A.   I PERSONALLY DID NOT.                                02:31:21

13   Q.   NOW, WHO DID YOU ASK TO PREPARE ONE, BECAUSE         02:31:22

14   MS. YEE TESTIFIED THAT SHE WAS GIVEN A PROJECT.           02:31:28

15   MS. KRALIK SEEMS TO INDICATE IN HER DECLARATION THAT      02:31:31

16   MS. YEE HAD THE PROJECT OF LOOKING AT THE CLAIM FILES,    02:31:35

17   AND MS. YEE SAYS THAT SHE ASKED CRAIG OR THAT CRAIG WAS   02:31:37

18   GIVEN A PROJECT ON THAT.  YOUR NAME DOESN'T APPEAR        02:31:41

19   ANYWHERE.                                                 02:31:44

20           JUST TO BE DONE WITH THE DEPO, HOPEFULLY IN 30    02:31:45

21   SECONDS, CAN YOU EXPLAIN YOUR ANSWER?                     02:31:49

22   A.   MY UNDERSTANDING IS THAT MS. YEE DID THE FIRST       02:31:49

23   RUN THROUGH THE CLAIM FILES, SHOWED ME WHAT DOCUMENTS     02:31:52

24   SHE HAD QUESTIONS ON, AND THEN HANDED OVER TO MR. PYNES   02:31:56

25   TO DO PRIVILEGE LOGS AND TO MAKE SURE THAT SHE DID NOT    02:31:58

                                                          69

1    MISS ANYTHING.                                                02:32:01

2        Q.    HANDED OVER TO MR. PYNES TO DO A PRIVILEGE LOG,     02:32:13

3    OR SHE GAVE YOU PRIVILEGE LOGS?                               02:32:16

4        A.    NO.    MR. PYNES PREPARED THE PRIVILEGE LOGS IS     02:32:18

5    MY UNDERSTANDING.    MS. YEE MIGHT HAVE TAGGED THE            02:32:20

6    DOCUMENTS.                                                    02:32:24

7        Q.    SO SHE MADE THE DECISION IT WAS PRIVILEGED?         02:32:25

8        A.    SHE MADE THE FIRST DECISION, BUT I AM CERTAIN       02:32:27

9    ASKED MR. PYNES TO CHECK ALL OF THE DOCUMENTS TO MAKE         02:32:30

10   SURE SHE DID NOT MISS ANYTHING.    THEN WHEN MS. YEE WAS      02:32:35

11   OUT ON MATERNITY LEAVE, I BELIEVE AS DOCUMENTS CAME IN,       02:32:40

12   MR. PYNES REVIEWED THEM, DID THE PRIVILEGE LOG, AND I         02:32:41

13   WOULD REVIEW WHAT HE DID.                                     02:32:44

14       Q.    THERE'S BEEN NO TESTIMONY IN THAT REGARD BY         02:32:45

15   ANYBODY IN THIS CASE SO QUESTIONING, MS. OLSON.               02:32:50

16             UP UNTIL THAT TESTIMONY FROM WHAT I'VE READ,        02:32:58

17   MR. PYNES SPENT THREE TO FOUR HOURS REVIEWING WORKERS'        02:33:03

18   COMPENSATION CLAIM FILES.    NOTHING ELSE.    THAT WAS THE    02:33:08

19   ONLY ASSIGNMENT.    I DON'T HAVE THE BILLING RECORDS, BUT     02:33:10

20   THAT'S IT.                                                    02:33:13

21             YOU'VE NOW SAID THAT WHEN SHE WAS GONE ON           02:33:14

22   MATERNITY LEAVE.    WHEN WAS THAT?                            02:33:18

23       A.    SOMETIME DURING THE PERIOD OF TIME IN WHICH         02:33:19

24   TONY'S FINE FOODS WAS AN OPEN FILE.    BUT I DO NOT KNOW      02:33:24

25   HER SPECIFIC MATERNITY LEAVE DATES.                           02:33:28

                                                              70



# CERTIFIED COPY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARGO CONCRETE, INC., A CALIFORNIA CORPORATION; ET AL., | ) ) ) |
| PLAINTIFFS, | ) ) |
| V. | ) NO. C07-04651 CRB (ADR) |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, A MASSACHUSETTS CORPORATION, AND DOES 1 THROUGH 100, INCLUSIVE, | ) ) ) ) |
| DEFENDANTS. | ) ) ) |

# DEPOSITION OF:   *MELODEE YEE*
# TAKEN:  FRIDAY, NOVEMBER 16, 2007

## Dalene Court Reporters

16161 Ventura Boulevard, #734

Encino, California 91436

Telephone: 661.726.0584

Reported By:
Magdalene S. Puente
CSR 8498

1   FIRM?                                                    03:19:52

2      A.   YES.                                             03:19:52

3      Q.   AND HOW IS IT DIFFERENT?                         03:19:53

4      A.   DIFFERENT AREA OF LITIGATION.                    03:19:54

5      Q.   HOW IS THAT?  WHAT'S THE DIFFERENT AREA?         03:19:56

6      A.   I'M DOING PRODUCT LIABILITY.                     03:19:58

7      Q.   WHY DID YOU LEAVE THE PETERSON FIRM?             03:20:01

8      A.   PERSONAL REASONS.                                03:20:04

9      Q.   HOW MANY PEOPLE DID YOU DEAL WITH WHEN YOU       03:20:10

10  WERE AT THE KERN AND WOOLEY FIRM IN TERMS OF LIBERTY     03:20:13

11  MUTUAL; HOW MANY DIFFERENT PEOPLE, APPROXIMATELY?        03:20:18

12         MS. HANSEN:  OBJECTION; VAGUE AND AMBIGUOUS.      03:20:18

13         THE DEPONENT:  WHAT LIBERTY EMPLOYEES I WORKED    03:20:20

14  WITH?                                                    03:20:23

15  BY MR. ROXBOROUGH:                                       03:20:23

16     Q.   HOW MANY PEOPLE WHO WERE EMPLOYED BY LIBERTY     03:20:24

17  DID YOU DEAL WITH DURING THE TIME PERIOD YOU WORKED AT   03:20:26

18  KERN AND WOOLEY?  WHAT WOULD YOU ESTIMATE?               03:20:29

19     A.   THAT I HAD CONTACT WITH?                         03:20:43

20     Q.   YES.                                             03:20:47

21     A.   MORE THAN TEN.                                   03:20:49

22     Q.   MORE THAN 20?                                    03:20:51

23         MS. OLSON SAID THERE WERE SOMETHING LIKE 100      03:20:55

24  OR SOME LARGE NUMBER.                                    03:20:58

25         YOU DIDN'T HAVE THAT MUCH CONTACT LIKE            03:20:59

DEPOSITION OF MELODEE YEE

1    MS. OLSON; RIGHT?                                          03:21:01

2        A.   I DON'T BELIEVE I HAD 100 CONTACTS AT LIBERTY.   03:21:04

3        Q.   WHAT DO YOU BELIEVE YOU HAD?                     03:21:08

4        A.   I SAID MORE THAN TEN.                            03:21:10

5        Q.   WHAT WAS THE RANGE?                              03:21:13

6        A.   I'D ESTIMATE 10 TO 25.                           03:21:19

7        Q.   IF THAT'S THE BEST ESTIMATE YOU CAN GIVE,        03:21:24

8    THAT'S FINE.                                              03:21:26

9        A.   YEAH.                                            03:21:26

10       Q.   IS THAT THE BEST?   OKAY.                        03:21:27

11            AND THEN AT PETERSON & BRADFORD DID YOU HAVE     03:21:29

12   CONTACT WITH LIBERTY EMPLOYEES ALSO ON THE CASES?         03:21:34

13       A.   YES.                                             03:21:36

14       Q.   APPROXIMATELY HOW MANY?                          03:21:37

15       A.   PROBABLY AROUND TEN.                             03:21:50

16       Q.   AND WHAT AREAS?                                  03:21:56

17            LIKE ADJUSTORS WOULD BE ONE GROUP; RIGHT?        03:21:57

18       A.   YES.                                             03:22:01

19       Q.   WHAT OTHER CATEGORIES?                           03:22:02

20       A.   MAINLY ADJUSTORS.                                03:22:07

21       Q.   THAT'S AT THE PETERSON FIRM.                     03:22:10

22            IS THAT THE SAME AT THE KERN AND WOOLEY FIRM,    03:22:12

23   MAINLY ADJUSTORS?                                         03:22:14

24       A.   YEAH, MAINLY ADJUSTORS.                          03:22:18

25       Q.   OKAY.   AND FORGIVE ME IF I ASKED YOU, BUT THE   03:22:20

21

| | | |
|---|---|---|
| 1 | PEOPLE WHO YOU REPORTED TO AT KERN AND WOOLEY WERE | 03:22:22 |
| 2 | MOSTLY MS. HANSEN AND MS. OLSON; IS THAT RIGHT? | 03:22:25 |
| 3 | A.   NO. | 03:22:28 |
| 4 | Q.   OKAY.   WHO DID YOU MOSTLY REPORT TO? | 03:22:29 |
| 5 | A.   RON SKOCYPEC AND SUSAN OLSON. | 03:22:32 |
| 6 | Q.   AND WOULD YOU SAY THEY'RE THE ONES WHO HAD THE | 03:22:41 |
| 7 | PRIMARY CONTACT WITH LIBERTY AT THE HIGHER LEVEL, GIVEN | 03:22:43 |
| 8 | THAT YOU SAID YOU TALKED MOSTLY TO ADJUSTORS?   OR DO | 03:22:46 |
| 9 | YOU WANT TO -- | 03:22:49 |
| 10 | A.   YES. | 03:22:50 |
| 11 | Q.   IS THAT RIGHT? | 03:22:50 |
| 12 | A.   YEAH.   THAT'S FAIR. | 03:22:51 |
| 13 | Q.   AND MS. OLSON -- STRIKE THAT. | 03:22:58 |
| 14 | MS. HANSEN, SHE WORKED WITH YOU AT THE | 03:23:01 |
| 15 | PETERSON FIRM. | 03:23:01 |
| 16 | DID SHE ALSO WORK WITH YOU AT THE GRACE FIRM? | 03:23:04 |
| 17 | MS. HANSEN:   CAN I HAVE THE QUESTION BACK? | 03:23:10 |
| 18 | MR. ROXBOROUGH:   IT'S FASTER. | 03:23:10 |
| 19 | BY MR. ROXBOROUGH: | 03:23:10 |
| 20 | Q.   MS. HANSEN, DID SHE WORK WITH YOU AT THE GRACE | 03:23:12 |
| 21 | FIRM? | 03:23:14 |
| 22 | A.   CURRENTLY, YES. | 03:23:14 |
| 23 | Q.   IS SHE YOUR SUPERVISOR?   DO YOU REPORT TO HER | 03:23:16 |
| 24 | ON CASES? | 03:23:20 |
| 25 | A.   NO. | 03:23:21 |

