EXHIBIT H

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARGO CONCRETE, INC., etc; et al.,    )
                                       )
                    Plaintiffs,        )
                                       )
          vs.                          )
                                       ) No. C07-04651CRB(ADR)
LIBERTY MUTUAL FIRE INSURANCE          )
COMPANY, etc., et al.,                 )
                                       )
                    Defendants.        )
_____)

DEPOSITION OF CRAIG S. PYNES

December 11, 2007

255066



**BARKLEY**
*Court Reporters*

(212) 808-8500 New York
(702) 366-0500 Las Vegas
(310) 207-8000 Los Angeles
(915) 922-5777 Sacramento
(858) 455-5444 San Diego
(949) 955-0400 Irvine
(408) 885-0550 San Jose
(951) 686-0606 Riverside
(415) 433-5777 San Francisco
(760) 322-2240 Palm Springs
(818) 702-0202 Woodland Hills

1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4

5    LARGO CONCRETE, INC., a        )
     California corporation;        )
6    et al.,                        )
                                    )
7              Plaintiffs,          )
                                    )
8         vs.                       )    No. C07-04651CRB(ADR)
                                    )
9    LIBERTY MUTUAL FIRE INSURANCE)
     COMPANY, a Massachusetts       )
10   corporation; et al.,           )
                                    )
11             Defendants.          )
     _____)

