EXHIBIT M

Eastern District of Kentucky
**FILED**

AUG 1 8 2006

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                    **PLAINTIFFS**

v.                                            CIVIL ACTION NO. 03-494-KSF

PLAINTIFF, REPUBLIC SERVICES, INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY CRAIG S. PYNES AND LAW OFFICES OF
ROXBOROUGH, POMERANCE & NYE; SUPPORTING DECLARATIONS OF CRAIG S.
PYNES, KAREN L. GICHTIN, JACK AN, MICHAEL B. ADREANI AND
<u>NICHOLAS P. ROXBOROUGH IN SUPPORT</u>

LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                           **DEFENDANTS**

** ** ** ** **

I.

<u>INTRODUCTION</u>

Liberty's recusal motion is nothing more than a thinly
veiled, tactical maneuver aimed at preventing Republic Services
from availing itself of its highly qualified, nationally
respected counsel, skilled in successfully prosecuting workers'
compensation bad faith claims. Liberty's motion fails, both on
the merits and on its obvious procedural defects, and must be
denied for the following reasons:

A.   <u>Mr. Pynes Has No Disqualifying Characteristics</u>:

Mr. Pynes worked for only eight <u>months</u> at the Kern & Wooley
law firm during his over 15-year career as an attorney.  See
Declaration of Craig S. Pynes ("Pynes Decl.") at ¶ 2, attached

hereto as Exhibit "A". <u>He never handled any workers' compensation bad faith claim handling cases at Kern & Wooley</u> (or anywhere else) before becoming associated with Roxborough, Pomerance & Nye, LLP ("RPN"). Only upon joining RPN did Mr. Pynes receive extensive training in both: (i) workers' compensation; and (ii) bad faith workers' compensation claims handling. RPN Partners, Nicholas Roxborough and Michael Adreani, personally trained Mr. Pynes because he had <u>no experience of any kind</u>, in any context, with the complexities of workers' compensation, prior to arriving at RPN. He also never worked on the <u>RemedyTemp</u> case for RPN or for Liberty when he was employed at Kern & Wooley. See Pynes Decl. at ¶ 8, Declaration of Michael Adreani, at ¶¶ 5-6, attached hereto as Exhibit "B", Declaration of Nicholas P. Roxborough, at ¶ 4, attached hereto as Exhibit "C".

Mr. Pynes <u>never received any training in Liberty's bad faith claim handling practices in the workers' compensation area</u>. See Pynes Decl. at ¶ 4,. He has <u>never</u> seen Liberty's workers' compensation Best Practices Manual, or any of their workers' compensation claim manuals prior to his working on the <u>present</u> case. See Pynes Decl. at ¶ 9-10,. <u>None</u> of the Rule 30 designees deposed in this case ever dealt with Mr. Pynes as they work in Liberty's workers' compensation division – a control group with which Mr. Pynes never had <u>any</u> involvement. See Pynes

Decl. at ¶ 12, , See Hansen Depo., attached hereto as Exhibit "D", at 41:6-11, 44:2-21, 45:12-14, and 72:15-19; Pynes Depo., to be lodged when received.

At most, Mr. Pynes worked on non-workers' compensation insurance matters while briefly employed at Kern & Wooley. This involved completely unrelated lines of insurance, such as first party property, auto, earthquake and commercial general liability 2½ years ago. See Pynes Decl. at ¶ 5, See Exhibit "D" at 40:1-19 and 42:23-43:21.

Finally, by Liberty's own reluctant acknowledgement, at most, he may have had access to confidential claims handling materials outside the workers' compensation context, but Liberty offers no evidence suggesting that he ever actually looked at such materials, utilized the materials or is presently utilizing any knowledge gained from reviewing such materials. At best, Liberty offers its speculation that he may have had access to unrelated claims manuals in completely distinguishable lines of insurance which have nothing to do with the case at bar. See Pynes Decl. at ¶ 11, Exhibit "D" at 35:23-25, 36:18-37:2, 37:18-21, 39:21-25 and 45:22-47:9. That Mr. Roxborough, in several other Workers' Compensation cases against Liberty, was already aware of Liberty's claims handling practices, further means that Mr. Pynes' employment with Kern & Wooley was of no moment. See Roxborough Decl. ¶ 3.

3

B.    <u>Ms. Gichtin Has No Disqualifying Characteristics</u>:

Karen Gichtin only recently joined RPN. She has <u>never</u> worked on any case involving Liberty Mutual for RPN. She has been and is completely screened off from any involvement in the present action. Ms. Gichtin would have no opportunity to review any of the file materials for this case as they are maintained in Michael Adreani's office, which is locked when he is not in.

Moreover, only Mr. Adreani and other attorneys and staff working on the case have access to the files. See Declaration of Jack An ("An Decl.") at ¶¶ 2-3, attached hereto as Exhibit "E". All RPN attorneys and staff have been specifically instructed that only RPN personnel specifically working on the case are allowed access to the files. See An Decl. at ¶ 6.

Ms. Gichtin's declaration specifically acknowledges her <u>strict compliance</u> with RPN's guidelines and that she has <u>never</u> violated those guidelines by reviewing any of Republic Services' files, discussing the Liberty case with any other RPN attorneys or staff or engaging in any conduct which, in any way, could even be construed as violating RPN's screening procedures. See Declaration of Karen Gichtin ("Gichtin Decl.") at ¶¶ 2-3, attached hereto as Exhibit "F". As reflected by RPN's office manager, Jack An's declaration, all other RPN attorneys and staff also have been required to and have strictly comported with RPN's screening procedures. See An Decl. at ¶ 6.

4

Moreover, Liberty does not identify any specific client confidences that were disclosed to Ms. Gichtin. Any unclarity on the issue is quickly dispelled by Ms. Gichtin's own declaration substantiating that she received no client confidences while working at Kern & Wooley and she was not even permitted contact with clients, including Liberty Mutual, or review of confidential materials while working there. See Gichtin Decl. at ¶¶ 7-9. Instead, she was "micro-managed" by her superiors, including Lisa Kralik Hansen, and only allowed to undertake "projects" with no or limited autonomy.

   C.   Liberty's Motion is Based Entirely on Ms. Hansen's
        Affidavit:

Liberty presents to this Court nothing other than Ms. Hansen's declaration to support its motion. This evidence is not only vague and misleading, but is also refuted by the far stronger evidence presented by Republic, as well as Ms. Hansen's own testimony. For instance, in her three-page declaration, Ms. Hansen spends exactly one paragraph discussing Mr. Pynes. Ms. Hansen is deliberately vague on this subject, stating boldly that Mr. Pynes "would have been exposed to confidential information" without ever telling this Court: a) whether Mr. Pynes was actually every exposed to any such information; and b) that any such exposure would have been on completely different lines of insurance having nothing to do with the case at bar.

5

See Hansen Decl., ¶4, [DKT #213], Pynes Decl, ¶¶ 9-11, Exhibit
"D" at 45:2-47:9, Pynes Depo. to be lodged when received.

    Why would Ms. Hansen and Liberty's instant counsel leave
such things out?  We will never know:

27:21    Q.   WHY DID YOU DO THIS AFFIDAVIT?

