DEPOSITION OF LISA KRALIK HANSEN

1      Q.   OKAY.  WITH REGARD TO THE NEXT COMMENT YOU MAKE,

2   WRITTEN DISCOVERY, MR. PYNES NEVER PROPOUNDED OR RESPONDED

3   TO THE WRITTEN DISCOVERY WITH REGARD TO WORKERS'

4   COMPENSATION BAD FAITH, DID HE?

5      A.   I DON'T KNOW THAT HE NEVER DID THAT.  TO THE BEST

6   OF MY RECOLLECTION, HE DID NOT.

7      Q.   MEDIATION, MR. PYNES WAS NOT INVOLVED IN ANY

8   MEDIATION WITH REGARD TO WORKERS' COMPENSATION BAD FAITH,

9   WAS HE?

10      A.   I DO NOT BELIEVE HE WAS.

11      Q.   OKAY.  STRATEGY DISCUSSIONS, MR. PYNES WAS NEVER

12   INVOLVED IN STRATEGY DISCUSSIONS WITH REGARDS TO WORKERS'

13   COMPENSATION BAD FAITH, WAS HE?

14      A.   I CANNOT TESTIFY THAT HE WAS NEVER INVOLVED IN

15   STRATEGY DISCUSSIONS RELATING TO WORKERS' COMPENSATION.

16   WE HAD A NUMBER OF THOSE CASES IN OUR OFFICE AT THAT POINT

17   IN TIME AND WE HAD MEETINGS, INTERNAL FIRM MEETINGS,

18   PRACTICE GROUP MEETINGS IN WHICH CASES WOULD HAVE BEEN

19   DISCUSSED, THERE COULD HAVE BEEN DISCUSSIONS IN THE

20   HALLWAY, HE COULD HAVE WALKED IN ON A DISCUSSION AMONG

21   LAWYERS, THERE COULD HAVE BEEN DISCUSSIONS ABOUT THOSE

22   CASES AT LUNCH, VERY COMMON FOR US TO DISCUSS AND --

23   DISCUSS CASES AMONG LAWYERS IN OUR FIRM AND HE WAS A

24   MEMBER OF OUR PRACTICE GROUP.  I BELIEVE HE WAS PROBABLY

25   ACTUALLY -- ACTUALLY WAS PRIVY TO SOME STRATEGY

40

DEPOSITION OF LISA KRALIK HANSEN

```
1    DISCUSSIONS.

2        Q.  MR. PYNES NEVER MET IN PERSON ANYBODY IN THE

3    WORKERS' COMPENSATION CONTROL GROUP AT LIBERTY, DID HE?

4        A.  I DON'T KNOW WHAT YOU MEAN BY "WORKERS'

5    COMPENSATION CONTROL GROUP."

6        Q.  OKAY.  ANYONE FROM CLAIMS IN WORKERS'

7    COMPENSATION, MR. PYNES NEVER MET THEM, DID HE?

8        A.  I DON'T KNOW.

9        Q.  MR. PYNES NEVER MET ANYONE FROM THE VARIOUS AUDIT

10   TEAMS THAT LIBERTY HAS, DID HE?

11       A.  I DON'T KNOW.

12       Q.  AND WHEN YOU REFER IN THIS SENTENCE TO "DOCUMENT

13   PRODUCTION (INCLUDING ANALYSIS OF PRIVILEGED MATERIALS),"

14   I ASSUME THAT AS IT PERTAINS TO WORKERS' COMPENSATION BAD

15   FAITH, YOU'RE ONLY REFERRING TO THAT DOCUMENT REVIEW THAT

16   HE DID IN THE TONY'S FINE FOOD CASE.  RIGHT?

17       A.  WELL, AT THE TIME I PREPARED AND SIGNED THIS

18   DECLARATION ON AUGUST 1ST, DOCUMENT PRODUCTION,

19   INCLUDING ANALYSES OF PRIVILEGED MATERIAL, WOULD HAVE BEEN

20   FOR LIBERTY MUTUAL MATTERS IN GENERAL.

21       Q.  SO NOT RELATED TO WORKERS' COMPENSATION BAD FAITH

22   AT ALL; RIGHT?  BECAUSE HE DIDN'T WORK ON THOSE CASES;

23   RIGHT?

24           MR. SKOCYPEC:  COUNSEL, YOU INTERRUPTED HER WHEN

25   SHE WAS ANSWERING THE QUESTION.  I WOULD APPRECIATE IT IF
```