22

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | (WHEREUPON, PLAINTIFF'S EXHIBIT 4 WAS MARKED | 03:26:38 |
| 2 | FOR IDENTIFICATION AND WAS ATTACHED HERETO.) | 03:26:38 |
| 3 | **BY MR. ROXBOROUGH:** | 03:26:38 |
| 4 | Q.   THIS IS A DECLARATION THAT YOU SIGNED ON | 03:27:14 |
| 5 | OCTOBER 22ND, 2007; IS THAT RIGHT? | 03:27:19 |
| 6 | A.   IT APPEARS TO BE, YES. | 03:27:22 |
| 7 | Q.   ALL RIGHT.   WHO WERE THE PEOPLE INVOLVED IN | 03:27:23 |
| 8 | THE PREPARATION OF ANY FORM OF THIS AGREEMENT OTHER | 03:27:30 |
| 9 | THAN SECRETARIES? | 03:27:34 |
| 10 | **MS. HANSEN:**  OBJECTION; MISSTATES THE | 03:27:37 |
| 11 | DOCUMENT. | 03:27:39 |
| 12 | IT'S A DECLARATION, NOT AN AGREEMENT. | 03:27:42 |
| 13 | **MR. ROXBOROUGH:**  WHAT DID I CALL IT? | 03:27:44 |
| 14 | **MS. HANSEN:**  THE AGREEMENT. | 03:27:46 |
| 15 | **MR. ROXBOROUGH:**  I'LL REPHRASE. | 03:27:47 |
| 16 | **BY MR. ROXBOROUGH:** | 03:27:47 |
| 17 | Q.   WHO PARTICIPATED IN THE CREATION OF EXHIBIT 4? | 03:27:48 |
| 18 | **MR. SVESLOSKY:**  JUST BEFORE YOU ANSWER: | 03:27:54 |
| 19 | EXHIBIT 4 ALSO CONTAINS EXHIBIT A, WHICH IS A COMPLAINT | 03:27:56 |
| 20 | FROM TONY'S FINE FOODS. | 03:28:00 |
| 21 | SO JUST FOR CLARIFICATION, YOU'RE JUST | 03:28:03 |
| 22 | REFERRING TO THE DECLARATION? | 03:28:05 |
| 23 | **MR. ROXBOROUGH:**  YES.   THANK YOU. | 03:28:08 |
| 24 | **THE DEPONENT:**  MYSELF AND I BELIEVE | 03:28:11 |
| 25 | MR. SKOCYPEC. | 03:28:20 |

25

| | | |
|---|---|---|
| 1 | BY MR. ROXBOROUGH: | 03:28:22 |
| 2 | Q.   AND WHY DO YOU BELIEVE YOU HELPED PREPARE IT? | 03:28:22 |
| 3 | A.   BECAUSE IT WAS PROVIDED BY HIS FIRM, A DRAFT. | 03:28:29 |
| 4 | Q.   WHAT WAS PROVIDED BY HIS FIRM? | 03:28:36 |
| 5 | A.   A DRAFT. | 03:28:38 |
| 6 | Q.   WHERE ARE THE DRAFTS? | 03:28:39 |
| 7 | DID YOU THROW THEM AWAY? | 03:28:43 |
| 8 | MS. HANSEN:  OBJECTION; WORK PRODUCT. | 03:28:45 |
| 9 | MR. ROXBOROUGH:  IT'S NOT WORK PRODUCT. | 03:28:46 |
| 10 | BY MR. ROXBOROUGH: | 03:28:46 |
| 11 | Q.   DID YOU THROW THE DRAFTS AWAY? | 03:28:48 |
| 12 | A.   THEY WERE SHREDDED. | 03:28:50 |
| 13 | Q.   WHY WERE THEY SHREDDED? | 03:28:51 |
| 14 | A.   THAT'S MY STANDARD PRACTICE IF I'M NOT GOING | 03:28:53 |
| 15 | TO RETAIN SOMETHING. | 03:28:56 |
| 16 | Q.   OKAY.  SO YOU SHREDDED THE DRAFT THAT HE | 03:29:02 |
| 17 | PROVIDED TO YOU, OR DID YOU -- | 03:29:05 |
| 18 | WHAT DID YOU SHRED? | 03:29:07 |
| 19 | A.   I SHREDDED A PRIOR VERSION OF THIS DOCUMENT. | 03:29:08 |
| 20 | Q.   HOW MANY PRIOR VERSIONS WERE THERE BEFORE YOU | 03:29:16 |
| 21 | SIGNED IT ON OCTOBER 22ND? | 03:29:18 |
| 22 | A.   TWO OR THREE. | 03:29:39 |
| 23 | Q.   OVER WHAT PERIOD OF TIME? | 03:29:48 |
| 24 | MS. HANSEN:  FOR WHAT? | 03:29:52 |
| 25 | /// | 03:29:55 |

26

DEPOSITION OF MELODEE YEE

```
 1    BY MR. ROXBOROUGH:                                          03:40:12

 2        Q.   DO YOU HAVE THE QUESTION IN MIND?                  03:40:14

 3        A.   NO.   CAN WE HAVE IT READ BACK, PLEASE.            03:40:15

 4             (WHEREUPON, THE FOLLOWING QUESTION

 5             WAS READ:

 6                  Q.   SO FAR HE SENT IT TO YOU ONCE;

 7             YOU HAVE ANOTHER CONVERSATION; YOU RETURN

 8             IT.

 9                       ARE YOU RETURNING TO HIM IN

10             FINAL WHEN YOU SIGNED IT OR HAVE YOU

11             GONE THROUGH AND MADE DRAFTS BEFORE

12             YOU RETURNED IT AND SIGNED IT?)                    03:40:38

13        THE DEPONENT:   OKAY.   THERE WERE DRAFTS BEFORE        03:40:38

14    I RETURNED IT.                                              03:40:42

15    BY MR. ROXBOROUGH:                                          03:40:44

16        Q.   WHO MADE THOSE DRAFTS?                             03:40:44

17             WHAT WAS THE PROCESS?                              03:40:46

18        A.   I RECEIVED A DRAFT, I REVIEWED IT, I CONSULTED     03:40:50

19    WITH MY COUNSEL, MS. HANSEN, AND THEN I MADE                03:40:57

20    HANDWRITTEN CHANGES.   I CONTACTED MR. SVESLOSKY, AND I     03:41:03

21    BELIEVE HE DIRECTED ME TO CONTACT HIS SECRETARY SO THE      03:41:14

22    CHANGES COULD BE MADE.                                      03:41:18

23        Q.   AND HOW DID YOU GO ABOUT CONTACTING THE            03:41:19

24    SECRETARY?                                                  03:41:22

25        A.   I'M NOT SURE IF I CALLED HER OR IF SHE CALLED      03:41:23
```

31

1   ME.                                                          03:41:25

2       Q.   FOR THE PURPOSES OF MAKING THE CHANGES?             03:41:26

3       A.   YES.                                                03:41:29

4       Q.   HOW MANY PAGES WAS -- STRIKE THAT.                  03:41:33

5            THE DECLARATION EXCLUDING THE CAPTION PAGE          03:41:38

6   CONSISTS OF FIVE NUMBERED PARAGRAPHS.                        03:41:41

7            HOW MANY NUMBERED PARAGRAPHS WERE ON THE            03:41:43

8   DRAFT?                                                       03:41:45

9       A.   I BELIEVE THERE ARE FIVE.                           03:41:45

10      Q.   AND WHAT WERE THE CHANGES YOU MADE?                 03:41:47

11      A.   I JUST CHANGED A COUPLE OF WORDS IN -- I THINK      03:41:50

12  THE FIRST -- SECOND PARAGRAPH I BELIEVE THEY HAD THE         03:42:03

13  INITIALS REFERENCED TO MY CURRENT FIRM INCORRECT.  I         03:42:07

14  MAY HAVE CHANGED A WORD OR TWO AT LINE 11 OR 12.  I          03:42:24

15  THINK I ADDED A COUPLE OF WORDS.                             03:42:40

16      Q.   WHAT LINE, PLEASE?                                  03:42:43

17      A.   LINES 13 AND 14.                                    03:42:44

18      Q.   WHAT DID YOU CHANGE?                                03:42:47

19      A.   "RELATING TO MY LEGAL PRACTICE" JUST TO MAKE        03:42:48

20  SURE IT WAS DURING THE TIME THAT I WAS EMPLOYED AT KERN      03:42:51

21  AND WOOLEY.                                                  03:42:58

22           AROUND LINES 18 THROUGH 20 I BELIEVE I ADDED        03:42:58

23  "FOR A PERIOD OF TIME" BECAUSE I WASN'T SURE EXACTLY         03:43:16

24  WHEN MR. PYNES WAS EMPLOYED THAT WE WERE BOTH                03:43:21

25  ASSOCIATES AT KERN AND WOOLEY.                               03:43:25

                                                         32

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | Q.    I'M SORRY.  WHAT LINE? | 03:43:27 |
| 2 |       OH.  LINE 18? | 03:43:29 |
| 3 | A.    UH-HUH. | 03:43:30 |
| 4 | Q.    "YES"? | 03:43:31 |
| 5 | A.    YES.  AND THAT WE WERE BOTH -- I JUST -- | 03:43:33 |
| 6 |       I DON'T KNOW WHAT THE ORIGINAL DRAFT SAID, BUT | 03:43:36 |
| 7 | I MAY HAVE ADDED SOMETHING THAT WE WERE BOTH IN THE | 03:43:38 |
| 8 | SAME PRACTICE GROUP. | 03:43:46 |
| 9 |       IN PARAGRAPH FOUR THE FIRST LINE 23, 24 I JUST | 03:43:59 |
| 10 | PUT IN "ONE OF THE CASES."  I THINK THIS IS MINE, "ONE | 03:44:13 |
| 11 | OF THE CASES THAT WE WORKED ON." | 03:44:17 |
| 12 | Q.    YOU PUT IN "TONY'S FINE FOODS"? | 03:44:19 |
| 13 | A.    NO.  I SAID "ONE OF THE CASES." | 03:44:21 |
| 14 | Q.    OH.  I SEE.  YOU ADDED "ONE OF THE CASES IN | 03:44:23 |
| 15 | WHICH MR. PYNES AND I REPRESENTED LIBERTY WAS TONY'S | 03:44:28 |
| 16 | FINE FOODS"? | 03:44:32 |
| 17 | A.    RIGHT.  THE TONY'S FINE FOODS AND THE | 03:44:32 |
| 18 | REFERENCE TO THE CASE AND THE CASE NUMBER AND THE | 03:44:34 |
| 19 | FILING DATE, THAT WAS THERE.  I DIDN'T CHANGE THAT. | 03:44:36 |
| 20 | Q.    WHO GAVE YOU -- | 03:44:39 |
| 21 |       HOW DID YOU COME IN POSSESSION OF EXHIBIT A TO | 03:44:41 |
| 22 | YOUR DECLARATION? | 03:44:46 |
| 23 | A.    I THINK THAT WAS ADDED AFTERWARDS. | 03:44:51 |
| 24 | Q.    MY QUESTION IS:  HOW DID YOU GET IN POSSESSION | 03:44:54 |
| 25 | OF IT? | 03:44:57 |