12

13

14

15             Deposition of CRAIG S. PYNES,

16        taken on behalf of Defendant Liberty

17        Mutual Fire Insurance Company, at

18        1901 Avenue of the Stars, Suite 1600,

19        Los Angeles, California, beginning at

20        9:15 a.m. on Tuesday, December 11, 2007,

21        before SUSAN VAN BOOVEN, Certified

22        Shorthand Reporter No. 3956.

23

24

25

                              2

```
1    APPEARANCES:

2

3    For Plaintiffs:

4          ROXBOROUGH, POMERANCE & NYE, LLP
             BY:  NICHOLAS P. ROXBOROUGH
5          Attorney at Law
             5820 Canoga Avenue, Suite 250
6          Woodland Hills, California  91367
             (818) 992-9999
7          npr@rpnlaw.com

8

     For Defendant Liberty Mutual Fire Insurance Company:
9
             SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
10          BY:  FRANK FALZETTA
             Attorney at Law
11          333 South Hope Street, Suite 4800
             Los Angeles, California  90071-1448
12          (213) 620-1780
             ffalzetta@sheppardmullin.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

1                           INDEX

2   WITNESS
                                              EXAMINATION
3   CRAIG S. PYNES

4

5              BY MR. FALZETTA                      5

6

7

8                         EXHIBITS

9   DEPOSITION                                  PAGE

10  50   Letter to Angelica Leon from Craig Pynes        45
         dated 3-11-04, and attachments; 3 pages
11
    51   Declaration of Craig S. Pynes in Opposition     60
12       to Liberty Mutual's Motion to Disqualify
         Roxborough, Pomerance & Nye from Representing
13       Plaintiffs; 10 pages

14  52   Legal eXchange Invoice from Kern and Wooley      77
         LLP; 3 pages
15
    53   Tony's Fine Foods v. Liberty Mutual             91
16       Insurance Company; 2 pages

17

18

19                INSTRUCTION NOT TO ANSWER

20                      Page   Line
                         20     8
21                       66    16
                         75    14
22                       75    22
                        138    24
23

24

25

                            4

                    CRAIG S. PYNES

                                              BARKLEY
                                              Court Reporters

1    So I would produce documents or, you know, include a

2    work product document that had to do with the

3    underlying case.  It wouldn't capture a legal memo

4    that, you know, was done after the case was filed.

5        Q    It wouldn't capture Kern and Wooley attorney

6    work product, whether it was done by you or another

7    attorney, correct?

8        A    Right.

9        Q    And it wouldn't capture case evaluations and

10   others' communications between the client and Liberty

11   Mutual, right?

12       A    Yes.

13       Q    But you did do privilege logs in the cases

14   you handled for Liberty Mutual?

15       A    Yes.

16            MR. ROXBOROUGH:  Objection; asked and

17   answered.

18            THE WITNESS:  Some.

19   BY MR. FALZETTA:

20       Q    Therefore, to generate those privilege logs,

21   you looked at Liberty Mutual documents and you decided

22   if there were any attorney-client-privileged, work

23   product or other confidential information that

24   shouldn't be produced; is that right?

25       A    No, that's not right.  What I would look

38

CRAIG S. PYNES

BARKLEY
Court Reporters

1    at --

2            MR. ROXBOROUGH:  He didn't ask you what you

3    looked at.

4            THE WITNESS:  No, that's not right.

5    BY MR. FALZETTA:

6        Q    What did you look at to prepare privilege

7    logs in the Liberty Mutual cases that you handled?

8            MR. ROXBOROUGH:  Objection; overbroad, calls

9    for a narrative, lacks foundation.

10           THE WITNESS:  You would look at the

11   underlying claim files, you would look at, you know,

12   the underlying -- you know, it's an earthquake claim,

13   you look at the documents in the case.  Are they, you

14   know, work product or are they, you know, source

15   materials that should be produced?

16   BY MR. FALZETTA:

17       Q    Okay.  So tell me all the things that would

18   cause you not to produce a document that was otherwise

19   called for in a litigation that you handled for

20   Liberty Mutual while you were at Kern and Wooley.

21       A    They would either be something that was work

22   product or it was not relevant, typically.

23       Q    What about attorney-client privilege?

24       A    If it was attorney-client privilege, I

25   wouldn't produce it, but I don't remember that being a

39

CRAIG S. PYNES

BARKLEY
Court Reporters

1  big issue.

2      Q   Did you ever withhold a document in a Liberty

3  Mutual case on the grounds that it was attorney-

4  client-privileged?

5      A   I'm sure I did.

6      Q   And that means you actually looked at the

7  document, read it, decided it was attorney-client-

8  privileged and did not produce it, correct?

9      A   Right.

10     Q   Okay.  And you also said you withheld

11 documents on the grounds of attorney work product,

12 right?

13     A   Right.

14     Q   And you made the determination that it was

15 attorney work product, correct?

16     A   Correct.

17     Q   And you, therefore, logged the document and

18 did not produce it to the other side?

19     A   Right.

20     Q   But you read it?

21     A   I would have reviewed it enough to know

22 whether it was attorney-client or work product.

23 Whether I would have read it for substance, not

24 necessarily.

25     Q   Okay.  What about documents that were

40

CRAIG S. PYNES

BARKLEY
Court Reporters

1    she did something like that.  There could have been

2    others.

3         Q    When did Lisa do that?  What case?

4         A    I don't remember the name of the case.

5         Q    Was it in Tony's Fine Foods?

6         A    No way.

7         Q    Okay.  Did you do a privilege log in Tony's

8    Fine Foods?

9         A    Yes.

10        Q    Who else worked on a privilege log that you

11   worked on?

12             MR. ROXBOROUGH:  Objection; foundation.

13             THE WITNESS:  I would be speculating.  I

14   don't know.