27:22    MR. SKOCYPEC:  OBJECTION.  WORK PRODUCT.

27:23    INSTRUCT THE WITNESS NOT TO ANSWER.

27:24    BY MR. ADREANI:

27:25    Q.  DO YOU ACCEPT THAT INSTRUCTION?

28:1    A.  YEAH.

28:2    MR. ADREANI:  I DON'T GET TO KNOW WHY SHE DID

28:3    THIS AFFIDAVIT?   THAT'S FINE IF THAT'S THE

        INSTRUCTION.

28:4    MR. SKOCYPEC:  YEAH.

28:5    MR. ADREANI:  OKAY.

28:6    MR. SKOCYPEC:  I DON'T SEE HOW THAT'S NOT WORK

28:7    PRODUCT.

28:8    MR. ADREANI:  WELL --

28:9    MR. SKOCYPEC:  IT'S CERTAINLY HER THOUGHT

28:10    PROCESS.

28:11    MR. ADREANI:  I'M PRETTY SURE OUR JUDGE IN

28:12    KENTUCKY WILL BE INTERESTED IN THAT ANSWER.

Exhibit "D" at 27:21-28:12.

In the short 2½ hour span of her deposition, <u>Ms. Hansen was</u> <u>instructed not to answer questions on 19 occasions</u>, claiming that even communications with Liberty's outside counsel in this case constituted Attorney-Client privileged information.

The declarations of Mr. Pynes, Ms. Gichtin, Mr. Roxborough, Mr. Adreani, Mr. An, and the deposition testimony of Ms. Hansen, Mr. Pynes and Ms. Gichtin make clear that the weight of the evidence is overwhelmingly in favor of Republic on the alleged conflict issue.   Conversely, Ms. Hansen <u>refused</u> to expand on her vague, speculative and misleading Affidavit by hiding behind a misconstrued privilege.

D.   <u>Liberty has Waived the Conflict Issue</u>:

If Liberty really believed that RPN or any of its attorneys had a conflict of interest, why did Liberty wait more than <u>3</u> <u>months until the day after the discovery cutoff</u> to file its recusal motion?   Why did Liberty <u>never respond</u> to the *Pro Hac Vice* applications that this Court granted in early May of 2006? Is it <u>mere coincidence</u> that Liberty's motion and required briefing exacted on Republic Services' lawyers coincides with the most critical juncture in this case: the month of August specifically set aside by this Court for all expert depositions? Clearly, litigation tactics have taken precedent over merit in this motion, which seeks only to prejudice Republic.

In the meantime, RPN was working diligently on behalf of its client, and in conjunction with the McBrayer firm, to prosecute this matter. Mr. Adreani alone has taken, defended or appeared at 21 depositions in this case between May, 2006 and August, 2006 (including taking and defending Rule 30 and expert depositions) – with no objection from Liberty. See Adreani Decl., ¶23. Mr. Roxborough is in Kentucky at the time of filing of this opposition, taking and defending expert depositions. See Roxborough Decl., ¶ 11.

## II.

### FACTUAL BACKGROUND

Last April, RPN was retained by Republic Services and submitted pro hac vice applications to this Court. See Roxborough Decl. at ¶ 6. In conjunction with submitting the applications, RPN's senior partner, Nicholas P. Roxborough, called one of Liberty Mutual's top home office executives, Bill Cuppelo, to specifically advise him that RPN would be involved in the action. See Roxborough Decl. at ¶ 7-8.

RPN's pro hac vice applications, which included Mr. Pynes' application, were granted, without objection, last May (served on Liberty through its counsel herein). That same month, Mr. Pynes participated in deposing Liberty adjusters.

8

On July 31, 2006, discovery closed in this action. This was to permit expert depositions to take place during the month of August, 2006. On August 1, 2006, the day after the discovery cutoff and right before expert depositions were scheduled to commence, Liberty filed the present recusal motion. Clearly, motion workup was deliberately scheduled at a critical juncture where expert preparation and depositions would be actively underway.

Mr. Pynes has been at RPN for 2½ years since leaving Kern & Wooley. Throughout that time, RPN represented another Liberty insured named RemedyTemp in its lawsuit against Liberty. During that entire time, Liberty never objected, filed any recusal motion or did anything to even suggest its belief that Mr. Pynes had a conflict of interest or that any screening mechanisms employed by RPN were less than adequate. Liberty waited another 4 months to bring the present motion when it knew that RPN would be completely immersed in preparing for expert depositions. Why did Liberty lie in wait until the commencement of expert depositions? So that it could completely disrupt Republic Services' deposition preparations, regardless of whether its motion had any merit.

### III.

NEITHER MR. PYNES NOR MS. GICHTIN HAVE ANY CONFLICT OF INTEREST

Disqualification of a party's chosen counsel "is a drastic measure, which Courts should hesitate to impose except when absolutely necessary."  Carlsen v. J.W. Thomas, 159 F.R.D. 661, 671 (E.D. KY 1994).

> "The ability to deny one's opponent, the services of his chosen counsel, is a potent weapon.  Confronted with such a motion, Court's must be sensitive to the competing public interests of requiring professional conduct by an attorney and permitting a party to retain counsel of his choice." Kitchen v. Aristech, 769 F.Supp. 254, 256-257 (S.D. Ohio 1991).

The party seeking disqualification of counsel has the initial burden of proving grounds for disqualification. Carlsen, 159 F.R.D. at 669.

Liberty's moving papers rely on a Nebraska state court and New York district court for the alleged elements to analyze a conflict of interest.  See moving papers at pages 5-6.

However, long-standing Sixth Circuit authority provides "a three part test for a disqualification motion asserting a conflict of interest as to a former client:

(1) A past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify;

(2) The subject matter of those relationships was/is substantially related; and

(3) The attorney *acquired confidential information* from the party seeking disqualification." (Emphasis Added)

Id. at 665; Dana Corp. v. Blue Cross and Blue Shield, 900 F.2d 882, 8889 (6th Cir. 1990); Valley-Vulcan Mold Co. v. Ampco-Pittsburg Corp., 237 B.R. 322, 337 (6th Cir. 1999), emphasis in original.

Kentucky state law, moreover, applies a more lenient standard than does other jurisdictions within the 6th Circuit. Carlsen, supra, 159 F.R.D. at 665 & 671, citing Kentucky Supreme Court Rules ("SCR") 3.130(1.9)(C)(1). Specifically, Michigan's Rule 1.9 "is somewhat stricter, dealing with information 'acquired,' whereas Kentucky proscribes the 'use' of confidential information." Carlsen, supra, 159 F.R.D. at 671. Kentucky's former-client disqualification rule provides in pertinent part,

> "(c) A lawyer who has formerly represented a client in a matter of whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client . . ."
> SCR 3.130(1.9)(C)(1) [emphasis added].

The Judicial Comments to the Kentucky's conflict rule provides:

"The scope of a 'matter' . . . may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been <u>directly involved</u> in a <u>specific</u> transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a <u>type of problem</u> for a former client is not precluded from later representing another client in a wholly distinct problem of that type, even though the subsequent representation involves a position adverse to the prior client. . . . The underlying question is whether the lawyer was <u>so involved</u> in the matter that the subsequent representation can be justly regarded as changing sides in the matter in question. . . . The fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." See comments to SCR 3.130 (1.9). (Emphasis Added)

(A)   <u>Mr. Pynes did not represent Liberty on any matters that are "substantially related" to the present action</u>.