41

DEPOSITION OF LISA KRALIK HANSEN

1    YOU WOULD LET HER FINISH HER ANSWER BEFORE YOU ASK THE

2    NEXT QUESTION.

3              MR. ADREANI:  YOU'RE RIGHT, RON.  SORRY.

4              MR. SKOCYPEC:  CAN WE HAVE THAT READ BACK,

5    PLEASE.

6              (WHEREUPON THE RECORD WAS READ BACK BY

7              THE DEPOSITION OFFICER AS FOLLOWS:

8                  "Q  AND WHEN YOU REFER IN THIS

9              SENTENCE TO "DOCUMENT PRODUCTION

10             'INCLUDING ANALYSIS OF PRIVILEGED

11             MATERIALS,' I ASSUME THAT AS IT PERTAINS

12             TO WORKERS' COMPENSATION BAD FAITH,

13             YOU'RE ONLY REFERRING TO THAT DOCUMENT

14             REVIEW THAT HE DID IN THE TONY'S FINE

15             FOOD CASE.  RIGHT?

16                 "A  WELL, AT THE TIME I PREPARED

17             AND SIGNED THIS DECLARATION ON

18             AUGUST 1ST, DOCUMENT PRODUCTION,

19             INCLUDING ANALYSES OF PRIVILEGED

20             MATERIAL, WOULD HAVE BEEN FOR LIBERTY

21             MUTUAL MATTERS IN GENERAL.")

22             THE DEPONENT:  UPON MY -- TO FINISH MY ANSWER,

23   UPON MY RECEIPT OF THE DEPOSITION SUBPOENA, I -- MY

24   MEMORY, MY RECOLLECTION WAS REFRESHED TO SPECIFICS THAT

25   MR. PYNES HAD SPECIFICALLY WORKED ON A DOCUMENT PRODUCTION

42

DEPOSITION OF LISA KRALIK HANSEN

1   AND A PRIVILEGE REVIEW AND PRIVILEGE LOG PREPARATION IN

2   THE TONY'S FINE FOOD CASE.

3   BY MR. ADREANI:

4       Q.  DO YOU RECALL WHO DIRECTED MR. PYNES TO DO THAT

5   REVIEW ON TONY'S FINE FOODS OR WHO ASKED HIM TO DO IT?

6       A.  I BELIEVE IT WAS MELODEE YEE.

7       Q.  AND OTHER THAN LOOKING AT THOSE DOCUMENTS THAT

8   AFTERNOON, MR. PYNES DIDN'T DO ANY WORK ON THAT CASE, DID

9   HE?

10      A.  WELL, COUNSEL, I DON'T KNOW.  YOU'RE THROWING IN

11  TESTIMONY IN YOUR QUESTIONS BECAUSE I DON'T KNOW WHAT TIME

12  MR. PYNES SPENT, I DON'T HAVE HIS TIME SHEETS, AND I CAN'T

13  ANSWER A QUESTION THAT HAS AN ASSUMPTION THAT HE DID

14  SOMETHING IN ONE AFTERNOON.

15      Q.  OKAY.  SO YOU DON'T KNOW?

16      A.  SO I CAN'T ANSWER THE QUESTION AS YOU PHRASED IT

17  BECAUSE --

18      Q.  WELL, OTHER THAN THE REVIEW THAT YOU'VE

19  MENTIONED, MR. PYNES DID NO OTHER WORK ON THAT PARTICULAR

20  CASE; RIGHT?

21      A.  NOT TO MY PERSONAL KNOWLEDGE.

22      Q.  OKAY.  MOVING ON IN THE SAME SENTENCE,

23  "PREPARATION OF LEGAL MEMORANDA," MR. PYNES NEVER PREPARED

24  A LEGAL MEMORANDA WITH REGARD TO A WORKERS' COMPENSATION

25  BAD FAITH CASE, DID HE?

43

DEPOSITION OF LISA KRALIK HANSEN

1      A.  I DON'T KNOW IF HE DID OR HE DID NOT.

2      Q.  OKAY.  THE NEXT SENTENCE, "MR. PYNES ALSO HAD

3  SOME CLIENT CONTACT WITH CLAIMS PERSONNEL WITH LIBERTY,"

4  NOW, THAT CLIENT CONTACT WITH CLAIMS PERSONNEL WAS NEVER

5  WITH WORKERS' COMPENSATION CLAIMS PERSONNEL, WAS IT?

6      A.  TO MY PERSONAL KNOWLEDGE, MR. PYNES WOULD NOT

7  HAVE HAD CLIENT CONTACT WITH CLAIMS PERSONNEL WHO AT THAT

8  TIME WERE HANDLING WORKERS' COMPENSATION BAD FAITH

9  MATTERS.

10      Q.  OKAY.  WELL, WHAT DO YOU MEAN BY "AT THAT TIME"?

11      A.  DURING THE TIME HE WAS EMPLOYED.

12      Q.  OKAY.  SO HE NEVER HAD -- TO YOUR KNOWLEDGE --

13  YOUR TESTIMONY IS THAT TO YOUR KNOWLEDGE, MR. PYNES NEVER

14  HAD CONTACT WITH CLAIMS PERSONNEL REGARDING WORKERS'

15  COMPENSATION?

16      A.  WELL, NO.  I THINK YOU'RE SPINNING MY TESTIMONY.

17  MY ANSWER WAS THAT TO MY PERSONAL KNOWLEDGE, HE NEVER HAD

18  CONVERSATIONS WITH LIBERTY MUTUAL PERSONNEL WHO WERE

19  INVOLVED WITH THE HANDLING OF WORKERS' COMPENSATION BAD

20  FAITH CLAIMS OR ABOUT WORKERS' COMPENSATION BAD FAITH

21  CLAIMS.

22          HE MAY HAVE HAD DISCUSSIONS WITH LIBERTY MUTUAL

23  WORKERS' COMPENSATION CLAIMS PERSONNEL IN PART BECAUSE I

24  HAVE SPECIFIC RECOLLECTION THAT HE WORKED ON AT LEAST ONE

25  UNINSURED MOTORIST OR UNDERINSURED MOTORIST CASE BAD FAITH

44

DEPOSITION OF LISA KRALIK HANSEN

1   WITH LIBERTY WITH ME AND THERE MAY HAVE BEEN A WORKERS'

2   COMPENSATION RELATED ISSUE IN THAT CASE.   THERE OFTEN ARE

3   IN THOSE TYPES OF CASES.   THERE MAY HAVE BEEN.

4        Q.   THAT WASN'T A WORKERS' COMPENSATION BAD FAITH

5   CASE, WAS IT?

6        A.   NO.   IT WAS UNINSURED OR UNDERINSURED MOTORIST.

7        Q.   SO WHEN YOU SAY HERE THAT MR. PYNES DID HAVE SOME

8   CLIENT CONTACT WITH CLAIMS PERSONNEL AT LIBERTY, THAT

9   CLIENT -- YOU ARE AWARE OF SOME CLIENT CONTACT THAT HE HAD

10  WITH CLAIMS PERSONNEL; RIGHT?

11       A.   YES.

12       Q.   OKAY.   BUT THOSE CLAIMS PERSONNEL WERE IN

13  DIFFERENT LINES OF INSURANCE THAT YOU'RE AWARE OF; RIGHT?

14       A.   YES.

15       Q.   WHY DON'T YOU PUT THAT IN HERE?   WHY ISN'T THAT

16  HERE?

17           MR. SKOCYPEC:   OBJECTION.   ATTORNEY WORK PRODUCT.

18  INSTRUCT THE WITNESS NOT TO ANSWER.

19  BY MR. ADREANI:

20       Q.   ARE YOU GOING TO ACCEPT THAT INSTRUCTION?

21       A.   YES.

22       Q.   OKAY.   THE NEXT SENTENCE, "MR. PYNES WOULD HAVE

23  BEEN EXPOSED TO CONFIDENTIAL INFORMATION CONCERNING

24  LIBERTY MUTUAL'S PRACTICES AND PROCEDURES, STRATEGIES FOR

25  HANDLING LITIGATION, CLAIMS OPERATION, GENERAL CLAIM FILE

45

DEPOSITION OF LISA KRALIK HANSEN

1  MANAGEMENT AND RECORD KEEPING," DO YOU SEE THAT?

2      A.  YES.

3      Q.  DID YOU WRITE THAT SENTENCE?

4      A.  YES, I DID.

5      Q.  YOU SAY "WOULD HAVE BEEN EXPOSED."  WAS HE OR

6  WASN'T HE?

7      A.  HE WAS.

8      Q.  BUT NOT TO WORKERS' COMPENSATION CONFIDENTIAL

9  INFORMATION; RIGHT?

10      A.  HE WAS EXPOSED TO IT.  IT WAS THERE.

11      Q.  YOU SAY "WOULD HAVE BEEN."  YOU'RE NOT AWARE OF

12  ANY SUCH EXPOSURE, ARE YOU?

13      A.  I AM AWARE OF EXPOSURE.

14          FOR EXAMPLE, THE -- A TEN VOLUME -- LET'S GET

15  SPECIFIC.  A TEN VOLUME VERSION OF LIBERTY MUTUAL CLAIMS

16  MANUAL WAS AT THAT TIME MAINTAINED IN MY OFFICE.  ONE OF

17  THE VOLUMES WAS SPECIFIC TO WORKERS' COMPENSATION.  HE HAD

18  ACCESS TO IT.  HE WAS EXPOSED TO IT.

19      Q.  ALL RIGHT.  SO YOUR SPECIFIC EXAMPLE OF EXPOSURE

20  IS THAT YOU HAD ONE VOLUME OUT OF TEN VOLUMES OF MANUALS

21  IN YOUR OFFICE THAT -- AND THAT'S IT?  THAT THEY HAPPENED

22  TO BE IN YOUR OFFICE?

23      A.  WELL, THAT IS AN EXAMPLE.

24      Q.  WELL, I'M JUST TRYING TO FIGURE OUT WHAT YOUR

25  EXAMPLE IS JUST FOR THE RECORD.

46

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

1       YOU HAD TEN VOLUMES OF CLAIMS MANUALS IN YOUR

2  OFFICE; RIGHT?

3     A.  CORRECT.

4     Q.  ONE OF WHICH HAD TO DO WITH WORKERS'

5  COMPENSATION?

6     A.  CORRECT.

7     Q.  AND IN YOUR OFFICE YOU DON'T MEAN THE SUITE THAT

8  KERN & WOOLEY HAD?  YOU MEAN YOUR OFFICE; RIGHT?

9     A.  YES.

10    Q.  OKAY.  AND THAT'S WHAT YOU MEAN WHEN -- THIS ONE

11  VOLUME OF A TEN SET -- ONE VOLUME IN A SET OF TEN WAS IN

12  YOUR OFFICE, THAT'S WHAT YOU MEAN WHEN YOU SAY MR. PYNES

13  WOULD HAVE BEEN EXPOSED?

14    A.  HE WAS EXPOSED.  THERE WERE CLAIMS MANUALS FOR

15  VARIOUS TIME PERIODS AND FOR ALL LINES OF INSURANCE

16  SPECIFICALLY, INCLUDING WORKERS' COMPENSATION, THAT WERE

17  HELD AND MAINTAINED IN OUR OFFICE AS COUNSEL FOR LIBERTY

18  MUTUAL SO THAT LIBERTY MUTUAL DID NOT NEED TO REPEATEDLY

19  PRINT OUT COPIES OF CLAIMS MANUALS TO BE PRODUCED IN

20  LITIGATION PURSUANT TO PROTECTIVE ORDER.

21       THOSE CLAIM MANUALS WERE MAINTAINED BY OUR OFFICE

22  IN A GENERAL AREA AND IN MY OFFICE, ALONG WITH ALL THE

23  OTHER LIBERTY MUTUAL OPEN LITIGATION AND NONLITIGATION

24  FILES AND OTHER GENERAL LIBERTY MUTUAL INFORMATION THAT

25  WAS ACCESSIBLE TO ALL ATTORNEYS IN OUR PRACTICE GROUP, IF

47

DEPOSITION OF LISA KRALIK HANSEN

1    NOT THE FIRM.

2        Q.  NOW, MR. PYNES IN HIS OFFICE DIDN'T HAVE ANYTHING

3    RELATED TO WORKERS' COMPENSATION; RIGHT?

4        A.  I DON'T KNOW WHAT YOU MEAN BY ANYTHING IN HIS

5    OFFICE RELATED TO WORKERS' COMPENSATION.  I MEAN, HE...

6        Q.  WELL, DO YOU KNOW WHAT HE HAD IN HIS OFFICE?

7        A.  I DON'T RECALL WHAT HE DID OR DID NOT HAVE IN HIS

8    OFFICE.

9            MR. ADREANI:  YOU GUYS WANT TO TAKE A LITTLE

10    BREAK?

11            MR. SKOCYPEC:  SURE.

12            MR. ADREANI:  WE'VE BEEN GOING A LITTLE OVER AN

13    HOUR.

14            (RECESS TAKEN, FROM 11:16 TO 11:33.)

15    BY MR. ADREANI:

16        Q.  WE TALKED ABOUT CLAIMS MANUALS EARLIER AND

17    SPECIFICALLY SOME MANUALS THAT WERE IN YOUR OFFICE; RIGHT?

18        A.  IN PART, YES.

19        Q.  THESE ARE MANUALS THAT LIBERTY PRODUCED IN

20    DISCOVERY; RIGHT?

21        A.  PURSUANT TO PROTECTIVE ORDER.

22        Q.  AND PURSUANT TO PROTECTIVE ORDER, LIBERTY WOULD

23    PRODUCE THEM IN THEIR ENTIRETY; RIGHT?

24        A.  WELL, IT WOULD DEPEND ON WHAT THE PROTECTIVE

25    ORDER SAID.  THERE WERE ALSO SOME INTERNAL PROCEDURE

48

DEPOSITION OF LISA KRALIK HANSEN

1   MANUALS THAT DO NOT GET PRODUCED.

2       Q.   YOU DON'T MENTION ANY INTERNAL PROCEDURE MANUALS

3   IN YOUR DECLARATION, DO YOU?

4       A.   I MENTION CONFIDENTIAL INFORMATION.

5       Q.   DO YOU RECALL WHEN MR. PYNES LEFT KERN & WOOLEY?

6       A.   I BELIEVE IT WAS IN MARCH OF 2004.

7       Q.   AND DO YOU RECALL WHERE HE ACCEPTED EMPLOYMENT?

8       A.   YOUR FIRM.

9       Q.   AT ROXBOROUGH, POMERANCE & NYE; CORRECT?

10      A.   CORRECT.

11      Q.   AND YOU WERE AWARE WHEN HE LEFT KERN & WOOLEY

12  THAT'S WHERE HE WAS GOING; RIGHT?

13      A.   YES.

14      Q.   AND SO WAS SUSAN AND RON?

15      A.   I ASSUME SO.

16      Q.   WELL, YOU HAD DISCUSSIONS WITH CRAIG ABOUT IT;

17  RIGHT?

18      A.   YES.  HE INFORMED US THAT HE HAD ACCEPTED ANOTHER

19  JOB OFFER AND IT WAS WITH THE ROXBOROUGH FIRM.

20      Q.   NOW, IN MARCH OF 2004 WHEN MR. PYNES CAME TO THE

21  ROXBOROUGH FIRM, IT WAS SHORTLY THEREAFTER THAT THE REMEDY

22  TEMP CASE WAS FILED; RIGHT?

23      A.   I BELIEVE THE REMEDY TEMP WAS FILED IN MAY OF

24  2004.