33

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | A.   PRIOR TO TODAY? | 03:44:58 |
| 2 | Q.   HOW DID YOU GET IN POSSESSION OF IT PRIOR | 03:45:00 |
| 3 | TO -- IN ORDER TO MAKE IT AN EXHIBIT TO YOUR | 03:45:03 |
| 4 | DECLARATION? | 03:45:06 |
| 5 | A.   I DIDN'T HAVE A COPY OF THE COMPLAINT AT THE | 03:45:08 |
| 6 | TIME I SIGNED MY DECLARATION. | 03:45:12 |
| 7 | Q.   I'M SORRY.  YOU DIDN'T HAVE A COPY OF WHAT? | 03:45:14 |
| 8 | A.   OF EXHIBIT A. | 03:45:16 |
| 9 | Q.   SO WHEN YOU SIGNED THE DECLARATION, YOU HADN'T | 03:45:19 |
| 10 | EVEN SEEN THE COMPLAINT THAT YOU ATTACHED AS EXHIBIT A? | 03:45:22 |
| 11 | A.   THE COMPLAINT IS A PUBLIC RECORD, SO THE FACT | 03:45:27 |
| 12 | THAT IT WAS -- THE DECLARATION ATTACHED IT -- | 03:45:34 |
| 13 | Q.   MY -- | 03:45:39 |
| 14 | A.   I DIDN'T HAVE A COPY OF IT AT THE TIME I | 03:45:40 |
| 15 | SIGNED THE DECLARATION. | 03:45:42 |
| 16 | Q.   OKAY.  SO THAT WAS ADDED AFTER YOU SIGNED THE | 03:45:42 |
| 17 | DECLARATION, AS FAR AS YOU KNOW? | 03:45:47 |
| 18 | A.   THAT'S CORRECT. | 03:45:48 |
| 19 | Q.   SO YOU DIDN'T EVEN LOOK AT EXHIBIT A WHEN YOU | 03:45:48 |
| 20 | SIGNED THE DECLARATION; CORRECT? | 03:45:52 |
| 21 | A.   CORRECT. | 03:45:54 |
| 22 | Q.   SO HOW DID YOU KNOW THE COURT NUMBER WAS | 03:46:02 |
| 23 | ACCURATE WHEN YOU SIGNED IT? | 03:46:06 |
| 24 | A.   I SAID PREVIOUSLY THAT THAT NUMBER WAS ALREADY | 03:46:07 |
| 25 | IN THE DECLARATION. | 03:46:12 |

34

| | | |
|---|---|---|
| 1 | Q.   MY QUESTION -- LISTEN TO MY QUESTION.   MY | 03:46:13 |
| 2 | QUESTION IS:   HOW DID YOU KNOW THAT NUMBER WAS ACCURATE | 03:46:15 |
| 3 | WHEN YOU SIGNED IT IF YOU DIDN'T HAVE THE COMPLAINT? | 03:46:17 |
| 4 | DID YOU HAVE OTHER TONY'S FINE FOODS RECORDS | 03:46:21 |
| 5 | TO REFER TO? | 03:46:23 |
| 6 | A.   NO. | 03:46:24 |
| 7 | Q.   SO HOW DID YOU KNOW THE NUMBER WAS CORRECT? | 03:46:24 |
| 8 | A.   I PRESUMED IT WAS CORRECT. | 03:46:26 |
| 9 | Q.   YOU ASSUMED THAT WAS CORRECT. | 03:46:28 |
| 10 | SO WHEN SHEPPARD, MULLIN, RICHTER & HAMPTON | 03:46:30 |
| 11 | SENT YOU THE DECLARATION, THEY DID NOT SEND YOU EXHIBIT | 03:46:38 |
| 12 | A AT ANY POINT IN TIME? | 03:46:42 |
| 13 | A.   THAT'S CORRECT. | 03:46:44 |
| 14 | Q.   OKAY.   ALL RIGHT.   GO AHEAD.   WHAT OTHER | 03:46:44 |
| 15 | CHANGES DID YOU MAKE? | 03:46:48 |
| 16 | LET'S GO TO PARAGRAPH FIVE. | 03:46:49 |
| 17 | A.   PARAGRAPH FIVE I JUST CLARIFIED HOW HE -- | 03:46:53 |
| 18 | MR. PYNES -- SORRY -- BECAME ASSIGNED TO THIS SPECIFIC | 03:47:05 |
| 19 | PROJECT THAT'S REFERENCED IN THAT PARAGRAPH. | 03:47:10 |
| 20 | Q.   HOW DID YOU CLARIFY IT? | 03:47:12 |
| 21 | A.   THAT I DISCUSSED IT WITH HIS SUPERVISING | 03:47:16 |
| 22 | ATTORNEY. | 03:47:19 |
| 23 | Q.   HOW DID THAT CLARIFY IT? | 03:47:19 |
| 24 | WHO WAS THE SUPERVISING ATTORNEY? | 03:47:21 |
| 25 | A.   THAT'S BEEN ASKED AND ANSWERED. | 03:47:23 |

35

| | | |
|---|---|---|
| 1 | Q.   RIGHT.   BUT TODAY YOU'RE TESTIFYING MAJORITY, | 04:21:55 |
| 2 | AND TO ME -- JUST WORDS. | 04:21:57 |
| 3 | YOU'RE A LAWYER; RIGHT? | 04:21:59 |
| 4 | A.   WELL -- | 04:22:00 |
| 5 | Q.   WHAT DID YOU MEAN? | 04:22:02 |
| 6 | MR. SVESLOSKY:   MISSTATES HER PRIOR TESTIMONY. | 04:22:02 |
| 7 | BY MR. ROXBOROUGH: | 04:22:04 |
| 8 | Q.   WHAT DO YOU MEAN BY A MAJORITY OF YOUR WORK | 04:22:04 |
| 9 | WAS FOR LIBERTY? | 04:22:06 |
| 10 | WHAT PERCENTAGE WOULD YOU ASSIGN TO IT SO I | 04:22:07 |
| 11 | CAN GET AN IDEA? | 04:22:10 |
| 12 | MS. HANSEN:   ASKED AND ANSWERED. | 04:22:10 |
| 13 | WHY DON'T YOU ANSWER IT SO WE CAN GET THIS | 04:22:11 |
| 14 | QUESTION OVER. | 04:22:13 |
| 15 | THE DEPONENT:   I ALREADY ATTRIBUTED AT LEAST | 04:22:13 |
| 16 | BETWEEN 80 AND 90 PERCENT OF MY WORK IS FOR LIBERTY. | 04:22:16 |
| 17 | BY MR. ROXBOROUGH: | 04:22:18 |
| 18 | Q.   OKAY.   ALL RIGHT. | 04:22:19 |
| 19 | WHAT PERCENTAGE OF WORK OF THE 80, 90 PERCENT | 04:22:31 |
| 20 | WAS COVERAGE? | 04:22:35 |
| 21 | A.   AS OPPOSED TO? | 04:22:40 |
| 22 | Q.   ALL OF THE OTHER THINGS YOU TESTIFIED TO | 04:22:42 |
| 23 | TODAY. | 04:22:48 |
| 24 | A.   PROBABLY ABOUT 65 PERCENT. | 04:22:55 |
| 25 | Q.   SIXTY-FIVE PERCENT OF THE EIGHTY TO NINETY | 04:22:58 |

59

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | PERCENT WAS COVERAGE. | 04:23:01 |
| 2 | HOW MUCH WAS IN THE OTHER RELATED MATTERS | 04:23:03 |
| 3 | WHERE YOU TALKED ABOUT CONTRIBUTION, MALICIOUS | 04:23:10 |
| 4 | PROSECUTION, EARTHQUAKE? | 04:23:12 |
| 5 | A.  WELL, I MEAN IT VARIED DURING THE YEARS. | 04:23:14 |
| 6 | Q.  BALLPARK. | 04:23:16 |
| 7 | A.  TWENTY-FIVE PERCENT. | 04:23:17 |
| 8 | Q.  SO ABOUT 10 PERCENT OF YOUR TIME WAS ON BAD | 04:23:19 |
| 9 | FAITH LITIGATION, IS THAT RIGHT, FOR LIBERTY? | 04:23:23 |
| 10 | MS. HANSEN:  MISSTATES PRIOR TESTIMONY. | 04:23:25 |
| 11 | THE DEPONENT:  NO, THAT'S NOT RIGHT.  NO. | 04:23:27 |
| 12 | BY MR. ROXBOROUGH: | 04:23:29 |
| 13 | Q.  WELL, I ADDED 65 PERCENT -- MAYBE I ADDED | 04:23:29 |
| 14 | WRONG. | 04:23:32 |
| 15 | SIXTY-FIVE PLUS TWENTY-FIVE PERCENT IS NINETY | 04:23:32 |
| 16 | PERCENT. | 04:23:32 |
| 17 | DO YOU WANT TO -- | 04:23:36 |
| 18 | A.  YEAH.  I'LL JUST -- I MEAN -- WHEN YOU | 04:23:36 |
| 19 | Q.  WHEN I PUT IT THAT WAY IT'S AROUND -- | 04:23:39 |
| 20 | A.  YES. | 04:23:41 |
| 21 | Q.  I'M JUST ESTIMATING ABOUT 10 PERCENT BAD FAITH | 04:23:41 |
| 22 | LITIGATION. | 04:23:44 |
| 23 | A.  WELL, I JUST DON'T DISTINGUISH BETWEEN THEM BY | 04:23:45 |
| 24 | PERCENTAGE IN MY MIND. | 04:23:50 |
| 25 | Q.  RIGHT.  YOU DIDN'T IN YOUR DECLARATION.  YOU | 04:23:52 |