15   BY MR. FALZETTA:

16        Q    Do you know if anyone did?

17        A    Could have been Melodie Yee.

18        Q    Do you know?

19        A    I don't know.

20        Q    All right.  Do you know if anyone worked on

21   this privilege log that I put in front of you as

22   Exhibit 50, other than you?

23        A    Don't know specifically.

24        Q    All right.  You said earlier that you would

25   not log communications between Kern and Wooley and a

50

BARKLEY
Court Reporters

1    approximately three hours preparing the privilege log

2    in Tony's Fine Foods; is that correct?

3        A    I think I said I spent three to four hours --

4    I thought it was probably closer to four hours --

5    working on the privilege log and reviewing the

6    documents.

7        Q    Okay.  Could it have been more than that?

8        A    It was such a blip, I don't remember.

9        Q    Could it have been twice that much time?

10            MR. ROXBOROUGH:  Six to eight hours?

11            THE WITNESS:  I honestly don't -- I didn't

12    even remember the case until it came up on a motion.

13    BY MR. FALZETTA:

14        Q    Well, your declaration -- do you want me to

15    show you your declaration?

16        A    Sure.

17            MR. FALZETTA:  Let's mark it as Exhibit 51.

18            (Deposition Exhibit 51 was marked for

19            identification by the deposition officer.)

20    BY MR. FALZETTA:

21        Q    It's the Declaration of Craig S. Pynes in

22    Opposition to Liberty Mutual's Motion to Disqualify

23    Roxborough, Pomerance & Nye from Representing

24    Plaintiffs.

25            MR. ROXBOROUGH:  Do you have a copy for me?


                              60

                    CRAIG S. PYNES

1           MR. FALZETTA:  That's it, that's all I got.

2           MR. ROXBOROUGH:  All right.  Let's get

3   copies, though, afterwards because it will just speed

4   things up.

5           MR. FALZETTA:  Okay.

6           MR. ROXBOROUGH:  It's what I did for you

7   guys.

8           MR. FALZETTA:  I'm sorry.

9           THE WITNESS:  That's how I do depos, too.

10          MR. ROXBOROUGH:  So what paragraph do you

11  want him to look at?

12  BY MR. FALZETTA:

13      Q   First of all, look at the document and look

14  at your signature and verify for me, please, that that

15  is the declaration that you signed and submitted in

16  this case.

17      A   That's my signature on page 8.

18      Q   Did you prepare this declaration?

19      A   I did not.

20      Q   Who prepared it?

21      A   Prepared it.  Another associate at the firm.

22      Q   Who is that?

23      A   Michael Phillips.

24      Q   How did he prepare it?

25      A   I would be speculating.

·61

BARKLEY
Court Reporters

1    personal knowledge.

2            Do you know if he relied on any of those

3    things in preparing your declaration?

4        A    I don't know.

5        Q    Did you make any changes to the draft

6    declaration that Mr. Phillips gave to you?

7        A    Clerical changes.

8        Q    Such as?

9        A    Such as if there was a typo or -- nothing of

10   a substantive nature.

11       Q    So you agreed with everything that he put in

12   the draft for you to sign?

13       A    Yes.

14       Q    Okay.  Why don't you look at paragraph 5,

15   then.

16       A    Okay.

17       Q    Does paragraph 5 describe the totality of

18   what you did in the Tony's Fine Foods case when you

19   were at Kern and Wooley?

20       A    Yes.

21       Q    And is it accurate?

22       A    As far as I recall, yes.

23       Q    You state at line 22, quote, I spent less

24   than four hours performing this task, end quote.  Do

25   you see that?

63

BARKLEY
Court Reporters

1       A    Yes.

2       Q    Okay.  You're very definitive there:  It's

3    less than four hours, right?

4       A    I don't even remember the case, honestly.

5       Q    That's not my question.

6       A    I mean, honestly, until the motion was filed,

7    the first motion in the Kentucky case, I didn't

8    remember the Tony's Fine Foods case; I didn't remember

9    the name of the case, I didn't remember anything about

10   it.

11            It was only when that got brought up that I

12   vaguely recalled looking over, you know, claim files

13   for personal information in it.  I didn't remember

14   spending more than four hours on the task.

15      Q    You were very definitive in this declaration.

16   You state, "I spent less than four hours performing

17   this task."

18            MR. ROXBOROUGH:  Objection; asked and

19   answered.  What's your question?

20   BY MR. FALZETTA:

21      Q    Is that your testimony here today, under

22   oath, that you spent less than four hours performing

23   the task described in this paragraph?

24            MR. ROXBOROUGH:  Asked and answered.  He's

25   already said that, to the best of his recollection,

64

CRAIG S. PYNES

BARKLEY
Court Reporters

1    that's what he recalls.  If you want to show him the

2    billing records that maybe show more hours than that,

3    knock yourself out.

4            I've been asking for those through the whole

5    motion.

6            THE WITNESS:  And I'm telling you, it was a

7    blip.  I don't remember.

8    BY MR. FALZETTA:

9        Q    That's not my question.

10        A    I understand.  I don't remember -- I barely

11   remember working on the case, much less working more

12   than four hours on the case.

13        Q    So why did you say that you worked less than

14   four hours if you don't really remember?

15        A    Because all I remember was rifling through

16   claim files quickly and redacting personal

17   information.  And it was just a blip.  It wasn't legal

18   work.  It was nothing.  It was -- it was fill-in time.

19   It was filling billable hour time.  That's all it was.

20        Q    But why did you pick four hours?  And why did

21   you say definitively -- not "to the best of my

22   recollection," but you said, "I spent less than four

23   hours performing this task."  Why did you say that?

24        A    Because that's what I remembered, Frank.

25        Q    Is that your current best recollection today?


65

CRAIG S. PYNES

BARKLEY
Court Reporters