In determining whether a "substantial relationship" exists, the "Court must look behind mere facial similarities or dissimilarities between the prior and pending cases and focus on the precise nature of the subject matters presented in the two representations." <u>Duncan v. Merrill-Lynch, et al.</u>, 646 F.2d 1020, 1031 (5th Cir. 1981). Likewise, "merely pointing to a superficial resemblance between the present and prior representations would not substitute for the careful comparison

demanded." Id. at 1029; Jackson v. J.C. Penney Co., 521 F.Supp. 1032, 1035 (N.D. Ga. 1981).

SCR 3.130[10] defines "substantial" to denote "a material matter of clear and mighty importance." Case law further elucidates the terms "substantial" and "relation." "'Substantial' is defined as 'considerable in importance, value, degree, amount or extent.' [Citation omitted] 'Relation' is defined as 'a logical or natural association between two or more things: connection.' [Citation omitted] Taken together, the plain meaning of the phrase implies that the two cases must have a clear connection." Phillips v. Haidet, 119 Ohio App.3d 322, 327 (1997), emphasis added.

In Duncan, the law firm/attorney involved [Smathers and Thompson] represented a brokerage firm customer in a securities fraud lawsuit against the brokerage firm (Merrill-Lynch) he previously represented. The Court did not find a substantial relationship between counsel's representation against the prior brokerage firm client in the securities fraud lawsuit and his representation of that firm in ten prior matters involving securities, margin accounts and the firm's relationship with its clients, even though counsel had reviewed the firm's records, held conferences with the brokerage's employees and prepared a range of legal documents on the brokerage firm's behalf. Duncan, 646 F.2d at 1031. This was despite the law

firm's/counsel's own acknowledgment "that it learned confidential information while representing Merrill-Lynch [but] argues that these confidences pertained only to the matters then at hand. . . . Merrill-Lynch cannot have Smathers & Thompson disqualified simply by stating that the firm has knowledge of Merrill-Lynch's 'practices and procedures.' Instead, it must prove that Smathers & Thompson has knowledge of the particular practices and procedures which are the subject matter of Duncan's suit." Duncan, 646 F.2d at 1032, emphasis added.

Likewise, in Smalley Transportation v. Prime Computer, 137 F.R.D. 397 (M.D. Fla. 1991), plaintiff asserted that information regarding Smalley's computer requirements and data processing procedures as well as information about its internal and financial operations were given to its counsel at a meeting in 1981. The same counsel subsequently brought action against Smalley relating to a different computer system. "Plaintiff alleges that since both actions involve computer fraud, and Mr. Cristo was given information to formulate legal strategies and damages" a substantial relationship existed between the two suits. The Court disagreed: "The mere fact that Smalley provided information to Mr. Cristo about its data processing and internal operations in a separate lawsuit involving a different computer does not mean the former case is substantially related to the present case. This case is similar to the assertion of

mere facial similarities under Duncan." Smalley, 137 F.R.D. at 400, emphasis in original.

Similarly, in Wal-Mart v. Kortum, 559 N.W.2d 496, relied upon by Liberty, the Court found that counsel's representation of Wal-Mart in a prior slip and fall case was not substantially related to his representation of a customer that had allegedly slipped and fallen in a wet-mopped area at Wal-Mart. Kortum, 559 N.W.2d at 502 ("The mere fact that the pleadings are similar does not make the two cases substantially related. The differences in the factual and legal issues, where a plaintiff falls into a hole in a parking lot as opposed to where a plaintiff falls on a wet floor inside of a store, are crucial and are not outweighed by the similarities.")

There is no substantial relationship between the matters Mr. Pynes worked on at Kern & Wooley and the present action. Prior to associating with RPN, Mr. Pynes never worked on a workers' compensation bad faith claims handling case, much less any case involving workers' compensation. At most, there is a superficial similarity to the causes of action brought (breach of contract and bad faith) in his prior Liberty work and the fact that the matters involve insurance generally. However, workers' compensation insurance is completely unrelated to other lines of insurance. Workers' compensation has its own distinct insurance policies, claims manuals and claims handling practices

that bear no relationship to completely distinct insurance policies, claims handling manuals and claims handling practices involved in handling other lines of insurance, such as commercial general liability, first party property, earthquake and other lines.

Likewise, the standards applicable to the causes of action on the distinct insurance lines flow from completely distinct case law. For instance, workers' compensation has its own distinct line of cases dealing with bad faith claims handling practices on workers' compensation cases. See Roxborough Decl. at ¶ 2. Accordingly, like the Duncan, Smalley and Kortum cases, Mr. Pynes' previous work for Liberty bears no more than a very superficial, surface resemblance to his present work, but involves a completely distinct insurance line with distinct case law remedies and Liberty Policies and Procedures.

    (B)   Neither Mr. Pynes nor Ms. Gichtin acquired or used confidential information from Liberty.

Both the Kentucky Supreme Court Professional Rules and ample case law reflects that an attorney's potential exposure or even actual acquisition of confidential information is insufficient to support disqualification. The Court must find that an attorney both acquired confidential information and used the confidential information against the former client to support disqualification. Carlsen, supra, 159 F.R.D. at 665.

In Duncan, the law firm involved conceded that it had learned confidential information while representing Merrill-Lynch, but that this did not support disqualification: "Merrill-Lynch cannot have Smathers & Thompson disqualified simply by stating that the firm has knowledge of Merrill-Lynch's 'practices and procedures.'" Duncan, supra, 646 F.2d at 1032; and Rules of Kentucky Supreme Court, Rule 3.130(1.9)(C)(1) ("A lawyer who has formerly represented a client in a matter of whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use the information relating to their representation to the disadvantage of the former client . . .") See also Centimark Corp. v. Brown Sprinkler Serv., 85 Ohio App.3d 485, 488-89 ("A former client must demonstrate the existence of a confidence or secret, and that the knowing use of such confidence or secret would work to the former client's disadvantage. . . . [A] violation of the Code of Professional Responsibility alone should not result in a disqualification, unless disqualification is found to be absolutely necessary.")

Likewise, both the professional responsibility rules and case law reflect that even if counsel learns purportedly confidential information that is subsequently disclosed through production, that it does not matter whether he then relies on such information. Kortum, 559 N.W.2d at 502 ("We agree with the

special master's findings that during the time Wal-Mart was represented by Smith, the policies, procedures, and practices Smith was told about did not include any trade secrets or anything that was not discoverable. . . .[Moreover], the defense strategies utilized in these types of relatively uncomplicated slip-and-fall actions are generally commonplace and routine. Wal-Mart did not assert that Van Steenberg became privy to any defense strategies that are unique, unexpected, unusual, or novel. . . . Because Van Steenberg did not acquire any specialized knowledge of defense strategies or any other discovery advantages, we conclude that the similarity of the factual and legal issues does not create a genuine threat that Van Steenberg may have received confidential information from Wal-Mart that could be used against Wal-Mart in the instant case.") See also CSCR Rule 3.130 (1.9)(C)(1).