25      Q.   APRIL 1ST.

49

DEPOSITION OF LISA KRALIK HANSEN

1      A.   I'M CLOSE.

2      Q.   AND YOUR FIRM, AT LEAST AT THE BEGINNING OF THAT

3  MATTER, REPRESENTED LIBERTY MUTUAL IN THE REMEDY TEMP

4  CASE; RIGHT?

5      A.   YES.

6      Q.   AND YOU'RE AWARE THAT CRAIG WORKED AT THE

7  ROXBOROUGH FIRM AT THE TIME YOU WERE ENGAGED TO REPRESENT

8  LIBERTY IN REMEDY TEMP; CORRECT?

9      A.   YES.

10     Q.   SO YOU WERE AWARE THAT MR. PYNES -- SO MR. PYNES

11 NEVER WOULD HAVE WORKED ON THE REMEDY TEMP CASE ON BEHALF

12 OF LIBERTY; RIGHT?

13     A.   CORRECT.

14     Q.   AND YOU AND YOUR FIRM AND LIBERTY NEVER MADE ANY

15 MOTION OR ANY INDICATION OF ANY MOTION TO DISQUALIFY THE

16 ROXBOROUGH FIRM, DUE TO MR. PYNES' EMPLOYMENT WITH THAT

17 FIRM, IN THE REMEDY TEMP CASE; RIGHT?

18     A.   THERE WAS NO NEED TO DO SO IN THAT PARTICULAR

19 CASE BECAUSE, TO OUR KNOWLEDGE, MR. PYNES -- WELL,

20 MR. PYNES NEVER APPEARED AS COUNSEL OF RECORD FOR REMEDY

21 TEMP IN THAT MATTER AND, TO OUR KNOWLEDGE, WAS NOT WORKING

22 ON THE CASE. WE WERE VERY COGNIZANT OF THE FACT THAT HE

23 WAS THERE AND HAD HE, TO OUR KNOWLEDGE, DONE ANY WORK ON

24 THE CASE, YOU BETTER BELIEVE WE WOULD HAVE DONE A MOTION

25 TO DISQUALIFY.

50

DEPOSITION OF LISA KRALIK HANSEN

1      Q.  SO YOU ARE -- YOU AND KERN & WOOLEY AND LIBERTY

2  MUTUAL, THEN, ARE SATISFIED WITH THE ROXBOROUGH PROCEDURES

3  FOR EXCLUDING SOMEBODY FROM WORKING ON A CASE?

4      A.  I HAVE NO IDEA WHAT YOUR FIRM'S PROCEDURES ARE.

5      Q.  THE ONLY REASON YOU DIDN'T MAKE THAT MOTION WAS

6  BECAUSE YOU WERE NOT AWARE OF MR. PYNES WORKING ON THAT

7  CASE; CORRECT?

8      A.  CORRECT.

9          AND I WOULD ASSUME THAT MR. PYNES WOULD NOT HAVE

10  DONE SO BECAUSE IT WOULD HAVE BEEN A BREACH OF HIS

11  ATTORNEY'S ETHICAL OBLIGATIONS AND THE STANDARDS OF

12  CONDUCT IF HE HAD DONE SO BECAUSE IT WOULD HAVE BEEN

13  REPRESENTATION OF AN ADVERSE INTEREST.

14         AND AS LAWYERS WE ALL PRESUME THAT WHEN ONE

15  LAWYER LEAVES ONE FIRM AND GOES TO ANOTHER FIRM THAT

16  REPRESENTS INTERESTS ADVERSE TO THAT CLIENT, THAT THAT

17  LAWYER WILL DO THE APPROPRIATE THING AND HAVE NOTHING TO

18  DO WITH THAT CASE.

19         I CANNOT SIT HERE AND TESTIFY THAT MR. PYNES

20  NEVER HAD ANY INVOLVEMENT IN REMEDY TEMP.  I DON'T KNOW.

21  WE SAW NO BASIS ON WHICH TO MOVE TO DISQUALIFY YOUR FIRM

22  IN THE REMEDY TEMP LITIGATION BECAUSE, TO OUR KNOWLEDGE,

23  MR. PYNES NEVER WORKED ON THE CASE, OR AT LEAST IT WAS

24  NEVER MADE KNOWN TO US THAT HE WORKED ON THE CASE.

25      Q.  OKAY.  DID KERN & WOOLEY HAVE A PROCEDURE FOR

51

DEPOSITION OF LISA KRALIK HANSEN

```
 1   WALLING OFF PEOPLE FROM CERTAIN MATTERS IF THERE WAS A

 2   CONFLICT?

 3        A.   WHAT DO YOU MEAN BY "PROCEDURE"?

 4        Q.   WAS THERE ANY KNOWN MEANS FOR KEEPING SOMEBODY

 5   FROM WORKING ON A CASE IF THERE WAS A POTENTIAL FOR A

 6   CONFLICT?

 7        A.   THE KERN & WOOLEY FIRM WOULD HAVE DONE WHAT IT

 8   NEEDED TO DO DEPENDING ON THE LAW THAT APPLIED TO THAT

 9   PARTICULAR CASE, WHAT VENUE, STATE.  AND IF AN ATTORNEY

10   THERE HAD A CONFLICT, THAT PERSON WOULD NOT HAVE WORKED ON

11   THE CASE.  TO MY PERSONAL KNOWLEDGE, I DON'T KNOW WHAT THE

12   FIRM ITSELF DID IN THAT SITUATION.  I DON'T KNOW IF THAT

13   SITUATION EVER IN FACT REALLY AROSE.

14        Q.   WHAT ABOUT PETERSON & BRADFORD, YOUR CURRENT

15   EMPLOYER?  DO THEY HAVE SUCH PROCEDURES?

16        A.   AGAIN, THERE'S -- TO MY KNOWLEDGE THERE'S NOTHING

17   IN WRITING, AND THE FIRM WOULD FOLLOW AND ABIDE BY

18   WHATEVER THE LAW REQUIRES THE FIRM TO DO WITH RESPECT TO

19   THAT PARTICULAR PERSON.

20             WE HAVE BOTH -- WE HAVE, OUR PRACTICE GROUP, IN

21   THE PAST AT WHATEVER LAW FIRM, ARE COGNIZANT OF NOT HIRING

22   PEOPLE WITH KNOWN CONFLICTS.  SO IN PART THAT'S ONE WAY

23   THAT BOTH -- I KNOW PERSONALLY BOTH KERN & WOOLEY AND NOW

24   AT PETERSON & BRADFORD THAT OUR GROUP HANDLES THAT

25   SITUATION.
```

52

DEPOSITION OF LISA KRALIK HANSEN

1      I MEAN, WE CAN GO INTO THEORETICALS IF SHOULD A

2  CONFLICT RISE, WHAT WE WOULD DO.  I MEAN, I'M NOT GOING TO

3  TESTIFY ABOUT THAT BECAUSE I DON'T KNOW.  THAT'S JUST A

4  HYPOTHETICAL.

5      Q.  NO.  THAT'S NOT NECESSARY.

6      SO THE REASON THAT NO MOTION WAS BROUGHT IN THE

7  REMEDY TEMP MATTER WAS THAT YOU WERE SATISFIED THAT

8  MR. PYNES HAD NO INVOLVEMENT IN THE REMEDY TEMP CASE?

9      A.  WELL, WE WEREN'T SATISFIED THAT HE HAD NO

10  INVOLVEMENT.  WE HAD NO IDEA WHETHER OR NOT HE HAD ANY

11  INVOLVEMENT.  HE NEVER APPEARED AS COUNSEL OF RECORD.  HE

12  NEVER SIGNED ANY LETTERS.  HE NEVER SIGNED ANY PLEADINGS,

13  TO OUR KNOWLEDGE.  HE NEVER CALLED ANY LAWYER AT KERN &

14  WOOLEY ABOUT THE REMEDY TEMP CASE, TO MY KNOWLEDGE, NEVER

15  SENT US ANY E-MAILS ABOUT THE REMEDY TEMP CASE, TO MY

16  KNOWLEDGE.  WE HAD NO REASON TO BELIEVE THAT HE WAS

17  WORKING ON THE CASE.

18      Q.  SO THE LACK OF ALL THOSE THINGS THAT YOU JUST

19  MENTIONED WAS ENOUGH TO DISSUADE YOU FROM MAKING SUCH A

20  MOTION?

21      A.  WELL, I MEAN, I'M PERSONALLY NOT GOING TO MAKE A

22  MOTION TO DISQUALIFY SOMEONE UNTIL THEY WORK ON THE CASE.

23      Q.  AND WHAT -- I GUESS WHAT I MEANT IS YOU AND YOUR

24  CLIENT, LIBERTY, HAVING NOT RECEIVED E-MAILS, HAVING NOT

25  SEEN MR. PYNES ON THE PLEADINGS, HAVING NOT SEEN HIM

53

DEPOSITION OF LISA KRALIK HANSEN

1    APPEAR AS COUNSEL OF RECORD, LIBERTY MUTUAL, YOU AND YOUR

2    FIRM, DECIDED NOT TO MAKE ANY MOTION TO DISQUALIFY?

3        A.   THAT'S PRIVILEGED AND PROTECTED.   I'M NOT GOING

4    TO ANSWER THAT QUESTION.   YOU'RE ASKING ME ABOUT MY

5    DISCUSSIONS --

6            MR. SKOCYPEC:  GOOD OBJECTION, AND I'LL REITERATE

7    IT AS YOUR COUNSEL.

8            MR. ADREANI:  I'LL TREAT YOU GUYS AS ONE IN THE

9    SAME FOR THAT ONE.

10       Q.   SO WHAT CRITERIA DO YOU LOOK AT IN TERMS OF

11   LOOKING AT WHETHER OR NOT SOMEONE SHOULD BE DISQUALIFIED?

12           MR. SKOCYPEC:  OBJECTION.  ATTORNEY WORK PRODUCT.

13           MR. ADREANI:  INSTRUCT HER --

14           MR. SKOCYPEC:  INSTRUCT THE WITNESS NOT TO

15   ANSWER.

16   BY MR. ADREANI:

17       Q.   DO YOU ACCEPT THE INSTRUCTION?

18       A.   YEAH.

19           MR. SKOCYPEC:  ALSO CALLS FOR AN EXPERT OPINION.

20           MR. ADREANI:  WELL, I ASKED THE QUESTION -- I

21   PHRASED IT AS "YOU."

22       Q.   AND BY THAT I MEAN YOU, LIBERTY OR KERN & WOOLEY.

23           THE SAME INSTRUCTION?

24           MR. SKOCYPEC:  CORRECT.

25   ///

                                                              54

DEPOSITION OF LISA KRALIK HANSEN

1   BY MR. ADREANI:

2       Q.  THE SAME ACCEPTANCE OF INSTRUCTION?

3       A.  YOUR LAST QUESTION ALSO INVADES ATTORNEY/CLIENT

4   PRIVILEGE.

5       Q.  YET ANOTHER INSTRUCTION.  ARE YOU INSTRUCTING

6   YOURSELF?

7       A.  I'M INSTRUCTING MYSELF NOT TO ANSWER AND I'M

8   FOLLOWING THE INSTRUCTION OF COUNSEL.

9       Q.  HAVE YOU TALKED TO MS. GILFORD ABOUT THIS CASE?

10      A.  NO.

11      Q.  NOT IN THE HALL DURING A BREAK OR ANYTHING?

12      A.  NO.

13      Q.  IS MS. GILFORD YOUR ATTORNEY?

14      A.  NO.

15      Q.  WHEN DID KAREN GICHTIN BEGIN WORKING AT KERN &

16  WOOLEY?

17      A.  IT WAS LATE SPRING OR EARLY SUMMER OF 2004.  IT

18  MAY HAVE BEEN JUNE OF 2004.  I DON'T RECALL THE SPECIFIC

19  MONTH OR DATE.

20      Q.  SO SHORTLY AFTER CRAIG LEFT?

21      A.  YES.

22      Q.  AND MS. GICHTIN WAS INVOLVED IN THE REMEDY TEMP

23  CASE; CORRECT?

24      A.  YES.

25      Q.  YOU HAVE IN PARAGRAPH 6 OF YOUR DECLARATION A

55

DEPOSITION OF LISA KRALIK HANSEN

```
 1   LAUNDRY LIST OF THINGS THAT MS. GICHTIN DID ON THE REMEDY

 2   TEMP CASE; RIGHT?

 3        A.  WELL, IT'S A LIST OF MATTERS THAT SHE DID.  THIS

 4   IS NOT -- THE A THROUGH L ITEMS ARE NOT EXCLUSIVE OF THE

 5   WORK THAT SHE DID.  IT SAYS SHE WAS INVOLVED IN ALL

 6   ASPECTS -- VIRTUALLY ALL ASPECTS, INCLUDING THOSE ITEMS.

 7        Q.  A IS "REVIEWING AND DISCUSSING LIBERTY MUTUAL'S

 8   OVERALL LITIGATION POSITION AND STRATEGY"?

 9        A.  YES.

10        Q.  SHE WASN'T INVOLVED IN OVERALL STRATEGY, WAS SHE?

11        A.  YES, SHE WAS.

12        Q.  OKAY.  IN WHAT RESPECT?

13            MR. SKOCYPEC:  OBJECTION.  ATTORNEY WORK PRODUCT.

14   INSTRUCT THE WITNESS NOT TO ANSWER.  ALSO ATTORNEY/CLIENT

15   PRIVILEGE.  SAME INSTRUCTION.

16   BY MR. ADREANI:

17        Q.  B, "VOLUMINOUS DOCUMENT PRODUCTION INCLUDING

18   PROTECTION OF CONFIDENTIAL AND PRIVILEGED DOCUMENTS," DO

19   YOU SEE THAT?

20        A.  YES.

21        Q.  DID MS. GICHTIN -- WHAT DO YOU MEAN "PROTECTION

22   OF CONFIDENTIAL AND PRIVILEGED DOCUMENTS"?  I DON'T KNOW

23   WHAT THAT MEANS.

24        A.  OKAY.  MY DELAY IS I WAS TAKEN ABACK BY YOUR

25   STATEMENT.  BUT OKAY.  YOU WANT ME TO EXPLAIN TO YOU WHAT
```