60

1  ARE DOING IT IN THE DEPOSITION TODAY.  I APPRECIATE IT.      04:23:55

2        TEN PERCENT BAD FAITH LITIGATION, MAYBE                04:23:57

3  FIFTEEN PERCENT IN A GIVEN YEAR, MAYBE LESS THAN TEN         04:24:00

4  PERCENT.  JUST AN ESTIMATE.  IS THAT ABOUT RIGHT, AND        04:24:05

5  THEN WE'LL MOVE ON?                                          04:24:06

6     A.    WELL, IT VARIED.  LET'S SAY 25 PERCENT BAD          04:24:07

7  FAITH, 25 PERCENT OTHER MATTERS, 50 PERCENT INSURANCE        04:24:10

8  COVERAGE.                                                    04:24:14

9     Q.    SO YOU'RE GIVING ME A DIFFERENT --                  04:24:15

10        YOU SAID 50 PERCENT COVERAGE?                         04:24:17

11    A.    RIGHT.                                              04:24:21

12    Q.    AS OPPOSED TO 65 PERCENT?                           04:24:22

13    A.    IT VARIED.                                          04:24:24

14    Q.    OKAY.                                               04:24:25

15    A.    I MEAN, DURING THE YEARS DEPENDING ON WHAT          04:24:26

16  CASES I WAS WORKING ON DURING THAT YEAR.                    04:24:28

17    Q.    SO IN SOME YEARS IT WAS ONLY 10 PERCENT BAD         04:24:30

18  FAITH LITIGATION AND OTHER YEARS IT COULD HAVE BEEN AS      04:24:34

19  HIGH AS 25 PERCENT?                                         04:24:36

20    A.    YEAH.                                               04:24:37

21    Q.    SO NO MATTER WHAT, WHEN YOU WERE AT KERN AND        04:24:37

22  WOOLEY, AT LEAST 75 PERCENT OR MORE OF YOUR TIME WAS        04:24:41

23  SPENT ON NON-BAD FAITH LITIGATION; RIGHT?                   04:24:44

24    A.    AROUND THERE.                                       04:24:48

25    Q.    OKAY.  AND DURING THE TIME PERIOD THAT              04:24:49

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | LOOK AT THE NEXT PAGE, SUBSTITUTION OF | 04:33:42 |
| 2 | ATTORNEY, DECEMBER 19TH, 2002, MR. CARLSON. | 04:33:45 |
| 3 | DOES THAT REFRESH YOUR MEMORY THAT MR. CARLSON | 04:33:49 |
| 4 | WAS THE LAWYER? | 04:33:52 |
| 5 | A.   NO, IT DOESN'T. | 04:33:52 |
| 6 | Q.   DID YOU EVER HAVE ANY DEALINGS WITH | 04:33:53 |
| 7 | MR. CARLSON? | 04:33:54 |
| 8 | A.   I MAY HAVE SENT PLAINTIFF'S COUNSEL SOME | 04:33:55 |
| 9 | CORRESPONDENCE. | 04:33:57 |
| 10 | Q.   BUT YOU DON'T RECALL HIS NAME? | 04:33:59 |
| 11 | A.   NO, I DON'T. | 04:34:01 |
| 12 | Q.   BUT HE'S ON THE CASE FOR THREE YEARS FROM | 04:34:03 |
| 13 | DECEMBER OF 2002 -- IF YOU LOOK AT EXHIBIT 3 -- TO THE | 04:34:05 |
| 14 | TIME THE CASE WAS DISMISSED AUGUST OF 2005, ALMOST | 04:34:08 |
| 15 | THREE YEARS, AND YOU DON'T RECALL HIM; CORRECT? | 04:34:13 |
| 16 | A.   NO, I DON'T RECALL THE NAME OF PLAINTIFF'S | 04:34:18 |
| 17 | COUNSEL ON THIS CASE. | 04:34:21 |
| 18 | Q.   OKAY.  JUST TO REFRESH YOUR MEMORY, DOES THIS | 04:34:21 |
| 19 | REFRESH YOUR MEMORY THAT AROUND JULY 7, 2003, THERE WAS | 04:34:27 |
| 20 | AN APPLICATION RE:  STAY GRANTED?  AT THE TOP OF THE | 04:34:32 |
| 21 | SECOND PAGE. | 04:34:37 |
| 22 | A.   I DON'T RECALL AN APPLICATION FOR A STAY BEING | 04:34:45 |
| 23 | GRANTED. | 04:34:49 |
| 24 | Q.   YOU WOULD NEED TO SEE THE FILE TO REFRESH YOUR | 04:34:50 |
| 25 | MEMORY OR THIS DOCUMENT? | 04:34:53 |

70

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | A.  NO.  I KNEW THAT AT SOME POINT THAT A MATTER | 04:34:54 |
| 2 | WAS STAYED. | 04:34:57 |
| 3 | Q.  WAS STAYED FOR HOW MANY YEARS? | 04:34:57 |
| 4 | A.  WELL, I CAN READ THIS DOCUMENT BUT I DON'T | 04:35:01 |
| 5 | HAVE AN INDEPENDENT RECOLLECTION. | 04:35:03 |
| 6 | Q.  DID YOU EVER LOOK AT REGISTER OF ACTIONS AS A | 04:35:05 |
| 7 | LITIGATOR? | 04:35:08 |
| 8 | A.  YES, I DO. | 04:35:08 |
| 9 | Q.  DO YOU RELY UPON THEM AS A LITIGATOR? | 04:35:09 |
| 10 | A.  FOR THE MOST PART. | 04:35:11 |
| 11 | Q.  IF YOU LOOKED AT THIS DOCUMENT, YOU CAN SEE | 04:35:13 |
| 12 | THAT THE CASE, ACCORDING TO THIS, WAS STAYED JULY 7TH, | 04:35:15 |
| 13 | 2003.  MR. PYNES WAS NOT EVEN AT KERN AND WOOLEY THEN, | 04:35:19 |
| 14 | AND IT WAS DISMISSED AUGUST 30TH, 2005. | 04:35:23 |
| 15 | THAT'S APPROXIMATELY 25 MONTHS; RIGHT?  YOU | 04:35:26 |
| 16 | AGREE WITH THAT? | 04:35:31 |
| 17 | A.  SURE. | 04:35:32 |
| 18 | Q.  OKAY.  SO YOU DON'T RECALL DOING ANY | 04:35:32 |
| 19 | LITIGATION IN TERMS OF MOTIONS TO COMPEL, MOTIONS FOR | 04:35:35 |
| 20 | SUMMARY JUDGMENT, OR ANYTHING LIKE THAT IN THE TONY'S | 04:35:39 |
| 21 | FINE FOODS CASE; RIGHT? | 04:35:42 |
| 22 | A.  I DON'T RECALL FILING ANYTHING. | 04:35:44 |
| 23 | Q.  AND YOU DON'T RECALL SEEING ANYTHING; RIGHT? | 04:35:46 |
| 24 | A.  I KNEW WE WERE -- HAD COMMUNICATIONS WITH | 04:35:50 |
| 25 | PLAINTIFF'S COUNSEL. | 04:35:56 |

71

1    Q.   BUT YOU DON'T REMEMBER HIS NAME?       04:35:59

2    A.   RIGHT.       04:36:01

3    Q.   AND THEN IF YOU LOOK AT THE FIRST PAGE OF    04:36:03

4  EXHIBIT 3, AGAIN, MS. YEE, YOU'LL SEE THAT THERE'S A  04:36:05

5  REFERENCE TO MAY 7TH, 2003 A LETTER FROM PENELOPE PARK.  04:36:12

6      SHE WAS TAKING OVER FOR YOU --    04:36:17

7      WAS THIS THE TIME THAT YOU WERE ON YOUR FIRST  04:36:19

8  MATERNITY LEAVE?    04:36:21

9      **MS. HANSEN:**   WHAT DOCUMENT, COUNSEL?  04:36:25

10      **THE DEPONENT:**   YES.    04:36:26

11      **MR. ROXBOROUGH:**   EXHIBIT 3.   I'M SORRY.  04:36:26

12  YOU'RE LOOKING AT LEFT-HAND FIRST PAGE RIGHT THERE.   IF  04:36:28

13  YOU LOOK ON THE LEFT SIDE, MAY 27, 2003, PENELOPE PARK.  04:36:31

14  **BY MR. ROXBOROUGH:**    04:36:31

15    Q.   YOUR NAME WASN'T EVEN ON ANY PLEADINGS IN THIS  04:36:37

16  CASE; ISN'T THAT TRUE?    04:36:40

17    A.   I DON'T KNOW.    04:36:43

18    Q.   WELL, IF YOU TURN TO A FEW PAGES AND IF YOU'LL  04:36:44

19  BE KIND ENOUGH, YOU'LL SEE A NOTICE OF EX PARTE  04:36:48

20  APPLICATION JUNE 20TH, 2003.    04:36:51

21      DO YOU SEE THAT?   KEEP TURNING.   KEEP TURNING.  04:36:54

22      YOU RECOGNIZE THAT AS A LETTERHEAD OF KERN AND  04:37:00

23  WOOLEY; RIGHT?    04:37:04

24    A.   YES.    04:37:04

25    Q.   AND YOU WERE ALREADY BACK FROM YOUR MATERNITY  04:37:04

72

| | | |
|---|---|---|
| 1 | LEAVE AS OF JUNE 20TH, 2003; CORRECT? | 04:37:07 |
| 2 | A.    I DON'T RECALL THE EXACT DATE THAT I RETURNED. | 04:37:11 |
| 3 | Q.    YOU TESTIFIED EARLIER TODAY THAT FEBRUARY 2003 | 04:37:35 |
| 4 | THROUGH JUNE 2003 WAS YOUR MATERNITY. | 04:37:38 |
| 5 | DOES THAT REFRESH YOUR MEMORY? | 04:37:42 |
| 6 | A.    YES. | 04:37:43 |
| 7 | Q.    OKAY.  SO YOUR NAME ISN'T ON THE PLEADINGS, | 04:37:43 |
| 8 | YOU DIDN'T EVEN WORK ON THIS CASE, YOU DIDN'T FILE A | 04:37:46 |
| 9 | DEMURRER ON TONY'S FINE FOODS CASE; CORRECT? | 04:37:50 |
| 10 | MS. HANSEN:  OBJECTION; MISSTATES TESTIMONY. | 04:37:52 |
| 11 | BY MR. ROXBOROUGH: | 04:37:53 |
| 12 | Q.    I'M JUST ASKING. | 04:37:54 |
| 13 | A.    IF THE DEMURRER WAS FILED WHILE I WAS ON A | 04:37:55 |
| 14 | MATERNITY LEAVE, THEN NO, I DID NOT WORK ON IT. | 04:38:00 |
| 15 | Q.    AND YOU DON'T HAVE AN INDEPENDENT RECOLLECTION | 04:38:01 |
| 16 | OF DOING THAT; CORRECT? | 04:38:03 |
| 17 | A.    CORRECT. | 04:38:04 |
| 18 | Q.    AND PENELOPE PARK, WAS SHE A SENIOR LAWYER TO | 04:38:04 |
| 19 | YOU? | 04:38:07 |
| 20 | A.    NO, SHE WAS NOT. | 04:38:07 |
| 21 | Q.    SHE WAS EQUAL TO YOU OR LESS THAN YOU? | 04:38:08 |
| 22 | A.    SHE WAS A MORE JUNIOR ATTORNEY. | 04:38:11 |
| 23 | Q.    A MORE JUNIOR ATTORNEY.  AND YET HER NAME IS | 04:38:14 |
| 24 | ON THE PLEADINGS AND YOURS IS NOT; DO YOU KNOW WHY? | 04:38:15 |
| 25 | A.    NO. | 04:38:21 |