```
 1        A    As I said, my best recollection is this case
 2   was a blip that I remember very little about.
 3        Q    Is it your best recollection today under oath
 4   that you spent less than four hours on --
 5        A    It could have been more.  It could have been
 6   more.  I honestly don't remember.
 7        Q    Could it have been double?
 8        A    Could have been.
 9        Q    More than double?
10        A    Don't know.
11        Q    Why didn't you say that in the declaration?
12        A    Because I didn't remember the case.
13        Q    You stated definitively, "I spent less than
14   four hours performing this task," without any caveats
15   or conditions, right?
16        MR. ROXBOROUGH:  Instruct him not to answer.
17   You're argumentative.  Take it down a notch, Frank.
18   We had discussion this morning about this.  I knew
19   this was going to happen.  I understand it -- take it
20   down a notch.
21   BY MR. FALZETTA:
22        Q    Is that what happened?
23        A    The case was a blip.
24        Q    So you don't remember how much time you spent
25   on Tony's Fine Foods, do you?
```

66

CRAIG S. PYNES

1    two-minute break.  You guys are going way too fast.

2            (Recess.)

3            (Record read.)

4            MR. FALZETTA:  We're back on the record.

5            Nick, we had a conversation, before we began,

6    in which I told you that I wanted to mark Craig's time

7    entries from the Tony's Fine Foods case but I wanted

8    your stipulation and agreement that by marking this

9    document, and doing so without even a confidentiality

10   agreement, that I wouldn't be waiving privilege and

11   there would be no subject-matter waiver as a result of

12   me doing so, and you said you would agree with that.

13           Is that correct?

14           MR. ROXBOROUGH:  That's correct.

15           MR. FALZETTA:  Okay.  Let's mark this, then,

16   as Exhibit 52, next in order.

17           (Discussion off the record.)

18           (Deposition Exhibit 52 was marked for

19           identification by the deposition officer.)

20   BY MR. FALZETTA:

21       Q   Craig, have you had an opportunity to review

22   Exhibit 52?

23       A   Not entirely, no.

24       Q   Go ahead, take your time.

25       A   Okay.

77

CRAIG S. PYNES

BARKLEY
Court Reporters