Here, there is no evidence that Mr. Pynes or Ms. Gichtin actually acquired, much less have used, any confidential information they allegedly learned from previously representing Liberty. As to Mr. Pynes, Lisa Hansen's affidavit at most speculates that he potentially "would have been exposed to confidential information", but not that he actually reviewed and acquired confidential information. See Lisa Kralik Hansen's Declaration at ¶ 4 [DKT #213]. Conspicuously absent from Ms. Hansen's declaration is any description of whether the Practice

and  Procedure  Manuals  bore  any  relationship  to  workers'
compensation  claims  handling  issues  as  distinct  from  <u>other</u>
<u>unrelated</u>  insurance  areas.  As  Mr.  Pynes  did  not  work  on  any  bad
faith  workers'  compensation  claims  handling  cases  while  at  Kern
&  Wooley,  it  is  unlikely  that  he  even  would  have  been  exposed  to
any  confidential  materials  or  information  in  a  practice  area  <u>he</u>
<u>was  not  working  in</u>  and  <u>had  received  no  training  or  knowledge</u>.

Similarly,  Liberty  presents  no  evidence  that  Ms.  Gichtin
<u>actually  acquired  confidential  information</u>,  much  less  is
presently  using  such  information  to  Republic  Services'  benefit
(to  Liberty's  detriment).    While  Ms.  Hansen's  declaration
suggests  that  Ms.  Gichtin  allegedly  reviewed  specific  materials
pertinent  to  the  <u>RemedyTemp</u>  matter,  she  fails  to  identify  any
generalized  strategic  confidential  information  that  could  be
used  on  matters  outside  the  specific  facts  of  that  action.
Even  as  to  the  items  that  Ms.  Hansen  suggests  Ms.  Gichtin
reviewed,  Ms.  Gichtin's  declaration  reflects  her  disagreement
that  she  ever  received  or  reviewed  the  identified  materials.

Per  both  her  and  Mr.  Pynes'  declarations,  Ms.  Hansen  micro-
managed  work  on  her  (and  Mr.  Pynes')  cases  and  would  never  have
allowed  either  associate  access  to  strategic  confidential
materials.    Second,  to  the  extent  that  internal  best  practices
were  disclosed  to  her,  such  materials  are  <u>commonly  produced</u>  in
litigation.    For  instance,  in  the  present  action,  Liberty  has

19

produced its Best Practices Manuals.  Thus, they can hardly be deemed "confidential".  Finally, as addressed below, even if Ms. Gichtin did somehow acquire confidential information, in an abundance of caution, she has been carefully screened from <u>all</u> <u>work</u> in the present matter precluding RPN's recusal.

IV.

### RPN HAS IMPLEMENTED APPROPRIATE SCREENING TO PRECLUDE MS. GICHTIN'S INVOVLEMENT IN THE PRESENT ACTION.

Even assuming that Liberty can somehow show that there is a substantial relationship between the subject matter of Ms. Gichtin's prior and present representations and that she has been privy to confidential information received from Liberty, the Court must determine whether RPN has properly screened her from work on the present action.  Such screening mechanisms "effectively insulate against any confidential information from the quarantined attorney to other members of his present firm." <u>Manning v. Waring, et al.</u>, 849 F.2d 222, 225 (6th Cir. 1988); <u>LaSalle Nat'l Bank v. County of Lake</u>, 703 F.2d 252 (7th Cir. 1983).  "Such a determination can be based on objective and verifiable evidence presented to the trial court and must be made on a case-by-case basis.  Factors appropriate for consideration by the trial court might include, but are not limited to, the size and structural divisions of the law firm involved, the likelihood of contact between the 'infected'

20

attorney and the specific attorney responsible for the present representation, the existence of rules which prevent the 'infected' attorney from access to relevant files or other information pertaining to the present litigation, or which prevent him from sharing the fees derived from such litigation." Manning, 849 F.2d at 225-226.

RPN has implemented ample mechanisms to screen Ms. Gichtin from the present action. Her office is at the extreme opposite end of RPN's office space from counsel actively involved in representing Republic Services in this matter. The Republic Services v. Liberty files are segregated from the central or main files and are held by the firm in one of the partner's offices, Michael Adreani, where they are kept under lock and key when he is not in the office. See An Decl. at ¶ 3-4. Both Ms. Gichtin and other members of RPN have been specifically advised not to discuss any information about Liberty Mutual, Kern & Wooley, and representation in the Republic Services matter or anything remotely related to these topic areas. RPN is not aware of any violation of these instituted mechanisms. See An Decl. at ¶ 6.

Conversely, Liberty fails to identify any basis for impuning RPN's screening mechanism other than its speculation that RPN is too small a firm to effectively screen Ms. Gichtin. Speculation alone will not substantiate a lack of screening.

Liberty must provide "objective and verifiable evidence" that RPN's screening mechanisms are anything less than completely adequate.

V.

### LIBERTY HAS WAIVED ITS RIGHT TO OBJECT TO RPN'S REPRESENTATION OF REPUBLIC SERVICES IN THIS ACTION.

"A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion. [Citations omitted] A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed." Jackson, supra, 521 F.Supp. at 1034-1035; Cox v. American Cast Iron, 847 F.2d 725, 729 (11th Cir. 1988); and see City of Cleveland v. Cleveland Electric, 440 F.Supp. 193, 205 (N.D. OH 1977)("It is axiomatic that the client's right to object to an attorney's allegedly adverse representation may be waived.") "Waiver refers to the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor." City of Cleveland, 440 F.Supp. at 205.

In the Jackson case, counsel seeking the recusal was aware of opposing counsel's alleged conflicts of interest for a number of months, but failed to move for disqualification until after

substantial preparation of the case had been completed. The court held that failure to move to disqualify counsel during the intervening months constituted a waiver of the conflict. Jackson, 521 F.Supp. at 1034-1035.

Similarly, in the City of Cleveland case, counsel was aware of the conflict from the inception of opposing counsel's representation, but did nothing to seek recusal until months later. City of Cleveland, 440 F.Supp. at 205.

Concurrently with RPN's filing its pro hac vice applications, it advised one of Liberty's top executives involved in a prior lawsuit against Liberty, Bill Cuppello, that RPN would be substituting in as counsel for Republic Services in the present action. See Roxborough Decl. at ¶ 7-8. Armed with this information, Liberty chose not to object to RPN's pro hac vice applications and lied in waited for almost four months before filing its recusal motion one day after the discovery cutoff during the one month when all expert depositions had been scheduled to take place in this action. Liberty should not be rewarded for sitting on any alleged right to seek recusal until the most inopportune time where it could try and inflict the worst prejudice to Republic Services' preparation of its case. Liberty's failure to act constituted an unambiguous waiver of its rights.

Moreover, RPN previously prosecuted an action against Liberty called RemedyTemp for the majority of the 2½ years Mr. Pynes has been associated with RPN. At no point did Liberty ever move to recuse RPN, much less object to its representation of RemedyTemp in its action against Liberty. If Liberty really believed that Mr. Pynes' association with RPN somehow created a conflict of interest, why did it wait for 2½ years before doing anything to object in any way to the purported conflict of interest. Liberty's actions are merely tactical and should not be rewarded by this Court.