56

DEPOSITION OF LISA KRALIK HANSEN

1    I MEAN BY THAT?

2        Q.   UH-HUH.   YES.

3        A.   MS. GICHTIN WAS INVOLVED IN VIRTUALLY EVERY

4    ASPECT OF THE VOLUMINOUS DOCUMENT PRODUCTIONS IN THAT CASE

5    REGARDING HUNDREDS OF CLAIM FILES, COMPUTER NOTES,

6    MANUALS, GUIDELINES, UNDERWRITING MANUALS, UNDERWRITING

7    GUIDELINES, PREMIUM CALCULATIONS, DISCUSSIONS WITH

8    INTERNAL LAWYERS, SENSITIVE PROPRIETARY BUSINESS

9    COMMERCIAL INFORMATION.

10           I'M NOT FINISHED.   I'M THINKING AS I GO ON HERE.

11       Q.   THAT'S OKAY.

12       A.   SHE WAS ALSO INVOLVED IN DECIDING AND DETERMINING

13   DOCUMENTS THAT WOULD BE SENT TO WITNESSES, CONSULTANTS,

14   LITIGATION CONSULTANTS, WITH THE ATTORNEY FILES THAT WERE

15   PRODUCED IN THAT CASE.

16           I MEAN, MICHAEL, YOU KNOW AS WELL AS I DO THERE

17   WERE A LOT OF DOCUMENTS PRODUCED IN THAT CASE, AND

18   MS. GICHTIN WAS INVOLVED IN, MY RECOLLECTION IS, VIRTUALLY

19   EVERY ASPECT OF THE DOCUMENT PRODUCTION THROUGHOUT HER

20   TENURE OF HER EMPLOYMENT.

21       Q.   AND ALL OF THOSE DOCUMENTS WERE PRODUCED TO ME;

22   RIGHT?

23       A.   THE NONPRIVILEGED DOCUMENTS, YES.   WHATEVER WAS

24   THE NONPRIVILEGED OR NONPROTECTED DOCUMENTS WERE PRODUCED.

25   MY RECOLLECTION IS THAT THERE WERE A NUMBER OF DOCUMENTS

57

DEPOSITION OF LISA KRALIK HANSEN

1    THAT WERE NOT PRODUCED THAT WERE PUT ONTO LOGS AND

2    MS. GICHTIN WOULD HAVE BEEN INVOLVED IN THE PRIVILEGE

3    REVIEW AND THE PREPARATION OF THE PRIVILEGE LOGS FOR THOSE

4    DOCUMENTS.  SHE WOULD HAVE PERSONALLY SEEN MOST, IF NOT

5    ALL, OF ANY DOCUMENTS THAT WERE NOT PRODUCED IN THE REMEDY

6    TEMP LITIGATION.

7        Q.  OKAY.  WELL, YOU RECALL IN THAT CASE THAT THERE

8    WERE SEVERAL MOTIONS BEFORE THE COURT TO GET UNREDACTED

9    DOCUMENTS, TO GET DOCUMENTS THAT WERE INITIALLY PRODUCED.

10   THE CLAIM FILES, FOR INSTANCE, YOU'RE AWARE THAT THE

11   ENTIRETY OF ALL THE CLAIM FILES WERE ULTIMATELY PRODUCED

12   IN THAT CASE; RIGHT?

13       A.  I KNOW THERE WERE SUPPLEMENTAL PRODUCTIONS.  I

14   DON'T RECALL AS I SIT HERE TODAY IF THE ENTIRETY OF THE

15   CLAIMS FILE WITHOUT ANY REDACTIONS OR ANY DOCUMENTS

16   REMOVED WHATSOEVER.

17           I HAVE A RECOLLECTION THAT DESPITE THE VARIOUS

18   MOTIONS TO COMPEL AND THE COURT ORDERS, THERE WERE

19   STILL -- AT THE END OF THE DAY, SO TO SPEAK, THERE WERE

20   STILL SOME PRIVILEGED, PROTECTED, OR REDACTED DOCUMENTS.

21       Q.  OKAY.  THIS IS NOT CONFIDENTIAL THERE.  YOU CAN

22   GO ON TO PACER AND FIND THE COURT'S ORDERS.

23           BUT THE ENTIRETY OF THE CLAIM FILES WERE ORDERED

24   PRODUCED BY THE JUDGE IN THE FEDERAL DISTRICT COURT;

25   RIGHT?

58

DEPOSITION OF LISA KRALIK HANSEN

1      A.  THE ORDERS SAY WHAT THEY SAY.  I DON'T RECALL AS

2  I SIT HERE TODAY THE EXACT WORDING OF THE COURT'S ORDERS.

3      Q.  SO IN TERMS OF CLAIMS FILES, MS. GICHTIN NEVER

4  SAW ANYTHING THAT I DIDN'T SEE; RIGHT?

5      A.  I CAN'T SAY THAT.  MY RECOLLECTION IS THAT SHE

6  WOULD HAVE SEEN DOCUMENTS BEYOND WHAT YOU HAVE SEEN.

7      Q.  IN CLAIM FILES?

8      A.  AS I SIT HERE TODAY, I BELIEVE SO.

9      Q.  OKAY.  WELL, THAT WOULD BE CONTEMPT OF A COURT

10  ORDER, LISA.  I HOPE THAT'S NOT THE CASE.

11      A.  I JUST TESTIFIED THAT AS I SIT HERE TODAY, THAT'S

12  THE BEST OF MY RECOLLECTION, MICHAEL.  IF YOU WANT TO PUT

13  THE DOCUMENTS IN FRONT OF ME, GO AHEAD, AND WE CAN SIT

14  HERE FOR ABOUT FIVE DAYS.

15      MR. SKOCYPEC:  COUNSEL, IF YOU BADGER THE

16  WITNESS, WE WILL END THE DEPOSITION AND SEEK A PROTECTIVE

17  ORDER.  THIS IS GOING TO STOP.

18  BY MR. ADREANI:

19      Q.  MS. GICHTIN NEVER LOOKED AT YOUR EXPERT REPORTS,

20  DID SHE?

21      A.  MS. GICHTIN DID LOOK AT A RETAINED CONSULTANT

22  REPORT.  I DON'T KNOW IF THAT WAS ULTIMATELY A DESIGNATED

23  EXPERT IN THE LITIGATION OR NOT.

24      I DON'T KNOW IF THE LITIGATION'S OVER.

25      Q.  IT'S NOT.

59

DEPOSITION OF LISA KRALIK HANSEN

```
1        A.  OKAY.

2        Q.  SHOULD WE GO OFF THE RECORD FOR A SECOND?

3        A.  YEAH.

4            (WHEREUPON A BRIEF DISCUSSION WAS HELD

5            OFF THE RECORD.)

6   BY MR. ADREANI:

7        Q.  SO YOUR TESTIMONY IS THAT YOU BELIEVE MS. GICHTIN

8   DID LOOK AT AN EXPERT CONSULTANT REPORT?

9        A.  THAT'S MY RECOLLECTION, IS THAT SHE DID SEE ONE.

10       Q.  IS THAT YOUR BELIEF OR DO YOU ACTUALLY RECALL HER

11  LOOKING AT AN EXPERT CONSULTANT REPORT?

12       A.  I BELIEVE SHE WAS COPIED.

13           YOU KNOW WHAT?  I CAN'T -- I NEED TO TALK TO

14  MR. SKOCYPEC BEFORE I ANSWER THIS BECAUSE I THINK I'M --

15       MR. SKOCYPEC:  YEAH.  IF YOU --

16       THE DEPONENT:  I'M WALKING A FINE LINE HERE ON

17  PRIVILEGE AND PROTECTION.

18       MR. ADREANI:  LET'S GO OFF.

19       THE DEPONENT:  CAN WE GO OFF THE RECORD?

20       MR. ADREANI:  I JUST AS SOON YOU TALK TO COUNSEL

21  OFF THE RECORD.

22       MR. SKOCYPEC:  THANK YOU, COUNSEL.

23       (RECESS TAKEN, FROM 11:57 TO 12:02.)

24       MR. ADREANI:  CAN WE GO BACK ON AND READ BACK

25  THAT LAST QUESTION.
```