DEPOSITION OF MELODEE YEE

| | | |
|---|---|---|
| 1 | Q.   IS THERE ANY REASON WHY IN YOUR DECLARATION | 04:38:21 |
| 2 | YOU DIDN'T TELL THE COURT THAT YOU HADN'T EVEN WORKED | 04:38:23 |
| 3 | ON THE CASE BEFORE IT WAS STAYED? | 04:38:26 |
| 4 | **MS. HANSEN:**  OBJECTION; ARGUMENTATIVE, | 04:38:28 |
| 5 | MISSTATES TESTIMONY. | 04:38:31 |
| 6 | **BY MR. ROXBOROUGH:** | 04:38:33 |
| 7 | Q.   IS THERE ANY REASON WHY YOU DIDN'T TELL THE | 04:38:35 |
| 8 | COURT THAT ON TONY'S FINE FOODS, ANY REASON AT ALL? | 04:38:36 |
| 9 | A.   I DON'T THINK THAT IT'S -- | 04:38:39 |
| 10 | Q.   IT WASN'T NECESSARY? | 04:38:42 |
| 11 | A.   NO.  I DON'T KNOW HOW TO ANSWER THAT.  I MEAN, | 04:38:43 |
| 12 | I WORKED ON THE FILE. | 04:38:46 |
| 13 | Q.   WHEN DID YOU FIRST WORK ON THE FILE, THEN?  DO | 04:38:47 |
| 14 | YOU EVEN RECALL? | 04:38:50 |
| 15 | A.   I DON'T RECALL. | 04:38:50 |
| 16 | Q.   YOU NEED TO LOOK AT YOUR BILLING RECORDS; | 04:38:51 |
| 17 | RIGHT? | 04:38:54 |
| 18 | A.   THAT WOULD PROBABLY REFLECT WHEN I FIRST | 04:38:55 |
| 19 | STARTED WORKING ON IT. | 04:38:58 |
| 20 | Q.   WHAT ELSE WOULD PROBABLY REFLECT? | 04:38:59 |
| 21 | A.   I THINK THAT WOULD PROBABLY BE THE BEST. | 04:39:05 |
| 22 | Q.   OKAY.  AND THAT FILE IS STILL AT KERN AND | 04:39:08 |
| 23 | WOOLEY; RIGHT?  AND YOU LEFT -- | 04:39:11 |
| 24 | WHEN THE CASE WAS DISMISSED AUGUST OF -- | 04:39:12 |
| 25 | EXCUSE ME -- AUGUST 30TH OF 2005, YOU HAD NOT LEFT KERN | 04:39:14 |

74

EXHIBIT
G

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   LARGO CONCRETE, INC. A CALIFORNIA    )
     CORPORATION; N.M.N. CONSTRUCTION,    )
 6   INC., A CALIFORNIA CORPORATION,      )
                                          )
 7                      PLAINTIFFS,       )
                                          )CASE NO.
 8      V.                                )C07-04651 CRB (ADR)
                                          )
 9   LIBERTY MUTUAL FIRE INSURANCE        )
     COMPANY, A MASSACHUSETTS             )
10   CORPORATION, AND DOES 1 THROUGH      )
     100, INCLUSIVE,                      )
11                                        )
                        DEFENDANTS.       )
12                                        )

13

14              ROUGH TRANSCRIPT OF LISA HANSEN

15

16              DEPOSITION OF LISA HANSEN, TAKEN

17              ON BEHALF OF THE PLAINTIFF, AT

18              5820 CANOGA AVENUE, SUITE 250,

19              WOODLAND HILLS, CALIFORNIA, COMMENCING

20              AT 1:07 P.M., TUESDAY, NOVEMBER 27, 2007,

21              BEFORE MAGDALENE S. PUENTE, CSR 8498.

22

23

24

25
                                                   2
                DALENE COURT REPORTERS


 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4           ROXBOROUGH, POMERANCE & NYE, LLP
```

2      A.    YEAH.

3            MR. SCHULTZ:  BY THE WAY, OBJECTION.  MOVE --

4            THAT'S VAGUE AND AMBIGUOUS AS TO "WORK."

5            I ASSUME YOU MEAN SOME LITIGATED CASES

6      INVOLVING REPRESENTATION OF LIBERTY MUTUAL OF COVERAGE

7      OR BAD FAITH.

8            IS THAT WHAT YOU MEAN?

9            MR. ROXBOROUGH:  SHE'S ALREADY ANSWERED THE

10     QUESTION.  LET'S JUST MOVE ON TO SPEED THINGS UP.

11           MR. SCHULTZ:  WELL, IF YOU WANT THERE TO BE

12     SOME AMBIGUITY, FINE, GO AHEAD.  IT'S YOUR DEPO.

13     BY MR. ROXBOROUGH:

14     Q.    AT KERN AND WOOLEY YOU DID VARIOUS TYPES OF

15     LEGAL SERVICES FOR LIBERTY MUTUAL; IS THAT CORRECT?

16     A.    I DON'T UNDERSTAND WHAT YOU MEAN BY "VARIOUS

17     TYPES OF LEGAL SERVICES."

18     Q.    VARIOUS TYPES, SUCH AS YOU DID COVERAGE WORK

19     FOR LIBERTY; RIGHT?

20     A.    YES.

21     Q.    YOU DID LITIGATION?

22     A.    YES.

23     Q.    DID BAD FAITH LITIGATION?

24     A.    YES.

25     Q.    AND I BELIEVE IN YOUR DEPOSITION YOU HANDLED

                                           9
                   DALENE COURT REPORTERS


1      ONE WORKERS' COMP BAD FAITH CASE, THE REMEDY CASE?

2      A.    ME PERSONALLY, YES.

3      Q.    AND THAT'S THE ONLY WORKERS' COMP BAD FAITH

4      CASE YOU HANDLED AT KERN AND WOOLEY DURING THE EIGHT

5      AND A HALF YEARS YOU WERE THERE?

6      A.    FOR ME PERSONALLY, YES.

7     Q.   OKAY.  NOW, DID YOU WHILE AT KERN AND WOOLEY

8   DO ANY WORK FOR ANYONE ELSE OTHER THAN LIBERTY?

9         MR. SCHULTZ:  OBJECTION.

10        WHAT'S THE RELEVANCE TO THAT?

11        YOU'RE GOING TO HAVE TO GIVE ME AN OFFER OF

12   PROOF AS TO THAT.  THIS IS VERY LIMITED DEPOSITION

13   TAKING IN TERMS OF WHAT'S AT ISSUE.

14        WHAT ARE YOU TALKING ABOUT?

15        MR. ROXBOROUGH:  WELL, MR. SCHULTZ, I'M GOING

16   TO SAY IT TO MAKE IT CLEAR:  YOU'RE HERE REPRESENTING A

17   PERSON WHO GAVE A DECLARATION.  THIS IS A DEPOSITION

18   THAT WON'T TAKE THAT LONG.  IF YOU HAVE ANY QUESTIONS,

19   I'M HAPPY TO CALL THE JUDGE IN FEDERAL COURT IF YOU

20   WANT TO INSTRUCT THE WITNESS NOT TO ANSWER ON

21   RELEVANCE.

22        MR. SCHULTZ:  I DIDN'T SAY THAT.

23        WOULD YOU PLEASE GIVE ME AN OFFER OF PROOF?

24        MR. ROXBOROUGH:  NO.

25   BY MR. ROXBOROUGH:

                                              10
                   DALENE COURT REPORTERS


1     Q.   JUST ANSWER THE QUESTION, PLEASE.

2     A.   WELL, YOU USED THE TERM "LIBERTY."  THERE ARE

3   VARIOUS ENTITIES WITHIN THE LIBERTY MUTUAL GROUP OF

4   COMPANIES.

5     Q.   OKAY.

6     A.   SO I OVER THE YEARS WOULD HAVE REPRESENTED A

7   LOT OF THOSE ENTITIES.  YES, DID WORK FOR OTHER CLIENTS

8   AS WELL.

9     Q.   OTHER NON-LIBERTY CLIENTS?

10    A.   YES.

11    Q.   OKAY.  WHAT WAS THE PERCENTAGE?

```
12          MR. SVESLOSKY:  VAGUE AS TO TIME.

13          THE DEPONENT:  WELL, WHILE AT KERN AND WOOLEY?

14   BY MR. ROXBOROUGH:

15     Q.   YES.  I'M SORRY.

16     A.   THE PERCENTAGE OF WORK FOR WHAT?

17     Q.   LIBERTY VERSUS NON-LIBERTY.

18     A.   IT WOULD VARY.  I'M GOING TO HAVE TO GIVE A

19   ROUGH ESTIMATE OF 95-ISH PERCENT.

20     Q.   FOR LIBERTY?

21     A.   YES.

22     Q.   OKAY.  WERE YOU A PARTNER AT KERN AND WOOLEY?

23     A.   NO.

24     Q.   ARE YOU A PARTNER AT THE GRACE FIRM?

25     A.   YES.
```

                                                    11
                    DALENE COURT REPORTERS

```
 1     Q.   AND WERE YOU A PARTNER AT THE PETERSON FIRM?