```
 1        Q   All right.  First, have you ever seen this
 2   document before?
 3        A   No.
 4        Q   Do the time entries look familiar?
 5        A   No.
 6        Q   Do you have any reason to believe that these
 7   time entries by you in the Tony's Fine Foods case are
 8   inaccurate?
 9        A   I don't know, necessarily, that they're by
10   me.
11        Q   Oh.  Would you enter your own time entries
12   when you worked at Kern and Wooley?
13        A   Yes.
14        Q   And how would you do that?
15        A   I would type them into the computer.
16        Q   You would directly type them in?
17        A   Uh-huh.
18            MR. ROXBOROUGH:  Can you say "yes"?
19            THE WITNESS:  I'm sorry.  Yes.  Sorry.
20   BY MR. FALZETTA:
21        Q   And you would enter them into some sort of
22   time and billing system that Kern and Wooley had?
23        A   Yes.
24        Q   And do you believe that anyone subsequently
25   'modified your time entries?
```

78

CRAIG S. PYNES

BARKLEY
Court Reporters

1          MR. FALZETTA:  Well, that --

2     Q    That's an interesting statement you're

3     making.

4     A    Uh-huh.

5     Q    And one I'm sure that they'll be interested

6     in and will be contacting you --

7          MR. ROXBOROUGH:  I don't know, it may be

8     privileged.

9          THE WITNESS:  It may be privileged, and it's

10    true, so --

11         MR. ROXBOROUGH:  Oh, but I'm not here

12    representing Kern and Wooley.  I don't care.

13    BY MR. FALZETTA:

14    Q    Craig, do you know if any such time-entry

15    increases or decreases were done on your time entries

16    done in the Tony's Fine Foods matter?

17    A    I don't recall.

18    Q    Okay.  All right.  Do the time entries on the

19    document that I've marked as 52 look familiar to you?

20    A    Generally.

21         MR. ROXBOROUGH:  Objection --

22         THE WITNESS:  Generally, yes.

23    BY MR. FALZETTA:

24    Q    Are they the types of time entries that you

25    would enter in Liberty matters that you worked on?

CRAIG S. PYNES

BARKLEY
Court Reporters

1         A    Generally, yes.

2         Q    Is any of the language something that is very

3    Craig Pynes, so to speak?

4         A    I don't know what that would mean.

5         Q    Well, is there a vernacular and type of entry

6    style that you used in your billing entries?

7              MR. ROXBOROUGH:  Well, objection in terms of

8    what he does for our firm.  That's not even close to

9    what we do in our firm.

10             MR. FALZETTA:  I realize that.  I'm sorry, I

11   meant at Kern and Wooley.

12             MR. ROXBOROUGH:  Oh, I'm sorry.  I'm sorry.

13             THE WITNESS:  Generally, it looks similar.

14   It wouldn't necessarily reflect everything that I

15   input, but generally it looks similar.

16   BY MR. FALZETTA:

17        Q    Do you have any reason to believe that you

18   did not enter the time entries that are listed in 52?

19        A    It looks like there might be some stuff that

20   was added.

21        Q    Okay.  Tell me what.

22        A    Like in parens, where it says "and redaction

23   and segregation of privileged information," back

24   slash, "documents," I don't know if that's something I

25   would -- I don't know that I would use those words.

83

CRAIG S. PYNES

BARKLEY
Court Reporters