VI.

CONCLUSION

Republic Services respectfully requests that the Court deny Liberty's recusal motion as Liberty fails to substantiate that there was a substantial relationship between cases that Craig Pynes worked on for Liberty previously and the present case; Mr. Pynes and Karen Gichtin did not acquire and/or use any confidences against Liberty; appropriate screening was implemented by RPN to preclude Ms. Gichtin's involvement or access to any Republic Services v. Liberty documents and Liberty's failure to move to recuse RPN for almost four months after being apprised of its representation waives its right to seek recusal.

Dated: August 16, 2006

24

Respectfully submitted,

By: _____
Nicholas E. Roxborough, Esq., *pro hac vice*
Michael B. Adreani, Esq., *pro hac vice*
ROXBOROUGH, POMERANCE & NYE, LLP
5820 Canoga Avenue, Suite 250
Woodland Hills, California 91367
Telephone: (818) 992-9999
Facsimile: (818) 992-9991

And

Brent L. Caldwell, Esq.
Robert E. Maclin, III, Esq.
David A. Cohen, Esq.
MCBRAYER, MCGINNIS, LESLIE
 & KIRKLAND, PLLC
201 East Main Street, Suite 1000
Lexington, KY 40507-1361
Telephone: (859) 231-8780

ATTORNEYS FOR PLAINTIFF,
REPUBLIC SERVICES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via US regular mail on this 18th day of August, 2006 to the following:

J. Clarke Keller, Esq.
Gregory P. Parsons, Esq.
STITES & HARBISON, PLLC
250 West Main Street, Suite 2300
Lexington, Kentucky 40507
ATTORNEYS FOR DEFENDANTS,
THE LIBERTY COMPANIES

By: _____
ATTORNEYS FOR PLAINTIFF,
REPUBLIC SERVICES, INC.

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                 **PLAINTIFFS**

v.

CIVIL ACTION NO. 03-494-KSF

DECLARATION OF CRAIG S. PYNES

LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                           **DEFENDANTS**

**       **       **       **       **

I, CRAIG S. PYNES, DECLARE AS FOLLOWS:

1.   I am an attorney licensed to practice law before all of the Courts of the State of California and the United States Federal Courts and am an associate with the law firm of Roxborough, Pomerance & Nye, LLP.  I have worked for Roxborough, Pomerance & Nye, LLP since March, 2004.   I have personal knowledge of the following facts, and if called to testify as a witness, I could and would competently testify thereto.

2.   I previously worked at the law offices of Kern & Wooley for approximately 8-9 months.  I have been an attorney for over 15 years.

3.   During the time that I worked at Kern & Wooley, I did not personally handle any workers' compensation bad faith claim handling actions for Liberty or anyone else.  My only extremely

limited connection with workers' compensation bad faith was in assisting another attorney, Melodie Yee, with reviewing claim files for purposes of redacting personal identifying information of claimants, such as their social security numbers and telephone numbers.

4.    I received no training and knew nothing about the workers' compensation bad faith claims handling area of law during the time that I was associated with Kern & Wooley.    I certainly had no experience litigating such matters.

5.    All of the cases I handled involving bad faith litigation and coverage related only to completely different lines of insurance, including commercial, general liability, first party property, bodily injury and personal injury, earthquake coverage, contribution actions among insurers and other areas wholly unrelated to workers' compensation (both from a coverage perspective and a bad faith claims handling litigation perspective).    I never had any contact with any Liberty personnel regarding Liberty's workers' compensation operation, including adjusters, case managers, underwriters, sales personnel, home office personnel, or any other personnel.

6.    Before leaving Kern & Wooley, I personally discussed with Lisa Kralik Hansen, my offer to work for Roxborough, Pomerance & Nye, LLP.    We specifically discussed that the Roxborough, Pomerance & Nye firm handles workers' compensation

bad faith claims cases distinct from the type of work I had done at Kern & Wooley. We both agreed that this was a completely new area of practice for me and a wonderful opportunity for me to learn a completely different area of the legal practice.

7.    I began working for Roxborough, Pomerance & Nye, LLP on March 24, 2004. I received extensive training on workers' compensation bad faith claims handling personally from Mr. Roxborough, which was supplemented with informal training over the next couple of months from Michael Adreani.

8.    At no time during my relationship with Roxborough, Pomerance & Nye did I ever work on the RemedyTemp v. Liberty case.

9.    I have reviewed the declaration filed by Lisa Kralik Hansen in support of Liberty's Motion to Disqualify. Her declaration is inaccurate when she says that I was involved in review of Liberty's claim manuals, written discovery, mediation and strategy discussions, document productions and preparation of legal memoranda as it relates to workers' compensation bad faith. I never saw such materials for the workers' compensation bad faith or coverage area. I only reviewed one file comprised of a few claim files for a few hours, and only for purposes of redacting personal identifying information of workers' compensation claimants.

3

10.  I do not recall ever reviewing Liberty Mutual's practice and procedures, strategies for handling litigation, claims operation, general claim file management and record keeping documents or having any discussion with Liberty personnel about these issues on workers' compensation or non-workers' compensation cases.

11.  Conversely, I was specifically precluded from reviewing such materials or having hardly any client contact because the principals at Kern & Wooley involved with handling Liberty matters, Ron Skocypec, Susan Olson and Lisa Kralik Hansen wanted to maintain such contacts and ensure protection for the documents for themselves so as to ensure that associates did not get too close to their clients or their clients' materials.  Each of these attorneys therefore micro-managed cases to ensure extremely limited contact with executive Liberty personnel and even to a large extent, adjusters, and little or no review of Liberty documents.  For instance, on cases I worked on with Ms. Hansen, she, not me, dealt with Liberty personnel to obtain claim handling manuals and other Liberty documents.  She then personally kept such materials in her office and acted as the gatekeeper ensuring that associates did not have ready access to them.  She, not me, would then pull out pertinent portions that I would then review and produce.

4

12.  I have never spoken with, met with or dealt with any of the Liberty representatives identified as principals in this case.  It is unlikely that I would ever have had contact with workers' compensation adjusters as they work in a different department than property and CGL adjusters.

13.  I submitted my pro hac vice application in this matter on April 20, 2006.  A true and correct copy of my letter to the Court and attached application are attached hereto as Exhibit "A".

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.

Executed this 16th day of August, 2006 in Woodland Hills, California.

Craig S. Pynes

5

STATE OF CALIFORNIA        )
                          )
COUNTY OF LOS ANGELES     )

The foregoing Declaration was subscribed, sworn to and acknowledged before me this 16 day of August, 2006, by Craig S. Pynes.

My Commission expires:    December 10, 2008



Notary Public, California State at Large

(SEAL)

ELIA GUTIERREZ
Commission # 1526276
Notary Public - California
Los Angeles County
My Comm. Expires Dec 10, 2008

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                    PLAINTIFFS

v.