60

DEPOSITION OF LISA KRALIK HANSEN

1          (WHEREUPON THE PREVIOUS QUESTION WAS

2      READ BACK BY THE DEPOSITION OFFICER AS

3      FOLLOWS:

4          "Q  IS THAT YOUR BELIEF OR DO YOU

5      ACTUALLY RECALL HER LOOKING AT AN EXPERT

6      CONSULTANT REPORT?")

7          THE DEPONENT:  MS. GICHTIN WAS AN INACTIVE MEMBER

8  OF THE LIBERTY MUTUAL LITIGATION TEAM AT THE TIME THAT

9  KERN & WOOLEY HAD THE FILE AND SHE WAS NOT WALLED OFF FROM

10  ANY INFORMATION OR DOCUMENTS ABOUT THE FILE.  NOTHING IN

11  THAT CASE WAS WITHHELD FROM HER.  SHE WAS ROUTINELY COPIED

12  ON INTERNAL E-MAILS, EXTERNAL E-MAILS, CORRESPONDENCE WITH

13  CO-COUNSEL, AND I HAVE NO REASON TO BELIEVE THAT SHE DID

14  NOT SEE ANY CONSULTANT REPORT OR OPINION.

15  BY MR. ADREANI:

16      Q.  BUT YOU NEVER SAW HER LOOKING AT IT OR ANYTHING

17  LIKE THAT?

18      A.  I DO HAVE A RECOLLECTION THAT SHE DID READ

19  IT BECAUSE I BELIEVE --

20          DEPOSITION OFFICER:  I'M SORRY.  SHE DID OR

21  DIDN'T READ IT?  YOU HAD YOUR HAND BY YOUR MOUTH.

22          MR. SKOCYPEC:  YEAH.  IF YOU CAN ANSWER THAT

23  QUESTION WITHOUT INVADING THE ATTORNEY/CLIENT PRIVILEGE

24  AND WAIVING THE ATTORNEY/CLIENT PRIVILEGE OR THE ATTORNEY

25  WORK PRODUCT RULE, THEN YOU CAN ANSWER IT.  BUT OTHERWISE

61

DEPOSITION OF LISA KRALIK HANSEN

```
1   I'M GOING TO INSTRUCT HER NOT TO ANSWER.

2        THE DEPONENT:  I THINK I CAN ONLY ANSWER THIS, IN

3   LIGHT OF THE INSTRUCTION FROM MY COUNSEL, TO SAY THAT

4   THERE WERE INTERNAL DISCUSSIONS AMONG COUNSEL, INCLUDING

5   MS. GICHTIN, ABOUT ANY REPORT AND ALL ASPECTS OF THE

6   LITIGATION.

7   BY MR. ADREANI:

8        Q.  ARE YOU DONE?

9        A.  (WITNESS NODS HEAD UP AND DOWN.)

10        Q.  LET'S LOOK AT SUBSECTION D, "EVALUATING LIBERTY

11   MUTUAL'S CLAIMS HANDLING PRACTICES."  THAT'S A DOCUMENT

12   YOU'RE REFERRING TO; RIGHT?

13        A.  NO.  THAT IS A LAWYER'S EVALUATION OF HOW CLAIMS

14   WERE HANDLED.

15        Q.  OKAY.  SO NOT THE -- THAT'S NOT WHAT'S REFERRED

16   TO AS BEST PRACTICES?

17        A.  CORRECT.  NO, THAT'S NOT.  THAT'S ACTUALLY

18   LAWYERING, ANALYSIS EVALUATION.

19        Q.  LIKE A CONSULTANT LAWYER FROM OUTSIDE?  I MEAN,

20   WHAT -- OR SOMEONE FROM YOUR FIRM TALKING ABOUT CLAIMS

21   HANDLING PRACTICES?

22        A.  NO.  I'M TALKING ABOUT MS. GICHTIN ANALYZING,

23   EVALUATING, PROVIDING LEGAL ANALYSIS AND OPINIONS ABOUT

24   LIBERTY MUTUAL'S CLAIMS HANDLING.

25        Q.  OH, I SEE.
```