 2     A.   NO.

 3     Q.   SO THIS YEAR IS THE FIRST TIME YOU'VE BEEN A

 4   PARTNER IN A LAW FIRM?

 5     A.   CORRECT.

 6     Q.   OKAY.  WHEN YOU SAY "DIFFERENT LIBERTY

 7   COMPANIES," HOW MANY WERE THERE AT THE KERN AND WOOLEY

 8   FIRM THAT YOU WORKED ON?

 9     A.   WELL, FOR THE EIGHT-AND-A-HALF-YEAR PERIOD, IT

10   VARIED.

11     Q.   RIGHT.

12          MR. SCHULTZ:  IS YOUR QUESTION RELATED TO THE

13   ENTIRE TIME SHE WAS THERE TO GIVE YOU AS MANY LIBERTY

14   MUTUAL COMPANIES THAT SHE WORKED FOR?

15          MR. ROXBOROUGH:  WHAT'S YOUR OBJECTION?

16          MR. SCHULTZ:  I'M ASKING --
```

17          VAGUE AND AMBIGUOUS.

18          MR. ROXBOROUGH:  THANK YOU.

19          MR. SCHULTZ:  IF YOU UNDERSTAND WHAT HE'S

20  ASKING FOR, ANSWER IT, OTHERWISE, YOU CAN ASK HIM TO

21  REPHRASE IT.

22          THE DEPONENT:  IT'S A MATTER OF PUBLIC RECORD

23  WITH RESPECT TO LITIGATED CASES.

24          I WOULD ESTIMATE AS I SIT HERE TODAY FIVE TO

25  TEN DIFFERENT ENTITIES OVER THE PERIOD OF TIME AT KERN

12

DALENE COURT REPORTERS


1  AND WOOLEY WITHIN THE LIBERTY MUTUAL GROUP OF

2  COMPANIES.

3  BY MR. ROXBOROUGH:

4       Q.   DID EACH OF THE DIFFERENT ENTITIES HAVE

5  DIFFERENT MANUALS WHILE YOU WERE AT KERN AND WOOLEY?

6       A.   SOME DID.  SOME DID NOT.

7       Q.   WHICH ONES DID?

8          MR. SCHULTZ:  OBJECTION; ATTORNEY WORK

9  PRODUCT.

10          ARE YOU GETTING -- YOU'RE GETTING INTO HER

11  WORK FOR LIBERTY MUTUAL SPECIFICALLY.

12          AND I INSTRUCT YOU NOT TO ANSWER THAT

13  QUESTION.

14          MR. ROXBOROUGH:  OKAY.  AND I'M GOING TO MOVE

15  TO STRIKE YOUR CLIENT'S DECLARATION ABOUT MR. PYNES

16  HAVING ACCESS TO MANUALS OKAY.  DO YOU STIPULATE TO

17  THAT COUNSEL, OR DO YOU WANT TO WITHDRAW YOUR

18  OBJECTION?

19          MR. SCHULTZ:  I WITHDRAW THE ATTORNEY/CLIENT.

20  AND ATTORNEY WORK PRODUCT, IT'S VAGUE AND AMBIGUOUS AS

21  TO TIME.

22          AND GO AHEAD.

23          MR. ROXBOROUGH:  THANK YOU.

24          MR. SCHULTZ:  THANK YOU.

25          THE DEPONENT:  WHILE WE WERE AT KERN AND

                                        13
              DALENE COURT REPORTERS


1     WOOLEY, THERE WERE CLAIM MANUALS FOR THE LIBERTY MUTUAL

2     GROUP OF COMPANIES THAT APPLIED TO THE LIBERTY ENTITIES

3     SUCH AS LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY

4     MUTUAL FIRE INSURANCE COMPANY, AND THE LIBERTY

5     INSURANCE CORPORATION.  THERE WERE ALSO CLAIMS MANUALS

6     FOR EMPLOYERS INSURANCE OF WAUSAU, WAUSAU INSURANCE

7     COMPANY.  THERE WERE CLAIM MANUALS I ALSO BELIEVE ONCE

8     THERE WAS AN ACQUISITION OF THE PIECE OF THE PRUDENTIAL

9     BUSINESS BY LIBERTY MUTUAL OR ONE OF THE LIBERTY MUTUAL

10    COMPANIES.

11          THERE WOULD HAVE BEEN VARIOUS VERSIONS OF

12    VARIOUS CLAIM MANUALS OVER TIME.  YOU HAVE TO

13    UNDERSTAND THAT OUR REPRESENTATION OF THE LIBERTY

14    MUTUAL COMPANIES WENT BACK DECADES, SO -- AND SOME OF

15    THE LITIGATION WE WERE HANDLING, SUCH AS CONSTRUCTION

16    DEFECT, WOULD GO BACK IN TIME PERIOD OF TEN YEARS.

17          SO IN THE BAD FAITH LITIGATION IT WAS OFTEN

18    THE CASE THAT THE CLAIMS MANUALS AT ISSUE AND THOSE

19    THAT WE HAD IN OUR OFFICE WOULD HAVE BEEN VARIOUS

20    GENERATIONS OF MANUALS FROM ANY OF THOSE COMPANIES I'VE

21    IDENTIFIED OVER THE PEROD OF YEARS.  THERE WERE

22    REVISIONS THERE WERE DIFFERENT VERSIONS OF MANUALS.

23          SO WHILE AT KERN AND WOOLEY WE WOULD HAVE HAD

24    COPIES OF LOTS OF DIFFERENT CLAIM MANUALS FOR DIFFERENT

25    COMPANIES FOR DIFFERENT PERIODS OF TIME.

                                        14

```
22          AND GO AHEAD.

23          MR. ROXBOROUGH:  THANK YOU.

24          MR. SCHULTZ:  THANK YOU.

25          THE DEPONENT:  WHILE WE WERE AT KERN AND
```

13

DALENE COURT REPORTERS

```
 1    WOOLEY, THERE WERE CLAIM MANUALS FOR THE LIBERTY MUTUAL

 2    GROUP OF COMPANIES THAT APPLIED TO THE LIBERTY ENTITIES

 3    SUCH AS LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY

 4    MUTUAL FIRE INSURANCE COMPANY, AND THE LIBERTY

 5    INSURANCE CORPORATION.  THERE WERE ALSO CLAIMS MANUALS

 6    FOR EMPLOYERS INSURANCE OF WAUSAU, WAUSAU INSURANCE

 7    COMPANY.  THERE WERE CLAIM MANUALS I ALSO BELIEVE ONCE

 8    THERE WAS AN ACQUISITION OF THE PIECE OF THE PRUDENTIAL

 9    BUSINESS BY LIBERTY MUTUAL OR ONE OF THE LIBERTY MUTUAL

10    COMPANIES.

11          THERE WOULD HAVE BEEN VARIOUS VERSIONS OF

12    VARIOUS CLAIM MANUALS OVER TIME.  YOU HAVE TO

13    UNDERSTAND THAT OUR REPRESENTATION OF THE LIBERTY

14    MUTUAL COMPANIES WENT BACK DECADES, SO -- AND SOME OF

15    THE LITIGATION WE WERE HANDLING, SUCH AS CONSTRUCTION

16    DEFECT, WOULD GO BACK IN TIME PERIOD OF TEN YEARS.

17          SO IN THE BAD FAITH LITIGATION IT WAS OFTEN

18    THE CASE THAT THE CLAIMS MANUALS AT ISSUE AND THOSE

19    THAT WE HAD IN OUR OFFICE WOULD HAVE BEEN VARIOUS

20    GENERATIONS OF MANUALS FROM ANY OF THOSE COMPANIES I'VE

21    IDENTIFIED OVER THE PEROD OF YEARS.  THERE WERE

22    REVISIONS THERE WERE DIFFERENT VERSIONS OF MANUALS.

23          SO WHILE AT KERN AND WOOLEY WE WOULD HAVE HAD

24    COPIES OF LOTS OF DIFFERENT CLAIM MANUALS FOR DIFFERENT

25    COMPANIES FOR DIFFERENT PERIODS OF TIME.
```

14

```
 9  MS. OLSON HAD ONE, AND THERE WOULD HAVE BEEN ONE
10  GENERAL REFERENCE SOURCE AREA WHERE AN ADDITIONAL COPY
11  OR COPIES OR SUBSEQUENT VERSIONS WERE KEPT ALSO.
12     Q.   SO A LOT OF THE MANUALS THAT YOU HAD WERE
13  ANTIQUATED MANUALS, GOING BACK TO CONSTRUCTION DEFECT
14  CASES THAT WERE DECADES OLD AS YOU TESTIFIED TO; IS
15  THAT RIGHT?
16         MR. SVESLOSKY:  OBJECTION; MISSTATES HER
17  EARLIER TESTIMONY.
18         THE DEPONENT:  IT WOULD DEPEND ON THE CASE AND
19  DEPEND ON THE TIMING AND WHAT TIME PEROID WAS INVOLVED
20  IN ANY PARTICULAR CASE.
21  BY MR. ROXBOROUGH:
22     Q.   SO IS IT FAIR TO SAY THAT YOU HAD MANY
23  DIFFERENT TYPES OF MANUALS IN YOUR OFFICE AS WELL AS
24  THE KERN AND WOOLEY OFFICE CONCERNING LIBERTY AND THE
25  FIVE TO TEN DIFFERENT COMPANIES THAT YOU TESTIFIED TO?
```

17

DALENE COURT REPORTERS