```
 1        A    Less than that.

 2        Q    Less than two Bekins boxes?

 3             MR. ROXBOROUGH:  Asked and answered.

 4             THE WITNESS:  No, I'm not sure.

 5             MR. FALZETTA:  All right.

 6             Let me mark as Exhibit 53 a privilege log in

 7    Tony's Fine Foods versus Liberty Mutual Insurance

 8    Company, two-page document.

 9             (Deposition Exhibit 53 was marked for

10             identification by the deposition officer.)

11    BY MR. FALZETTA:

12        Q    Take a look at it and tell me when you're

13    ready for a question.

14        A    All right, I'm ready for a question.

15        Q    Does this log look familiar to you?

16        A    Not really.

17        Q    Do you know if you prepared this log?

18        A    I would be speculating.

19        Q    All right.  It's possible that you did, it's

20    possible that you didn't?

21        A    It's possible I prepared part of it,

22    possible.  I -- I don't recall.

23        Q    And you don't remember one way or the other?

24        A    Huh-uh.

25        Q    Do you recall including documents in the
```

91

CRAIG S. PYNES

BARKLEY
Court Reporters

1   Company as a defendant?

2          MR. ROXBOROUGH:  Objection; asked and

3   answered.

4          THE WITNESS:  I don't recall.

5   BY MR. FALZETTA:

6      Q   And the Ashou case, do you recall the

7   defendant?

8          MR. ROXBOROUGH:  Same objections.

9   BY MR. FALZETTA:

10     Q   Go ahead.

11     A   It was some Liberty entity, I don't remember

12   which.

13     Q   Will you look at Exhibit 50, please, in the

14   caption page, or the caption on the letter.

15     A   Oh, on the letter?  It says "In re Northridge

16   Litigation," which I assume is referring to the

17   earthquake.

18     Q   The next line, please.

19          MR. ROXBOROUGH:  Looking at the second line

20   here?

21          THE WITNESS:  "Raymonda Ashou versus Liberty

22   Mutual Fire Insurance Company."

23   BY MR. FALZETTA:

24     Q   Does that refresh your recollection that it

25   was Liberty Mutual Fire Insurance Company as the

98

BARKLEY
Court Reporters

1  defendant in the Ashou case?

2      A   Vaguely.

3      Q   Do you have any reason to believe that your

4  re line in your letter was inaccurate?

5      A   No.  We treated them all basically like the

6  same entity.

7          MR. ROXBOROUGH:  He's not asking you that.

8  BY MR. FALZETTA:

9      Q   Why did you treat them all pretty much like

10  the same entity?

11     A   It was Liberty.  Everything would say

12  "Liberty"; it wouldn't say "Liberty Mutual Fire."  It

13  would say "Liberty" or "Liberty Mutual."

14     Q   The only distinction you would draw is if it

15  was Wausau or Golden Eagle?

16         MR. ROXBOROUGH:  Objection.

17         THE WITNESS:  Or a different other carrier.

18  There were other carriers.

19  BY MR. FALZETTA:

20     Q   But you don't remember who they were?

21     A   No, I don't.

22     Q   Do you remember any other bad-faith

23  litigation that you worked on involving a Liberty

24  entity?

25     A   I don't remember the specific names.  I know

99

BARKLEY
Court Reporters

1   you those portions?

2       A   Oh, I don't remember those.  So many cases

3   ago, I honestly couldn't.  I would be completely

4   speculating.

5       Q   Okay, don't want you to do that.  Do you

6   recall preparing privilege logs in all of the

7   bad-faith cases that you were involved in for Liberty

8   while you were at Kern and Wooley?

9           MR. ROXBOROUGH:  Objection; overbroad, asked

10  and answered.

11          THE WITNESS:  I don't know about all the

12  cases.

13  BY MR. FALZETTA:

14      Q   Do you recall any bad-faith litigation matter

15  that you were involved in for Liberty Mutual where you

16  didn't prepare a privilege log?

17      A   I don't recall either way.  I just don't

18  remember that I prepared them in every case.

19      Q   Okay.  All right.  Did you have direct

20  communications with Liberty's in-house attorneys and

21  other employees in the Ashou matter?

22      A   I don't recall.

23      Q   Did you communicate with Michael Gonzalez of

24  Liberty Mutual on the Ashou matter?

25      A   I don't recall.

113

CRAIG S. PYNES

BARKLEY
Court Reporters

1    Q    Did you communicate with Wayne Cupelo,

2    Esquire, in-house counsel of Liberty Mutual, on the

3    Ashou matter?

4    A    I don't recall.

5    Q    Did you communicate with Nancy McCormick of

6    Liberty's home office legal department on the Ashou

7    matter?

8    A    I don't recall.

9    Q    Okay.  On the other matters that you handled,

10   the bad-faith matters, McLoughlin, Mock, the uninsured

11   motorist case that we talked about, did you prepare

12   pleadings in those cases?

13        MR. ROXBOROUGH:  Objection; overbroad, and

14   asked and answered on some of them.

15        THE WITNESS:  You have to go case by case.

16   BY MR. FALZETTA:

17   Q    Let's take McLoughlin.  Did you prepare

18   pleadings in that case?

19   A    Yes.

20   Q    Did you prepare discovery requests and

21   responses?

22   A    Yes.

23   Q    Did you prepare research memorandum?

24   A    I don't recall.

25   Q    Did you research any legal issues?

114

CRAIG S. PYNES

BARKLEY
Court Reporters

1    A    McLoughlin, I don't remember.

2    Q    Did you prepare case evaluations and

3    summaries in the McLoughlin case?

4    A    I don't recall.

5    Q    Did you prepare case status reports in that

6    case?

7    A    I -- I don't recall specifically.

8    Q    Did you send correspondence or e-mails to

9    Liberty Mutual employees in that case?

10    A    I don't recall.

11    Q    Did you have any attorney-client

12    communications with Liberty Mutual in the McLoughlin

13    case?

14    A    I just don't remember specifically.

15    Q    Did you prepare case summaries for meetings

16    with home office personnel at Liberty Mutual?

17    A    I don't recall.

18    Q    Did you review and analyze claim file

19    materials and claim notes in the McLoughlin case?

20    A    I remember looking at the underlying

21    documents, yes.

22    Q    Did you look at claims manual documents in

23    the McLoughlin case?

24    A    I don't know about claims manuals; I remember

25    looking at claim files.

CRAIG S. PYNES

BARKLEY
Court Reporters

1   STATE OF CALIFORNIA          )
                                 )  ss.
2   COUNTY OF LOS ANGELES        )

3

4           I, Oscar Ventura  , hereby certify:

5           I am an employee of Barkley Court Reporters,

6   duly authorized agent for the deposition officer that

7   stenographically recorded the testimony in the foregoing

8   proceeding and authorized to execute this copy

9   certificate.

10          The foregoing is a true and correct copy of

11  the original transcript of the stated proceeding.

12

13  Dated  12/12/07  .

14

15

16

17

18

19

20

21

22

23

24

25