CIVIL ACTION NO. 03-494-KSF

DECLARATION OF MICHAEL B. ADREANI

LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                            DEFENDANTS

**    **    **    **    **

I, MICHAEL B. ADREANI, DECLARE AS FOLLOWS:

1.    I am an attorney licensed to practice law before all of the Courts of the State of California and the United States Federal Courts and am a partner with the law firm of Roxborough, Pomerance & Nye, LLP. I have worked for Roxborough, Pomerance & Nye, LLP since September, 1997. I have personal knowledge of the following facts, and if called to testify as a witness, I could and would competently testify thereto.

2.    One of the areas my firm specializes in is the litigation of bad faith claims on behalf of employers against their workers' compensation carriers. We focus on claims handling, reserving, collateral and other issues germane to the employer/workers' compensation carrier relationship. It is not an overstatement to say that our firm "developed the law" in

this area in California. We rarely, if ever, hire an associate at this firm who has experience in the type of law we practice. Therefore, we engage in extensive instructional and on-the-job training of new associates on how to litigate California workers' compensation bad faith cases.

3. In March of 2004, this firm hired Craig S. Pynes as an associate. Mr. Pynes had been working previously with the law firm of Kern & Wooley. Mr. Pynes was a very experienced attorney with a background in insurance coverage litigation.

4. As expected with all new associates at our firm, it was clear from the interview process that Mr. Pynes did not know anything about our specialty area of practice.

5. At the time Mr. Pynes was hired, this firm had not yet filed the *RemedyTemp v. Liberty* matter mentioned in the moving papers.

6. Mr. Pynes never worked on the *RemedyTemp* case at all and was not involved in any discussion or review of anything even remotely related to that case.

7. Liberty hired Kern & Wooley to defend the *RemedyTemp* matter. The attorneys at Kern & Wooley, and Ms. Hansen in particular, were well aware of the fact that Mr. Pynes had joined our firm in March of 2004. Ms. Hansen was, in fact, one of Mr. Pynes' direct supervisors at the Kern & Wooley firm.

2

8.  During the course of litigating the *RemedyTemp* matter with Kern & Wooley, I dealt with Ms. Hansen on a regular basis, as well as Susan Olson, who I believed to be Ms. Hansen's superior at that firm.  On at least 3 occasions, during depositions, meetings or appearances, the subject of Mr. Pynes working at my firm was discussed openly and casually with both Ms. Hansen and Ms. Olsen.  Both asked me on more than one occasion to "say hello" to Mr. Pynes.  Both were well aware of Mr. Pynes' employment at my firm as well as the fact that he was not involved with the *RemedyTemp* case.

9.  Neither Liberty nor Kern & Wooley ever made any threat, nor any indication of any threat, that Mr. Pynes' situation at my firm was a problem *vis a vis* the *RemedyTemp* litigation.  There was no mention at any time of any motion to disqualify our firm, nor was there any indication that Liberty had any problem whatsoever with Mr. Pynes' employment at my firm.

10.  Kern & Wooley, through Ms. Olsen, informed me in December of 2004 that they were no longer going to be litigating the *RemedyTemp* matter, and that they would be substituting out of that case.  This process took some months, as several firms came and went on that case.  First, the firm of Barger & Wolen attempted to substitute into the case.  That firm had a conflict with my client and was not able to represent Liberty in that

matter. Next the firm of Wilson, Elser, Moskowitz, Edelmen & Dicker associated into the case with Kern & Wooley, with a representation that Kern & Wooley would be substituting out shortly. Then, in May of 2005, both Kern & Wooley and the Wilson, Elser firm were substituted out of the RemedyTemp litigation and two more firms, Berger Kahn (from California) and Husch & Eppenberger (from St. Louis) substituted in. Kern & Wooley has had no involvement in the RemedyTemp matter since about May of 2005.

   11. On May 25, 2005, prior to the official substitution of counsel in RemedyTemp, I received a phone call from Bill Cupelo, in-house legal counsel at Liberty in Boston. Mr. Cupelo contacted me to let me know that new counsel would be coming into the case and to introduce me to those new attorneys. Because neither Mr. Cupelo nor the new attorneys were "counsel of record," I expressed my discomfort with the situation. Mr. Cupelo expressly informed me that he, along with outside counsel, "represented" Liberty and that I may in fact deal with him directly. I informed Ms. Hansen and Kern & Wooley of this communication in writing, and they approved of the form of communication with Mr. Cupelo. Since that time, Mr. Cupelo has been "front and center" in the RemedyTemp case, along with outside counsel. Mr. Cupelo has had any number of communications with both me and Mr. Roxborough regarding that

4

case, with full knowledge of Berger Kahn and the Husch firm.  In addition, Mr. Cupelo made very clear to us that he would appreciate any "heads up" from our firm as to possible future litigation involving Liberty.  In fact, both Mr. Roxborough and I have contacted Mr. Cupelo on matters unrelated to the *RemedyTemp* case.  For this reason, I am aware that Mr. Roxborough attempted to contact Mr. Cupelo prior to our firm coming into the *Republic* case and inform him about the nature of that representation.  It is my understanding that neither Mr. Cupelo nor anyone from Liberty called Mr. Roxborough back.

12.  As stated, Mr. Pynes came to this firm with no experience whatsoever in the area of workers' compensation bad faith litigation.  He had never reviewed workers' compensation policies, he had never dealt with workers' compensation claims handling, never dealt with workers' compensation adjusters, and never litigated any matters germane to the employer/workers' compensation carrier relationship at all.  He needed and received training on this area of litigation from both Mr. Roxborough and myself.

13.  Given that Mr. Pynes had never worked on behalf of Liberty in the area of workers' compensation bad faith, and had certainly never obtained any confidential information from or about Liberty in that area of practice, Mr. Roxborough and I had no problem having him assist us on the instant *Republic v.*

5

*Liberty* matter.   Prior to Mr. Pynes' involvement in the Republic matter, I had never discussed any Liberty action or issue with Mr. Pynes.

14.   In late April, 2006, Mr. Roxborough, Mr. Pynes and I all submitted to this Court an application to be admitted to the Eastern District of Kentucky *Pro Hoc Vice*.   With no opposition from Liberty or its counsel, this Court signed off on those application on or about May 2, 2006.

15.   At the end of March, 2006, this firm hired Ms. Karen Gichtin, who had previously worked at Kern & Wooley.

16.   I was aware of Ms. Gichtin's involvement in the *RemedyTemp* matter when this firm hired her.   My understanding is that Ms. Gichtin functioned as a junior level associate on the *RemedyTemp* case, dealing mostly with document production and issues involving an attack on the pleading via a FRCP Rule 12(b)(6) motion that Liberty filed in that case.

17.   Since Kern & Wooley was removed from the *RemedyTemp* case, I have never discussed the *RemedyTemp* case with Ms. Gichtin whatsoever.

18.   Ms. Gichtin is completely walled off ("Ethical Wall" or "Chinese Wall") within this firm from any involvement in any Liberty-related matter due to her prior representation in *RemedyTemp* (however limited).   This includes the *Republic v. Liberty* matter as well as the *RemedyTemp* matter.