DEPOSITION OF LISA KRALIK HANSEN

1          SO MAYBE SHE DID A MEMO OR SOMETHING ABOUT THE

2   CLAIMS HANDLING PRACTICES?

3      A.  THE CONTENT I WILL NOT DISCLOSE.

4      Q.  BUT IT WAS AN EVALUATION BY HER OF CLAIMS

5   HANDLING PRACTICES?

6      A.  IT WAS A LEGAL EVALUATION ANALYSIS, AN OPINION OR

7   OPINIONS, THERE WAS MORE THAN ONE FROM MY RECOLLECTION,

8   BOTH VERBALLY AND IN WRITING ANALYZING THE CASE AS PART OF

9   THE WORK THAT WE DID IN DEFENDING LIBERTY MUTUAL IN THE

10  REMEDY TEMP LITIGATION.

11     Q.  ALL RIGHT.  SUBSECTION E, "REVIEWING AND

12  ADDRESSING SPECIAL SERVICES INSTRUCTIONS," AGAIN, I KNOW

13  WHAT THE SPECIAL SERVICES INSTRUCTIONS ARE.  THAT'S A

14  DOCUMENT THAT YOU PRODUCED IN THAT CASE; RIGHT?

15     A.  YES, I BELIEVE SO.

16     Q.  BUT HERE YOU'RE REFERRING TO SOMETHING SHE DID

17  REGARDING THOSE INSTRUCTIONS?

18     A.  REVIEWING AND ADDRESSING THEM, AGAIN, SHE WAS

19  ANALYZING THEM.  WITHOUT REVEALING THE CONTENT, WHICH IS

20  SUBJECT TO ATTORNEY/CLIENT PRIVILEGE AND WORK PRODUCT

21  PROTECTION, SHE, AGAIN, WOULD HAVE CONDUCTED A LEGAL

22  ANALYSIS AND EVALUATION WITH REGARD TO LIBERTY'S SPECIAL

23  SERVICES INSTRUCTIONS.

24     Q.  AND IS THAT THE SAME REGARDING LIBERTY'S INTERNAL

25  BEST PRACTICES?

                                                          63

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

1      A.  YES.

2      Q.  THE BEST PRACTICES, AGAIN, THERE WERE DOCUMENTS

3  THAT YOU PRODUCED TO ME IN THAT CASE; RIGHT?

4      A.  THERE IS A DOCUMENT THAT IS EITHER ENTITLED OR

5  EVERYONE REFERS TO AS THE BEST PRACTICES.

6      Q.  BUT IN THIS SUBSECTION YOU'RE SAYING IT WAS

7  SOMETHING MORE THAN THAT, THAT SHE WAS DOING SOMETHING

8  ABOUT THE BEST PRACTICES?

9      A.  SHE WAS NOT JUST READING THE DOCUMENT.  SHE WOULD

10  HAVE BEEN INVOLVED IN THE OVERALL ANALYSIS AND EVALUATION

11  OF THE CLAIMS BEING MADE AGAINST LIBERTY MUTUAL WITH

12  RESPECT TO CLAIMS HANDLING SERVICE INSTRUCTIONS OR BEST

13  PRACTICES, WHICH THEN WOULD HAVE TURNED INTO INTERNAL

14  ANALYSIS AT OUR FIRM AND/OR -- IT'S WORK PRODUCT AND

15  ATTORNEY/CLIENT PRIVILEGE.

16      Q.  ALL RIGHT.  MS. GICHTIN'S REVIEW OF THE BEST

17  PRACTICES, ARE YOU SAYING THAT THAT'S SOMEHOW DISTILLED TO

18  SOME WORK PRODUCT DOCUMENT?  IS IT A PHYSICAL DOCUMENT?

19      MR. SKOCYPEC:  WELL, I THINK HOW SHE HANDLED IT

20  IS WORK PRODUCT IN ITSELF.  WHETHER IT WAS ORALLY

21  COMMUNICATED, WRITTEN, ALL OF THAT IS WORK PRODUCT AND

22  SHE'S INSTRUCTED NOT TO ANSWER ANYTHING FURTHER ON THAT.

23      MR. ADREANI:  ALL RIGHT.

24      Q.  "APPLICABLE CLAIM MANUALS" IN SUBSECTION G,

25  THAT'S, AGAIN, DOCUMENTS YOU PRODUCED IN THE REMEDY TEMP

64

DEPOSITION OF LISA KRALIK HANSEN

1    CASE; RIGHT?

2        A.   IT WOULD HAVE INCLUDED THAT.  AND IT WOULD HAVE

3    ALSO, TO THE BEST OF MY RECOLLECTION, INVOLVED A

4    DETERMINATION --

5        MR. SKOCYPEC:  LET'S BE CAREFUL ON THAT.  I THINK

6    WE'RE CROSSING THE LINE POTENTIALLY.  SO TO THE EXTENT YOU

7    CAN ANSWER HIS QUESTION WITHOUT DISCLOSING EITHER WORK

8    PRODUCT OR ATTORNEY/CLIENT PRIVILEGED COMMUNICATIONS, FEEL

9    FREE TO DO SO, BUT OTHERWISE YOU'RE INSTRUCTED NOT TO

10   ANSWER.

11        THE DEPONENT:  SHE DID MUCH MORE ON THE CASE THAN

12   READ DOCUMENTS THAT WERE PRODUCED TO YOUR FIRM IN THE

13   LITIGATION.

14   BY MR. ADREANI:

15        Q.   SUCH AS?

16        MR. SKOCYPEC:  SAME INSTRUCTION.

17   BY MR. ADREANI:

18        Q.   ARE YOU GOING TO ACCEPT THAT?

19        MR. SKOCYPEC:  IF YOU CAN ANSWER IT WITHOUT

20   INVADING THE ATTORNEY/CLIENT PRIVILEGE OR THE ATTORNEY

21   WORK PRODUCT RULE, YOU MAY DO SO.  OTHERWISE YOU'RE

22   INSTRUCTED NOT TO ANSWER.

23        THE DEPONENT:  MS. GICHTIN WORKED ON THE REMEDY

24   TEMP CASE ALMOST ON A DAILY BASIS FOR A LOT OF THE TIME

25   THAT SHE WAS EMPLOYED BY KERN & WOOLEY UP THROUGH THE FILE

65

DEPOSITION OF LISA KRALIK HANSEN

1   TRANSFER TO BERGER, KAHN, AND SHE WAS INVOLVED IN ALL

2   ASPECTS OF THE LITIGATION AND STRATEGY DISCUSSIONS.

3   BY MR. ADREANI:

4       Q.   SUBSECTION G JUST SAYS THAT SHE REVIEWED CLAIM

5   FILE MATERIALS AND APPLICABLE CLAIMS MANUALS.  I JUST WANT

6   TO MAKE SURE THAT THOSE ARE -- OR NOT MAKE SURE.

7   REVIEWING THE CLAIM FILE MATERIALS AND APPLICABLE CLAIMS

8   MANUALS, THOSE WERE THE SAME DOCUMENTS THAT WERE PRODUCED

9   TO ME IN THAT CASE; RIGHT?  I'VE SEEN THOSE SAME DOCUMENTS

10  THAT SHE WAS REVIEWING; RIGHT?

11      A.   SHE REVIEWED -- MY RECOLLECTION IS THAT

12  MS. GICHTIN REVIEWED AND SAW DOCUMENTS AND WRITTEN

13  COMMUNICATIONS WELL BEYOND WHAT WAS PRODUCED TO YOU IN THE

14  LITIGATION.

15      Q.   I'M TALKING ABOUT SUBSECTION G, "REVIEWING

16  LIBERTY MUTUAL'S CLAIMS FILE MATERIALS AND APPLICABLE

17  CLAIMS MANUALS."  THOSE ARE THE SAME CLAIM FILE MATERIALS

18  AND APPLICABLE CLAIMS MANUALS THAT WERE PRODUCED TO ME IN

19  THAT CASE; RIGHT?

20      A.   THE ONLY WAY THAT I CAN ANSWER THAT IS THAT

21  MS. GICHTIN, YES, WOULD HAVE REVIEWED CLAIMS FILES AND

22  CLAIMS MANUALS THAT WERE PRODUCED IN THE REMEDY TEMP

23  LITIGATION, BUT SHE DID MUCH MORE THAN THAT.

24      Q.   WITH REGARD TO SECTION G?  IT JUST SAYS

25  "REVIEWED."  IT DOESN'T SAY "ANALYZED."  IT DOESN'T SAY

66

DEPOSITION OF LISA KRALIK HANSEN

```
 1   "ADDRESSED."  IT DOESN'T SAY "PREPARE MEMORANDUM."  IT

 2   DOESN'T SAY "EVALUATE."

 3        A.  I'M NOW ADDING REVIEW, ANALYZE, AND EVALUATE.

 4           MR. SKOCYPEC:  THERE WAS NO QUESTION PENDING.

 5   THERE WAS A STATEMENT BY COUNSEL SO YOU DON'T HAVE TO

 6   ANSWER ANYTHING UNTIL THERE IS A QUESTION PENDING.

 7   BY MR. ADREANI:

 8        Q.  SO YOU'RE SAYING ON SECTION G, IT WAS REVIEW,

 9   ANALYZE, AND ALL THAT, THE CLAIMS FILE MATERIALS AND THE

10   APPLICABLE CLAIMS MANUALS?  IT WASN'T JUST REVIEWING THE

11   DOCUMENTS?  IS THAT YOUR TESTIMONY?

12        A.  YES.  IT WAS NOT LIMITED TO REVIEWING THE

13   DOCUMENTS THAT WERE PRODUCED.

14        Q.  OKAY.  SECTION H, "REVIEWING BOCOMP AND EXPRS

15   COMPUTER SCREENS," THOSE ARE THE SAME BOCOMP AND EXPRS

16   COMPUTER SCREENS THAT I GOT IN PRODUCTION?

17        A.  IN PART, YES, FOR THE FILES AT ISSUE IN THE

18   LITIGATION.

19        Q.  "IN PART," WHAT DO YOU MEAN?

20        A.  WELL, I DON'T KNOW IF I CAN EXPLAIN THAT WITHOUT

21   INVADING ATTORNEY/CLIENT PRIVILEGE AND WORK PRODUCT.

22           MR. SKOCYPEC:  TO THE EXTENT THAT'S IMPOSSIBLE,

23   I'LL INSTRUCT HER NOT TO ANSWER.

24   BY MR. ADREANI:

25        Q.  ALL RIGHT.  SHALL I MOVE ON, THEN, OR ARE YOU
```

                                                        67

DEPOSITION OF LISA KRALIK HANSEN

1   STILL THINKING?

2       A.  I CAN'T ANSWER THAT WITHOUT REVEALING WORK

3   PRODUCT AND ATTORNEY CLIENT PRIVILEGED MATERIAL.

4       Q.  SO YOU'RE ACCEPTING THE INSTRUCTION?  YOU'RE NOT

5   GOING TO ANSWER BASED ON PRIVILEGE AND WORK PRODUCT?

6       A.  YES.

7       Q.  OKAY.  SUBSECTION I, "INTERNAL AUDITS AND CLAIM

8   REVIEWS," MS. GICHTIN NEVER SAW THAT STUFF, DID SHE?

9       A.  SHE SAW IT.

10      Q.  SHE SAW THE INTERNAL AUDITS?

11      A.  I BELIEVE SO.

12      Q.  OKAY.  THERE WAS A HEARING BEFORE THE MAGISTRATE

13  ON THAT ISSUE AS WELL, WASN'T THERE, ON THE PRODUCTION OF

14  THOSE AUDITS; RIGHT?

15      A.  I -- YES.

16      Q.  YOU WERE THERE AND I WAS THERE BEFORE THE

17  MAGISTRATE; RIGHT?

18      A.  I DON'T KNOW IF I WENT TO THAT HEARING OR IF IT

19  WAS SUSAN OLSON OF MY OFFICE.  I BELIEVE IT WAS SUSAN.

20      Q.  AND THAT INVOLVED THE FILING OF A MOTION,

21  OPPOSITION, SUPPLEMENTAL PLEADINGS.  MS. GICHTIN WASN'T

22  INVOLVED IN THAT, WAS SHE?

23          MR. SKOCYPEC:  OBJECT TO THE FORM OF THE QUESTION

24  AS BEING VAGUE AND AMBIGUOUS.

25          THE DEPONENT:  I DO BELIEVE THAT MS. GICHTIN

68

DEPOSITION OF LISA KRALIK HANSEN

1    WAS -- SHE WAS INVOLVED TO SOME EXTENT IN THE MOTION

2    PROCESS AND STRATEGY DISCUSSIONS ABOUT LIBERTY MUTUAL'S

3    POSITION IN THE LITIGATION REGARDING INTERNAL AUDITS AND

4    CLAIM REVIEWS.

5    BY MR. ADREANI:

6        Q.  ALL RIGHT.  SUBSECTION J, "REVIEWING AND

7    ADDRESSING THE RISKTRAC COMPUTER SYSTEM," DO YOU SEE THAT?

8        A.  YES.

9        Q.  NOW, RISKTRAC IS SOMETHING THAT REMEDY TEMP AND

10   REPUBLIC HAVE ACCESS TO, IN ANY EVENT; RIGHT?

11       A.  I DON'T KNOW WHAT REPUBLIC HAS ACCESS TO.  I KNEW

12   FROM THE REMEDY TEMP LITIGATION THAT REMEDY TEMP HAD

13   ACCESS TO LIBERTY'S RISKTRAC SYSTEM.

14       Q.  IN FACT, THEY HAD THE TOP OF THE LINE FULL BLOWN

15   ACCESS TO IT; RIGHT?

16       A.  I DON'T RECALL THAT AND I NEVER HEARD ANYONE

17   EXPLAIN IT IN THOSE TERMS.

18       Q.  OKAY.  THE CADILLAC, DO YOU REMEMBER THAT?

19       A.  NO.

20       Q.  OKAY.  WHAT DO YOU MEAN BY "ADDRESSING THE

21   RISKTRAC COMPUTER SYSTEM"?

22       A.  SHE WAS INVOLVED WITH BOTH INTERNAL FIRM

23   DISCUSSIONS AND DISCUSSIONS WITH LIBERTY MUTUAL ON ISSUES

24   PERTAINING TO RISKTRAC.

25           MR. ADREANI:  CAN I HAVE THAT READ BACK.

69

DEPOSITION OF LISA KRALIK HANSEN

```
 1              (WHEREUPON THE PREVIOUS ANSWER WAS READ

 2              BACK BY THE DEPOSITION OFFICER.)

 3   BY MR. ADREANI:

 4       Q.  YOU'RE TALKING ABOUT PRIVILEGED DISCUSSIONS ABOUT

 5   RISKTRAC?

 6       A.  YES.

 7       Q.  OKAY.  SUBSECTION K, "PREPARING LIBERTY MUTUAL

 8   EMPLOYEES FOR DEPOSITION," DID MS. GICHTIN ACTUALLY

 9   PREPARE EMPLOYEES FOR DEPOSITION?

10       A.  YES, SHE PARTICIPATED IN THE PREPARATION OF

11   LIBERTY MUTUAL EMPLOYEES FOR THEIR DEPOSITIONS.

12       Q.  I MEAN, OTHER THAN LOGISTICAL THINGS LIKE MAKING

13   SURE PEOPLE SHOW UP ON TIME, DID SHE ACTUALLY PREPARE

14   PEOPLE FOR THEIR TESTIMONY?

15       A.  SHE WAS LITERALLY IN THE ROOM WITH ME AND THE

16   LIBERTY MUTUAL DEPONENTS TO PREPARE THEM FOR THEIR

17   DEPOSITIONS.

18       Q.  OKAY.  DISCUSSING DISPUTED FILES WITH CLAIMS

19   HANDLERS, ARE YOU SAYING MS. GICHTIN HAD CONTACT WITH

20   CLAIMS HANDLERS AND ADJUSTORS?

21       A.  YES.

22       Q.  OKAY.  WHAT DO YOU MEAN BY "DISPUTED FILES"?

23       A.  THE FILES THAT WERE AT ISSUE IN THE LITIGATION

24   THAT REMEDY TEMP AND YOUR FIRM WAS TARGETING AS DISPUTED

25   ISSUES OR FILES THAT WERE IN ISSUE.
```

70

DEPOSITION OF LISA KRALIK HANSEN

1      Q.   THE FILES THAT WERE GOING TO THE EXPERTS AND

2   STUFF?

3      A.   CORRECT.

4      Q.   OKAY.   AND WHAT KIND OF CONTACT DID SHE HAVE WITH

5   THESE ADJUSTORS?

6           MR. SKOCYPEC:   OBJECT TO THE FORM OF THE

7   QUESTION.

8           THE DEPONENT:   I CAN ONLY ANSWER THIS TO THE

9   EXTENT TO TELL YOU THAT THE COMMUNICATION SHE WOULD HAVE

10  HAD WITH THEM WOULD HAVE BEEN IN PERSON, OVER THE PHONE,

11  BY E-MAIL, AND POSSIBLY VIA LETTERS, BUT I WILL NOT REVEAL

12  THE CONTENT OF THOSE COMMUNICATIONS.

13  BY MR. ADREANI:

14     Q.   SO SHE MET WITH ADJUSTORS IN PERSON?

15     A.   YOU USED THE TERM "ADJUSTORS."   YOU KNOW IT'S NOT

16  A LIBERTY MUTUAL TERM.

17     Q.   CASE MANAGER, SHE MET WITH CASE MANAGERS?

18     A.   WELL, I DON'T RECALL THE EXACT TITLES OF THE

19  PEOPLE THAT SHE MET WITH, BUT THEY WERE CLAIM HANDLERS,

20  PEOPLE INVOLVED IN THE CLAIM OR MANAGEMENT OR SUPERVISION

21  OF CLAIMS.

22     Q.   LISA, HAVE YOU EVER MET GREG BRISEE?

23     A.   I MET HIM -- NOW YOU'RE TALKING ABOUT GREG

24  B-R-I-S-E-E?

25     Q.   "BRISEE."

71

DEPOSITION OF LISA KRALIK HANSEN

```
1       A.   MET HIM IN PERSON, NO.

2       Q.   MS. GICHTIN NEVER MET HIM, DID SHE?

3       A.   I DON'T BELIEVE SO.

4       Q.   HAVE YOU EVER MET TOM THOMPSON?

5       A.   NOT THAT I RECALL.

6       Q.   HAVE YOU EVER MET FRANK RADICK?

7       A.   NOT THAT I RECALL.

8       Q.   HAVE YOU EVER MET DENNIS MINCIN?

9       A.   I DON'T RECALL THAT I'VE MET HIM.

10      Q.   HAS MS. GICHTIN EVER MET THESE PEOPLE,

11  MR. THOMPSON, MR. RADICK, MR. MINCIN?

12      A.   I DON'T KNOW.

13      Q.   NOT THAT YOU KNOW OF?

14      A.   I DON'T KNOW.

15      Q.   MR. PYNES HAS NEVER MET ANY OF THESE PEOPLE, HAS

16  HE, THAT YOU KNOW OF?

17      A.   I HAVE NO IDEA.

18      Q.   YOU DON'T KNOW?

19      A.   I DON'T KNOW.

20      Q.   WHEN YOU WERE AT KERN & WOOLEY, HOW MANY WORKERS'

21  COMPENSATION BAD FAITH CASES DID YOU HANDLE?

22           MR. SKOCYPEC:   I'M GOING TO OBJECT TO THAT AS

23  CALLS FOR ATTORNEY WORK PRODUCT, EXCEPT TO THE EXTENT THAT

24  APPARENTLY THERE HAVE BEEN ACTIVE LITIGATION, MANY OF

25  WHICH THE WITNESS PARTICIPATED IN.
```