```
 1     A.   WELL, IN MY OFFICE I HAD A TEN VOLUME SET.  AT
 2  VARIOUS TIMES OVER THAT EIGHT AND A HALF YEARS I'M SURE
 3  I HAD PORTIONS OF VARIOUS OTHER MANUALS IN MY OFFICE AS
 4  THEY WERE BEING REVIEWED OR I WAS REVIEWING WHAT OTHER
 5  ATTORNEYS HAD PULLED AND THEN THEY WERE BEING EITHER
 6  PRODUCED PURSUANT TO PROTECTIVE ORDER OR WHATEVER WAS
 7  HAPPENING ON A PARTICULAR CASE.  BUT THROUGHOUT OUR
 8  OFFICE AT KERN AND WOOLEY THERE WERE VARIOUS VERSIONS
 9  OF VAIOUS MANUALS FOR VARIOUS COMPANIES.
10     Q.   SO YOU WOULD PRODUCE THOSE MANUALS TO OPPOSING
11  COUNSEL PER A PROTECTIVE ORDER AS FOR EXAMPLE THE
12  REMEDY CASE?
13     A.   THEY WOULD ONLY BE PRODUCED PURSUANT TO A
```

14    PROTECTIVE ORDER.

15        Q.    BUT MY POINT IS THAT AT DIFFERENT -- YOU KNOW

16    THAT LIBERTY HAD DIFFERENT MANUALS FOR DIFFERENT LINES

17    OF COVERAGE, DIFFERENT TYPES OF WORK, OR DIFFERENT

18    TYPES OF SERVICES THAT THEY PROVIDED IN THE INSURANCE

19    MARKET; CORRECT?

20        A.    WELL, IT DEPENDS ON THE POINT IN TIME.

21            THERE WERE DIFFERENT MANUALS OR DIFFERENT

22    VOLUMES OF MANUALS THAT MAY HAVE ADDRESSED A CERTAIN

23    TYPE OF CLAIM.

24        Q.    RIGHT.

25        A.    I DON'T RECALL THE TIME PERIOD, BUT AT SOME

                                                          18
                    DALENE COURT REPORTERS


 1    POINT IN TIME THERE WAS ONE GENERAL SET.  AT A LATER

 2    POINT IN TIME THERE MAY HAVE -- THERE WERE MANUALS OR

 3    EVEN INFORMATION AVAILABLE TO INTERNAL LIBERTY

 4    PERSONNEL VIA  ELECTRONIC AS OF COURSE TECHNOLOGY GOT

 5    BETTER.

 6        Q.    ARE YOU DONE?  I DON'T WANT TO INTERRUPT YOU.

 7        A.    CAN I HAVE THE QUESTION BACK?  I'M NOT SURE I

 8    FINISHED.

 9        Q.    WHAT I'M GOING TO DO IS I'M GOING TO MOVE TO

10    STRIKE YOUR TESTIMONY AND I'M GOING TO ASK YOU THE

11    QUESTION.

12            THE QUESTION IS:  AT KERN AND WOOLEY THERE

13    WERE MANY, MANY, MANY DIFFERENT TYPES OF MANUALS FOR

14    THE VARIOUS TYPES OF INSURANCE PROGRAMS THAT THE

15    VARIOUS LIBERTY COMPANIES YOU'VE TESTIFIED ABOUT

16    OFFERED IN THE MARKETPLACE; CORRECT?

17            MR. SCHULTZ:  OBJECTION; VAGUE AND AMBIGUOUS,

18    COMPOUND, INCREDIBLY COMPOUND.  MANY, MANY COMPOUND.

14    PROTECTIVE ORDER.

15      Q.    BUT MY POINT IS THAT AT DIFFERENT -- YOU KNOW

16    THAT LIBERTY HAD DIFFERENT MANUALS FOR DIFFERENT LINES

17    OF COVERAGE, DIFFERENT TYPES OF WORK, OR DIFFERENT

18    TYPES OF SERVICES THAT THEY PROVIDED IN THE INSURANCE

19    MARKET; CORRECT?

20      A.    WELL, IT DEPENDS ON THE POINT IN TIME.

21            THERE WERE DIFFERENT MANUALS OR DIFFERENT

22    VOLUMES OF MANUALS THAT MAY HAVE ADDRESSED A CERTAIN

23    TYPE OF CLAIM.

24      Q.    RIGHT.

25      A.    I DON'T RECALL THE TIME PERIOD, BUT AT SOME

                                                          18
                    DALENE COURT REPORTERS


 1    POINT IN TIME THERE WAS ONE GENERAL SET.  AT A LATER

 2    POINT IN TIME THERE MAY HAVE -- THERE WERE MANUALS OR

 3    EVEN INFORMATION AVAILABLE TO INTERNAL LIBERTY

 4    PERSONNEL VIA  ELECTRONIC AS OF COURSE TECHNOLOGY GOT

 5    BETTER.

 6      Q.    ARE YOU DONE?  I DON'T WANT TO INTERRUPT YOU.

 7      A.    CAN I HAVE THE QUESTION BACK?  I'M NOT SURE I

 8    FINISHED.

 9      Q.    WHAT I'M GOING TO DO IS I'M GOING TO MOVE TO

10    STRIKE YOUR TESTIMONY AND I'M GOING TO ASK YOU THE

11    QUESTION.

12            THE QUESTION IS:  AT KERN AND WOOLEY THERE

13    WERE MANY, MANY, MANY DIFFERENT TYPES OF MANUALS FOR

14    THE VARIOUS TYPES OF INSURANCE PROGRAMS THAT THE

15    VARIOUS LIBERTY COMPANIES YOU'VE TESTIFIED ABOUT

16    OFFERED IN THE MARKETPLACE; CORRECT?

17            MR. SCHULTZ:  OBJECTION; VAGUE AND AMBIGUOUS,

18    COMPOUND, INCREDIBLY COMPOUND.  MANY, MANY COMPOUND.

19          THE DEPONENT:  YES.

20   BY MR. ROXBOROUGH:

21      Q.    AND THERE WAS ONE CALLED A BEST PRACTICES

22   GUIDELINE; RIGHT?

23      A.    THERE IS A BEST PRACTICES GUIDELINE THAT IS

24   DIFFERENT AND DISTINCT FROM A CLAIM MANUAL.

25      Q.    OKAY.  LET ME TALK TO YOU ABOUT THE BEST

                                                      19
                   DALENE COURT REPORTERS


1    PRACTICES DOCUMENT.

2          IT'S NOT CALLED A MANUAL, IS IT?

3       A.    NO.  I BELIEVE THE TITLE OF IT IS BEST

4    PRACTICES OR BEST PRACTICES GUIDELINE.

5       Q.    WHY DIDN'T YOU MENTION THAT IN YOUR

6    DECLARATION?

7       A.    FOR WHICH CASE?

8       Q.    FOR EITHER CASE; THE KENTUCKY CASE OR THE

9    CALIFORNIA CASE.

10          MR. SCHULTZ:  OBJECTION; LACKS FOUNDATION,

11   ASSUMES THAT THERE WAS A REASON.

12          THE DEPONENT:  WHY DIDN'T I MENTION THE BEST

13   PRACTICES?

14          WELL, I BELIEVE MY DECLARATION TALKS ABOUT

15   CLAIM MANUALS AND OTHER GUIDELINES --

16   BY MR. ROXBOROUGH:

17      Q.    DO YOU HAVE AN ANSWER?

18      A.    -- AND RELATED MATERIALS.

19          I BELIVE I SAY CLAIMS MANUAL AND RELATED

20   MATERIALS.  TO ME BEST PRACTICES GUIDELINES ARE

21   RELATEDED MATERIALS --

22      Q.    OKAY.

23      A.    -- TO CLAIMS HANDLING FOR CERTAIN TYPES OF

6    BAD FAITH CASE; IS THAT ACCURATE?

7        A.    I WAS ONE OF THE HANDLING ATTORNEYS ON THE

8    REMEDYTEMP CASE.  I MAY HAVE DONE SOME WORK ON SOME

9    OTHER CASES WHILE AT KERN AND WOOLEY, BUT I WOULD NOT

10   HAVE BEEN THE HANDLING ATTORNEY ON ANY OTHER WORKERS'

11   COMP.

12       Q.    AND EVEN ON REMEDYTEMP, MS. OLSON WAS THE LEAD

13   ATTORNEY ON THAT CASE; CORRECT?

14       A.    IT WOULD HAVE DEPENDED ON WHAT WAS HAPPENING

15   ON THE CASE AT ANY CERTAIN POINT IN TIME.  CERTAIN

16   THINGS I WAS LEAD, CERTAIN THINGS SHE WAS LEAD.

17       Q.    OKAY.  SO THERE WAS NO LEAD.

18             YOU SHARED THAT ROLE WITH MS. OLSON ON THE

19   REMEDYTEMP CASE; RIGHT?

20       A.    NO.  I'M NOT --

21             I CAN PROBABLY ANSWER THIS BUT NOT MUCH MORE.

22   I THINK THIS IS GETTING INTO WORK PRODUCT.

23             AT TIMES IT WAS SHARED.  AT TIMES IT WAS NOT.

24       Q.    OKAY.  YOU DIDN'T GIVE ANY TRAINING TO CRAIG

25   PYNES ON WORKERS' COMP BAD FAITH CASES OBVIOUSLY, DID

                                              23
                      DALENE COURT REPORTERS


1    YOU?

2        A.    DID I PERSONALLY?

3        Q.    YES.

4        A.    WELL, I SPOKE WITH MR. PYNES IN GENERAL ABOUT

5    AN ASSIGNMENT THAT HE DID ON TONY'S FINE FOODS CASE, SO

6    I WOULD CONSIDER QUESTIONS THAT HE HAD ASKED ME AND

7    ISSUES WE HAD DISCUSSED ABOUT THE ASSIGNMENT HE HAD

8    WITH TONY'S FINE FOODS AS TRAINING.

9        Q.    OKAY.  WELL, I'M NOT GOING TO ARGUE WITH YOU

10   ABOUT THAT.  WE'LL COME BACK TO THAT.

23  COME AND ASK ME SOME QUESTIONS ABOUT THE ASSIGNMENT

24  THAT HE WAS GIVEN.  SO TO THE EXTENT I WOULD HAVE

25  PROVIDED SOME GUIDANCE, RECOMMENDATIONS, INFORMATION OR

33

DALENE COURT REPORTERS

1   HELP, THAT'S SUPERVISION.

2   BY MR. ROXBOROUGH:

3      Q.   THAT'S WHAT YOU MEANT BY "SUPERVISE HIM"?

4      A.   WELL, THAT'S INVOLVED IN SUPERVISION.

5      Q.   SO YOU WERE INVOLVED IN SUPERVISING HIM ON

6   THIS ASSIGNMENT INVOLVING WORKERS' COMPENSATION CLAIM

7   FILES.

8           IS THAT YOUR TESTIMONY?

9           MR. SCHULTZ:  OBJECTION; ARGUMENTATIVE, VAGUE,

10  COMPOUND, MISSTATES HER TESTIMONY.  TESTIMONY STANDS AS

11  SHE TESTIFIED.

12          THE DEPONENT:  WHILE AT KERN AND WOOLEY I WAS

13  ONE OF THE SUPERVISORING ATTORNEYS FOR OUR PRACTICE

14  GROUP, AND OFTEN WOULD SUPERVISE MR. PYNES AND OTHERS

15  ON A VARIETY OF CASES.

16  BY MR. ROXBOROUGH:

17     Q.   HE WAS A COMPETENT LAWYER?

18     A.   PARDON?

19     Q.   HE WAS A COMPETENT LAWYER?

20          MR. SCHULTZ:  OBJECTION; VAGUE.

21          THE DEPONENT:  YEAH.  SURE.

22  BY MR. ROXBOROUGH:

23     Q.   GOOD LAWYER?

24          MR. SCHULTZ:  SAME.

25          THE DEPONENT:  YES.

34

DALENE COURT REPORTERS

```
 1   BY MR. ROXBOROUGH:

 2       Q.   HARD WORKER?

 3       A.   YES.

 4       Q.   HONEST?

 5       A.   I HAVE NO REASON TO BELIEVE OTHERWISE.

 6       Q.   THIS SUPERVISION OF CRAIG PYNES ON TONY'S FINE

 7   FOODS, WHAT WOULD YOU ESTIMATE THE LENGTH OF THE TIME

 8   YOU SPENT SUPERVISING HIM ON THIS ASSIGNMENT?

 9       A.   MY DISCUSSION WITH HIM WOULD HAVE BEEN AS I

10   SIT HERE TODAY AN ESTIMATE OF 15 MINUTES.

11       Q.   AND HOW IS IT THAT YOU RECALL THAT SO VIVIDLY?

12            MR. SCHULTZ:  OBJECTION; ARGUMENTATIVE.

13            THE DEPONENT:  I HAVE A RECOLLECTION THAT

14   MR. PYNES WALKED INTO MY OFFICE, WAS STANDING IN MY

15   OFFICE AND HAD ASKED ME QUESTIONS ABOUT THE ASSIGNMENT,

16   THE PROJECT THAT HE WAS WORKING ON IN THE TONY'S FINE

17   FOODS CASE AND ASKED ME SOME SPECIFIC QUESTIONS EITHER

18   ABOUT THE DOCUMENT REVIEW, THE ASSIGNMENT, OR ISSUES

19   INVOLVING THE WORKERS' COMP BAD FAITH.

20   BY MR. ROXBOROUGH:

21       Q.   WELL, DID HE ASK YOU ABOUT THE DOCUMENT REVIEW

22   OR DID HE ASK YOU ABOUT THE ASSIGNMENT OR DID HE ASK

23   YOU ABOUT THE ISSUES INVOLVING THE WORKERS' COMP BAD

24   FAITH CASE?

25            MR. SCHULTZ:  OBJECTION; COMPOUND.
```

35

DALENE COURT REPORTERS

```
 1   BY MR. ROXBOROUGH:

 2       Q.   WHICH ONE DID HE ASK YOU ABOUT?

 3            MR. SCHULTZ:  OBJECTION; COMPOUND.

 4            THE DEPONENT:  AS I SIT HERE TODAY, IT WAS
```

5    ABOUT THE ASSIGNMENT IN GENERAL WHICH ENCOMPASSED ALL

6    OF THOSE.

7         I DON'T RECALL ANY -- ANY OF THE SPECIFICS IN

8    TERMS OF WHAT HE SAID AND WHAT I SAID, BUT I DO

9    DISTINCTLY REMEMBER THAT CRAIG AND I DID DISCUSS THAT

10   PROJECT.

11   BY MR. ROXBOROUGH:

12     Q.    BUT YOU DON'T REMEMBER WHICH OF THE THREE

13   SUBJECTS YOU TALKED ABOUT?

14         MR. SVESLOSKY:  OBJECTION; MISSTATES HER

15   TESTIMONY, ARGUMENTATIVE.

16         MR. SCHULTZ:  VAGUE AND COMPOUND, TOO.

17         THE DEPONENT:  I THINK I ANSWERED THAT.

18   BY MR. ROXBOROUGH:

19     Q.    DID YOU TAKE NOTES OF THE CONVERSATION?

20     A.    NO.

21     Q.    YOU HAD NEVER WORKED WITH HIM ON TONY'S FINE

22   FOODS UP UNTIL THAT POINT; CORRECT?

23     A.    CORRECT.

24     Q.    YOU DIDN'T EVEN GIVE HIM THE ASSIGNMENT, DID

25   YOU?

36

DALENE COURT REPORTERS

1    A.    NO, I DID NOT.

2    Q.    WHAT MONTH WAS THIS?

3    A.    I DON'T RECALL AS I SIT HERE TODAY.

4    Q.    WHAT YEAR WAS IT?

5    A.    WELL, IT WAS DURING THE TIME HE WAS EMPLOYED

6    AT KERN AND WOOLEY, SO IT WAS EITHER THE FALL OF 2003

7    OR BEFORE HE LEFT IN JANUARY, FEBRUARY, MARCH OF 2004.

8         MR. ROXBOROUGH:  I'M GOING TO HAVE MARKED AS

9    EXHIBIT 2 YOUR DECLARATION CALLED AN AFFIDAVIT AND THE

15          CAN I HAVE THE QUESTION BACK?

16          (WHEREUPON, THE FOLLOWING QUESTION

17            WAS READ:

18              Q.    AND ARE YOU INTERESTED IN

19            PURSUING AND OBTAINING ANY BUSINESS AT

20            THE GRACE FIRM DOING WORK FOR LIBERTY

21            MUTUAL?)

22          THE DEPONENT:  WELL, I SUPPOSE AS ANY LAWYER

23    WHOSE SURVIVES ON REVENUE, ADDITIONAL CLIENTS ARE

24    ALWAYS A GOOD THING, BUT I HAVE NO NEED TO OBTAIN

25    BUSINESS FROM LIBERTY MUTUAL.

71

DALENE COURT REPORTERS

1     BY MR. ROXBOROUGH:

2        Q.    SO ARE YOU INTERESTED IN OBTAINING BUSINESS

3     FROM LIBERTY MUTUAL OR NOT?

4            MR. SVESLOSKY:  OBJECTION; ASKED AND ANSWERED.

5     BY MR. ROXBOROUGH:

6        Q.    CALLS FOR "YES" OR "NO," EITHER YOU ARE OR

7     NOT.

8        A.    IF I WERE APPROACHED AND ASKED TO DO SOME WORK

9     FOR LIBERTY MUTUAL, I WOULD CONSIDER IT.

10       Q.    OKAY.  DID YOU CONSIDER DURING THE TIME PERIOD

11    PRIOR TO SIGNING YOUR EXHIBIT 5 DECLARATION ASKING

12    LIBERTY MUTUAL TO GET YOU A COPY OF THE TONY'S FINE

13    FOODS CASE?

14           MR. SVESLOSKY:  OBJECTION; VAGUE AND

15    AMBIGUOUS.

16           MR. ROXBOROUGH:  MR. SCHWARTZ, I'M NOT SURE

17    THAT'S APPROPRIATE WHILE A QUESTION IS PENDING TO BE

18    WHISPERING IN MS. HANSEN'S EAR.

19           THE DEPONENT:  MR. ROXBOROUGH, THE PROBLEM I

Mailbox:///C|/DOCUMENTS%20AND%20SETTINGS/SEAN/AP...

12          DO SEE THAT?

13     A.   YES.

14     Q.   OKAY.  WERE YOU IN THE ROOM WHEN MS. YEE

15   DIRECTED MR. PYNES ON THAT ASSIGNMENT?

16     A.   NO.

17     Q.   YOU WEREN'T PRESENT; CORRECT?

18          YOU WEREN'T PRESENT WHEN MS. YEE GAVE THIS

19   ALLEGED ASSIGNMENT TO MR. PYNES, WERE YOU?

20          MR. SVESLOSKY:  OBJECTION; ARGUMENTATIVE IN

21   REGARDS TO THE TERM "ALLEGED."

22          THE DEPONENT:  AS I PREVIOUSLY ANSWERED, NO, I

23   WAS NOT.

24   BY MR. ROXBOROUGH:

25     Q.   AND SO WHEN YOU SAY IT WAS AT THE DIRECTION OF

77

DALENE COURT REPORTERS


 1   MS. YEE, THAT'S BASED UPON WHAT MS. YEE TOLD YOU?

 2     A.   WHAT I LEARNED FROM MS. YEE AND WHAT MR. PYNES

 3   TOLD ME WHEN HE SPOKE WITH ME ON THIS PROJECT.

 4     Q.   OKAY.  NOW, IF YOU WEREN'T HIS SUPERVISING

 5   ATTORNEY ON THIS PROJECT, DO YOU KNOW WHY CRAIG CAME TO

 6   TALK TO YOU ABOUT THE ASSIGNMENT AS OPPOSED TO MS. YEE?

 7          MR. SVESLOSKY:  OBJECTION; MISSTATES PRIOR

 8   TESTIMONY, ARGUMENTATIVE, LACKS FOUNDATION.

 9          THE DEPONENT:  MR. PYNES, FOR WHATEVER REASON

10   HE HAD, CAME TO ME AND ASKED ME SOME QUESTIONS ABOUT

11   THE CLAIM FILE REVIEW, THE PRIVILEGE REVIEW AND

12   ANALYSIS AND THE PREPARATION OF PRIVILEGE LOG THAT HE

13   WAS WORKING ON.

14   BY MR. ROXBOROUGH:

15     Q.   MY QUESTION MAY BE POORLY WORDED AND I

16   APOLOGIZE WAS:  IF MS. YEE DIRECTED HIM TO DO AN

```
 5          INSTRUCT YOU NOT TO ANSWER.
 6   BY MR. ROXBOROUGH:
 7      Q.  DO THEY EXIST?
 8          MR. SCHULTZ:  OBJECTION; CALLS FOR
 9   SPECULATION.
10          MR. SVESLOSKY:  VAGUE.
11          THE DEPONENT:  I HAVE NO IDEA.
12   BY MR. ROXBOROUGH:
13      Q.  WHO WOULD KNOW --
14          MR. SCHULTZ:  OBJECTION; CALLS FOR
15   SPECULATION.
16   BY MR. ROXBOROUGH:
17      Q.  -- BETWEEN YOU, MS. OLSON AND MR. SKOCYPEC?
18          MR. SCHULTZ:  OBJECTION; CALLS FOR
19   SPECULATION.
20          THIS IS WHAT DAY NOW?
21          THE DEPONENT:  I DON'T KNOW.
22   BY MR. ROXBOROUGH:
23      Q.  BEFORE PREPARING YOUR EXHIBIT 5 DECLARATION --
24   STRIKE THAT.
25          BETWEEN AUGUST 1ST AND AUGUST 15TH, 2006, YOU
```
                                                102
                     DALENE COURT REPORTERS


```
 1   TESTIFIED THAT YOUR MEMORY WAS REFRESHED ABOUT YOUR
 2   MEETING WITH CRAIG PYNES; RIGHT?
 3      A.  YES.
 4      Q.  BETWEEN AUGUST 1ST AND AUGUST 15TH, 2006, DID
 5   YOU CONSIDER CALLING ANYBODY AT LIBERTY MUTUAL TO
 6   OBTAIN THE BILLING RECORDS ON TONY'S FINE FOODS?
 7      A.  NO.
 8      Q.  LIBERTY MUTUAL GENERALLY -- STRIKE THAT.
 9          YOU AGREE THAT GENERALLY THE CLIENTS THAT
```



# DECLARATION OF SUSAN T. OLSON

I, Susan T. Olson, declare as follows:

I am an attorney duly licensed to practice before this Court and all courts in the State of California and am an attorney with the law firm of Kern and Wooley LLP, attorneys of record for defendant Liberty Insurance Corporation and Liberty Mutual Insurance Company (erroneously sued and served as Liberty Insurance Company) and Andrea Burton (collectively "Liberty"). I am one of the attorneys responsible for the handling of this matter on behalf of Liberty.

This declaration is submitted in support of Liberty's ex parte application for an order to stay this action. I have personal knowledge of the facts stated herein. If called and sworn as a witness, I could and would testify competently to the following:

1.    Attached hereto as Exhibit "A" is a true and correct copy of the stipulation of all parties to stay this action. In an effort to preserve judicial resources and facilitate the resolution of this action, the parties have stipulated to stay this action, in its entirety, for a period of six (6) months. During this time, the parties have agreed to exchange the relevant documents contained in or related to the claim files in issue, to have them reviewed independently by and expert and to seek to resolve any differences through private mediation.

2.    Based on the above, it was agreed that I would file and serve the ex parte application to stay the action by stipulation of the parties on June _16_, 2003.

---

2