6

19. Ms. Gichtin has no access to any of the *Republic* or *RemedyTemp* files and has not participated in any manner whatsoever in those pieces of litigation. In fact, Ms. Gichtin does not even have access to our one paralegal, Razia Noorzay, as she works on the *Republic* matter. For paralegal-type projects, Ms. Gichtin uses one of our file clerks, Sean An.

20. Ms. Gichtin has never discussed with me her involvement in the *RemedyTemp* matter, has never discussed with me any information she obtained in that matter, has never disclosed to me any conversation she had with anyone regarding that matter, has never shown me anything regarding that matter, and has never even mentioned that matter since she has been employed at this firm. Ms. Gichtin has, in fact, never discussed anything with me related to Liberty.

21. Ms. Gichtin does not work on any matter at this firm related to Liberty.

22. I have read the declaration of Ms. Hansen in support of Liberty's motion. At paragraph 6, there is a list of "activities" undertaken by Ms. Gichtin. It is worth noting each and every one of the "confidential" documents identified by Ms. Hansen to which she claims Ms. Gichtin had access were produced in the *RemedyTemp* matter (sometimes by Court order). In other words, I have myself had access to those very same documents

because Liberty and its attorneys gave them to me in that litigation.

23. Neither Liberty nor its counsel have made any attempt (or any indication of any attempt) to recuse this firm in the *RemedyTemp* matter due to the employment of either Mr. Pynes or Ms. Gichtin at this firm.

24. Since being admitted *Pro Hoc Vice* in this case, I have, to the knowledge of Liberty and its attorneys, been a very active participant in the *Republic* litigation. Just in terms of depositions in this case, my participation has been as follows:

     * May 17, 2006 - Took deposition of team manager Michelle Garvey in Sacramento, California;

     * May 17-18, 2006 - Attended deposition of Derek Scott in Sacramento, California;

     * May 18, 2006 - Took deposition of team manager Dara Warner in Sacramento, California;

     * May 19, 2006 - Attended deposition of adjuster Cherlon Taubodo in Sacramento, California;

     * June 28-29, 2006 - Attended deposition of Dan Dunne, individually and on behalf of Liberty as the designee on several key Rule 30(b)(6) categories in Tampa, Florida;

     * July 17-18, 2006 - Attended deposition of Mike Pisari, Liberty's underwriter on the Republic account in Boston, Massachusetts;

8

* July 18-19, 2006 - Attended deposition of Mike Ward, Liberty's sales person on the Republic account in Boston, Massachusetts;

* July 19, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's use of Ristrac in Boston, Massachusetts;

* July 19, 2006 - Attended deposition of Cathy Simes, individually, in Boston, Massachusetts;

* July 20, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's use of medical bill review, in Boston, Massachusetts;

* July 20, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's negotiation and use of Preferred Provider Organization contracts, in Boston, Massachusetts;

* July 20, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's negotiation and use of third party software and other vendors in the medical bill review life cycle, in Boston, Massachusetts;

* July 20, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's use and charging of allocated costs to claims, in Boston, Massachusetts;

* July 20, 2006 - Attended deposition of Liberty's Rule 30(b)(6) designee on the subject of all litigation on

similar      issues      pending      against      Liberty,      in      Boston, Massachusetts;

      * July 20, 2006 - Attended deposition of Liberty's Rule 30(b)(6) designee on the subject matter of this action and the pleadings filed by Liberty, in Boston, Massachusetts;

      * July 21, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's audits and reviews of claims, in Boston, Massachusetts;

      * July 21, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's internal standards for documenting a claim file, in Boston, Massachusetts;

      * July 21, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's development, implementation and use of it's Claims Best Practices document, in Boston, Massachusetts;

      * July 21, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's standards of care for  handling  workers'  compensation  claims,  in  Boston, Massachusetts;

      * July 21, 2006 - Took deposition of Liberty's Rule 30(b)(6) designee on the subject of Liberty's use of the BoComp and ExPRS claims tracking systems, in Boston, Massachusetts;

      * August 1-2, 2006 - Defended Republic Expert Tim Snoddy in Lexington, Kentucky;

* August 3-4, 2006 - Took deposition of Liberty Expert Marc Ray in Lexington, Kentucky.

23. Liberty did not inform us of any issue they may have had regarding our ability to represent Republic in this matter until a letter, addressed to Rob Maclin, was given to me by Mr. Maclin on August 1, 2006 - one day after the Court's discovery cut-off. My co-counsel Mr. Maclin informed me of the letter, as that letter was not addressed to me or anyone at my firm. A true and correct copy of Liberty's July 31, 2006 letter (received August 1, 2006) is attached hereto as Exhibit "B."

24. Liberty filed it's instant motion that same afternoon, on August 1, 2006.

25. While defending the deposition of Republic's expert Tim Snoddy at Liberty's counsel's office in Lexington, Kentucky on August 1st and 2nd, Liberty said nothing to me on or off the record about my representation and did not object to my defending Mr. Snoddy. It was not until August 3rd, when taking the deposition of Liberty's expert Mr. Ray in Lexington that Liberty's counsel finally objected to my appearance in this case.

26. On August 15, 2006, I took the deposition of Ms. Hansen at my offices in Woodland Hills, California. This deposition took place pursuant to a ruling by Magistrate Todd.

Attached hereto as Exhibit "C" is a true and correct copy of the relevant portions of Ms. Hansen's deposition transcript.

Executed this 16th day of August, 2006 in Woodland Hills, California.

Michael B. Adreani

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )

The foregoing Declaration was subscribed, sworn to and acknowledged before me this 16 day of August, 2006, by Michael B. Adreani.

My Commission expires:    _December 10, 2008_


_____
Notary Public, California State at Large


(SEAL)



13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                    PLAINTIFFS

v.

CIVIL ACTION NO. 03-494-KSF

DECLARATION OF NICHOLAS P. ROXBOROUGH

LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                            DEFENDANTS

**      **      **      **      **

I, NICHOLAS P. ROXBOROUGH, DECLARE AS FOLLOWS:

1.    I am an attorney duly licensed to practice before the courts of the State of California and the U.S. Courts in California and I am admitted to the Bar of this Court. I am a partner in the law firm of Roxborough Pomerance & Nye, and if called upon to testify, I could and would be able to competently testify concerning the above action.

2.    Approximately 20 years ago, I first started practicing in the unique area of representing employers who had workers' compensation premium and dividend disputes with their workers' compensation carriers. I regularly am a guest speaker at State Bar Associations, Trade Groups and so on. Over the last 20 years, I was fortunate to build a practice in this area of the law and my case work has helped to develop the case law in

California.    I personally handled and won the following seven published decisions and trials:

a)  *Courtesy Ambulance v. State Fund*, (1992) 8 Cal. App.4[th] 1504, 11 Cal. Rptr. 2d 1161

b)  *Security Officers Services, Inc. v. State Fund*, (1993) 17 Cal.App.4[th] 887, 21 Cal. Rptr. 653

c)  *Maxon Industries, Inc. v. State Fund*, (1993) 8 Cal.App.4[th] 1504, 11 Cal. Rptr.2d 1161

d)  *Tricor California, Inc. v. State Fund*, (1994) 30 Cal.App.4[th] 230, 35 Cal. Rptr. 2d 550

e)  *MacGregor Yacht Corp. v. State Fund*, (1998) 63 Cal.App.4[th] 448, 74 Cal. Rptr. 2d 473

f)  *Joe Notrica dba Notrica's 32nd Street Markets v. State Fund*, (1999) 70 Cal.App.4[th] 911, 83 Cal. Rptr. 2d 89

g)  *Shaefer Ambulance v. State Fund* (California Supreme Court) (2001) 24 Cal.4[th] 930

Prior to these cases, there was no case law developed on this subject in California.