72

DEPOSITION OF LISA KRALIK HANSEN

```
 1          THE DEPONENT:  OKAY.  WORKERS' --

 2          MR. SKOCYPEC:  MAY I HAVE THE QUESTION READ BACK.

 3          THE DEPONENT:  YEAH.  I NEED IT READ BACK.

 4          (WHEREUPON THE PREVIOUS QUESTION WAS

 5          READ BACK BY THE DEPOSITION OFFICER AS

 6          FOLLOWS:

 7              "Q  WHEN YOU WERE AT KERN & WOOLEY,

 8          HOW MANY WORKERS' COMPENSATION BAD FAITH

 9          CASES DID YOU HANDLE?")

10          THE DEPONENT:  TO THE BEST OF MY RECOLLECTION,

11   WHILE AT KERN & WOOLEY I PERSONALLY HANDLED ONLY THE

12   REMEDY TEMP LITIGATION, BUT OUR FIRM HANDLED OTHER CASES

13   BEYOND REMEDY TEMP.  THOSE CASES WERE HANDLED BY OTHER

14   LAWYERS IN OUR FIRM IN OUR PRACTICE GROUP.

15   BY MR. ADREANI:

16       Q.  AND CAN YOU IDENTIFY THOSE CASES?

17          MR. SKOCYPEC:  AGAIN, LIMITING IT TO THOSE THAT

18   ARE IN LITIGATION?

19          MR. ADREANI:  THAT ARE OR EVER WERE IN

20   LITIGATION, YEAH, THAT'S FINE.

21          THE DEPONENT:  WHILE AT KERN & WOOLEY?  WELL,

22   TONY'S FINE FOODS IS ONE THEM.

23   BY MR. ADREANI:

24       Q.  YOU WORKED ON THAT CASE?  YOU DID NOT?

25       A.  I WAS NOT THE HANDLING ATTORNEY.
```

73

DEPOSITION OF LISA KRALIK HANSEN

1          MR. SKOCYPEC:  WASN'T THAT YOUR QUESTION?

2          MR. ADREANI:  IT IS.  THE FIRST QUESTION WAS SHE

3   WORKED ON, SHE IDENTIFIED THE ONE, AND NOW IT'S KERN &

4   WOOLEY GENERALLY.

5          MR. SKOCYPEC:  THAT WERE IN LITIGATION AT KERN &

6   WOOLEY?

7          MR. ADREANI:  AND SHE IDENTIFIED ONE MORE, YES.

8          THE WITNESS:  THIS IS GOING TO TAKE ME A WHILE

9   BECAUSE THIS IS A MEMORY TEST.

10         MR. ADREANI:  WE CAN TAKE A BREAK IF YOU WANT.

11         THE DEPONENT:  SURE.

12         (RECESS TAKEN, FROM 12:27 TO 12:34.)

13   BY MR. ADREANI:

14         Q.  WE'RE BACK ON THE RECORD AND YOU WERE TRYING TO

15   REMEMBER SOME CASES.

16         A.  TO THE BEST OF MY RECOLLECTION, AS I SIT HERE

17   TODAY, THE NAMES OF THE OTHER CASES WOULD BE TONY'S FINE

18   FOODS, WESTWARD, W-E-S-T-W-A-R-D, HO, H-O, OR PETERSON,

19   THIRD CASE WOULD BE VERGIS, V-E-R-G-I-S, AND THE FOURTH

20   CASE IS KIMCO, K-I-M-C-O.

21         Q.  SO YOU RECALL WORKING YOURSELF ON THE REMEDY TEMP

22   CASE AS A WORK COMP BAD FAITH CASE AND YOU RECALL, AS YOU

23   SIT HERE TODAY, LITIGATED CASES INVOLVING ALLEGATIONS OF

24   BAD FAITH IN THE WORK COMP CONTEXT, WESTWARD HO, TONY'S

25   FINE FOODS, KIMCO, AND VERGIS?

74

DEPOSITION OF LISA KRALIK HANSEN

1          A.  YES, WITH A CLARIFICATION.  YOU USED THE PHRASE

2    "WORKED ON."

3          Q.  I APOLOGIZE.

4          A.  I HANDLED -- I WAS ONE OF THE HANDLING ATTORNEYS

5    OF THE REMEDY TEMP LITIGATION.  I MAY HAVE DONE SOME WORK

6    ON THESE OTHER FILES OR FILES BEYOND THIS LIST OF THESE

7    ADDITIONAL FOUR THAT WE HAD IN OUR OFFICE, BUT I WAS NOT

8    THE HANDLING ATTORNEY.  I MAY HAVE PICKED UP OR --

9          Q.  YOU MAY HAVE DID A DOCUMENT REVIEW FOR SOMEBODY

10   OR SOMETHING LIKE CRAIG DID?

11         A.  AS I SIT HERE TODAY -- I MEAN, WAS THAT A

12   QUESTION?

13         Q.  YES.

14         A.  I MAY HAVE.  I DON'T RECALL ANY SPECIFIC WORK I

15   DID ON THESE OTHER FILES.

16         Q.  WESTWARD HO, WAS THAT THE GROCERY STORE?

17         A.  I HAVE NO IDEA.

18         Q.  YOU SAID WESTWARD HO OR PETERSON?

19         A.  I THINK IT RELATED TO A HOTEL/MOTEL OR SERIES OF

20   MOTELS.  I'M GUESSING.  I...

21         MR. SKOCYPEC:  COULD WE GO OFF THE RECORD A

22   SECOND?

23         MR. ADREANI:  YEAH.

24         (WHEREUPON A BRIEF DISCUSSION WAS HELD

25         OFF THE RECORD.)

75

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

1   BY MR. ADREANI:

2        Q.  HOW LONG WERE YOU AT KERN & WOOLEY?

3        A.  OH, I BELIEVE THAT THE START DATE AT KERN &

4   WOOLEY WAS SOMETHING LIKE FEBRUARY 3, 1997, THROUGH IT'S

5   MID SEPTEMBER OF 2004, AND MY LAST DAY MAY HAVE BEEN

6   SEPTEMBER 16TH AT KERN & WOOLEY IN 2005.

7            MR. ADREANI:  OKAY.  I DON'T HAVE ANYTHING

8   FURTHER.

9            ARE WE DONE, STEPHANIE?

10           MS. GILFORD:  YEAH.  I HAVE NO QUESTIONS.

11           MR. ADREANI:  ALL RIGHT.  THANKS, LISA.  THANKS,

12   RON.

13           MR. SKOCYPEC:  WHAT ARE YOU DOING WITH THE DEPO

14   HERE?  DO YOU ALLOW ANY STIPS?

15           MR. ADREANI:  OH, MY GOD.

16           THE DEPONENT:  IT'S CALIFORNIA.

17           MR. ADREANI:  LET'S GO OFF THE RECORD.

18           (WHEREUPON A BRIEF DISCUSSION WAS HELD

19           OFF THE RECORD.)

20           MR. ADREANI:  I PROPOSE THE STIPULATION WITH

21   COUNSEL WHEREBY WE RELIEVE THE COURT REPORTER OF HER

22   DUTIES UNDER THE CODE AND THE FEDERAL RULES, TO THE EXTENT

23   THEY APPLY; I PROPOSE THAT WE HAVE THE ORIGINAL OF THIS

24   TRANSCRIPT BE PROVIDED TO MS. HANSEN AND HER ATTORNEYS;

25   MS. HANSEN WILL HAVE UNTIL FRIDAY OF THIS WEEK,

76

DALENE COURT REPORTERS

DEPOSITION OF LISA KRALIK HANSEN

1    AUGUST 18TH, TO REVIEW AND INFORM ME AND COUNSEL OF ANY

2    CHANGES MADE TO HER DEPOSITION; SHOULD THE ORIGINAL BE

3    LOST, STOLEN, OR UNAVAILABLE AT TRIAL FOR ANY REASON, A

4    CERTIFIED COPY MAY BE USED IN ITS PLACE.

5         DO YOU GUYS HAVE ANYTHING TO ADD?  SO STIPULATED?

6         MR. SKOCYPEC:  SO STIPULATED.

7             (WHEREUPON THE PROCEEDINGS

8         CONCLUDED AT 12:44 P.M.)

9                   ***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              77