3.    I reviewed the Declaration of Lisa K. Hansen dated August 1, 2006. Her declaration identifies two employees of Roxborough Pomerance & Nye ("RPN"), namely Craig S. Pynes and Karen Gichtin. Regarding Karen Gichtin, she was employed on or about March 29, 2006. At the time she was hired, my partner, Michael Adreani, and I were aware that she had worked on the *RemedyTemp vs. Liberty Mutual* case. I and Mr. Adreani were already working on that matter and several years earlier had also litigated a similar case against Liberty for our client

KIMCO. Thus long before that Ms. Gichtin and Mr. Pynes joined RPN, I had a detailed understanding of Liberty's Workers' Compensation Program. Although we understood her role on that case to have been of a Junior Associate, with no deposition involvement, a condition of her employment with RPN was that she could not work on any Liberty Mutual case while employed in our office. She, in fact, during the term of her employment, has not worked on any matter involving Liberty Mutual in our office, including but not limited to, the *RemedyTemp* action or the herein action involving Republic Services, Inc. (RSI). Accordingly, she has not attended any meetings, been sent any emails, attended any conference calls, or worked with anyone from our firm on the RSI or *RemedyTemp* matters. Furthermore, she has not been asked to review, nor has she reviewed any pleadings in the *RemedyTemp* or RSI matters. Instead, she works on other cases involving other insurance carriers and third party administrators for myself and other partners in the firm. At no time has she discussed with me a single fact involving either Liberty Mutual or the *RemedyTemp* matter.

4. As to Craig S. Pynes, he was hired on or about March 24, 2004. During the past 2½ years, I have spent time training Mr. Pynes in this particular unique area of workers' compensation/bad faith practice, as he had no prior experience in this specialized area. Indeed, at the time he came to our

3

firm, he represented that he had not worked in this area at all at Kern & Wooley or at any other prior law firm. Nevertheless, at no time did Mr. Pynes work on any matter involving the *RemedyTemp v. Liberty Mutual* case. In fact, we did not even speak to Mr. Pynes about that case because his prior employer, Kern & Wooley, were counsel of record on that case. This was true even though Mr. Pynes worked at Kern & Wooley less than nine months and represented that he never worked on any cases or reviewed any claims manuals or any claim files involving Liberty's Workers' Compensation Program. He also represented he had no knowledge concerning Liberty's workers' compensation policies and procedures.

5. Accordingly, for the first two years with our firm, Mr. Pynes worked extensively with me on cases involving other (non-Liberty) workers' compensation bad faith disputes. Over his first two years, Mr. Pynes exhibited a tremendous amount of interest in this area, read all the cases, attended adjuster depositions I took to learn how to take these depositions, went to court with me on these types of cases, and received training in this specialized area.

6. In or about April, 2006, I, my partner, Mr. Adreani, and Craig Pynes submitted Pro Hac Vice Applications to this Honorable Court. My review of the file indicates that this Honorable Court accepted all of our Pro Hac Vices on or about

May 2, 2006.   I signed my Pro Hac Vice on April 21, 2006 and forwarded it to Kentucky counsel for filing.

7.   In 2006, I understood William Cupelo to be second in command in terms of General Counsel at Liberty Mutual's home office in Boston, Massachusetts.   Mr. Cupelo and I had, I believe, developed a cordial relationship during mediation of the *RemedyTemp* case.   In fact, with the written consent of Liberty's outside counsel on *RemedyTemp*, Mr. Cupelo was dealing directly with both me and Mr. Adreani from June 2005 through the present on the *RemedyTemp* case.   As such, Mr. Cupelo said that in the future, if I was ever going to be involved in a lawsuit on behalf of an employer against Liberty that I should be kind enough to first give him a call to see if there wasn't something we could do to resolve those issues.

8.   Consistent with Mr. Cupelo's request, as a professional courtesy, I called Mr. Cupelo in the last week of April, 2006 for the purpose of advising him that I and my firm would be associating in as counsel in the RSI case.   Mr. Cupelo was not available, but I left him a detailed message and invited him to call me back on the RSI case.   At no time did he call me back or communicate a response in any way.   Assuming Mr. Cupelo received and listened to my voicemail message, he was aware of my firm's involvement in this case on or before May 1, 2006, over three and a half months ago.

9.    I can unequivocally state and would be more than pleased to so testify before this Honorable Court that:

    a)    I have not had any communications at any point in time with Ms. Gichtin regarding anything having to do with Liberty Mutual whatsoever;

    b)    With one exception, I have not had any communications at any point in time with Mr. Pynes regarding anything having to do with Liberty Mutual whatsoever.    Indeed, the only communications Mr. Pynes and I have had concerning a Liberty Mutual case started in or about April, 2006, over two years after Mr. Pynes began working for our law firm and those conversations only involve the facts and issues specific to RSI's case against Liberty Mutual. In working with Mr. Pynes in this case, Mr. Pynes has not shared a single fact about Liberty with me (or to my knowledge with Mr. Adreani) concerning what Ms. Hansen describes as "confidential information concerning Liberty Mutual's practices and procedures, strategies for handling litigation, claims operations, general claim file management, and recordkeeping."

    c)      Litigating a workers' compensation bad faith case is entirely different than other insurance lines:

        (1)   different policies and procedures;

        (2)   different case law;

        (3)   different individuals within the control group at the insurance company;

        (4)   different witnesses;

        (5)   different manuals;

        (6)   etc.

    d)      When he was hired, Mr. Pynes knew nothing of this unique area of practice. Mr. Adreani and I trained him extensively in this area.

10.  During the entire time my firm has worked on this case, Karen Gichtin has been completely screened from all involvement on this case. All attorneys in my firm have been instructed not to discuss the case with her. She has also been so instructed. Moreover, the file is kept under lock and key in my partner, Mr. Adreani's office. She also sits on the far end of the office from other attorneys working on the case. In fact, Ms. Gichtin does not have any access and does not use our firm Paralegal working on this case.

11.  At the time of preparing and filing the present opposition brief, I am taking and defending expert depositions here in Kentucky.

I declare under penalty of perjury under the laws of the State of Kentucky that the foregoing is true and correct.

Executed this *18TH* day of August, 2006, in the City of Lexington, State of Kentucky.

NICHOLAS P. ROXBOROUGH

STATE OF KENTUCKY          )
                          )
COUNTY OF FAYETTE         )

The foregoing Declaration was subscribed, sworn to and acknowledged before me this 8th day of August, 2006, by Nicholas P. Roxborough.

My Commission expires: *January 21, 2009*

Notary Public,
Kentucky State at Large

P:\Liberty Mutual\pleadings\Roxborough\NPR Declaration.doc