DEPOSITION OF LISA KRALIK HANSEN

```
 1
 2          I, LISA KRALIK HANSEN, SAY I HAVE READ THE
 3   FOREGOING DEPOSITION AND DECLARE UNDER PENALTY OF PERJURY
 4   THAT MY ANSWERS AS INDICATED ARE TRUE AND CORRECT.
 5   _____          _____
 6        DATE                     LISA KRALIK HANSEN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

78

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                   PLAINTIFFS

v.

                                   CIVIL ACTION NO. 03-494-KSF


DECLARATION OF KAREN L. GICHTIN


LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                   DEFENDANTS

\*\*    \*\*    \*\*    \*\*    \*\*

I, KAREN L. GICHTIN, DECLARE AS FOLLOWS:

1.    I am an attorney licensed to practice law before all of the Courts of the State of California and the United States Federal Courts in California and am an associate with the law firm of Roxborough, Pomerance & Nye, LLP. I have worked for Roxborough, Pomerance & Nye, LLP since March 29, 2006. I have personal knowledge of the following facts, and if called to testify as a witness, I could and would competently testify thereto.

2.    When I was hired by Roxborough, Pomerance & Nye, it was mutually understood between Roxborough, Pomerance & Nye and myself that I would not be involved in any Liberty matters, including, but not limited to, Remedytemp Inc. v. Liberty Mutual Fire Insurance Company, et al., C.D. Cal, 8:04-cv-00385-GAF-MLG,

a matter in which I had been involved at a prior firm. In fact, I am screened ("walled off") from participation in any Liberty matters.    I do not even know the current status of the RemedyTemp case. I am paid an annual salary and will not be apportioned any specific part of a fee involving Liberty cases.

3.    From the date I was hired by Roxborough, Pomerance & Nye to the present, I have not worked on any matters involving Liberty.    Furthermore, other than with regard to the instant declaration, I have not been involved in any discussions concerning Liberty.    I am precluded from using the Firm's only paralegal, as it is my understanding that she works on Liberty matters. Rather, for paralegal type projects, I utilize one of our file clerks.

4.    Prior to my employment at Roxborough, Pomerance and Nye, I worked as a contract attorney for several law firms, including the law firm of Watt, Tieder, Hoffar & Fitzgerald in Irvine, California (construction law).

5.    Prior to such contract work, for a period of about 18 months, I worked at the law offices of Kern & Wooley.

6.    I was laid-off from Kern & Wooley on or about September 16, 2006, as a result of the firm's losing its Liberty Mutual Fire Insurance Company ("Liberty") business, which was accompanied by the departure of the three attorneys whom controlled the Liberty account: Susan Olson, Ron Skocypec and

2

Lisa Kralik Hansen. While Kern & Wooley did not technically have any "partners," Ms. Olson, Mr. Skocypec and Ms. Hansen were the functional equivalents of partners (collectively referred to as "'Partners'").

7.   The "Partners," especially Ms. Hansen, micro-managed cases, such that I did not have case management authority and most of my work was performed on a task-by-task basis.   For example, in Ashou v. Liberty Mut. Fire Ins. Co., Los Angeles Superior Court Case No. B179641, my involvement was limited to drafting and arguing a Demurrer to a Third Amended Complaint. I was not involved in or even consulted with regard to the subsequent appeal, which was handled by Ms. Hansen. (See, Ashou v. Liberty Mutual Fire Insurance Company, (2006) 138 Cal.App.4th 748.)   Almost everything I did went through the "Partners." Motions, correspondence and discovery generally required "Partner" review and approval.   My involvement in RemedyTemp focused upon discovery and some related motion work.   In addition to propounding discovery on RemedyTemp and analyzing RemedyTemp's discovery responses, a good part of my time was spent redacting workers' compensation claim files for discovery production (i.e. redactions based upon claimant privacy rights - social security numbers, addresses, unrelated medical information, etc...).

8.   I also had very little client contact at Kern & Wooley, as the "Partners" maintained tight control over their Liberty relationships. As a general rule, I was not allowed to speak with Liberty personnel, other than peripheral players (*i.e.* computer department in order to obtain database list). In fact, other than on some first party homeowners' policies involving Northridge Earthquake settlements, I do not believe I ever spoke with Liberty claims adjusters about the cases in which I participated.

9.   Case strategy was determined by the "Partners."  The "Partners" conferred with the client on strategy.  I do not have personal knowledge regarding Liberty's position on any strategic matters.

10.  In fact, I have no idea why Liberty chose to remove Kern & Wooley from the RemedyTemp matter in the summer of 2005, instead substituting-in the law firms of Husch and Eppenberger, and Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone. I have never met or spoken with Bill Cupello, whom I believe was the key Liberty contact on the RemedyTemp matter.

11.  I have reviewed the Declaration of Lisa Kralik Hansen submitted in this matter and note that it contains a less than accurate portrayal of my involvement in the RemedyTemp matter. Specifically, while I did work primarily on the RemedyTemp matter during my 18 months at Kern & Wooley, I did not partake

4

in all of the activities listed in Paragraph 6 of Ms. Hansen's declaration and/or to the same extent as she has characterized. Specifically, I do not recall doing any of the following as Ms. Hansen declares: (1) discuss Liberty's overall litigation position and strategy with Liberty; (2) review Liberty Claim Manuals; (3) review Liberty expert reports; (4) review internal audits and claim reviews; (5) review Special Service Instructions; (6) prepare Liberty employees for deposition; and (7) discuss specific disputed files with Liberty claim handlers. The following chart further responds to Ms. Hansen's assertions:

| Kralik Hansen's Assertions | Gichtin Response |
| --- | --- |
| "(a)  reviewing and discussing Liberty Mutual's overall litigation position and strategy, | Objection: vague and ambiguous as to what constitutes: (1) "overall litigation position and strategy;" (2) the type of documents allegedly reviewed; (3) with whom said discussions allegedly occurred; and (4) when Liberty's overall litigation position and strategy was allegedly determined.

The Partners were the key players on the case, such that I was excluded from many matters.  I do not recall reviewing or discussing Liberty's overall litigation position or strategy.

In fact, I never met or spoken with the client contact on the case, Bill Cupello.

One of my primary assignments |

| | |
|---|---|
| | in RemedyTemp involved discovery, particularly the production of third party workers' compensation claims files. I, among other attorneys and paralegals, spent countless hours redacting third party privacy information contained in the claim files (i.e. social security numbers). Said claim files were later produced unredacted, upon Court Order. Kern & Wooley withdrew from representing Liberty on the case, such that I imagine Liberty's overall position and strategy was likely determined between Liberty and said subsequent attorneys. |
| (b) voluminous document production including protection of confidential and privileged documents, | Objection: vague and ambiguous as to whose confidential information I was allegedly involved in producing. Said production involved both Liberty and third party "confidences." <br><br> My participation in the document production focused primarily upon third party confidences (i.e. redacting social security numbers) in connection with the production of workers' compensation claim files (eventually reproduced unredacted, per Court Order). <br><br> Liberty "confidences" (i.e. Claim Manuals) were handled and maintained by the Partners. Production of said Liberty "confidences," if any, would have been handled by the Partners and the paralegals assigned to the matter. |

| | |
|---|---|
| (c)  reviewing and evaluating expert consultant reports and opinions, | I do not recall reviewing or evaluating Liberty's expert reports or opinions.<br><br>I believe the case was transferred to Berger, Kahn before such expert reports and opinions were rendered. |
| (d)  evaluating Liberty Mutual's claims handling practices, | I did review some 2-3 page documents listing Liberty's claims handling/best practices (about 2-3 pages per policy year), and made a year-by-year chart using another attorney's evaluations.<br><br>Copies of Liberty's claims handling/best practices guidelines were produced, without redaction, to opposing counsel. |
| (e)  reviewing and addressing special services instructions, | I do not recall reviewing and/or addressing special service instructions. |
| (f)  reviewing and addressing Liberty Mutual's internal best practices, | See, response to item (d) above. |
| (g)  reviewing Liberty Mutual's claims file materials and applicable claim manuals, | While I reviewed workers' compensation claims files (claimant specific), I do not recall ever reviewing Liberty Claim Manuals.<br><br>Liberty's Claim Manuals were handled and maintained by the Partners.<br><br>My participation in the case did not involve review of Liberty Claims Manuals. |
| (h)  reviewing BoComp and ExPrs computer screens, | I reviewed BoComp and ExPrs computer screens, which are essentially claims adjusters' log notes on specific claims.<br><br>Copies of the BoComp and ExPrs |

| | computer screens were produced to opposing counsel (at some point, they were produced without redaction, per Court Order). |
|---|---|
| (i) reviewing and evaluating internal audits and claims reviews, | I do not recall ever reviewing and evaluating internal audit and claims reviews.<br><br>Said internal audits and claim review documents were handled and maintained by the Partners. |
| (j) reviewing and addressing the RiskTrac computer system, | I did speak to someone at Liberty, I believe in Atlanta, about the types/list of computer databases contained in Liberty's RiskTrac computer system, in order to address the request for production of documents. |
| (k) preparing Liberty Mutual employees for deposition, and | Objection: vague and ambiguous as to the term "preparing."<br><br>I did not "prepare" Liberty Mutual employees for depositions.  My participation was clerical in nature.  I never met with and/or prepared witnesses for their deposition testimony. |
| (l) discussing specific disputed files with Liberty Mutual claims handlers." | I did not discuss any specific disputed files with Liberty Mutual claims handlers.  I was not privy to any such discussions, as I believe Ms. Hansen and Ms. Olson controlled and handled such matters. |

12.  At bottom, the "Partners" closely guarded their Liberty relationships and confidences.

I declare under penalty of perjury under the laws of the
State of California and of the United States that the foregoing
is true and correct.

Executed this 16th day of August, 2006 in Woodland Hills,
California.

Karen L. Gichtin

F:\KLG\Disqualify Me\KLG Declaration.doc

9

STATE OF CALIFORNIA           )
                              )
COUNTY OF LOS ANGELES         )

The foregoing Declaration was subscribed, sworn to and acknowledged before me this 16 day of August, 2006, by Karen L. Gichtin.

My Commission expires:     _December 10, 2008_



Notary Public, California State at Large

(SEAL)

ELIA GUTIERREZ
Commission # 1526276
Notary Public - California
Los Angeles County
My Comm. Expires Dec 10, 2008

10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.                                    PLAINTIFFS

v.

CIVIL ACTION NO. 03-494-KSF

DECLARATION OF JACK AN

LIBERTY MUTUAL INSURANCE
COMPANY, et al.                                            DEFENDANTS

** ** ** ** **

I, JACK AN, DECLARE AS FOLLOWS:

1.    I am presently the Office Manager at the firm of
Roxborough Pomerance & Nye.  I have held that position for over 10
years.  I have personal knowledge of all the information set forth
in my Declaration, and if called upon to testify, I could and would
be able to competently testify to the information set forth below
in court, if necessary.

2.    From the time that Karen L. Gichtin associated with the
firm of Roxborough Pomerance & Nye, on or about March 29, 2006, I
personally oversaw implementation of screening mechanisms to ensure
that she was excluded from all involvement in the Republic Services
v. Liberty action and any access to materials or information
regarding that action.

3.    The files for the Republic Services v. Liberty matter are
kept in the office of Michael B. Adreani.  He is a partner with the

firm of Roxborough Pomerance & Nye whose office is at the extreme
opposite end from Ms. Gichtin's office.  When Mr. Adreani is not in
the office, it is locked.  The Republic Services v. Liberty file
materials are kept in his office, not the general main filing room
area for the firm in general.

4.   Only Mr. Adreani and the other partners of Roxborough,
Pomerance & Nye have keys to Mr. Adreani's office.

5.   I personally have addressed attorneys involved with this
matter, including Nicholas Roxborough, Michael Adreani and Craig
Pynes to ensure that they do not discuss any of the information or
share any of the materials pertaining to the Republic Services v.
Liberty matter with Ms. Gichtin.

6.   I have also personally spoken with Ms. Gichtin, other RPN
attorneys and the office staff to ensure that they understand that
Ms. Gichtin is screened off from any involvement and is not
provided access to any materials or information pertaining to the
Republic Services v. Liberty matter.

I declare under penalty of perjury under the laws of the State
of California that the foregoing is true and correct.

Executed this 16th day of August, 2006, in the city of Woodland
Hills, State of California.

JACK AN

2

STATE OF CALIFORNIA          )
                            )
COUNTY OF LOS ANGELES       )

    The foregoing Declaration was subscribed, sworn to and

acknowledged before me this _16_ day of August, 2006, by Jack An.

My Commission expires: _December 10, 2008_



_____
Notary Public, California State at Large

(SEAL)

ELIA GUTIERREZ
Commission # 1526276
Notary Public - California
Los Angeles County
My Comm. Expires Dec 10, 2008